**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

TEXAS MEDICAL ASSOCIATION,
DR. ADAM CORLEY, and TYLER RE-
GIONAL HOSPITAL, LLC,

        *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, OF-
FICE OF PERSONNEL MANAGEMENT,
DEPARTMENT OF LABOR, DEPART-
MENT OF THE TREASURY, XAVIER
BECERRA *in his official capacity as the Sec-
retary of Health and Human Services*;
KIRAN AHUJA *in her official capacity as the
Director of the Office of Personnel Manage-
ment*, JANET YELLEN *in her official capac-
ity as the Secretary of the Treasury*, and
MARTIN J. WALSH *in his official capacity
as the Secretary of Labor*

        *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. _____

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Texas Medical Association, Dr. Adam Corley, and Tyler Regional Hospital, LLC bring this action for declaratory and injunctive relief against defendants the United States Department of Health and Human Services, Office of Personnel Management, Department of Labor, Department of the Treasury, and the current heads of those agencies in their official capacities, and allege as follows:

## INTRODUCTION

1.      This action under the Administrative Procedure Act ("APA") challenges certain provisions of an interim final rule issued by defendants in clear violation of their statutory authority. The rule, entitled "Requirements Related to Surprise Billing; Part I," 86 Fed. Reg. 36,872 (July 13, 2021) (the "July Rule"), implements provisions of the federal surprise medical billing law, the No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 1182, 2758–890 (2020) ("NSA").

2.      The NSA made parallel amendments to provisions of the Public Health Service ("PHS") Act, which is enforced by the Department of Health and Human Services ("HHS"); the Employee Retirement Income Security Act ("ERISA"), which is enforced by the Department of Labor; and the Internal Revenue Code ("IRC"), which is enforced by the Department of the Treasury. Many of the regulations adopted in the July Rule are parallel provisions that apply, as relevant, to group health plans ("plans") and health insurance issuers offering group or individual health insurance coverage ("issuers") (collectively, "insurers").[1]

---

[1] The relevant statutory and regulatory provisions at issue in this case generally appear in triplicate and, except as noted, are identical in all material respects. The NSA's provisions are codified at 42 U.S.C. § 300gg-111 (PHS Act), 29 U.S.C. § 1185e (ERISA), and 26 U.S.C. § 9816 (IRC). For ease of reference, this complaint cites the PHS Act provisions and implementing regulations.

3.      The NSA limits patient cost-sharing when patients receive certain medical services from out-of-network healthcare providers, *i.e.*, physicians and facilities who are not within a health insurance plan's contracted network. It also restricts out-of-network providers' ability to bill patients for amounts in excess of their in-network cost-sharing obligation in certain situations. Instead, out-of-network healthcare providers must negotiate with the patient's insurer to obtain adequate reimbursement.

4.      When the parties cannot agree on an appropriate reimbursement amount, either party may initiate arbitration before a certified independent dispute resolution ("IDR") entity. The arbitration proceeds "baseball-style": after each party submits an offer, the arbitrator must select one of their offers as the appropriate payment amount. To guide arbitrators' decisions, Congress specified factors that arbitrators must consider. 42 U.S.C. § 300gg-111(c)(5)(C)(i). One of those factors is the "qualifying payment amount" or "QPA." *Id.* § 300gg-111(c)(5)(C)(i)(I).

5.      Unfortunately, as this Court has twice held, the Departments' implementation of the NSA's arbitration process materially deviated from Congress's design by "treat[ing] the QPA—an insurer-determined number—as the default payment amount and impos[ing] on any provider attempting to show otherwise a heightened burden of proof that appears nowhere in the statute." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.* ("*TMA I*"), 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022); *see also LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.* ("*LifeNet I*"), No. 6:22-cv-162, 2022 WL 2959715 (E.D. Tex. Jul. 26, 2022).

6.      This action challenges another way in which the Departments have deviated from Congress's commands: by issuing a methodology for calculating QPAs that artificially deflates these insurer-calculated metrics. Following this Court's decisions in *TMA I* and *LifeNet I*, arbitrators are no longer directed to presume that the bid closest to the QPA is the correct one. But under

the Departments' new IDR rule—which is the subject of a separate pending challenge, *see Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.* ("*TMA II*"), No. 6:22-cv-00372 (E.D. Tex.)[2]—arbitrators must consider the QPA first and may not give any weight to other circumstances unless a variety of other criteria are met, making the QPA the *de facto* benchmark rate. *See* 87 Fed. Reg. 52,618, 52,627–29 (Aug. 26, 2022). Even if plaintiffs in *TMA II* successfully challenge the Departments' renewed efforts to anchor arbitration outcomes to the QPA, however, the Departments' flawed methodology that deflates QPAs will continue to harm physicians. According to the NSA's terms, arbitrators must consider QPAs in making payment determinations. *See TMA I*, 87 F. Supp. 3d at 541. Beyond that, the QPA colors the entire negotiation and IDR process established by the NSA. Insurers often make initial payments that are equal to the applicable QPA. *See* 87 Fed. Reg. at 52,625 n.29. And if providers do not agree to that amount, insurers frequently refuse to negotiate during the open negotiation period and offer the QPA as their bid during the IDR process. *See* Mot. for Summary J., *TMA II*, 6:22-cv-00372 (E.D. Tex.), Dkt. 41, Ex. C (Decl. of Dr. Steven Ford) ¶ 13 ("[I]n my experience, each insurer's bid is always the QPA …").

7.    While "nothing in the Act treats the QPA as a proxy for the in-network price," let alone as a "proxy for the out-of-network price," *TMA I*, 87 F. Supp. 3d at 543 n.4, Congress designed the QPA to be based on historical contract rates agreed to by the parties in the marketplace for in-network services. According to the Departments, Congress intended to "ensur[e] that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889.

8.    Congress defined the QPA for an item or service as "the median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided

---

[2] *See also LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.* ("*LifeNet II*"), No. 6:22-cv-373, (E.D. Tex.).

by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The median is "determined with respect to all such plans of [each] sponsor or all such coverage offered by [each] issuer that are offered within the same insurance market," and the contracted rate is "the total maximum payment … under such plans or coverage." *Id.*

9.      The July Rule—issued by the Departments without the benefit of notice and comment and, thus, without hearing from healthcare providers about the problems with the Departments' approach—is inconsistent with the plain text of the NSA in four critical ways, each of which drives down QPAs, resulting in under-reimbursement to healthcare providers.

10.      *First*, the July Rule tells insurers to *include* rates in their QPA calculations that the plain text of the NSA requires them to *exclude*. The NSA requires each QPA to be derived from "contracted rates" for only those items and services that are "*provided* by a provider." *Id.* (emphasis added). Yet the July Rule defines "contracted rate" to encompass contracted rates without regard to whether any item or service was ever "provided" under that contract. *See* 45 C.F.R. § 149.140(a)(1) (omitting requirement that "contracted rates" must be for items or services that are "provided by a provider").

11.      In other words, the July Rule permits insurers to count what are referred to in the healthcare industry as "ghost rates"—rates included in contracts with providers who do not actually provide the specified item or service, and thus have no incentive to negotiate a fair and reasonable reimbursement rate. Unsurprisingly, these ghost rates are generally lower than they would be if providers had an incentive to meaningfully negotiate them, and therefore their inclusion artificially drives down QPAs.

12.     In FAQs issued after the July Rule, the Departments recognized "concerns" that inclusion of ghost rates "in the calculation of QPAs may artificially lower the QPA, as these providers have little incentive to negotiate fair reimbursement rates for these service[s]" and sometimes even accept "$0 as their rate." Dep'ts, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ("August 2022 FAQs").[3] These FAQs confirm that the July Rule does not require that a service actually be "provided by a provider" in order for that service's contracted rate to be included in a QPA. Although the Departments stated that $0 rates should not be included in QPA calculations, they did not say the same for ghost rates that are any amount other than $0, or otherwise indicate that insurers should also exclude from their QPA calculations any non-$0 reimbursement rates associated with services not actually provided. In short, it is the Departments' position that while a $0 ghost rate is excluded from QPA calculations, a $1 ghost rate is not, although that $1 ghost rate is also for a service that is not provided, and similarly deflates QPAs.

13.     *Second*, although the NSA requires insurers to *always* calculate QPAs based on the rates of providers "in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the July Rule instructs insurers to separately calculate rates by specialty "*only* where the [insurer] otherwise varies its contracted rates based on provider specialty," 86 Fed. Reg. at 36,891 (emphasis added), as part of its "usual business practice," 45 C.F.R. § 149.140(a)(12). In the August 2022 FAQs, the Departments explained that insurers can ignore Congress's "same or similar specialty" command unless the insurer determines that "there is a material difference in the median contracted rates … between providers of different specialties." In other words, the Departments determined, in both

---

[3]  *Available at*  https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

the July Rule and the August 2022 FAQs, that QPAs will in some circumstances be based in part on rates of providers who are *not* "in the same or similar specialty," despite Congress's across-the-board command that QPAs must always be based on in-specialty rates.

14.     Including out-of-specialty rates again tends to drive down QPAs. For one thing, out-of-specialty rates are often ghost rates. For example, a primary care physician may have contracted rates for radiology services, even though the primary care physician does not provide those services, and therefore did not meaningfully attempt to negotiate those rates with the insurer. Including such a rate when determining a QPA for radiology services provided by a radiologist therefore skews the QPA away from typical market rates. And even if a provider in a different specialty provides a service occasionally, but not frequently, the provider is likely to prioritize negotiating competitive rates for the provider's high-volume services during negotiations with the insurer, and therefore that provider's negotiated rate on a low-volume service is likely to be well below the typical market rate for the service when provided by the kind of specialist who frequently provides the service. In other words, providers are less motivated to negotiate rates for services they are less likely to provide, or which they provide less frequently, than providers in a different specialty that furnish that service more frequently. Congress was therefore explicit that QPAs must be specialty-specific.

15.     *Third*, the NSA says that each contracted rate used in a QPA calculation is "the total maximum payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But the July Rule requires insurers to use something less than the total payment when a contracted rate includes "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Providers may negotiate for shared savings payments made later in time, but such incentive-based and retrospective payments—which are

included in the rate paid to the provider—must be excluded from the contracted rate that is factored into a QPA calculation. *Id.*

16.    *Finally*, the NSA says that the QPA is "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). According to the statute's plain terms, each plan sponsor therefore must use only its own contracted rates when calculating QPAs, and multiple plan sponsors cannot aggregate their contracted rates to generate one QPA. However, "to reduce the burden imposed on sponsors of self-insured group health plans," the July Rule allows self-insured group health plans to instead "allow their third-party administrators to determine the QPA for the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)." 86 Fed. Reg. at 36,890; *see also* 45 C.F.R. § 149.140(a)(8)(iv). Self-insured group health plans can be expected to opt into their third-party administrator's group calculation if it generally serves to lower their applicable QPAs.

17.    These provisions of the July Rule are manifestly unlawful and systematically depress QPAs—metrics that the Departments have also tried, in parallel, to use as an anchor for IDR determinations. *See TMA I*, 87 F. Supp. 3d at 542–43; *TMA II*. As a result, the Departments' rules will undermine healthcare providers' ability to obtain adequate reimbursement for their services, to the detriment of both providers and the patients they serve. As the Departments have elsewhere recognized, undercompensating providers may "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." *Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021).

18.     Compounding the problems caused by the Departments' QPA methodology, the Departments have not only instructed insurers to miscalculate QPAs, they have also ensured that providers cannot review insurers' calculations and are unable to otherwise obtain information that would inform a challenge to these calculations. Once again, this is contrary to the scheme Congress created in the NSA. Congress instructed the Departments to issue rules establishing the information insurers "shall share with the nonparticipating provider or nonparticipating facility" when determining the QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(ii). Congress also required the Departments to set up a "process to receive complaints" that insurers "violat[ed]" the requirement to calculate the QPA in accordance with the NSA's terms. *Id.* § 300gg-111(a)(2)(B)(iv); *see also id.* § 300gg-111(a)(2)(A)(i)(II). The Departments may audit an insurer on the basis of such a complaint. *Id.* § 300gg-111(a)(2)(A)(ii)(II).[4]

19.     To make this statutorily mandated complaint process meaningful, providers must receive sufficient information to determine whether an insurer calculated the QPA at issue in accordance with the NSA. Indeed, the Departments acknowledge that providers "need transparency regarding how the QPA was determined." 86 Fed. Reg. at 36,898. Yet the July Rule requires insurers to make only the most minimal disclosures. For the most part, rather than providing information about the basis for their QPA calculation, insurers are only required to certify that, "based on the [insurer's] determination," the QPA was "determined in compliance with the methodology outlined in [the July Rule]." *Id.* This does not enable the provider to assess whether the insurer has correctly applied the NSA, or even the Departments' QPA methodology. Providers are therefore powerless to meaningfully access the complaint process Congress mandated in the NSA.

---

[4] This paragraph does not appear in the statutory provision that applies to the Department of Labor. *See* 29 U.S.C. § 1185e. The Department of Labor has preexisting authority to audit ERISA plans for compliance with ERISA (which now includes portions of the NSA).

20.    There is no other check on the accuracy or reliability of almost all insurer QPA calculations, at least with how the Departments have chosen to implement the NSA. HHS has announced that it "expects to conduct no more than 9 audits annually" of QPAs, *id.* at 36,935, and even then, it is unclear how many QPAs of each issuer will be subject to audit. Furthermore, none of the other Departments have announced audit results or even any intention to conduct audits. According to the Departments, their audits are the only check on insurers' calculations. In the August 2022 FAQs, the Departments declared that "[i]t is not the responsibility of a provider, facility," or even the "IDR entity to verify a QPA's accuracy, and plans and issuers are not obligated to demonstrate that a QPA was calculated in accordance with" the applicable regulations either before or during the IDR process. August 2022 FAQs (Q13).

21.    Accordingly, the Court should vacate, as contrary to law, in excess of statutory authority, and arbitrary and capricious, the challenged provisions of the July Rule that work together to drive down QPAs and prevent effective review of insurers' QPA calculations.

## PARTIES

22.    Plaintiff TMA is a trade association that represents more than 56,000 physicians and medical students. The nation's largest state medical society, TMA has its headquarters and principal place of business in Austin, Texas. TMA brings this suit on behalf of its healthcare provider members whose reimbursement amounts for out-of-network services are determined through the IDR process. This lawsuit is consistent with TMA's purpose to resolve challenges its members encounter in caring for their patients, and neither the claims asserted nor the relief requested requires participation of TMA's individual members.

23.    Plaintiff Adam Corley is a physician who resides and practices in Tyler, Texas. Dr. Corley works through Precision Emergency Physicians, PLLC ("PEP"), for which he receives hourly reimbursement for providing emergency medical services. Dr. Corley also owns a percent-

age of a freestanding emergency department in Tyler, Texas, and receives dividends based on profits from the facility.

24.     Plaintiff Tyler Regional Hospital, LLC d/b/a UT Health East Texas is a hospital in Tyler, Texas, that provides emergency services as defined in the NSA.

25.     Defendant Department of Health and Human Services is an executive department of the United States headquartered in Washington, D.C.

26.     Defendant Office of Personnel Management is an executive department of the United States headquartered in Washington, D.C.

27.     Defendant Department of the Treasury is an executive department of the United States headquartered in Washington, D.C.

28.     Defendant Department of Labor is an executive department of the United States headquartered in Washington, D.C.

29.     Defendant Xavier Becerra is the Secretary of Health and Human Services. Secretary Becerra is sued in his official capacity only.

30.     Defendant Kiran Ahuja is the Director of the Office of Personnel Management. Director Ahuja is sued in her official capacity only.

31.     Defendant Janet Yellen is the Secretary of the Treasury. Secretary Yellen is sued in her official capacity only.

32.     Defendant Martin J. Walsh is the Secretary of Labor. Secretary Walsh is sued in his official capacity only.

## JURISDICTION AND VENUE

33.    The Court has jurisdiction over this action under 28 U.S.C. § 1331 and the APA, 5 U.S.C. §§ 701–06. Plaintiffs are entitled to the requested declaratory and injunctive relief under the APA and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

34.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States, at least one plaintiff resides in this district, and no real property is involved in this action.

## STANDING

35.    TMA's members, Dr. Corley, and Tyler Regional Hospital face imminent, concrete, and particularized injury due to the challenged provisions of the July Rule and FAQs. TMA's members and Dr. Corley furnish out-of-network services that are subject to the NSA's balance-billing provisions and participate in the IDR process to resolve disputes with insurers over appropriate reimbursement rates. Tyler Regional Hospital also furnishes out-of-network emergency services that are subject to the NSA's balance-billing provisions, has participated in the open negotiation process, and anticipates participating in the IDR process to resolve disputes with insurers over appropriate reimbursement rates.

36.    In the NSA, Congress defined the QPA for each item and service, and required the Departments to promulgate rules requiring insurers to disclose information about their QPA calculations, in part to protect the concrete economic interests of healthcare providers in receiving fair and adequate compensation for their out-of-network services. The July Rule dismantles those protections by consistently driving down QPAs in a way that is inconsistent with Congress's commands and failing to ensure that providers have the information they need to assess whether insurers have properly calculated QPAs in accordance with the NSA and applicable regulations.

37.    TMA's members, Dr. Corley, and Tyler Regional Hospital are likely to suffer financial harm as a result of the July Rule. They have participated, or expect to participate, in the IDR process, and will continue to do so in the future. Under the July Rule, the QPAs considered by arbitrators in that process are not calculated consistent with the NSA's requirements and do not reflect negotiated market rates or the cost of providing services. Arbitrators' consideration of the artificially depressed QPAs calculated under the July Rule will lead to lower reimbursement amounts than would consideration of correctly calculated QPAs. As a result, the amounts plaintiffs are reimbursed for their out-of-network services will tend to decrease, along with their income.

## BACKGROUND

### A. The No Surprises Act

38.    Traditionally, when a patient with private insurance coverage receives medical care from an in-network provider, the insurer pays the provider the rate the insurer and provider had negotiated and agreed to by contract. The patient is responsible for only the cost-sharing that is required by her insurance plan, such as a co-pay, coinsurance, and any deductible. If there is a difference between a provider's billed charges and the contracted rate a provider receives from the insurer, the provider does not bill the patient for the difference.

39.    If the insurer and provider have not signed an agreement, the provider is "out-of-network." When a patient receives care from an out-of-network provider, the provider submits a bill to the patient's insurer, and the insurer determines how much to pay the provider. In addition to applicable out-of-network cost-sharing, the outstanding balance—the difference between what the provider billed and how much the insurer paid—has historically been the patient's responsibility. To collect that balance, the provider has traditionally sent the patient a "balance bill."

40.     "Balance bills" are sometimes called "surprise bills" because they may result from situations in which patients did not choose their care, such as in the case of emergency care or care provided at an in-network facility by an out-of-network healthcare provider.

41.     The NSA addresses these situations. Under the NSA, if a patient has not consented to out-of-network care, the patient's cost-sharing responsibility for emergency services furnished by an out-of-network provider, or non-emergency services furnished by an out-of-network provider at an in-network facility, may not exceed the cost-sharing requirement that would apply if the services had been provided by an in-network provider or facility. 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (b)(1)(A).

42.     In these circumstances, the NSA requires insurers to pay providers an "out-of-network rate," less the patient's cost-sharing requirement. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

**B.  The IDR Process**

43.     The NSA sets forth a detailed IDR process for resolving disputes between providers and insurers over out-of-network reimbursement rates. *See id.* § 300gg-111(c). If there is no applicable All-Payer Model Agreement and no relevant state law mandating a method to determine the total amount payable to an out-of-network provider, insurers first send the provider a payment or notice of denial of payment. *Id.* § 300gg-111(a)(1)(C)(iv)(I), (a)(3)(K). This begins a statutory period of open negotiation. If the provider disagrees with the insurer's payment determination, either party may, within four days following the conclusion of the open negotiation period, initiate arbitration through the IDR process. *Id.* § 300gg-111(a)(3)(K), (c)(1)(B).[5]

---

[5] The parties may continue their negotiations during the arbitration process. If they reach an agreement on the out-of-network rate before the arbitrator determines an out-of-network rate, their agreed-upon rate controls. 42 U.S.C. § 300gg-111(c)(2)(B).

44.     The statute prescribes a "baseball-style" IDR process in which the provider and insurer submit their best and final offers for the amount each considers to be reasonable payment, along with any information requested by the arbitrator and any additional information the party wishes the arbitrator to consider. *Id.* § 300gg-111(c)(5)(B), (C)(ii).

45.     The IDR entity must choose one of the parties' offers after "taking into account the considerations specified in subparagraph (C)." *Id*. § 300gg-111(c)(5)(A)(i). Subparagraph (C) spells out the factors arbitrator "shall consider" in "determining which offer is the payment to be applied." *Id.* § 300gg-111(c)(5)(C)(i).

46.     Among other things, arbitrators "shall consider" the QPA for the item or service at issue. *Id*. § 300gg-111(c)(5)(C)(i)(I).

47.     In a separate rule (which is the subject of a separate pending complaint, *see supra* ¶ 6), the Departments have required arbitrators to give the QPA privileged treatment. Arbitrators must always start by "consider[ing] the [QPA]" and must treat any information other than the QPA with special skepticism, including by evaluating its credibility, whether it relates to the offers submitted, and whether it is "already accounted for by the [QPA]." 87 Fed. Reg. at 52,652*.*

48.     In contrast, the arbitrator may not assess "the accuracy of the plan's or issuer's QPA calculation" and must accept the number calculated by the insurer as credible. *Id.* at 52,627 n.31. According to the Departments, "[i]t is not the responsibility of a provider … or [arbitrator] to verify a QPA's accuracy, and [insurers] are not obligated to demonstrate that a QPA was calculated in accordance with [applicable regulations]." August 2022 FAQs at p. 16 (FAQ 13). In fact, neither the arbitrator nor the provider is even provided with adequate information to assess the accuracy of the insurer's QPA calculation. *See* 45 C.F.R. § 149.140(d).

49.     The arbitrator's "selection of a payment amount is binding on the parties," and gen-erally "is not subject to judicial review." *TMA I*, 87 F. Supp. 3d at 535.

50.     It is therefore imperative that insurers calculate QPAs accurately and in strict ac-cordance with the NSA and implementing regulations. Under the statute as written, arbitrators must consider the QPA for the relevant item or service. And under the Departments' new IDR rules, arbitrators must further treat the QPA as automatically credible and give it privileged treat-ment when issuing a final determination of the rate the insurer will pay a healthcare provider. QPAs are important even before the IDR process begins. According to the Departments, "many plans and issuers make initial payments that are equivalent to or are informed by the corresponding QPA …." 87 Fed. Reg. 52625 n.29.

### C.  QPAs

51.     The NSA generally defines a QPA as "the median of the contracted rates recognized by the plan or issuer … under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," with annual inflation adjustments. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I); *see TMA I*, 87 F. Supp. 3d at 535.

52.     As the Departments have acknowledged, Congress intended for QPAs to serve as one metric reflecting negotiated market rates. *See* 86 Fed. Reg. at 36,889 (describing the Act's "statutory intent" as "ensuring that the QPA reflects market rates under typical contract negotia-tions"). A House Report for a bill that included a nearly identical definition of the QPA explained that the QPA is meant to be "market-based" and to "reflect[s] negotiations between providers and insurers in a local health care market." H. Rep. No. 116-615, 116th Cong. (2020), at 57.

53.     Congress therefore defined the QPA by insurance market, with the NSA specifying that different QPAs should be calculated for individual, large-group, small-group, and self-insured markets. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II), (a)(3)(E)(iv). Congress likewise mandated that the QPA for each item or service must be calculated separately based on rates for services actually "provided," separated out by "specialty" and "geographic region." *Id.*

54.     When an insurer "does not have sufficient information to calculate the median of the contracted rates described in clause [(E)](i)(I)," the statute provides alternative mechanisms for calculating a QPA. *Id.* § 300gg-111(a)(3)(E)(iii). The statute says that "[i]n the case of" insufficient information to calculate a median rate in accordance with the statute, the QPA "means the rate" determined by reference to an independent database, such as a state all-payer claims database, reflecting "allowed amounts paid to a health care provider or facility for relevant services furnished in the applicable geographic region." *Id.*

**D. The July Rule**

55.     On July 1, 2021, the Departments issued the July Rule. 86 Fed. Reg. 36,872 (July 13, 2021). The July Rule is an interim final rule, and the Departments issued it without providing notice or an opportunity for interested parties to comment on the Departments' approach.

56.     The July Rule sets forth a methodology for how insurers must calculate QPAs. 45 C.F.R. § 149.140(c); 86 Fed. Reg. at 36,889 (the rule "establish[es] the methodology that plans and issuers must use to calculate the median of contracted rates"). It also establishes the information insurers must disclose to providers about their QPA calculations. 45 C.F.R. § 149.140(d).

57.     The QPA calculation methodology the Departments created in the July Rule conflicts with the NSA in four key ways.

58.    *Including Ghost Rates*. Despite the NSA's command that the QPA be the median of rates for an item or service "that is *provided* by a provider," and "*provided* in the [same] geographic region," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added), the July Rule instructs insurers to include rates in the QPA calculation whether or not those rates are for items or services that were actually provided. The rule defines "contracted rate" as "the total amount (including cost sharing) that a group health plan or health insurance issuer has *contractually agreed to pay* a participating provider, facility, or provider of air ambulance services for covered items and services." 45 C.F.R. § 149.140(a)(1) (emphasis added).

59.    The Departments' definition of "contracted rate" broadly encompasses all contracted rates, without regard to whether any item or service has ever been "provided" at that rate under that contract. The preamble to the July Rule clarifies that "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate … *regardless of the number of claims paid at that contracted rate*." 86 Fed. Reg. at 36,889 (emphasis added). Thus, under the Departments' rules, even if no service has been provided and no claim has been paid at a rate specified in a contract, the rate factors into the QPA calculation.

60.    Including ghost rates in QPA calculations depresses these metrics. Providers have little incentive to negotiate a rate for services they do not provide. For instance, an office-based primary care doctor has little incentive to negotiate fair, market-based rates in a fee schedule for anesthesiology or emergency-care services that he or she will not—and often cannot—provide. The impact of ghost rates' downward pressure on QPAs is substantial. According to a recent white

paper, 57% of surveyed primary care professionals ("PCPs") contract for services they never actually provide. Avalere Health, PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act (Aug. 2, 2022), at p. 4.[6]

61.    The Departments did not explain their choice to define "contracted rate" to include rates for services not provided, or address the way in which this choice drives down QPAs. That choice was both contrary to the plain terms of the NSA and unreasonable.

62.    *Including Rates from Providers in Different Specialties*. The NSA says that the QPA is the median of contracted rates for an item or service provided "by a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The statute contains no exceptions to this requirement that a QPA include only contracted rates for providers in the same or similar specialty. Yet the July Rule allows insurers to include rates for providers not in the same or similar specialty when calculating QPAs. The July Rule defines "[p]rovider in the same or similar specialty" as "the practice specialty of a provider, as identified by the plan or issuer *consistent with the plan's or issuer's usual business practice*." 45 C.F.R. § 149.140(a)(12) (emphasis added). Insurers therefore must separate contracted rates by specialty only if "consistent with … [their] usual business practice." *Id.*; *see* 86 Fed. Reg. at 36,891 (explaining that insurers "should be required to calculate median contracted rates separately by provider specialty *only* where the [insurer] otherwise varies its contracted rates based on provider specialty" (emphasis added)). The Departments recognized that not all insurers "vary contracted rates by provider specialty" and "considered requiring a plan or issuer to calculate separate median contracted rates for every provider specialty," but opted against it. 86 Fed. Reg. at 36,891.

---

[6] *Available at* https://www.acr.org/-/media/ACR/Files/Advocacy/2022-8-15-Avalere-QPA-Whitepaper_Final.pdf.

63.    The Departments purportedly made this choice "to provide plans or issuers with the flexibility necessary to calculate the median contracted rate, relying on their contracting practices," to reduce the "burden associated with calculating the QPA," and to avoid "instances in which the plan or issuer would not have sufficient information to calculate the QPAs using its contracted rates." *Id.* The Departments divined a "statutory goal" of limiting the instances in which an insurer "has insufficient information to calculate a median contracted rate." *Id.* at 36,888. While the NSA "specifies an alternative methodology for determining the QPA" in those instances, the Departments believed the statute "envisions that these alternative methodologies … will be used in only limited circumstances." *Id.* Thus, the July Rule "generally seek[s] to ensure that plans and issuers can meet the sufficient-information standard when determining the QPA and that use of alternative methodologies is minimized wherever possible." *Id.* This goal is found nowhere in the NSA, and the Departments' choice to prioritize it over the NSA's plain textual command that QPAs be based on specialty-specific rates is contrary to law and unreasonable.

64.    *Excluding Retrospective and Incentive-Based Components of Contracted Rates.* Under the NSA, the QPA derives from "the contracted rates recognized by" an insurer, and each contracted rate is "the total maximum payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July Rule, on the other hand, requires insurers to exclude certain portions of the total maximum payment based on whether payment is made later in time.

65.    The Departments recognized that insurers and providers sometimes agree that payments to providers will be "reconciled retrospectively to account for utilization, value adjustments, or other weighting factors that can affect the final payment to a provider" and sometimes "agree to certain incentive payments during the contracting process." 86 Fed. Reg. at 36,894. "[W]hen calculating median contracted rates," however, the Departments commanded that insurers "*must*

*exclude* risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." *Id.* (emphasis added); *see* 45 C.F.R. § 149.140(b)(2)(iv).

66.     The Departments offered no textual basis for excluding such payments—which are part of the "total maximum payment" the insurer agreed to pay the provider—from the contracted rates used to calculate QPAs. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Instead, they asserted that "excluding these payments and payment adjustments" is "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process." 86 Fed. Reg. at 36,894. Typical calculation of cost-sharing obligations is beside the point, however. The NSA is clear that any amount that is part of the total maximum payment under a contract must be included.

67.     *Aggregating Contracted Rates Across Different Plan Sponsors*. The NSA says that the QPA is "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The statute is thus clear that QPAs must be calculated for each plan sponsor, with no option for plan sponsors to opt out and use the contracted rates of another sponsor for purposes of calculating their own QPAs. Under the July Rule, however, self-insured group health plans can instead, "at the option of the plan sponsor," decide to have their QPAs calculated using "all self-insured group health plans *administered by the same entity* (including a third-party administrator contracted by the plan)." 45 C.F.R. § 149.140(a)(8)(iv) (emphasis added).

68.     The "administrator" of a group health plan is, in many cases, a different entity from the plan's "sponsor." Many employers offering self-insured group health plans, for example, contract with a third-party administrator to administer the group health plans that the employer sponsors.[7] So a patient's health insurance can be provided by a self-insured health plan of the patient's employer, while that plan is administered by a different third-party entity. In that circumstance, the NSA requires the QPA to be calculated based on the median of the rates agreed to by all of the *sponsor's* plans, *i.e.*, the rates of the health care plans offered by that employer to the employer's workers. 42 U.S.C. § 300gg-111(a)(3)(E)(i). The July Rule, however, allows self-insured group health plans, at their election, to instead use QPAs calculated based on the rates of all self-insured group health plans administered by the same entity. 86 Fed. Reg. at 36,890.

69.     The Departments again offered no textual justification for their departure from the statutory definition of the QPA. Instead, they asserted that allowing insurers to calculate QPAs across all health plans administered by the same entity would "reduce the burden imposed on sponsors of self-insured group health plans." 86 Fed. Reg. at 36,890. The Departments also said that they "anticipate" that under this approach, "there will be fewer instances where a self-insured group health plan sponsor will lack sufficient information to calculate a median contracted rate." *Id.* Again, there is no basis in the NSA for a conclusion that Congress sought to minimize instances where there is insufficient information to calculate a median contracted rate. Congress said that when there is insufficient information, QPAs are derived from an independent database. 42 U.S.C. § 300gg-111(a)(3)(E)(ii), (iii). It was patently unreasonable for the Departments to depart from the NSA's terms to further a goal the Departments created out of whole cloth.

---

[7] *See* 29 C.F.R. § 2510.3-16.

70.    In addition to unlawfully skewing the QPA calculation methodology in insurers' favor, the Departments also departed from the NSA by allowing insurers to keep their QPA calculations secret, foreclosing the effective review of QPA calculations contemplated by the statute. The NSA instructs the Departments to establish through rulemaking the "information" that an insurer "shall share with the nonparticipating provider or nonparticipating facility" when determining the QPA, as well as "a process to receive complaints" that insurers have violated applicable requirements. 42 U.S.C. § 300gg-111(a)(2)(B)(ii), (iv). In particular, the complaint process must allow for complaints that a QPA applied by an insurer violated the requirement that the QPA "satisf[y] the definition" of the QPA laid out in the NSA. 42 U.S.C. § 300gg-111(a)(2)(A)(i)(II).

71.    The Departments "recognize[d]" that providers "need transparency regarding how the QPA was determined." 86 Fed. Reg. at 36,898. Understanding how the QPA was determined is "important in informing the negotiation process." *Id.* And in order to "decide whether to initiate the IDR process and what offer to submit," providers "must know not only the value of the QPA, but also certain information on how it was calculated." *Id.* The Departments therefore claimed that the regulations they adopted sought "to ensure transparent and meaningful disclosure about the calculation of the QPA." *Id.*

72.    Nonetheless, to "minimiz[e] administrative burdens on plans and issuers," the Departments required insurers to provide almost no information about their QPA calculations. *Id.* Under the July Rule, when an insurer sends a provider or facility an initial payment or notice of denial of payment, the only information the insurer must provide about the QPA is (1) the QPA as determined by the insurer (without any underlying calculations) and (2) a statement certifying that

the QPA applies and "was determined in compliance with" the methodology in the July Rule. 45

C.F.R. § 149.140(d)(1);[8] *see also* 86 Fed. Reg. at 36,933.

73.    In a later rule, the Departments added an additional QPA-disclosure requirement

applicable only when a QPA is calculated "based on a downcoded service code or modifier"—that

is, one "alter[ed]" by an insurer to a new code "associated with a lower [QPA] than the service

code or modifier billed by the provider." 45 C.F.R. § 149.140(a)(18), (d)(1)(ii). In that circum-

stance, the insurer must also disclose: (1) a statement that the code was downcoded; (2) an expla-

nation of why the claim was downcoded, including a description of which codes were altered; and

(3) the amount that the QPA would have been if the insurer had not downcoded. *Id.*

§ 149.140(d)(1)(ii).

74.    At a provider's request, the insurer must provide additional limited information: (1)

whether the QPA included contracted rates that were not on a fee-for-service basis and whether

the QPA was determined using underlying fee schedule rates or a derived amount; (2) if a related

service code was used to determine the QPA for a new service code, information to identify the

related service code; (3) if the plan or issuer used an eligible database to determine the QPA,

information to identify which database was used; and (4) if applicable, a statement that the plan's

or issuer's contracted rates include risk-sharing, bonus, or other incentive-based or retrospective

payments or payment adjustments for covered items and services that were excluded for purposes

of calculating the QPA. *Id.* § 149.140(d)(2); *see also* 86 Fed. Reg. at 36,933.

75.    This information is facially inadequate to allow providers to assess whether insurers

have complied with the definition of the QPA in the NSA, or even the Departments' (skewed)

---

[8] The insurer must also provide information about the availability of the negotiation period and the
IDR process, as well as contact information. 45 C.F.R. § 149.140(d)(1).

methodology for calculating the QPA. The required disclosures provide no basis for a complaint that an insurer has violated the NSA's requirement that the QPA be calculated in a way that "satisfies the [statutory] definition." 42 U.S.C. § 300gg-111(a)(2)(B)(iv); *id.* § 300gg-111(a)(2)(A)(i)(II). For example, insurers are not required to disclose the "contracted rates recognized by the plan or issuer" that were used in determining a median rate, or the "specialt[ies]" of the providers who contracted for those rates. *Id.* § 300gg-111(a)(3)(E). The insurer does not have to disclose whether it calculated the median rate using plans of the plan sponsor or rates of other self-insured group health plans administered by the same third-party administrator. And while an insurer must disclose upon request whether the insurer excluded incentive-based or retrospective payments from the rates used in calculating the QPA, that information means little without information on the amount of those excluded payments.

76.     The regulations are therefore substantively unreasonable. They make the complaint process prescribed by the NSA meaningless by depriving providers of the information necessary to take advantage of it. The Departments also unreasonably failed to explain how the barebones disclosures they require provide the "transparency" that even they recognized is "need[ed]," 86 Fed. Reg. at 36,898, and did not grapple with the need to provide enough information to allow entities to discover and articulate the basis for a complaint under the NSA. Indeed, the Departments did not consider the complaint process at all in establishing the information insurers must disclose. The Departments' total failure to consider or address this important aspect of its task in establishing the information insurers must disclose renders the regulations arbitrary and capricious. *See Tice-Harouff v. Johnson*, No. 6:22-cv-201-JDK, 2022 WL 3350375, at *11 (E.D. Tex. Aug. 12, 2022) (Kernodle, J.) ("[A]lthough an agency's experience and expertise presumably enable the agency to provide the required explanation, they do not substitute for the explanation." (cleaned up)).

**E.  August 2022 FAQs**

77.    In August 2022, the Departments issued a set of Frequently Asked Questions addressing various issues including aspects of the July Rule.

78.    The Departments acknowledged that the July Rule's definition of "contracted rates" allows insurers to include rates for services that "providers do not provide." *Id.* at p. 17 (FAQ 14). The Departments noted "concerns that the inclusion of these rates in the calculation of QPAs may artificially lower the QPA, as these providers have little incentive to negotiate fair reimbursement rates for these service[s]" and sometimes accept "$0 as their rate." *Id.* at p. 16 (FAQ 13). The Departments concluded that insurers "should not include $0 amounts in calculating median contracted rates." *Id.* at p. 17 n.29 (FAQ 14). But they did not prohibit insurers from including other non-negotiated rates that are artificially low, if not quite $0, because the services are never actually provided by the providers whose contracted rates form the basis for insurers' QPA calculations.

79.    The August 2022 FAQs also elaborated on the requirements for specialty-specific rates. The Departments recognized that fee schedules may include ghost rates, explaining that some insurers "establish contracted rates by offering most providers the same fee schedule for all covered services, and then it is up to the providers to negotiate increases to the rates for the services that they are most likely to bill." *Id.* at p. 16 (FAQ 14). Yet all rates, including for services not provided by that provider, "may be included in the provider contract." *Id.* Thus, "an anesthesiologist's contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services)." *Id.* at p. 17. Including such rates drives down QPAs.

80.    To address this, the Departments stated that insurers must calculate "separate median contracted rates" for different specialties not only when they expressly vary their contracted rates by specialty, but also "when the plan's or issuer's contracting process unintentionally results

in contracted rates that vary based on provider specialty." *Id.* According to the Departments, contracted rates "vary based on provider specialty if there is a material difference in the median contracted rates … between providers of different specialties, after accounting for variables other than provider specialty." *Id.* The Departments left it to insurers to determine when a difference in median contracted rates between providers of different specialties is "material."

81.    The Departments acknowledged that insurers "may have not understood the July 2021 interim final rules to require the calculation of separate median contracted rates" in these circumstances. Accordingly, the Departments offered a 90-day period of enforcement discretion to allow insurers to recalculate their QPAs. *Id.* In the meantime, QPAs that include materially different out-of-specialty contracted rates have been used since IDR proceedings began this spring, and will continue to be presented to arbitrators. Even after the period of enforcement discretion ends, providers will not know whether insurers have correctly restated their QPAs.

82.    While the FAQs' clarification of the circumstances in which insurers must calculate specialty-specific QPAs narrows the scope of the statutory violation, it does not eliminate it. The statute requires that QPAs *always* be specialty-specific, with no exception for cases where an insurer unilaterally determines that there is no "material difference" between different specialties' median contracted rates. Yet the Departments declared that if insurers do not perceive a "material difference" between in-specialty and out-of-specialty rates, insurers "are not required to calculate median contracted rates separately for each provider specialty." *Id.*

83.    The August 2022 FAQs also reiterate that "to reduce burden on self-insured group health plans," the July Rule "provide[s] that sponsors of self-insured group health plans may allow their [third-party administrators] to determine the QPA on behalf of the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans

administered by the [administrator], as opposed to only those of the particular plan sponsor." *Id.* at p. 18 (FAQ 15).

84.     Finally, the August 2022 FAQs make clear that under the July Rule the *only* check on "the accuracy of plans' and issuers' QPA calculation methodologies" is audits performed by "the Departments (and applicable state authorities)." *Id.* at p. 16 (FAQ 13). HHS intends to conduct "no more than 9 audits annually." 86 Fed. Reg. at 36,935. Nonetheless, according to the Departments, "[i]t is not the responsibility of a provider, facility, provider of air ambulance services, or certified IDR entity to verify a QPA's accuracy, and plans and issuers are not obligated to demonstrate that a QPA was calculated in accordance with the [applicable regulations] unless required to do so by an applicable regulator." August 2022 FAQs at p. 16 (FAQ 13). If a provider has "concerns about a plan's or issuer's compliance," the provider may "submit a complaint." *Id.* But the Departments did not explain how providers could discover concerns or support a complaint about a QPA calculation when insurers do not have to demonstrate compliance or otherwise reveal the basis of their QPA calculations. Under the July Rule, providers therefore remain powerless to meaningfully assess QPAs or submit complaints challenging their undisclosed bases.

## COUNT I

### THE CHALLENGED PROVISIONS ARE IN EXCESS OF STATUTORY AUTHORITY AND NOT IN ACCORDANCE WITH LAW (5 U.S.C. § 706; 42 U.S.C. § 300gg-111(a); 29 U.S.C. § 1185e(a); 26 U.S.C. § 9816(a))

85.     The foregoing *paragraphs* are incorporated by reference.

86.     The APA provides that courts will "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

87.     The July Rule is contrary to the plain terms of the NSA.

88.    *First*, the NSA specifies that for each item and service, the QPA is the "median of the contracted rates … for the same or a similar item or service *that is provided* by a provider in the same or similar specialty" and is "*provided* in the [same] geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). Yet the July Rule defines "contracted rate" as encompassing contracted rates without regard to whether any item or service is actually provided under the contract. 45 C.F.R. § 149.140(a)(1); *see also* 86 Fed. Reg. at 36,889. The definition of contracted rate is therefore inconsistent with the NSA's definition of the QPA, which does not allow insurers to include in QPAs any rates for items or services that were not actually provided.

89.    Further, the August 2022 FAQs clarify that insurers need only exclude $0 rates from their QPA calculations, even while acknowledging that some insurers include non-zero amounts in contracts for services that are not actually provided. By excluding $0 rates but not other equally artificial non-zero rates, the FAQs make clear the Departments' position that these non-zero rates are included in the QPA calculation under the July Rule, even though they are not associated with services actually provided. The July Rule and the FAQs are therefore inconsistent with the plain command of the NSA, which requires that insurers calculate QPAs using only rates for items or services "that [are] provided." The Departments' decision to include other "ghost" rates is not in accordance with law and exceeds their statutory authority.

90.    *Second*, the NSA specifies that the QPA *is* the "median of the contracted rates … for the same or a similar item or service that is provided *by a provider in the same or similar specialty*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). Despite these clear terms, the Departments opted against "requiring a plan or issuer to calculate separate median contracted rates for every provider specialty." 86 Fed. Reg. at 36,891. Instead, the Departments told insurers to identify provider specialties as different, and thus subject to separate QPA calculations, *only* if

"consistent with … [their] usual business practice." 45 C.F.R. § 149.140(a)(12). Put another way, only if an insurer concludes that it "var[ies] contracted rates by provider specialty" in its usual business practice is the insurer required to separately calculate QPAs for providers who are *not* in the same or similar specialty. 86 Fed. Reg. at 36,891.

91.    The August 2022 FAQs, in FAQ 14, confirm that the July Rule allows insurers to include out-of-specialty rates in determining QPAs if there is not a "material difference in the median contracted rates … between providers of different specialties, after accounting for variables other than provider specialty." Under the statute, however, the QPA must *always* be determined using only rates with providers in the "same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Both the July Rule and the components of FAQ 14 that allow the inclusion of out-of-specialty rates in QPA calculations are incompatible with the language Congress used in the NSA, are contrary to law, and exceed the Departments' statutory authority.

92.    *Third*, the NSA says that the QPA for each item and service derives from "the contracted rates recognized by" the insurer, and that the contracted rate is "the total maximum payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July Rule instead omits certain components from the rates that insurers agree to pay providers: "[i]n calculating the median contracted rate, a plan or issuer must … [e]xclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). This, too, cannot be reconciled with the NSA's plain terms. Under the terms of the statute it is immaterial that part of a payment may be added or subtracted on a retrospective basis. "[R]isk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" are part of the "total" rate that an insurer has agreed to pay a provider for a service and thus must be counted under the statute.

93.     *Fourth*, the NSA says that the QPA is "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July Rule instead allows self-insured group health plans to calculate each QPA based on the median of "all self-insured group health plans *administered by the same entity* (including a third-party administrator contracted by the plan)." 45 C.F.R. § 149.140(a)(8)(iv). The NSA does not authorize *multiple* plans unaffiliated with the same sponsor to aggregate contracted rates for purposes of QPA calculations. The Departments' decision to allow this aggregation in the July Rule, and as confirmed in FAQ 15, violates the statute.

94.     Because the July Rule and elements of the August 2022 FAQs (FAQ 14 in part and FAQ 15 in its entirety) exceed the Departments' statutory authority and are not in accordance with law in the above respects, they violate the APA.

## COUNT II

### THE CHALLENGED PROVISIONS ARE ARBITRARY AND CAPRICIOUS
### (5 U.S.C. § 706)

95.     The foregoing paragraphs are incorporated by reference.

96.     Even if the challenged provisions were not foreclosed by the statute, they are still unlawful because they are unreasonable and are not the product of the reasoned decisionmaking the APA requires.

97.     The combined effect of the challenged provisions is to arbitrarily and unreasonably depress the QPA, ensuring that it does *not* "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Although the Departments recognized the need to ensure that QPAs are based on such rates, the July Rule did not consider or address the ways in which the Departments' choices artificially skew QPAs.

98.    For example, the Departments did not address how allowing insurers to calculate QPAs by aggregating contracted rates of providers in different specialties, rather than using only rates for providers in the same or similar specialty, would drive down QPAs. Instead, they allowed insurers to mix different specialties within the same QPA calculation in order to offer "flexibility" and to reduce the "burden" on insurers in calculating QPAs. Making the process less burdensome for insurers is not an adequate justification for departing from Congress's stated methodology for calculating QPAs.

99.    In the August 2022 FAQs, the Departments acknowledged "concerns that the inclusion of" rates that providers "are not likely to bill or that are not utilized by their specific provider specialty" may "artificially lower [QPAs], as these providers have little incentive to negotiate fair reimbursement rates for these service[s]." But the Departments failed to respond to these concerns. They asserted that only $0 rates are not "contracted rates," despite acknowledging that the problem extends to other rates that, despite specifying a non-zero amount, are artificially low because they are associated with services not actually provided, or rarely provided, by a provider. The Departments' failure to address ways in which *they recognize* that their methodology may depart from Congress's intent is patently unreasonable.

100.    Further, the Departments' explanation that QPAs must be based on specialty-specific rates only if "there is a material difference in the median contracted rates … between providers of different specialties" does not pass muster under the APA. The Departments did not explain what a "material difference" is or provide any guidance to insurers on how to determine whether one exists. Nor did the Departments account for the fact that what insurers might consider immaterial differences in isolation might have a significant impact on QPAs in the aggregate.

101.    The Departments also did not provide rational explanations for their other decisions to craft the QPA methodology in ways that systematically depress QPAs.

102.    For example, the Departments repeatedly invoked a supposed "statutory goal" of limiting the instances in which an insurer "has insufficient information to calculate a median contracted rate" and sought "to ensure that plans and issuers can meet the sufficient-information standard when determining the QPA and that use of alternative methodologies is minimized wherever possible." 86 Fed. Reg. at 36,888. The Departments relied on this "statutory goal" as a reason to ignore the NSA's instruction that the QPA be determined by reference to specialty-specific rates, *id.* at 36,891, among other things. But there is no basis in the NSA's text or structure to conclude that Congress intended to limit the instances when an insurer has insufficient information to calculate a median rate in accordance with the statute. Instead, the statute makes clear that *whenever* an insurer "does not have sufficient information" to calculate a median rate in accordance with the statute, an alternative method should be used. 42 U.S.C. § 300gg-111(a)(3)(E)(iii). That alternative method is an independent database such as a state all-payer claims database—a reasonable method that relies on "amounts paid … for relevant services furnished in the applicable geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(iii). There is always a statutorily provided method for identifying a QPA. And Congress did not say that one is better than the other. Congress determined that reference to a database is the correct method for determining QPAs absent sufficient information to calculate a median—not manipulation of or exceptions to the QPA calculation. It was unreasonable for the Departments to create from whole cloth the "statutory goal" of minimizing reliance on independent databases, then elevate it over the NSA's plain text.

103.    Further, the Departments' regulations relating to the information insurers must disclose about their QPA calculations are arbitrary, capricious, and an abuse of discretion, because

the disclosures they require are insufficient to enable providers to assess the credibility or reliability of insurers' QPA calculations or to identify or express the basis for a complaint that the QPA an insurer applied does not satisfy the statutory definition of the QPA. The Departments also failed to provide a rational explanation for their decision not to require insurers to disclose sufficient information. The Departments' desire to "minimiz[e] administrative burdens on plans and issuers" is not a sufficient reason to fail to provide for meaningful disclosures allowing for a meaningful complaint process, as Congress instructed.

104.    For all these reasons, the challenged provisions are "arbitrary, capricious, [and] an abuse of discretion," and should be set aside. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    A declaration that the Departments acted unlawfully in promulgating the challenged provisions of the July Rule that (a) unlawfully instruct insurers to calculate the QPA in ways inconsistent with Congress's commands in the NSA and (b) fail to require meaningful disclosure of the basis of insurers' QPA calculations;

B.    An order vacating the following provisions of the July Rule:

a.    45 C.F.R. § 149.140(a)(1), from "means" to "benefit manager"; 45 C.F.R. § 149.140(a)(8)(iv), from "or at the option" to "on behalf of the plan."; 45 C.F.R. § 149.140(a)(12); 45 C.F.R. § 149.140(b)(1), from "(or the administering entity" to "if applicable)"; 45 C.F.R. § 149.140(b)(2)(i), from "(or the administering entity" to "if applicable)"; 45 C.F.R. § 149.140(b)(2)(iv); 45 C.F.R. § 149.140(b)(3)(i), from "If a plan or issuer" to "for the service code" and "as applicable";

b.    26 C.F.R. § 54.9816-6T(a)(1), from "means" to "benefit manager"; 26 C.F.R. § 54.9816-6T(a)(8)(iv), from "or at the option" to "on behalf of the plan."; 26 C.F.R. § 54.9816-6T(a)(12); 26 C.F.R. § 54.9816-6T(b)(1), from "(or the administering entity" to "if applicable)"; 26 C.F.R. § 54.9816-6T(b)(2)(i), from "(or the administering entity" to "if applicable)"; 26 C.F.R. § 54.9816-6T(b)(2)(iv); 26 C.F.R. § 54.9816-6T(b)(3)(i), from "If a plan has" to "for the service code" and "as applicable";

    c.    29 C.F.R. § 2590.716-6(a)(1), from "means" to "benefit manager"; 29 C.F.R. § 2590.716-6(a)(8)(iv), from "or at the option" to "on behalf of the plan."; 29 C.F.R. § 2590.716-6(a)(12); 29 C.F.R. § 2590.716-6(b)(1), from "(or the administering entity" to "if applicable)"; 29 C.F.R. § 2590.716-6(b)(2)(i), from "(or the administering entity" to "if applicable)"; 29 C.F.R. § 2590.716-6(b)(2)(iv); 29 C.F.R. § 2590.716-6(b)(3)(i), from "If a plan or issuer" to "for a service code" and "as applicable";

    d.    5 C.F.R. § 890.114(a), insofar as it requires compliance with the foregoing provisions.

C.    An order vacating the following provisions of the FAQs:

    a.    Response to Q.14, p. 17, ¶ 2, line 7, beginning with "and one separate …" through ¶ 3.

    b.    Response to Q15 in its entirety.

D.    An injunction barring the Departments from enforcing the foregoing provisions;

E.    Attorney's fees and costs pursuant to 28 U.S.C. § 2412; and

F.    Any other just and proper relief.


November 30, 2022            Respectfully submitted,


                      /s/ Penny P. Reid

                      Penny P. Reid
                      Texas Bar No. 15402570
                      preid@sidley.com
                      Kelsey M. Taylor
                      Texas Bar No. 24098507
                      ktaylor@sidley.com
                      SIDLEY AUSTIN LLP
                      2021 McKinney Ave., Suite 2000
                      Dallas, Texas 75201
                      Tel: (214) 981-3413
                      Fax: (214) 981-3400

                      Eric D. McArthur (*pro hac vice forthcoming*)
                      emcarthur@sidley.com
                      Brenna E. Jenny (*pro hac vice forthcoming*)

bjenny@sidley.com
Jillian Stonecipher (*pro hac vice forthcoming*)
jstonecipher@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8018
Fax: (202) 736-8711

Jaime L.M. Jones (*pro hac vice forthcoming*)
jaime.jones@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036

*Counsel for Plaintiffs*