**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

_____

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) Case No.: 6:22-cv-00450-JDK |
| v. | ) |
| | ) Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, et al., | ) |
| | ) |
| *Defendants*. | ) |

**TMA PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE ISSUE ........................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................. 2

   I.   The No Surprises Act ................................................................................................ 2

       A.   The IDR Process ................................................................................................ 4

       B.   QPA Definition, Methodology, and Disclosure ............................................... 5

   II.   The Departments' Implementing Regulations and Guidance ................................... 6

       A.   The July Interim Final Rule .............................................................................. 6

           1.   The July Rule's QPA Methodology ......................................................... 6

           2.   The July Rule's Systematic Depression of QPAs ..................................... 9

           3.   The July Rule's Disclosure Requirements .............................................. 12

       B.   The August 2022 FAQs .................................................................................. 14

LEGAL STANDARDS ..................................................................................................... 15

ARGUMENT .................................................................................................................... 17

   I.   The July Rule And August 2022 FAQs Are Not In Accordance With Law. ..................... 17

       A.   The challenged provisions conflict with the NSA's unambiguous terms. ............... 17

           1.   Including ghost rates violates the Act. ............................................................. 18

           2.   Including rates for providers in different specialties violates the Act. ............ 19

           3.   Excluding certain components of contracted rates violates the Act. ............... 20

           4.   Aggregating contracted rates across plan sponsors violates the Act. .............. 21

       B.   The challenged provisions are unreasonable and arbitrary and capricious. .............. 22

           1.   The challenged provisions unreasonably depress QPAs. ................................. 22

           2.   The Departments' purported justifications are unreasonable. .......................... 24

   II.   The Departments' Disclosure Rule Is Neither Reasonable Nor Reasonably Explained. ... 27

       A.   Meaningful disclosures are necessary. ............................................................ 27

       B.   The Departments' disclosure rule requires no meaningful disclosures. .................... 28

       C.   Failure to require meaningful disclosures was unreasonable. .................................. 29

   III.   The Challenged Provisions Should Be Declared Unlawful, Vacated In Part, And Remanded For Further Rulemaking Consistent With The NSA And APA. ...................... 30

CONCLUSION ................................................................................................................. 30

CERTIFICATE OF SERVICE ......................................................................................... 32

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. SEC*,
    804 F.2d 739 (D.C. Cir. 1986) ...............................................................................20

*Blue Ocean Inst. v. Gutierrez*,
    585 F. Supp. 2d 36 (D.D.C. 2008) ........................................................................16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ..............................................................................................25

*Chamber of Commerce v. Dep't of Labor*,
    885 F.3d 360 (5th Cir. 2018) ................................................................................27

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ..............................................................................................16

*Cigar Ass'n v. FDA*,
    964 F.3d 56 (D.C. Cir. 2020) ...............................................................................29

*Dish Network Corp. v. NLRB*,
    953 F.3d 370 (5th Cir. 2020) ................................................................................17

*Djie v. Garland*,
    39 F.4th 280 (5th Cir. 2022) .................................................................................21

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) .....................................................................................16, 24

*Forrest Gen. Hosp. v. Azar*,
    926 F.3d 221 (5th Cir. 2019) ................................................................................17

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ................................................................................16

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ...................................................................................23

*Judulang v. Holder*,
    565 U.S. 42 (2011) ................................................................................................22

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016) ..............................................................................................20

*LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.*,
  6:22-cv-00453-JDK (Dec. 1, 2022) ...............................................................10, 28, 29

*LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.*,
  No. 6:22-cv-162, 2022 WL 2959715 (E.D. Tex. Jul. 26, 2022) ..................................4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ...............................................................................................19

*MCI Telecomms. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994) ...................................................................................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .....................................................................................................17

*Music Choice v. Copyright Royalty Bd.*,
  970 F.3d 418 (D.C. Cir. 2020) ...................................................................................29

*Nat. Res. Def. Council, Inc. v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988) ...................................................................................23

*Nat'l Pork Producers Council v. EPA*,
  635 F.3d 738 (5th Cir. 2011) .....................................................................................20

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .....................................................................................................17

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ...............................................................................16, 22

*Taniguchi v. Kan Pac. Sai Pan, Ltd.*,
  566 U.S. 560 (2012) ...................................................................................................21

*Texaco Inc. v. Duhe*,
  274 F.3d 911 (5th Cir. 2001) .....................................................................................19

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022)............................................................ *passim*

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S.
  Ct. 2528 (2022) ..........................................................................................................24

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .......................................................................16

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ................................................................................22, 24

*Tice-Harouff v. Johnson*,
No. 6:22-cv-201-JDK, 2022 WL 3350375 (E.D. Tex. Aug. 12, 2022) ..................................29

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ..................................16

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ..................................17, 26

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ..................................18

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ..................................16, 23, 25

## Statutes

45 C.F.R. § 147.211 ..................................29

45 C.F.R. § 149.140 ..................................*passim*

86 Fed. Reg. 36,872 (July 13, 2021) ..................................*passim*

86 Fed. Reg. 55,980 (Oct. 7, 2021) ..................................23

87 Fed. Reg. 52,618 (Aug. 26, 2022) ..................................5, 27

5 U.S.C. § 706(2) ..................................16

42 U.S.C. § 300gg-111 ..................................*passim*

Fed. R. Civ. P. 56(a) ..................................15

## Other Authorities

D. Gordon, *New Healthcare Price Transparency Rule Took Effect July 1, But It
May Not Help Much Yet*, Forbes.com, July 3, 2022, *available at*
https://perma.cc/3YHP-TQQQ ..................................29

*FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021
Implementation Part 55* (Aug. 19, 2022) ..................................*passim*

*FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021
Implementation Part 49* (Aug. 20, 2021) ..................................29

*Oxford Eng. Dict. Online* (Dec. 2022 ed.) ..................................20

Plaintiffs Texas Medical Association ("TMA"), Dr. Adam Corley, and Tyler Regional Hospital, LLC, respectfully move for summary judgment on Counts I and II of their complaint.[1]

## **INTRODUCTION**

In the No Surprises Act ("NSA"), Congress significantly changed how out-of-network healthcare providers are compensated for their services. Under the Act, Congress eliminated out-of-network providers' ability to "balance bill" patients for amounts not covered by their insurers, and instead required insurers to pay reasonable compensation to the provider when one of their insureds receives services covered by the Act. To determine the amount the insurer must pay, Congress created an independent dispute resolution ("IDR") process under which billing disputes that the parties cannot resolve through negotiation are submitted to an independent arbitrator.

Under the NSA, one metric arbitrators must consider in determining the appropriate reimbursement rate is the qualifying payment amount, or "QPA." Congress generally defined the QPA as the insurer's median in-network contracted rate for the relevant item or service in 2019, adjusted for inflation. Congress charged the defendant Departments with (1) establishing a methodology for insurers to use to calculate their QPAs; (2) specifying the information insurers must disclose to providers about their QPA calculations; and (3) establishing a complaint process for providers to challenge insurers' QPA calculations. The Departments did so through an interim final rule, issued without notice and comment, in July 2021. *See* 86 Fed. Reg. 36,872 (July 13, 2021).

Unfortunately, the QPA calculation methodology the Departments established in the July Rule directly conflicts with the NSA's clear text in multiple, critical respects. And each of the Departments' departures from the statutory text predictably skews QPAs downward, slanting the

---

[1] Attached hereto as Exhibits A–D and incorporated herein by reference are plaintiffs' declarations in support of this motion.

Act's IDR process in insurers' favor and ultimately leading to unacceptably low payments to providers and creating devastating impacts for the nation's healthcare system.

Compounding the problem, although the NSA mandates that the Departments require insurers to make meaningful disclosures about how they calculate their QPAs, the Departments required insurers to make only the most barebones disclosures, leaving providers almost completely in the dark about whether insurers complied with the NSA and unable to meaningfully access the NSA's complaint process or to provide relevant information to arbitrators about the QPA.

The challenged portions of the July Rule and subsequent guidance are manifestly unlawful. They conflict with the statute's unambiguous terms and thus fail at *Chevron* step one. And they also fail at *Chevron* step two and are arbitrary and capricious because they do not permissibly interpret "QPA," as Congress defined the term, or reasonably implement the process Congress created in the NSA for providers to learn about and challenge insurers' QPA calculations. Accordingly, and as discussed more fully below, the challenged provisions should be declared unlawful, vacated in part, and remanded for further rulemaking consistent with the NSA and APA.

## STATEMENT OF THE ISSUE

The issue presented is whether the challenged provisions of the July Rule and subsequent guidance that artificially depress QPAs and prevent effective review of insurers' QPA calculations must be set aside because they conflict with the statute and are arbitrary and capricious.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     The No Surprises Act

When a patient with private insurance coverage receives medical care from an in-network provider, the insurer typically pays the provider the rate the insurer and provider previously negotiated and agreed to by contract. *See* 86 Fed. Reg. at 36,874. The patient is responsible for only the

cost-sharing that is required by the insurance plan, such as a co-pay, coinsurance, and any deductible. *See id.* If there is a difference between a provider's billed charges and the contracted rate a provider receives from the insurer, the provider does not bill the patient for the difference. *See id.*

When a patient receives care from a provider who is out-of-network, however, the insurer and provider have not signed an agreement determining what will be paid. *Id.* The provider therefore submits a bill to the patient's insurer, and the insurer determines what (if anything) it will pay the provider. *Id.* If the insurer chooses not to pay some or all of the bill, the difference between what the provider billed and how much the insurer paid has historically been the patient's responsibility. *Id.* To collect that balance, the provider traditionally sent the patient a "balance bill." *Id.*

The NSA addresses these situations.[2] Under the Act, the patient's insurer must pay the provider an amount determined through a statutorily mandated negotiation and arbitration process, while the patient's cost-sharing responsibility is limited. For emergency services furnished by an out-of-network provider, or non-emergency services furnished by an out-of-network provider at an in-network facility, the patient's cost-sharing responsibility may not exceed the amount that would apply if the services had been provided by an in-network provider or facility. 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (b)(1)(A). And the patient's insurer must pay the provider an "out-of-network rate," less the patient's cost-sharing. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

The "out-of-network rate" is governed by any applicable All-Payer Model Agreement or, if there is none, then by any applicable specified state law providing a method for determining out-of-network reimbursement. *Id.* § 300gg-111(a)(3)(K). Otherwise, insurers make an initial payment

---

[2] The NSA amended the Public Health Service ("PHS") Act, enforced by the Department of Health and Human Services ("HHS"); the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor; and the Internal Revenue Code ("IRC"), enforced by the Department of the Treasury. Relevant provisions generally appear in triplicate and are identical in all material respects. For ease of reference, this brief cites the PHS Act and implementing regulations.

in an amount of their choosing, which the provider may dispute. *Id.* § 300gg-111(b)(1). To resolve disputes, the NSA establishes an open negotiation process, followed, if necessary, by arbitration.

### A.      The IDR Process

The statute prescribes a "baseball-style" arbitration process in which the provider and insurer submit their best and final offers for the amount each considers to be reasonable payment. *Id.* § 300gg-111(c)(5)(B), (C)(ii). Subparagraph (C) details the factors arbitrators "shall consider" in choosing between the parties' offers. One of those factors is the QPA "as defined" by the NSA "for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region." *Id*. § 300gg-111(c)(5)(C)(i)(I). Arbitrators also must consider "information on" five "[a]dditional circumstances" specified by Congress, as well as any other information the arbitrator requests or a party submits relating to its offer. *Id.* § 300gg-111(c)(5)(C)(i)(II). After "taking into account" these "considerations," the arbitrator must select one of the parties' offers as the payment amount. *Id*. § 300gg-111(c)(5)(A)(i).

Unfortunately, the Departments' initial implementation of the NSA's arbitration process materially deviated from Congress's design by "treat[ing] the QPA … as the default payment amount and impos[ing] on any provider attempting to show otherwise a heightened burden of proof that appears nowhere in the statute." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.* ("*TMA I*"), 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022); *see also LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.* ("*LifeNet I*"), No. 6:22-cv-162, 2022 WL 2959715 (E.D. Tex. Jul. 26, 2022). Following this Court's decisions in *TMA I* and *LifeNet I*, the Departments issued a new IDR rule—the subject of separate pending challenges[3]—under which arbitrators must

---

[3] *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.* ("*TMA II*"), No. 6:22-cv-00372 (E.D. Tex.); *LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.* ("*LifeNet II*"), No. 6:22-cv-373 (E.D. Tex.).

consider the QPA first and may not give weight to any other information unless, among other things, it is not "already accounted for by the" QPA. 87 Fed. Reg. 52,618, 52,652 (Aug. 26, 2022).

The QPA is therefore a required input into the process Congress created in the NSA for determining provider reimbursement. Under the statute, it is one of the enumerated factors that arbitrators must always consider. And under the Departments' regulations, it is given outsized importance, serving as a *de facto* benchmark rate. In fact, even before the IDR process begins, "many plans and issuers make initial payments that are equivalent to or are informed by the corresponding QPA for the item or service at issue." 87 Fed. Reg. at 52,625 n.29.

In short, for the negotiation and arbitration process to function as Congress intended, it is critical both that insurers calculate their QPAs correctly under the statute and that providers have meaningful information about the basis for insurers' QPA calculations.

### B.    QPA Definition, Methodology, and Disclosure

Conscious of the role QPAs may play in influencing the "out-of-network rate" that insurers pay to providers, Congress carefully defined the term QPA. The NSA provides two alternate definitions. First, in general, "[t]he term 'qualifying payment amount' means":

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market …) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished,

with annual inflation adjustments. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Second, when an insurer "does not have sufficient information to calculate the median of the contracted rates described in clause [(E)](i)(I)," QPA "means the rate" determined by reference to an independent database, such as a state all-payer claims database, reflecting "allowed amounts

paid to a health care provider or facility for relevant services furnished in the applicable geographic region." *Id.* § 300gg-111(a)(3)(E)(iii).

Congress directed the Departments to promulgate rules establishing "the methodology" that insurers "shall use to determine the [QPA]." *Id.* § 300gg-111(a)(2)(B)(i). Congress further commanded the Departments to establish through rulemaking "the information" that insurers "shall share" with providers when determining a QPA, as well as "a process to receive complaints of violations" of applicable requirements. *Id.* § 300gg-111(a)(2)(B)(ii), (iv). The complaint process must allow for complaints that a QPA calculated by an insurer violates the requirement that the QPA "satisf[y] the definition" of QPA laid out in the NSA. *Id.* § 300gg-111(a)(2)(A)(i)(II).

## II.      The Departments' Implementing Regulations and Guidance

### A.      The July Interim Final Rule

On July 1, 2021, the Departments issued the rule at issue here. 86 Fed. Reg. 36,872 (July 13, 2021). The July Rule is an interim final rule, and the Departments issued it without providing notice or an opportunity for interested parties to comment on the Departments' approach. As relevant here, the July Rule sets forth (1) the methodology for insurers to calculate QPAs, 45 C.F.R. § 149.140(a)–(c); *see* 86 Fed. Reg. at 36,888–98; and (2) the information insurers must disclose to providers about their QPA calculations, 45 C.F.R. § 149.140(d); *see* 86 Fed. Reg. at 36,898–99.

### 1.      The July Rule's QPA Methodology

First, in laying out the methodology for how insurers must calculate QPAs, the July Rule provides that "contracted rates," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), are "the total amount (including cost sharing) that a group health plan or health insurance issuer has *contractually agreed to pay* a participating provider, facility, or provider of air ambulance services for covered items and services," 45 C.F.R. § 149.140(a)(1) (emphasis added). Thus, although the NSA defines the QPA as the "median of the contracted rates" for an item or service "that is *provided* by a *provider*"

6

and "*provided* in the [same] geographic region," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added), the Departments' definition of "contracted rate" broadly encompasses all contracted rates, without regard to whether any item or service has ever been "provided" at that rate under that contract, *see* 86 Fed. Reg. at 36,889 (confirming that "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate … *regardless of the number of claims paid at that contracted rate*" (emphasis added)). The Departments did not explain their choice to define "contracted rate" to include rates for items and services not provided by the relevant provider (commonly known in the industry as "ghost rates").

Second, the rule defines the statutory phrase "provider in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), to mean "the practice specialty of a provider, *as identified by the plan or issuer consistent with the plan's or issuer's usual business practice*," 45 C.F.R. § 149.140(a)(12) (emphasis added). Under the rule, therefore, insurers must separate contracted rates by specialty only if "consistent with … [their] usual business practice," *id.*, despite the NSA's categorical mandate that a QPA is the median of contracted rates for an item or service provided "by a provider in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The Departments recognized that not all insurers "vary contracted rates by provider specialty" and "considered requiring a plan or issuer to calculate separate median contracted rates for every provider specialty," but opted against it. 86 Fed. Reg. at 36,891. They stated that they made this choice: (1) "to provide plans or issuers with the flexibility necessary to calculate the median contracted rate, relying on their contracting practices"; (2) to reduce the "burden associated with calculating the QPA"; and (3) to avoid "instances in which the plan or issuer would not have sufficient information to calculate the QPAs using its contracted rates." *Id.* With regard to the third justification, the Departments asserted that a "statutory goal" of the NSA is to limit the instances in which an

7

insurer "has insufficient information to calculate a median contracted rate." *Id.* at 36,888. While the NSA "specifies an alternative methodology for determining the QPA" in those instances, the Departments believed the statute "envisions that these alternative methodologies … will be used in only limited circumstances" and thus designed the rule to "generally seek to ensure that plans and issuers can meet the sufficient-information standard when determining the QPA and that use of alternative methodologies is minimized wherever possible." *Id.*

Third, the July Rule says that insurers must "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). The Departments recognized that insurers and providers sometimes agree that payments to providers will be "reconciled retrospectively to account for utilization, value adjustments, or other weighting factors that can affect the final payment" and sometimes "agree to certain incentive payments during the contracting process." 86 Fed. Reg. at 36,894. The Departments offered no textual basis for excluding such payments from the rates used to calculate QPAs, which Congress specified must be the "total maximum payment" recognized by the insurer. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Instead, the Departments contended that excluding such payments is "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process." 86 Fed. Reg. at 36,894. The Departments did not explain why, under the statute, typical calculation of cost-sharing obligations is relevant to calculating the total maximum payment under a contract.

Finally, the rule permits self-insured group health plans, "at the option of the plan sponsor," to decide to calculate QPAs using rates from the contracts of "all self-insured group health plans

*administered by the same entity* (including a third-party administrator contracted by the plan)." 45 C.F.R. § 149.140(a)(8)(iv) (emphasis added). As the Departments recognized, "many" such group health plans "are administered by entities other than the plan sponsor (such as a third-party administrator contracted by the plan)." 86 Fed. Reg. at 36,890. In these situations, a patient's health insurance can be provided by a self-insured health plan of, for example, the patient's employer, while the plan is administered by a different third-party entity. By permitting the plan sponsor to opt to calculate QPAs using "*all* self-insured group health plans *administered*" by that third-party entity, 45 C.F.R. § 149.140(a)(8)(iv) (emphasis added), the July Rule allows plan sponsors to use the contracted rates of *another* sponsor for purposes of calculating their own QPAs. The Departments permitted this despite the NSA's requirement that QPAs must be "determined with respect to all such plans *of such sponsor*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The Departments again offered no textual justification for their choice. Instead, they asserted that allowing this opt-in process would "reduce the burden imposed on sponsors of self-insured group health plans." 86 Fed. Reg. at 36,890. The Departments also said that they "anticipate" that under this approach, "there will be fewer instances where a self-insured group health plan sponsor will lack sufficient information to calculate a median contracted rate." *Id.*

### 2. The July Rule's Systematic Depression of QPAs

In the July Rule, the Departments concluded that Congress intended for QPAs to "reflec[t] market rates under typical contract negotiations." *Id.* at 36,889. Thus, according to the Departments' own telling, the QPA—whether calculated using median in-network rates or identified by selecting a median volume-weighted payment from an independent database—is supposed to serve

as one measure of typical negotiated market rates.[4] Yet, in establishing the QPA methodology, the Departments made a series of deliberate choices that not only violate the statute's clear text, but consistently drive down QPAs *below* "market rates under typical contract negotiations."

First, allowing insurers to include ghost rates drives down QPAs. Providers who do not provide a given item or service have little incentive to negotiate the reimbursement rate for that item or service. Dep'ts, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ("August 2022 FAQs"[5]) at 16 (FAQ 13). Ghost rates therefore are generally lower than they would be if providers had an incentive to meaningfully negotiate them, and can be as low as $0. August 2022 FAQs at 16 (FAQ 13). Including these artificially low rates in QPA calculations drives down the median rate, depressing QPAs.

Second, including out-of-specialty rates tends to drive down QPAs. For one thing, out-of-specialty rates are often ghost rates.[6] Many insurers "establish contracted rates by offering most providers the same fee schedule for all covered services, and then it is up to the providers to negotiate increases to the rates for the services that they are most likely to bill." August 2022 FAQs at 16 (FAQ 14). Therefore, for example, a primary care physician may have contracted rates for radiology services, even though the primary care physician does not provide those services, and therefore did not meaningfully attempt to negotiate those rates with the insurer. *See* August 2022 FAQs at 16 (FAQ 14). Including such rates when determining QPAs for radiology services therefore skews the QPAs away from market rates. Even if a provider in a different specialty provides

---

[4] The Act does not, however, "trea[t] the QPA as a proxy for the in-network price," let alone as a "proxy for the out-of-network price." *TMA I*, 87 F. Supp. 3d at 543 n.4.

[5] *Available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

[6] *See* Compl., *LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.* (*LifeNet III*), 6:22-cv-00453-JDK, ¶¶ 54–55 (Dec. 1, 2022).

a service occasionally, but not frequently, the provider is likely to prioritize negotiating rates for the provider's high-volume services, meaning that the provider's rate for a low-volume service is likely to be well below the market rate for the service when provided by specialists who frequently provide it. *See* August 2022 FAQs at 16 (FAQ 14). Including out-of-specialty rates therefore drives down QPAs below market rates for specialties most likely to provide an item or service.

Third, excluding "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" from QPA calculations generally depresses QPAs. 45 C.F.R. § 149.140(b)(2)(iv). Providers often negotiate for shared savings payments made later in time. In these arrangements, the provider typically accepts a *lower* fixed per-service rate with the expectation that it will earn at least some additional, incentive-based payments. If the provider did not believe it would earn the additional, incentive-based payments, then the provider would demand a higher fixed per-service rate. These later-in-time payments can account for a significant portion of the rate an insurer ultimately pays a provider for a particular item or service. The Departments' decision to exclude "incentive-based or retrospective payments or payment adjustments" from QPA calculations therefore tends to depress QPAs.

Finally, by giving self-insured group health plans the option to use either rates from only their own plans or rates from all plans administered by their third-party administrator to calculate QPAs, the Departments allowed self-insured group health plans to pick whichever method leads to lower QPAs on balance. These plans can be expected to opt into their third-party administrator's group calculation if it generally serves to lower their applicable QPAs. Again, this lowers QPAs.

The Departments did not address how each of their choices regarding the QPA methodology depresses QPAs or how their choices are consistent with their own understanding that QPAs should "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889.

### 3.     The July Rule's Disclosure Requirements

The July Rule also addressed the NSA's command to the Departments to establish through rulemaking the "information" that an insurer "shall share with the nonparticipating provider or nonparticipating facility" when determining a QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(ii).

In the preamble, the Departments "recognize[d]" that providers "need transparency regarding how the QPA was determined." 86 Fed. Reg. at 36,898. Specifically, they acknowledged that understanding how the QPA was calculated is "important in informing the negotiation process," and that in order to "decide whether to initiate the IDR process and what offer to submit," providers "must know not only the value of the QPA, but also certain information on how it was calculated." *Id.* The Departments thus claimed that the disclosures required by the rule sought "to ensure transparent and meaningful disclosure about the calculation of the QPA." *Id.*

Nonetheless, again citing their goal of "minimizing administrative burdens on plans and issuers," *id.*, the Departments required insurers to provide only minimal information about their QPA calculations. Under the July Rule, when an insurer sends a provider or facility an initial payment or notice of denial of payment, the only information the insurer must provide about the QPA is (1) the QPA as determined by the insurer (without any underlying calculations) and (2) a statement certifying that the QPA applies and "was determined in compliance with" the methodology in the July Rule. 45 C.F.R. § 149.140(d)(1); *see also* 86 Fed. Reg. at 36,933.[7] At a provider's request, the insurer must provide additional limited information: (1) whether the QPA included contracted rates that were not on a fee-for-service basis and whether the QPA for those items or services was determined using underlying fee schedule rates or a derived amount; (2) if the plan

---

[7] The insurer must also provide information about the availability of the negotiation period and the IDR process, as well as contact information. 45 C.F.R. § 149.140(d)(1).

or issuer used an eligible database to determine the QPA, information to identify which database was used; (3) if a related service code was used to determine the QPA for a new service code, information to identify the related service code; and (4) if applicable, a statement that the plan's or issuer's contracted rates include risk-sharing, bonus, or other incentive-based or retrospective payments or payment adjustments for covered items and services that were excluded for purposes of calculating the QPA. 45 C.F.R. § 149.140(d)(2); *see also* 86 Fed. Reg. at 36,933.[8]

Insurers are not required to disclose the "contracted rates recognized by the plan or issuer" that were used in determining the median rate, or the "specialt[ies]" of the providers who contracted for those rates. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Nor do insurers have to disclose whether they calculated the median rate using plans of the plan sponsor or rates of other self-insured group health plans administered by the same third-party administrator. And while insurers must disclose upon request whether they excluded incentive-based or retrospective payments from the rates used, they are not required to disclose the amount of those excluded payments.

The Departments did not explain how the minimal disclosures their rule requires provide the "transparency" that they themselves recognized is "need[ed]." 86 Fed. Reg. at 36,898. They also did not grapple with the need to provide enough information to allow providers to discover and articulate the basis for a complaint under the complaint process created by the NSA. Specifically, the Departments are required to establish a process for receiving complaints, 42 U.S.C. § 300gg-111(a)(2)(B)(iv), including complaints that an insurer has violated the NSA's requirement that the QPA be calculated in a way that "satisfies the [statutory] definition" of the QPA, *id.*

---

[8] In a later rule, the Departments added a QPA-disclosure requirement applicable only when a QPA is calculated "based on a downcoded service code or modifier"—that is, one "alter[ed]" by an insurer to a new code "associated with a lower [QPA] than the service code or modifier billed by the provider." 45 C.F.R. § 149.140(a)(18), (d)(1)(ii). In this situation, the Departments require the insurer to disclose certain information related to the downcoding. *Id.*

§ 300gg-111(a)(2)(A)(i)(II), *id.* § 300gg-111(a)(2)(B)(iv). The Departments did not consider the complaint process at all in establishing the information insurers must disclose.

### B.    The August 2022 FAQs

In August 2022, the Departments issued a set of Frequently Asked Questions ("FAQs") addressing aspects of the July Rule. There, the Departments acknowledged that the rule allows insurers to include rates for services that "providers do not provide." August 2022 FAQs at 17 (FAQ 14). And they noted "concerns that the inclusion of these rates in the calculation of QPAs may artificially lower the QPA, as these providers have little incentive to negotiate fair reimbursement rates for these service[s]" and sometimes accept "$0 as their rate." *Id.* at 16 (FAQ 13). The Departments concluded that insurers "should not include $0 amounts in calculating median contracted rates." *Id.* at 17 n.29 (FAQ 14). But they did not prohibit insurers from including other non-negotiated rates that are artificially low, if not quite $0, because the services are never actually provided by the providers whose contracted rates form the basis for insurers' QPA calculations.

The FAQs also elaborated on when the Departments believe QPAs should be calculated using only rates associated with the same or similar specialty. The Departments recognized that some insurers "establish contracted rates by offering most providers the same fee schedule for all covered services," and then leave it "up to the providers to negotiate increases to the rates for the services that they are most likely to bill." *Id.* at 16 (FAQ 14). Yet all rates, including for services not provided, "may be included in the provider contract." *Id.* Thus, "an anesthesiologist's contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services)." *Id.* at 17  (FAQ 14). To address the reality that such rates are likely to be lower than contracted rates for providers in the relevant specialty, the Departments stated that insurers must calculate "separate median contracted rates" for different specialties not only when they expressly vary their contracted rates by specialty, but also "when the plan's or issuer's

14

contracting process unintentionally results in contracted rates that vary based on provider spe-cialty." *Id.* According to the Departments, contracted rates "vary based on provider specialty if there is a material difference in the median contracted rates … between providers of different specialties, after accounting for variables other than provider specialty." *Id.* The Departments left it to insurers to determine when a difference in median contracted rates is "material" based on "all the relevant facts and circumstances." *Id.* The Departments acknowledged that insurers "may have not understood the July 2021 interim final rules to require the calculation of separate median con-tracted rates" in these circumstances and gave insurers 90 days to recalculate their QPAs. *Id.*

The FAQs also reiterated that "to reduce burden on self-insured group health plans," the July Rule permits the plans' sponsors to "allow their [third-party administrators] to determine the QPA on behalf of the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the [administrator], as opposed to only those of the particular plan sponsor." *Id.* at 18 (FAQ 15).

Finally, the FAQs state that "[i]t is not the responsibility of a provider, facility, provider of air ambulance services, or certified IDR entity to verify a QPA's accuracy, and plans and issuers are not obligated to demonstrate that a QPA was calculated in accordance with the [applicable regulations] unless required to do so by an applicable regulator." *Id.* at 16 (FAQ 13). If a provider has "concerns about a plan's or issuer's compliance," the provider may "submit a complaint." *Id.* The Departments did not explain how providers could discover concerns or support a complaint about a QPA calculation without access to the bases of insurers' QPA calculations.

## **LEGAL STANDARDS**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In the context of a challenge under the APA, '[s]ummary judgment is the proper mechanism for

deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)); *see, e.g.*, *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 459–60 (5th Cir. 2020). Under the APA, courts will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

In assessing an agency's statutory interpretation, courts must first determine whether Congress authorized the agency "to speak with the force of law" with regard to the issue at hand. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). If so, then courts evaluate the agency's interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, courts "must give effect to the unambiguously expressed intent of Congress," *id.* at 843, deferring to the agency's interpretation only if "the statute is 'truly ambiguous' on the question" at hand and the agency's interpretation is a "permissible construction," *Gulf Fishermens Ass'n*, 968 F.3d at 460. Here, as discussed below, the challenged provisions are not entitled to *Chevron* deference, both because the statute unambiguously precludes the Departments' rules and because the rules are not a permissible construction of the NSA.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Although this standard is deferential and a court must not "substitute" its own "policy judgment for that of the agency," *id.*, arbitrary-and-capricious review "is not toothless," *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "In fact, … it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). Agency action must be set aside if the

agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Further, a court cannot uphold a rule based on grounds not given by the agency in the rule. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Dish Network Corp. v. NLRB*, 953 F.3d 370, 379–80 (5th Cir. 2020).

## ARGUMENT

The challenged portions of the July Rule and the August 2022 FAQs are unlawful. The Departments' QPA methodology rules conflict with the statute's unambiguous terms and therefore fail at *Chevron* step one. They also fail at *Chevron* step two and are arbitrary and capricious because they do not permissibly interpret the term "QPA," as Congress defined it in the NSA. Likewise, the Departments' QPA disclosure rules are arbitrary and unreasonable because they prevent providers from effectively utilizing the Act's complaint and IDR processes. And, in multiple respects, the challenged provisions flunk the APA's requirements of reasoned decisionmaking.

## I.     The July Rule And August 2022 FAQs Are Not In Accordance With Law.

### A.     The challenged provisions conflict with the NSA's unambiguous terms.

The statutory analysis here "begins where all [interpretive] inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989). Because the NSA's definition of the term "QPA" is clear and unambiguous, the statutory language is "also where the inquiry should end." *Id.* "[F]or where … the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Id.*; *see also Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 234 (5th Cir. 2019) ("[W]hen legal texts are unambiguous, as these are, courts should stand firm and decide, not tiptoe lightly and defer."). Because the method for calculating QPAs in the July Rule conflicts with the statute's plain language, the challenged provisions of the

17

rule violate the cardinal rule of administrative law that an "agency may not rewrite" or "revise clear statutory terms." *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 327–28 (2014).

The Departments' rule is inconsistent with the NSA's text in four critical ways: (1) it tells insurers to include in QPA calculations rates for items and services that *were not* "provided," despite the NSA's requirement that QPAs be calculated using rates that *were* "provided"; (2) it instructs insurers to separately calculate rates by specialty "*only*" in certain situations, although the NSA requires insurers to *always* calculate QPAs based on the rates of providers "in the same or similar specialty"; (3) it requires insurers to exclude "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" from rates used in calculating QPAs, despite the NSA's requirement that each rate used in a QPA calculation be "the total maximum payment … under such plans or coverage"; and (4) it allows self-insured group health plans to calculate QPAs "using the contracted rates recognized by all self-insured group health plans administered by the [plan's] third-party administrator (not only those of the particular plan sponsor)," while the NSA says that QPAs must be "determined with respect to all such plans *of such sponsor*." In each of these respects, the July Rule violates the "core administrative-law principle that [the Departments] may not rewrite clear statutory terms to suit [their] own sense of how the statute should operate." *TMA I*, 587 F. Supp. 3d at 541 (quoting *Util. Air*, 573 U.S. at 328).

### 1.    Including ghost rates violates the Act.

The July Rule tells insurers to *include* rates in QPA calculations that the plain text of the NSA requires them to *exclude*. The NSA requires each QPA to be derived from "contracted rates" for only those items and services that are "*provided* by a provider" and "*provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). Yet the July Rule defines "contracted rate" to encompass contracted rates without regard to whether the relevant item or service was ever "provided" under that contract. Specifically, the rule defines "contracted rate" broadly as

18

"the total amount (including cost sharing) that a group health plan or health insurance issuer has *contractually agreed to pay* … for covered items and services." 45 C.F.R. § 149.140(a)(1) (emphasis added). The rule's preamble clarifies that "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate … *regardless of the number of claims paid at that contracted rate*." 86 Fed. Reg. at 36,889 (emphasis added). Thus, under the Departments' rules, even if no service has been provided and no claim has been paid under a contract, the contract's rate for that service factors into the QPA calculation.

The Departments acknowledged in the August 2022 FAQs that the July Rule allows insurers to include rates for items and services that "providers do not provide." August 2022 FAQs at 17 (FAQ 14). The Departments' solution—instructing that insurers "should not include $0 amounts in calculating median contracted rates," *id.* at 17 n.29 (FAQ 14)—is not sufficient to bring the Departments' rule in line with the NSA's text, because the Departments still failed to prohibit insurers from including other, not-quite-$0, ghost rates. The NSA's plain text prohibits insurers from including *any* rates for items or services that were not provided, whether those rates are $0 or some other amount. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). And the July Rule cannot permit what the NSA prohibits. *See TMA I*, 587 F. Supp. 3d at 542 (holding that the Departments violated the statute by "impermissibly 'rewrit[ing] statutory language'" (quoting *Texaco Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001)); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (an agency may not "alter" a statute's clear terms).

### 2.    Including rates for providers in different specialties violates the Act.

The NSA requires insurers to *always* calculate QPAs based on the rates of providers "in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Yet the July Rule instructs insurers to separately calculate rates by specialty "*only* where the [insurer] otherwise varies its contracted rates based on provider specialty," 86 Fed. Reg. at 36,891 (emphasis added), as part of

its "usual business practice," 45 C.F.R. § 149.140(a)(12). In the August 2022 FAQs, the Departments continued to provide that insurers can ignore the NSA's "same or similar specialty" requirement except in certain circumstances: if they (1) "purposefully" vary "contracted rates based on provider specialty," or (2) determine that "there is a material difference in the median contracted rates … between providers of different specialties." August 2022 FAQs at 16–17 (FAQ 14).

The FAQs' statement that insurers must calculate QPAs using in-specialty rates when there are "material differences" between the rates of providers by specialty narrows the scope of the statutory violation, but it does not eliminate it. Under the NSA, a QPA is the median of contracted rates for an item or service provided "by a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The statute contains no exception to this requirement for cases where an insurer unilaterally determines that there is no "material difference" between different specialties' median contracted rates. The Departments were not free to create such an exception from "whole cloth." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (finding statutory language was unambiguous and mandatory where "[t]he text … ha[d] no exceptions"); *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 744 (D.C. Cir. 1986) (where statutory definition did not have exception, agency was not permitted to create an exception by regulation).

### 3.    Excluding certain components of contracted rates violates the Act.

Under the NSA, each contracted rate in a QPA calculation must be based on "the total maximum payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). "Total" means "[c]onstituting or comprising a whole; whole, entire." *Oxford Eng. Dict. Online* (Dec. 2022 ed.). And "maximum" is the "highest value or extreme limit," the "greatest value which a variable or function takes," or the "highest possible magnitude or quantity of something which is attained, attainable, or customary." *Id.* According to the plain meaning of these terms, the rates

included in a QPA calculation must be the "entire" amount of the "highest" payment for an item or service available under a contract. *See Taniguchi v. Kan Pac. Sai Pan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

The July Rule, however, requires insurers *not* to use the total maximum payment. Instead, when a contracted rate includes "risk sharing, bonus, penalty, or other incentive-based or retro-spective payments or payment adjustments," the Departments commanded that these amounts be subtracted from the rate included in the QPA. 45 C.F.R. § 149.140(b)(2)(iv). The Departments offered no textual basis—because there is none—for excluding such payments from the contracted rates used to calculate QPAs. Here again, the rule directly conflicts with the NSA's plain terms by creating an exception to the unqualified statutory command. *See Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022) ("When a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down.").

### 4. Aggregating contracted rates across plan sponsors violates the Act.

Finally, the NSA says that the QPA must be "determined with respect to all such plans *of such sponsor* or all such coverage offered by such issuer that are offered within the same insurance market." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). According to the statute's plain terms, therefore, each plan sponsor must use only its *own* contracted rates when calculating QPAs, and multiple plan sponsors cannot aggregate their contracted rates to generate one QPA. However, the July Rule allows self-insured group health plans to instead "allow their third-party administra-tors to determine the QPA for the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)." 86 Fed. Reg. at 36,890; *see also* 45 C.F.R. § 149.140(a)(8)(iv). This too is directly contrary to the NSA's text and cannot stand.

**B.      The challenged provisions are unreasonable and arbitrary and capricious.**

Even if the challenged provisions were not expressly foreclosed by the NSA, they are still unlawful because they do not reasonably construe the NSA, do not "reasonably effectuate Congress's intent," *Texas v. United States*, 497 F.3d 491, 506 (5th Cir. 2007), and are arbitrary and capricious, *see Sw. Elec.*, 920 F.3d at 1028–29 ("Because *Chevron* step two and the APA share the arbitrary and capricious standard, … analysis under the two standards proceeds similarly" or has "complete overlap" (cleaned up)); *see also Judulang v. Holder*, 565 U.S. 42, 53 n.7 (2011).

**1.      The challenged provisions unreasonably depress QPAs.**

According to the Departments themselves, Congress intended for QPAs to reflect one measure of negotiated market rates, whether the QPA is calculated using median rates or identified by selecting a median volume-weighted payment from an independent database. *See* 86 Fed. Reg. at 36,889 (describing the Act's "statutory intent" as "ensuring that the QPA reflects market rates under typical contract negotiations"). Yet the Departments created a methodology for calculating QPAs that consistently depresses them to well below market rates. *See supra*, at 9–11. For example, the Departments' exclusion of incentive-based payments keeps QPAs from "reflect[ing] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. In a "typical contract negotiation," a provider would demand higher fixed per-service rates if the provider understood that it would not be reimbursed based on "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." *Id.* at 36,894. The Departments ignored this, instead pretending that incentive-based payments did not matter to the providers who negotiated for them, and that those providers would have agreed to forgo those payments without demanding higher fixed per-service rates in return. This is not a rational analysis. It was unreasonable for the Departments to create a methodology that undermines the very purpose they believe Congress intended the methodology to achieve. *See Texas*, 497 F.3d at 506.

Indeed, for the most part, the Departments entirely failed to consider whether the choices they made would lead to QPAs that reflect market rates. This failure on its own dooms the Departments' decisions. *See Wages*, 16 F.4th at 1138 (holding that "omission" of discussion of a relevant factor "alone likely renders [agency] decision arbitrary and capricious" (cleaned up)); *see also Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 209–10 (D.C. Cir. 1988) (agencies must "come to grips with the obvious ramifications of [their] approach and address them in a reasoned fashion").

When the Departments did finally acknowledge the issue, at least with respect to ghost rates, in the FAQs, they failed to grapple with it. Specifically, while they acknowledged "stakeholder concerns that the inclusion of [ghost] rates in the calculation of QPAs may artificially lower the QPA," they responded by excluding only $0 rates, despite recognizing that the problem is broader. *See* August 2022 FAQs at 16 (FAQ 13) (acknowledging that "providers accept contracted rates … that they are not likely to bill or that are not utilized by their specific provider specialty" and recognizing concerns that "these providers have little incentive to negotiate fair reimbursement rates for these service codes, with some even accepting $0 as their rate for codes they do not utilize"). Failure to meaningfully grapple with stakeholders' concerns ran afoul of the APA. *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (an "agency violates the arbitrary-and-capricious standard if it fails to respond to significant points" (cleaned up)).

Further, Congress did not intend to create a system in which providers would be systematically undercompensated. As the Departments have elsewhere recognized, undercompensation of providers may "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021).  Yet the Departments'

methodology has led to reimbursement rates that threaten providers' viability, again unreasonably undermining what the Departments understand to be Congress's goals.

## 2.   The Departments' purported justifications are unreasonable.

The Departments' attempts to justify the challenged provisions fell well short of their obligation to "reasonably effectuate Congress's intent," *Texas*, 497 F.3d at 506,  and to "reasonably explai[n]" their choices, *Prometheus,* 141 S. Ct. at 1155.

To start, the Departments made no effort to defend their decision to include ghost rates in QPA calculations. Agencies always have an obligation to provide an adequate explanation for their actions. Yet the Departments failed to even acknowledge the statutory text stating that QPAs are the median of rates for an item or service that has been "provided," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), much less explain how incorporating ghost rates into QPAs could possibly "compor[t] with" that statutory command, *Texas v. Biden*, 20 F.4th 928, 992 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022) (finding agency action arbitrary and capricious for failure to explain action's consistency with statute).

The Departments gave perfunctory explanations for other challenged provisions, but each is unreasonable and inadequate. First, they invented a statutory purpose that Congress did not share and invoked that purpose as a justification for rules that conflict with the text of the statute Congress enacted. According to the Departments, the NSA "envisions" that the alternative methodology for determining QPAs "will be used in only limited circumstances." 86 Fed. Reg. at 36,888. But Congress said simply that where there is insufficient information, QPAs *are* derived from an independent database. 42 U.S.C. § 300gg-111(a)(3)(E)(ii), (iii). It did not state that using databases should be avoided or otherwise indicate any preference against that methodology. Unsurprisingly, then, the Departments offered no statutory evidence—indeed, they offered no support at all—for their view that use of independent databases should be "minimized." 86 Fed. Reg. at 36,888. The

24

conclusory nature of their reasoning is itself arbitrary and unreasonable. *See Wages*, 16 F.4th at

1137 (rejecting agency explanation as "conclusory, unsupported, and thus wholly insufficient").

Worse still, the Departments unlawfully prioritized their imagined statutory goal over the

NSA's text. Although the statute commands that QPAs be based on specialty-specific rates and on

the plans of the sponsor alone, the Departments allowed insurers to include rates for providers

outside the same or similar specialty and to aggregate rates across sponsors, in service of *their*

wish to "minimiz[e] wherever possible" the use of "alternative methodologies" for calculating

QPAs.  86 Fed. Reg. at 36,888, 36,890. The Departments were transparent about this: they "con-

sidered requiring a plan or issuer to calculate separate median contracted rates for every provider

specialty," but ultimately "concluded that this approach" (*i.e.*, the approach of following the stat-

utory text) "would lead to more instances in which the plan or issuer would not have sufficient

information to calculate the QPAs using its contracted rates." *Id.* at 36,891. The Departments'

"[p]olicy considerations cannot override … the text and structure of the Act." *Cent. Bank of Den-*

*ver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994). The Departments are

"bound" not by their own sense of how the statute should operate, but by the text that Congress

enacted into the law and "by the means *it* has deemed appropriate, and prescribed, for the pursuit

of th[e statute's] purposes." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994).

Second, the Departments stated that the challenged provisions were designed to provide

plans with "flexibility" and to reduce the "burden associated with calculating the QPA." 86 Fed.

Reg at 36,888. The Departments pointed to nothing in the NSA indicating that Congress was con-

cerned with the effort insurers would need to expend to comply with the statute's methodology for

calculating QPAs, and the Departments' own desire to make the process easier for insurers is not

a legitimate justification for departing from Congress's clear instructions. The Departments apparently believed that it was. They: (1) allowed insurers to mix different specialties within the same QPA calculation "to provide plans or issuers with … flexibility," 86 Fed. Reg. at 36,891, despite the statute's command that QPAs be determined based on specialty-specific rates; (2) permitted insurers to calculate QPAs across all health plans administered by the same entity to "reduce the burden imposed on sponsors of self-insured group health plans," *id.* at 36,890, despite the statute's instruction that QPAs be calculated for each plan sponsor; and (3) excluded incentive-based and retrospective payments from QPAs because doing so is "consistent with how cost sharing is typically calculated" by insurers for "in-network items and services," *id.* at 36,894, despite the statute's mandate that the QPA reflect the "total maximum payment" the insurer agreed to pay the provider. Reducing burdens on regulated parties may sometimes be a laudable goal, but it is not one that may be pursued at the expense of compliance with the fundamental obligation to "enforce" the statute "according to its terms." *Ron Pair Enters.*, 489 U.S. at 241.

The Departments did not dig themselves out of the hole with the August 2022 FAQs. For one, they doubled down on their flawed reasoning that aggregating rates across plan sponsors was permitted "to reduce burden on self-insured group health plans." August FAQs at 18 (FAQ 15). And their clarifications to the July Rule regarding same or similar specialty rates only underscore the rule's arbitrariness. Although the Departments did not say so clearly the first time, *see* August FAQs at 17 (FAQ 14) (implicitly acknowledging this), they explained in the FAQs that insurers must calculate separate rates when their process "unintentionally results" in rates that are "material[ly] different" by specialty, *id.* The Departments did not explain how that determination would work, or even what a "material difference" is. The Departments also asserted that, under the July Rule, $0 ghost rates do not "represent a contracted rate" and should not be included in QPAs. *Id.*

at 17 n.29. The Departments did not explain why $0 ghost rates, but not other ghost rates, are not "contracted rates," despite recognizing that *all* ghost rates may be artificially low because providers "have little incentive to negotiate fair reimbursement" for such rates. *Id.* at 16 (FAQ 13). "Only [the Departments'] fiat supports" treating these two types of ghost rates differently. *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). Unexplained inconsistency and illogical and shifting policies are "characteristic of arbitrary and unreasonable agency action." *Id.*

## II.     The Departments' Disclosure Rule Is Neither Reasonable Nor Reasonably Explained.

The Departments' regulations relating to the information insurers must disclose are also substantively and procedurally unreasonable. The NSA mandates that the Departments issue rules establishing the information insurers "shall share with the nonparticipating provider or nonparticipating facility" when determining the QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(ii). These disclosures serve several crucial purposes under the statute. But the barebones disclosures the Departments decided to require are insufficient to serve any of those purposes. And the Departments failed to even consider whether they were sufficient, let alone to reasonably explain their decision.

### A.     Meaningful disclosures are necessary.

First, meaningful disclosures are crucial to the NSA's negotiation and arbitration process. As the Departments recognized, absent "transparency regarding how the QPA was determined," providers are ill equipped to assess "whether to initiate the [arbitration] process" or "what offer to submit." 86 Fed. Reg. at 36,898. And providers need meaningful insight into QPAs to effectively advocate before the arbitrator, especially when (as is common) the insurer offers the QPA. *See* 87 Fed. Reg. at 52,625 n.29. A provider might suspect that a QPA was not correctly calculated, or was calculated based on rates that were rarely paid, such that they are not reliable indicators of market value. But the provider has no way of credibly introducing this to the arbitrator because,

under the Departments' disclosure requirements, the QPA is a black box into which only the insurer can see. *See* 86 Fed. Reg. at 36,889. Arbitrators—who by statute *must* consider the QPA "as defined in" the Act, 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I)—are similarly hamstrung. *See* 86 Fed. Reg. at 36,898; *see also* Compl. at ¶ 93, *LifeNet III*, Dkt. 1.

Second, Congress required the Departments to set up a "process to receive complaints" that insurers "violat[ed]" the requirement to calculate QPAs in accordance with the NSA's terms. *Id.* § 300gg-111(a)(2)(B)(iv); *see also id.* § 300gg-111(a)(2)(A)(i)(II). The Departments may audit an insurer on the basis of such a complaint. *Id.* § 300gg-111(a)(2)(A)(ii)(II). To make this complaint process meaningful, providers must receive sufficient information to determine whether a QPA calculated by an insurer "satisfies the definition" of QPA in the NSA. Providers cannot evaluate whether a QPA was calculated correctly if they are given only the insurer's say-so. Particularly with HHS performing only *nine* audits of QPAs per year, *see* 86 Fed. Reg. at 36,935, and with the Departments *still* having failed to finalize audit regulations that were due in October 2021, *see* 42 USC 300gg-111(a)(2)(A)(i), providers' ability to meaningfully evaluate insurers' QPA calculations and file complaints is a crucial check on those calculations. Yet the complaint process is toothless when providers are given no information about how insurers calculated their QPAs.

### B.     The Departments' disclosure rule requires no meaningful disclosures.

Despite acknowledging the importance of transparency, the Departments promulgated regulations that fail to require insurers to divulge even the most basic information about their secret QPA calculations. For example, insurers are not required to disclose (1) each rate that was included in the QPA; (2) the specialty of the provider who agreed to that rate; (3) the number of times that rate was *actually paid* by the insurer; or (4) the amount of any incentive payments excluded from the rates. *See also, e.g.*, Compl., *LifeNet III*, ¶ 91 (listing additional missing information, including relevant geographic region and insurance market).

The Transparency in Coverage Act now requires insurers to publish data on *current* in-network rates, including the names of providers and their specialty codes.[9] The Davanzo Declaration, an exhibit to the air-ambulance plaintiffs' complaint, 22-cv-00453, Dkt. 1-1, contains an analysis of one insurer's rate data made public as the result of this Act. Yet the Departments' regulation fails to require insurers to provide any data on the *2019* rates insurers must use to calculate QPAs.

### C.   Failure to require meaningful disclosures was unreasonable.

The Departments acted unreasonably in requiring that insurers make essentially no disclosures regarding their QPA calculations, certainly none that would achieve the purposes apparent from the NSA's text and structure. It was patently unreasonable for the Departments to issue regulations that do not do what even the Departments believe they must do: give providers the "transparency" necessary to assess "whether to initiate the [arbitration] process" or "what offer to submit." 86 Fed. Reg. at 36,898; *Cigar Ass'n v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (invalidating action that likely would not have the impact Congress mandated). And it was unreasonable to gut the NSA's complaint process: providers cannot meaningfully access that process if, as is true under the Departments' rules, insurers are required to reveal nothing of substance about their QPAs.

Compounding the problem, the Departments failed to meaningfully grapple with this fundamental "aspect of the problem." *Cigar Ass'n*, 964 F.3d at 61. Rather than addressing whether disclosures would provide the necessary transparency, the Departments engaged in rulemaking by "ipse dixit," asserting that this was so. *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020). And they neglected to consider any alternative to the minimalist approach to disclosures they adopted. These flaws are fatal. *See Tice-Harouff v. Johnson*, No. 6:22-cv-201-

---

[9] *See* 45 C.F.R. § 147.211(b)(1)(iii); FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 49 (Aug. 20, 2021), *available at* https://perma.cc/B7L7-QEKM; D. Gordon, *New Healthcare Price Transparency Rule Took Effect July 1, But It May Not Help Much Yet*, Forbes.com, July 3, 2022, *available at* https://perma.cc/3YHP-TQQQ.

JDK, 2022 WL 3350375, at *11 (E.D. Tex. Aug. 12, 2022) (Kernodle, J.). The only justification the Departments gave was, again, to "minimiz[e] administrative burdens on plans and issuers." 86 Fed. Reg. at 36,898. And, once again, the Departments' desire to ease the burden on insurers cannot justify their unreasonable rules or excuse their failure to reasonably explain their choices.

## III.     The Challenged Provisions Should Be Declared Unlawful, Vacated In Part, And Remanded For Further Rulemaking Consistent With The NSA And APA.

As in *TMA I*, "vacatur of the challenged portions of the [July] Rule" relating to the QPA methodology, along with the challenged portions of the FAQs, "is the appropriate remedy." *TMA I*, 587 F. Supp. 3d at 548. The "seriousness of the deficiency weighs heavily in favor of vacatur." *Id.* And because the challenged provisions "conflic[t] with the unambiguous terms of the Act in several key respects," the Departments cannot "rehabilitate or justify" them on remand. *Id.* The Court should thus vacate the challenged provisions as set forth in the attached proposed order.

The Court should also declare that arbitrators may not consider any QPA affected by the unlawful provisions. The NSA instructs arbitrators to consider QPAs "as defined in subsection (a)(3)(E)." 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). QPAs affected by the errors described above are not QPAs "as defined in" the Act and cannot inform the IDR process.

The Court should not, however, vacate the QPA disclosure regulations. Otherwise there would be no required disclosures until a replacement rule issued. Instead, the Court should declare that the Departments violated the APA in issuing the regulations and remand for further rulemaking with regard to insurers' QPA disclosure obligations, consistent with the NSA and APA.

## CONCLUSION

The Court should declare the challenged provisions unlawful, vacate them in part as set forth above, and remand the QPA disclosure regulations for further rulemaking.

Dated:  January 17, 2023

Respectfully submitted,

/s/ *Eric D. McArthur*

Eric D. McArthur (*pro hac vice*)
emcarthur@sidley.com
Brenna E. Jenny (*pro hac vice*)
bjenny@sidley.com
Jillian Stonecipher (*pro hac vice*)
jstonecipher@sidley.com
Madeleine Joseph† (*pro hac vice*)
mjoseph@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8018
Fax: (202) 736-8711

Penny P. Reid
Texas Bar No. 15402570
preid@sidley.com
Kelsey M. Taylor
Texas Bar No. 24098507
ktaylor@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Tel: (214) 981-3413
Fax: (214) 981-3400

Jaime L.M. Jones (*pro hac vice*)
jaime.jones@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036

†Admitted only in Massachusetts; pending approval of application for admission to the D.C. Bar, practicing law in the District of Columbia under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system on January 17, 2023.

/s/ *Eric D. McArthur*
Eric D. McArthur