IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., *Plaintiffs*, v. U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., *Defendants*. | Civ. Action No. 6:22-CV-00450-JDK Lead Consolidated Case |

**BRIEF OF *AMICUS CURIAE* AMERICAN MEDICAL ASSOCIATION**

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................. 1

INTRODUCTION ........................................................................................................... 3

ARGUMENT .................................................................................................................... 4

    I.    THE DEPARTMENTS' JULY RULE DEPRESSES THE QPA BELOW MARKET RATES IN CONTRAVENTION OF THE STATUTORY TEXT AND CONGRESSIONAL INTENT ...................... 4

        A.    Congress Intended The QPA To Reflect Market Rates ................ 4

        B.    The July Rule Impermissibly Allows "Contracted Rates" To Include Services That Are Never Provided ............................. 7

        C.    The July Rule Unlawfully Permits Insurers To Decide Whether To Separate Rates By Provider Specialty .................... 10

    II.    THE JULY RULE HARMS PATIENTS AND PROVIDERS ................ 11

CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES:**

*Estate of Cowart v. Nickols Drilling Co.*,
    505 U.S. 469 (1992) ............................................................................................... 6

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ........................................................................................... 8

*National Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................... 5

*Texaco Inc. v. Duhe*,
    274 F.3d 911 (5th Cir. 2001) ............................................................................ 8, 10

**STATUTES AND REGULATIONS:**

42 U.S.C.
    § 300gg-111(a)(1)(C)(ii) ........................................................................................ 5
    § 300gg-111(a)(3)(E)(i)(I) ............................................................................ 5, 6, 10
    § 300gg-111(a)(3)(E)(i)(II) ........................................................................... 5, 6, 10
    § 300gg-111(a)(3)(E)(iv) ....................................................................................... 6
    § 300gg-111(c)(5)(C)(ii)(II) ................................................................................... 6
    § 300gg-117(c)(1)(A) ............................................................................................. 5

45 C.F.R.
    § 149.140(a)(1) ...................................................................................................... 7
    § 149.140(a)(12) .................................................................................................. 10

**OTHER AUTHORITIES:**

86 Fed. Reg. 36,872 (July 13, 2021) ............................................................... 6, 7, 8, 10

AHA, *Fact Sheet: Underpayment by Medicare and Medicaid* (Feb.
    2022) .................................................................................................................... 13

Avalere Health, *PCP Contracting Practices and Qualified Payment
    Amount Calculation Under the No Surprises Act* (Aug. 2, 2022) .......................... 9

KaufmanHall, *The Current State of Hospital Finances: Fall 2022
    Update* (prepared at the request of Am. Hosp. Ass'n) (2022) .............................. 14

Letter from American College of Emergency Physicians to Members of
    the North Carolina Congressional Delegation (Dec. 9, 2021) ........................ 13, 14

Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980
   (Oct. 7, 2021) .................................................................................................. 15

Tepper, Nona, *Coming to a contract negotiation near you: the No
   Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022 ............................................ 12

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th
   ed. 2018) ........................................................................................................... 5

U.S. Departments of Labor, Health and Human Services, & Treasury,
   *FAQs About Affordable Care Act And Consolidated Appropriations
   Act, 2021 Implementation Part 55* (Aug. 19, 2022) ................................ 8, 9, 10, 11

WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2018) ...................................... 5

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The American Medical Association is the largest professional association of physicians, residents, and medical students in the United States. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. AMA members practice in every state and in every medical specialty. The AMA regularly files amicus briefs and engages in other advocacy efforts to support the interests of physicians nationwide, including by filing an amicus brief in the TMA Plaintiffs' related action pending before this Court. *See* Amici Brief, *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372 (E.D. Tex. Oct. 19. 2022), ECF No. 54.

The AMA and its members strongly support Congress's goal of protecting patients from "surprise billing." For years, the AMA has consistently advocated for a patient-first solution to surprise billing that would shield patients from unexpected medical bills, while enabling providers and insurers to determine fair payment among themselves and ensuring continued access to care. The AMA thus supports the compromise set forth in the No Surprises Act, which both protects patients from surprise medical bills and establishes an independent dispute resolution ("IDR") process with an intentionally balanced approach that does not skew towards either providers or insurers.

The Departments' July Rule, however, upsets the balance that Congress struck, and fails to achieve the goal of fair payment. The members of AMA therefore agree with the Plaintiffs that the rule is unlawful. The AMA submits this brief to emphasize why the Rule depresses payment reimbursements below market rates,

1

and to explain the detrimental impact the Rule will have on the ability of physicians to provide the excellent care their patients deserve.

## INTRODUCTION

The Departments agree that, in enacting the No Surprises Act, Congress intended the Qualifying Payment Amount ("QPA")—a key quantitative data point for payment negotiations and arbitrations under the Act—to reflect prevailing market rates. Yet the Departments' July Rule defies both that intent and the Act's plain text by permitting and even encouraging insurers to set the QPA well below the market. The Plaintiffs have already outlined the full scope of how the Departments' Rule deviates from the Act. The AMA files this brief to emphasize two of the July Rule's deviations that are particularly meaningful to its members.

First, although the Act states that the QPA must be based on the contracted rates for services actually "provided" to patients, the Departments allow insurers to calculate the QPA based on contracted rates for services *never* provided—just so long as the contracted rate is somewhere (anywhere) above $0. The Departments even admit that insurer-provider contracts include non-negotiated rates for never-provided services as a matter of form. Yet their Rule permits insurers to include those rates in the QPA, even though doing so obviously pushes the QPA below actual market rates.

Second, the July Rule defies Congress's requirement that the QPA be based on contracted rates for services provided in the *same or similar specialty*. Ignoring the Act's clear mandate, the Departments allow insurers to include contracted rates from different and dissimilar specialties—at least so long as their usual business practice is to do so and the difference in rates between specialties is not, in the *insurers'* view, material. This too depresses the QPA.

3

As with other offending aspects of the July Rule, these choices threaten serious harm to patients and to the provision of healthcare in this country. Because insurers know that they can seek the QPA's below-market rate from out-of-network providers through IDR arbitration, insurers have begun to drastically reduce rates—from 20-50%—for *in-network* providers, threatening to terminate contracts if providers do not acquiesce. The severe rate cuts enabled by the Departments' insurer-friendly regulations threaten the viability of physician practices and the scope of medical services nationwide. Ultimately, the victims will be the patients who lose ready access to care.

The AMA opposes surprise billing and supports the compromise that Congress struck in the No Surprises Act. But the Departments' Rules—which have consistently depressed the QPA's value while elevating its centrality—have undermined that compromise at every turn. The Departments should stop using their regulatory powers to pursue their own policy goals, and instead hew to the statutory text and purpose. That is the best way to protect the health of both the patients under professional care and the medical system as a whole.

## ARGUMENT

I. **THE DEPARTMENTS' JULY RULE DEPRESSES THE QPA BELOW MARKET RATES IN CONTRAVENTION OF THE STATUTORY TEXT AND CONGRESSIONAL INTENT**

    A.    Congress Intended The QPA To Reflect Market Rates

Congress intended the QPA to reflect the prevailing market rate for the cost of a particular service or item—*i.e.*, rates for services actually provided in the same or similar specialty. It thus did not intend for the QPA to reflect rates for every service

4

listed in a provider contract, regardless of whether the provider has ever provided (or even is capable of providing) such a service.

"[T]he best evidence of Congress's intent is the statutory text." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). The Act states that the QPA is the "median of the contracted rates *** for the same or a similar item or service that is *provided by* a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II) (emphasis added). Because the phrase "provided by a provider" modifies "item or service," the Act requires the QPA to be based on contracted rates for items or services that a provider in fact *provides*: that is, services that a provider "make[s] available" or "suppl[ies]" to the market. "Provide," WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2018); *see also* "Provide," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2018) ("To make available (something needed or desired)"; "To supply something needed or desired to [someone]"). Where Congress employed the phrase "provided by" elsewhere, it plainly contemplated scenarios in which medical services were, in fact, supplied. *See, e.g.*, 42 U.S.C. § 300gg-111(a)(1)(C)(ii) (patients' cost-sharing requirement should not be "greater than the requirement that would apply if such services were provided by a participating provider or a participating emergency facility"); *id.* § 300gg-117(c)(1)(A) (insurer may not require prior authorization for patient "who seeks coverage for obstetrical or gynecological care provided by a participating health care professional who specializes in obstetrics or gynecology"). Such "identical terms within [the] Act

5

[should] bear the same meaning." *Estate of Cowart v. Nickols Drilling Co.*, 505 U.S. 469, 479 (1992).

Other provisions of the Act reinforce Congress's intention for the QPA to reflect the prevailing market rate for a medical service. For one, the QPA is defined by the relevant insurance market, with the Act specifying that different QPAs should be separately calculated for the individual, large-group, small-group, and self-insured markets. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II), (a)(3)(E)(iv). Moreover, an important quantitative data point that IDR arbitrators must consider in determining the appropriate payment rate is the "market share held by the [provider or insurer] in the geographic region in which the item or service was provided." *Id.* § 300gg-111(c)(5)(C)(ii)(II). Knowing the respective market shares for a particular insurer and provider helps an arbitrator understand whether the prevailing market rate is actually a relevant data point for their payment dispute. But the only way to know the prevailing market rate is if the QPA reflects it.

The Departments themselves have emphasized, both in the July Rule and elsewhere, that the Act's "statutory intent" is to "ensur[e] that the QPA reflects *market rates* under typical contract negotiations." 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (emphasis added). In an earlier lawsuit brought by Plaintiffs, the Departments specifically acknowledged that the QPA reflects "Congress's expectation that—in the ordinary case at least—the qualifying payment amount is a proxy for the in-network price that a given medical service would command in a functional health care market." Defs' Cross-Mot. for Summ. J. at 20, *Texas Med. Ass'n v. United States*

6

*Dep't of Health & Hum. Servs.*, No. 6:21-cv-425 (E.D. Tex. Jan. 10, 2022), ECF No. 62. The Departments should therefore agree that, because the QPA is meant to reflect actual, prevailing market rates, the factors that go into determining the QPA should help ascertain—and not devalue it below—market rates.

### B. The July Rule Impermissibly Allows "Contracted Rates" To Include Services That Are Never Provided

Despite their lip service to the idea that the QPA should reflect market rates, the Departments have flouted that intent and deviated from the Act's plain language—including by interpreting the key phrase "contracted rates *** provided by a provider" to encompass services that are, in fact, never "provided."

The July Rule defines "contracted rate"—the underlying data point for the QPA—as encompassing *all* contracted rates, not just contracted rates for items or services that are actually "provided by a provider." *See* 45 C.F.R. § 149.140(a)(1) ("Contracted rate means the total amount (including cost sharing) that a group health plan or health insurance issuer has contractually agreed to pay a participating provider, facility, or provider of air ambulance services for covered items and services."). This was not an oversight. The Departments explained that in their view, "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate," and that "the rate negotiated under a contract constitutes a single contracted rate *regardless of the number of claims paid at that contracted rate*"—including, apparently, if the number of paid claims is zero. 86 Fed. Reg. at 36,889 (emphasis added). The July Rule thus permits insurers to include "ghost rates"—rates for services that are included in a provider contract but

7

never or very rarely provided, and therefore not negotiated—in their calculation of the QPA. By permitting insurers to incorporate into the QPA contracted rates for items and services "regardless" of whether they are ever in fact "provided by a provider," *id.*, the Departments straightforwardly violate the plain text of the Act, *see Texaco Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001) (a regulation cannot "rewrite statutory language by ascribing additional, material terms").

The Departments' August 2022 subregulatory guidance, "Frequently Asked Questions," does not cure this deficiency. *See* U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act And Consolidated Appropriations Act, 2021 Implementation Part 55* ("August 2022 FAQs") (Aug. 19, 2022).[1] Although they acknowledged that the July Rule allows insurers to calculate the QPA based on rates for items and services that "providers do not provide," *id.* at 17 (FAQ 14), the Departments did nothing more than admonish insurers in a footnote that they "should not include *$0* amounts in calculating [the QPA]," *id.* at 17 n.29 (FAQ 14) (emphasis added). Such guidance, however, "does not impose any legally binding requirements on private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (internal quotation marks omitted). And even if it did, the Departments thereby gave insurers permission not only to continue to include rates for items and services that are never provided by providers (in contravention of the Act's text), but

---

[1] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

8

to do so even if the non-negotiated rates fall drastically below market rates—just so long as the rates are any amount, even just a cent, above $0.

The Departments' choice exerts significant downward pressure on the QPA because a provider naturally has little to no incentive to negotiate rates for services she rarely or never provides. A recent survey found that of 75 primary care professionals surveyed, 68% included in their network contracts services that they provide fewer than two times a year, while 57% included in their network contracts services that they *never* provide. Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* at 4 (Aug. 2, 2022).[2] As the Departments have themselves explained, "some plans and issuers establish contracted rates by offering most providers the same fee schedule for all covered services." August 2022 FAQS, at 16 (FAQ 14). It is then "*up to the providers to negotiate increases to the rates for the services that they are most likely to bill.*" *Id.* (emphasis added). In the end, however, "the entire fee schedule may be included in the provider contract, with contracted rate modifications made *only* to certain service codes based on the negotiations." *Id.* (emphasis added). The below-market, non-negotiated rates thus remain in the contract, skewing the QPA downward under the July Rule.

---

[2] https://www.acr.org/-/media/ACR/Files/Advocacy/2022-8-15-Avalere-QPA-Whitepaper_Final.pdf

### C. The July Rule Unlawfully Permits Insurers To Decide Whether To Separate Rates By Provider Specialty

The July Rule has another key flaw. Although the Act defines the QPA as "the median of the contracted rates" for a service "provided by a provider *in the same or similar specialty*," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II), the July Rule does not actually require insurers to separate contracted rates by provider specialty. To the contrary, per the July Rule, insurers need do so only if "consistent with *** [their] usual business practice." 45 C.F.R. § 149.140(a)(12) (defining "[p]rovider in the same or similar specialty" as "the practice specialty of a provider, as identified by the plan or issuer consistent with the plan's or issuer's usual business practice"). The Departments acknowledge that, under the Rule, not all insurers "vary contracted rates by provider specialty." 86 Fed. Reg. at 36,891. That choice, too, impermissibly deviates from the Act's plain text. *See Texaco*, 274 F.3d at 920.

The Departments' August 2022 FAQs again provide no cure. The Departments admit that some insurers "reasonably and in good faith" read the July Rule to require them to vary rates by provider specialty *only* when insurers intentionally vary rates (*e.g.*, in set fee schedules) and not when rates vary between specialties as a result of the contracting process. August 2022 FAQs, at 17 (FAQ 14). Although the Departments have now instructed insurers to vary rates whenever "there is a *material* difference in the median contracted rates for a service code between providers of different specialties, after accounting for variables other than provider specialty," *id.* (emphasis added), they have provided no guidance on what constitutes

10

a "material difference" between rates—thus vesting impermissible discretion in insurers to make that determination.

As with including "ghost rates," the Departments' decision to allow insurers to include rates that are not varied by provider specialty will have the reliable effect of pushing the QPA below market rates. As the Departments have acknowledged, "an anesthesiologist's contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services)." August 2022 FAQs, at 16-17 (FAQ 14). The rate an anesthesiologist is willing to accept for dermatology services she does not offer is likely to be significantly below what a dermatologist is willing to accept for the same services that make up the core of her practice. And while the Departments have now instructed insurers to vary rates by provider specialty "if there is a material difference in the median contracted rates," self-interested insurers are given the sole (and practically unreviewable) prerogative to decide what is actually "material." *See* TMA Plfs' Mot. For Summ. J. at 15, 27-28, *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-450 (E.D. Tex. Jan. 17. 2023), ECF No. 25 (because "the QPA is a black box into which only the insurer can see," providers have "no way of credibly introducing" evidence to contest the QPA's calculation and thereby demonstrate that it is not a "reliable indicator[] of market value").

## II.   THE JULY RULE HARMS PATIENTS AND PROVIDERS

QPA calculations that come in reliably below market rates lead to not just dramatic underpayments for out-of-network care, but also drastic cuts for *in-network* contracted rates that will harm patients by reducing readily available care. If an in-

11

network provider refuses to accept a near-QPA rate during contract negotiations, an insurer can simply terminate the in-network contract and obtain the desired rate through IDR arbitration. That is particularly so given the Departments' decision to unlawfully overweight the QPA in IDR arbitration, a decision Plaintiffs have separately challenged. *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-450 (E.D. Tex.). But regardless of whether Plaintiffs' separate challenge is successful, the under-market QPA will still play an important role as a quantitative data point in both initial payment negotiations and IDR arbitrations.

In the wake of the Departments' campaign to depress the QPA's value while elevating its centrality, the AMA's members have seen abrupt demands from insurers for across-the-board rate reductions as high as 50%, and take-it-or-leave-it rate schedules that coalesce around the below-market QPA. *See* Nona Tepper, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022.[3] For instance, in response to the Departments' rulemaking, anesthesiologists, radiologists, and emergency physicians all received letters from Blue Cross Blue Shield of North Carolina demanding that, in light of the interim final rule, they agree to payment reductions of up to 30%—or forfeit their contracts. *Id.* And UnitedHealthcare has similarly requested a 40% rate cut from emergency physicians. *Id.* Because neither the July Rule nor the August 2022 FAQs fix the problem of undervaluing the QPA, the AMA's members expect insurers to continue to drive

---

[3] https://www.modernhealthcare.com/insurance/no-surprises-act-influencing-insurers-rate-setting-plans.

providers out of network, reducing patient choice and access to care, which is the opposite of what Congress intended.

Even providers who opt to remain in-network are seeing dramatic rate reductions—not just below the market average, but significantly below *Medicare rates*. The American Hospital Association has documented how Medicare rates typically underpay for the cost of care. AHA, *Fact Sheet: Underpayment by Medicare and Medicaid* (Feb. 2022).[4] In 2020, hospitals on average "received payment of only 84 cents for every dollar spent *** caring for Medicare patients," with "67 percent of hospitals" receiving Medicare payments that were less than the cost of care. *Id.* Such dramatic rate cuts will prove unsustainable for some providers.

In the end, it is patients who will suffer the most. Insurers' cuts threaten the scope of provider services (especially those that historically lose money) and the viability of provider practices (in particular, small- and mid-sized physician groups that have operated under stable contracts for years). *See, e.g.*, Letter from American College of Emergency Physicians to Members of the North Carolina Congressional Delegation (Dec. 9, 2021) ("ACEP Letter").[5] Insurers' non-negotiable reductions will inevitably lead some physician groups to close, sell, or relocate their practices. Even those practices that continue may not be able to expand to meet patient demand or staffing requirements. After weathering a once-in-a-century global pandemic,

---

[4] https://www.aha.org/fact-sheets/2020-01-07-fact-sheet-underpayment-medicare-and-medicaid.

[5] https://www.acep.org/globalassets/new-pdfs/advocacy/acep--nccep-insurer-cuts-letter-to-nc-delegation---12092021.pdf.

13

providers are already struggling with rising costs caused by inflation and labor shortages. For instance, margins for all U.S. hospitals are "down 37% relative to pre-pandemic levels" and "[m]ore than half of hospitals are projected to have negative margins through 2022." KaufmanHall, *The Current State of Hospital Finances: Fall 2022 Update* at 1 (prepared at the request of Am. Hosp. Ass'n) (2022).[6] These abrupt, uniform rate reductions come at a perilous time.

Rural and other underserved patient populations will bear the brunt of this sea change, losing their access to readily available and personalized care. Consider the example of just one North Carolina group of emergency physicians that operates on thin margins with no outside corporate or investor funding. *See* ACEP Letter. The group serves 11 emergency departments, including one designated as having a provider shortage and others located in rural areas of the state. In 2020, the group's physicians served 425,000 patients, 44% of whom were uninsured or on Medicaid. *Id.* At the end of 2021, just as the Act's regulations were set to go into effect, Blue Cross Blue Shield of North Carolina threatened termination of the group's contract if it did not accept an *immediate* 20% cut to its contracted rates. *Id.* Blue Cross made clear that, going forward, it would require the group to accept contracted rates closer to the QPA. *Id.* It is far from clear what will happen to patients when groups like this can no longer afford to serve them.

---

[6] https://www.kaufmanhall.com/sites/default/files/2022-09/KH-Hospital_Finances_Report-Fall2022.pdf.

14

The Departments previously recognized that significant reductions in provider rates could "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021). The Departments should heed their own warning.

## CONCLUSION

The AMA respectfully urges the Court to grant the TMA Plaintiffs' motion and set aside the provisions of the July Rule that depress QPA calculations and violate the Act, and remand for further rulemaking with regard to insurers' QPA disclosure obligations.

Dated:  January 31, 2023              Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　／s／ James E. Tysse
　　　　　　　　　　　　　　　　　　　　　　James E. Tysse
　　　　　　　　　　　　　　　　　　　　　　　　D.C. Bar No. 978722 (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Kelly M. Cleary
　　　　　　　　　　　　　　　　　　　　　　　　D.C. Bar No. 985642 (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Kristen E. Loveland
　　　　　　　　　　　　　　　　　　　　　　　　D.C. Bar No. 1684978 (*pro hac vice*)

　　　　　　　　　　　　　　　　　　　　　　AKIN GUMP STRAUSS HAUER & FELD LLP
　　　　　　　　　　　　　　　　　　　　　　2001 K Street, N.W.
　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　　　　Telephone: (202) 887-4000
　　　　　　　　　　　　　　　　　　　　　　jtysse@akingump.com
　　　　　　　　　　　　　　　　　　　　　　kcleary@akingump.com
　　　　　　　　　　　　　　　　　　　　　　kloveland@akingump.com

　　　　　　　　　　　　　　　　　　　　　　*Counsel to Amicus Curiae American Medical Association*

15

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I served the foregoing document upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

   /s/ James E. Tysse   <br>
James E. Tysse