IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 6:22-cv-450-JDK |
| | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) Lead Consolidated Case |
| | ) |
| Defendants. | ) |
| | ) |

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTIONS**

Hyland Hunt (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ..................................................................................................................................4

I.   The QPA Properly Excludes Value-Based Payments to Network Providers. .....................4

II.  QPA Methodology Is Rightly Designed to Include All Legitimate Contracted Rates. .......8

    A.   The QPA Properly Reflects All Negotiated Rates, Differentiating Between Provider Specialties Only When the Market Does. ..................................................8

    B.   The QPA Rightly Excludes Single Case Agreements that Do Not Reflect Normal Pre-Service Contract Negotiations. ............................................................10

III. QPA Calculations Are Subject to Extensive Scrutiny and Transparency, and Results Indicate the QPA Accurately Reflects Market Rates .........................................................12

CONCLUSION .............................................................................................................................15

# TABLE OF AUTHORITIES

**STATUTES AND REGULATIONS**

42 U.S.C.
  § 300gg-111(a)(1)(C) ............................................................................................. 7, 15
  § 300gg-111(a)(2)(B) .................................................................................................. 5
  § 300gg-111(a)(3)(E) ................................................................................................ 10
  § 300gg-111(b)(1)(B) .................................................................................................. 7
  § 300gg-112(b)(5)(C) ................................................................................................ 10

45 C.F.R. § 149.140(d)(1) ................................................................................................ 13

86 Fed. Reg. 36,872 (July 13, 2021) ......................................................................... *passim*

87 Fed. Reg. 52,618 (Aug. 26, 2022) ............................................................................... 12

**OTHER AUTHORITIES**

AHIP, Comment Letter (Sept. 3, 2021) ............................................................................. 6

AHIP, *No Surprises Act Prevents More than 9 Million Surprise Bills Since January 2022* (Nov. 2022) ............................................................................................................ 7, 14

Catalyst for Payment Reform, *CPR's Payment Reform Definitions* .................................. 4

Ctrs. for Medicare & Medicaid Servs., *Initial Report on the Independent Dispute Resolution (IDR) Process, April 15-September 30, 2022* ......................................... 7, 15

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) ....................................................................................... 10

Health Care Payment Learning & Action Network, *APM Measurement Effort* (2021) ..... 5

Jacqueline LaPointe, *Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Sept. 9, 2016) ...................................................................... 4, 5

Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023) ..................................................................................................... 4

Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018) ....................................................... 4

MGMA, *Patient Access and Value-Based Outcomes During the Great Attrition* ............ 5

U.S. Dep't of Labor, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ................................................... 8, 9

## INTEREST OF *AMICUS CURIAE*

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members have extensive experience working with nearly all health care stakeholders to ensure that patients have affordable access to needed medical services and treatments. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer consumers affordable networks that provide choices in the delivery of quality medical care. When unable to secure network agreements before treatment is rendered—which is particularly common for emergency care—health insurance providers seek to negotiate reasonable out-of-network payments to prevent surprise medical bills and reduce costs for patients. But before the No Surprises Act, some providers—particularly those who operate primarily in hospitals—often leveraged their refusal to participate in networks to send patients excessive surprise bills and extract payments well above typical market rates.

Congress, after significant debate, ultimately arrived at a bipartisan solution to protect consumers from out-of-network payment disputes and surprise bills by establishing a statutory scheme that hinges on the Qualifying Payment Amount (QPA). This lynchpin of the Act serves two key functions. First, the QPA often establishes the amount owed in patient cost sharing, enhancing cost predictability for patients while shielding consumers not only from surprise medical bills, but also from exorbitant cost-sharing amounts. Second, the QPA—at a minimum—is a mandatory consideration for resolving payment disputes in Independent Dispute Resolution (IDR). For the QPA to effectively serve these critical functions, it must, as everyone agrees,

1

accurately reflect negotiated market rates. The QPA works best when it approximates what the parties would have reasonably agreed to, had they reached a network agreement in advance. In other words, when it reflects market reality.

AHIP agrees with the Departments' legal arguments that the challenged rule is consistent with the Act and falls well within the Departments' discretion. AHIP writes separately to explain how, given its experience with health care contracting, the Departments' choices enhance the accuracy of the QPA rather than artificially deflating it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the cornerstone of the No Surprises Act, it is essential that the QPA represents negotiated market rates. The Act delegated to the Departments the authority to develop a methodology to make it so. Plaintiffs flyspeck disparate pieces of the methodology, but cannot show that it is designed to, or will, artificially deflate the QPA. On the contrary, each of the Departments' challenged methodological choices brings the QPA closer to market reality.

Excluding retrospective value-based adjustments—*i.e.*, provider-specific bonuses (or penalties) for overall quality and performance—makes sense. Such adjustments are a different kind of payment that compensates (or penalizes) providers' quality and performance over time, as opposed to the contracted fixed per-service rates that the QPA is supposed to reflect. Because such adjustments can both raise and lower provider compensation, the exclusion does not artificially depress the QPA. And excluding such adjustments is crucial for the QPA to serve its key function of matching out-of-network cost sharing to in-network cost sharing.

Turning to fee-for-service rates, the QPA methodology rightly includes all agreed, contracted network rates—whether or not a particular provider was paid that rate. AHIP agrees that $0 rates have no place in the QPA calculation (as the Departments have already made clear). But other agreed rates are not illegitimate simply because, due to shifting demand, a provider

happened not to provide a specific service during some unspecified timeframe. Negotiated network rates are valid evidence of market rates, regardless of whether a service is less common. And by clarifying that per-specialty rates must be calculated whenever they make a material difference, the Departments have made sure that the QPA reflects any market variation by specialty, while avoiding the wholly unnecessary administrative burden of calculating different QPAs when market rates do not vary by specialty.

The rule also rightly limits the QPA to network rates, excluding case-specific rates. Before the Act, insurance providers agreed to such one-off rates with air ambulance providers to try to better protect patients from air ambulance providers' aggressive use of balance bills. The QPA was intended to approximate the bargain that would have been struck had the parties negotiated a rate in advance, not to carry forward the inflated prices driven by now-banned surprise bills.

Although Plaintiffs portray the QPA as the result of an unknowable, unaccountable process, the regulatory history shows otherwise. The Departments are keeping careful watch over QPA implementation. As issues or questions have arisen during the first year of the Act's implementation, the Departments have issued clarifying guidance, refined the calculation, and imposed additional disclosure requirements. Audits are ongoing—as is review of provider QPA complaints—and further guidance may be forthcoming.

Meanwhile, for nearly all patient care, the system is working as Congress intended. AHIP estimates, based on industry studies, that patients were protected from over 12 million surprise medical bills in 2022. Although far too many payment disputes have been submitted to IDR— overloading the system, swamping the Departments' initial estimates, and driving up costs for patients and consumers—it remains the case that nearly all out-of-network claims are resolved without resorting to IDR. In addition, only a handful of services account for most IDR claims, and

most disputes are initiated by a small number of firms. Concentrated exploitation of the IDR process is driving IDR volume—not widespread issues with the QPA. Providers' pervasive, nearly universal acceptance of initial out-of-network payments underscores that the QPA, calculated in accord with the rule, is a reasonable market rate.

## ARGUMENT

I.      **The QPA Properly Excludes Value-Based Payments to Network Providers.**

Health care contracting is complex. Fee-for-service payments remain the dominant underlying approach, particularly in the commercial market, but there are many alternative payment models. *See* Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018), https://tinyurl.com/5n6wd26t. In these alternative models, health insurance providers partner with network medical providers to achieve goals related to the "results [physicians] deliver for their patients, such as the quality, equity, and cost of care." *See* Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023), https://tinyurl.com/48dxak6a. Alternative payment models take many forms. Pay-for-performance contracts provide a retrospective bonus or penalty linked to quality of outcomes. Jacqueline LaPointe, *Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Sept. 9, 2016), https://tinyurl.com/yr76k7ny. In shared savings models, providers who can avoid unnecessary costs through more efficient care delivery, improved patient outcomes, or better coordination will share in some of the savings that their better care generates. *Id.* With two-sided value arrangements, which are increasingly common, providers may gain financially from meeting certain quality or other metrics, but they also accept potential financial liability for failing to meet the goals. *See id.*; Catalyst for Payment Reform, *CPR*'s *Payment Reform Definitions*, https://tinyurl.com/bp5etec6 (defining shared risk).

Despite the variation, a common thread in alternative payment models is that retrospective value adjustments (up or down) are not tied to specific services. Instead, they are tied to a particular provider's (or facility's) overall performance over a period of time, based on quality metrics or the avoidance of unnecessary costs. *See* LaPointe*, supra*. For example, a physician (or facility) might receive a bonus or pay a penalty based on how many hospital re-admissions that facility's patients experienced within 30 days, or how many of that physician's patients experienced post-operative infections within 30 days. *See* MGMA, *Patient Access and Value-Based Outcomes During the Great Attrition*, at 3, https://tinyurl.com/y6ufbjwp (listing common quality measures). Such arrangements hinge not on a single negotiated fee for a specific service, but on long-term relationships between insurance providers and physicians.

Although retrospective value-based adjustments are not tied to particular services, most value-based payment models are built on fee-for-service architecture, meaning they include a per-service component. *See* Health Care Payment Learning & Action Network, *APM Measurement Effort*, at 2 (2021), https://tinyurl.com/uu3csy8j (survey estimating more than 96% of commercial payments are either straight fee-for-service or built on fee-for-service architecture). That distinct per-service fee is tied to each service and paid based on the date the service was furnished. The periodic retrospective adjustments for a provider who meets quality metrics or who furnishes cost effective care—or who fails to meet those targets—are not tied to a particular service.

Congress did not attempt to parse this complexity. Rather, it required the Departments to account for non-fee-for-service payments, without dictating how. 42 U.S.C. § 300gg-111(a)(2)(B). The Departments reasonably implemented that directive by requiring health insurance providers to use the "underlying fee schedule rate" or similar "derived amount" from cost sharing or other internal purposes, excluding retrospective quality bonuses and penalties or similar value-based

5

adjustments. *See* Gov. Br. 28-30; 86 Fed. Reg. 36,872, 36,893-94 (July 13, 2021).

The Departments' approach to alternative payment models best serves the QPA's market-rate objective for two main reasons. First, the per-service "fee" component of alternative payments is the contracted per-service rate that reflects the overall market for a given service. Performance adjustments are specific to the individual provider as part of a longer-term investment, not a measure of the market overall. And excluding them does not artificially deflate the QPA because they can either add or subtract from the negotiated fee. Second, it is essential to match the QPA to the contracted rate that health insurance providers use for cost sharing, and that rate excludes retrospective value adjustments.

As the Departments recognized (and Plaintiffs do not dispute), retrospective value adjustments are not typically included in the cost-sharing calculation. 86 Fed. Reg. at 36,894. They are not included in cost sharing (and thus do not belong in the QPA) because these amounts are not contracted to compensate a specific item or service. Rather than reflecting the going market-wide rate for a single service—undisputedly what the QPA is designed to approximate—value-based payments (or penalties) generally reflect a particular provider or provider group's overall quality and performance across many services and patients. Effectively, by seeking to add performance incentives (that may or may not be awarded) on top of median contract rates, Plaintiffs seek a QPA that treats all out-of-network providers as if they are the very best performing in-network providers. This is not only unfair, it also defies market reality. *See* AHIP, Comment Letter, at 12 (Sept. 3, 2021), https://tinyurl.com/4udnskzz ("The rules recognize that incentive-based payments to providers are an important tool for attracting and retaining high-quality, high-value providers to participate in robust health insurance networks and those incentive payments should not factor in the QPA.").

Worse still, as Plaintiffs ignore, including value-based adjustments could also wrongly penalize out-of-network providers for other providers' poor performance. This two-sided nature of value adjustments fatally undermines Plaintiffs' theory (TMA Br. 11) that excluding such adjustments artificially deflates the QPA because contracting physicians lowball their fees in exchange for potential bonuses. Providers entering such contracts are unlikely to accept lower-than-market per-service fees across the board precisely because physicians also sometimes take on downside risk under non-fee-for-service contracts. Bottom line: including value-based adjustments would only skew the QPA away from market-based service-specific rates.

Excluding retrospective value adjustments is not only consistent with the QPA's market-rate focus, it also furthers Congress's intent that cost sharing for applicable out-of-network services should match in-network cost sharing under an individual's plan terms. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(ii). Although Plaintiffs largely ignore it, the QPA has another critical function in the statutory scheme; it does more than compensate physicians. The QPA is equally if not more important to patients, who will often pay a percentage of the QPA as their cost share. *See id*. § 300gg-111(a)(1)(C)(iii), (b)(1)(B); Gov. Br. 7. The millions of patients protected by the QPA's cost-sharing role dwarfs the hundred thousand or so provider disputes about it. *See* AHIP, *No Surprises Act Prevents More than 9 Million Surprise Bills Since January 2022* (Nov. 2022), https://tinyurl.com/2syeh838 (9 million surprise bills avoided in first three quarters of 2022) (AHIP Survey); Ctrs. for Medicare & Medicaid Servs., *Initial Report on the Independent Dispute Resolution (IDR) Process, April 15-September 30, 2022*, at 7, https://tinyurl.com/mtp7kd3k (about 90,000 IDRs in same period) (IDR Report). The Departments' decision to harmonize in-network and out-of-network cost sharing, 86 Fed. Reg. at 36,894, is not about minimizing administrative burden (as Plaintiffs assert, TMA Br. 26). It is the only approach that comports with the QPA's

central role in the Act. If the rule required value adjustments to be included in the QPA, when they are not included in in-network cost sharing (and total bonuses outweighed penalties as Plaintiffs assume), it would cause patients' out-of-pocket costs to go up under the Act, not down—contrary to the Act's design. Gov. Br. 29-30 & n.10.

## II.  QPA Methodology Is Rightly Designed to Include All Legitimate Contracted Rates.

### A.  The QPA Properly Reflects All Negotiated Rates, Differentiating Between Provider Specialties Only When the Market Does.

As Plaintiffs and their *amici* appear to agree, the QPA is designed to "reflect[] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889; *see* TMA Br. 22; Am. Med. Ass'n Br. 4. Designing the QPA to reflect negotiated (in-network) market rates is consistent with the statutory text and essential for the QPA's two key functions. It ensures that out-of-network cost sharing approximates as closely as possible what the patient would have paid if the provider had been in-network. And it informs any IDR proceeding, by mandating consideration of a reasonable, in-network rate when determining which offer best represents the value of the service. Contrary to Plaintiffs' claims, the Departments' approach to contracted rates and provider specialties helps the QPA track closer to market reality, not depart from it.

To start: AHIP agrees that the QPA should reflect market rates as contracted, not $0 rates that are sometimes included in "fee schedule[s] for covered items and services that a provider or facility is not equipped to furnish." U.S. Dep't of Labor, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 n.29 (Aug. 19, 2022), https://tinyurl.com/3zvt3w3j (Departments' FAQ). The agencies have already issued clarifying guidance making that plain. *Id.* There is no evidence that anything other than $0 is used as a "not applicable" placeholder in the same way, so Plaintiffs' fears of some kind of "not-quite-$0" rates (say, $1) have no basis. *See* TMA Br. 19. Nor is there anything in the rules or guidance that permits

8

inclusion of rates that are "artificially low," as Plaintiffs claim (TMA Br. 14).

Negotiated rates recognized in verifiable contracts should and do count. Rates agreed within a network agreement are legitimate, actual rates accepted by providers in the marketplace, regardless of whether a provider happened to be paid that negotiated rate during a particular (unspecified) time period. As Defendants explain, nothing in the statutory text mandates that the term "contracted rates" exclude rates that were agreed but not paid. *See* Gov. Br. 19-21. Plaintiffs' theory for excluding some contracted rates from the QPA is that if a rate has not been paid, a provider must not perform that service and therefore was likely to agree to a below-market rate. *See* TMA Br. 10. This is not necessarily the case; a provider may perform a service less frequently and still have every incentive to negotiate a reasonable rate for when it does occur. Moreover, to the extent there is any rate differential between providers who often perform a service and those who don't, the Departments have already addressed that issue. Separate QPAs must be calculated whenever there is a material difference in the median rate between a specialty that regularly bills for a service and all others. Departments' FAQ at 16-17. That resolves Plaintiffs' concerns about artificially deflated rates. *See* Gov. Br. 24-27.

Plaintiffs' related insistence that separate QPAs must be calculated for every provider specialty, even when it makes no market difference, has no statutory basis, as Defendants explain. *See* Gov. Br. 25-26. As the Departments recognized, health insurance providers do not always "vary contracted rates by provider specialty." 86 Fed. Reg. at 36,891. Provider specialty is sometimes immaterial. For example, the same fee schedule often applies for inpatient consultations by surgeons, regardless of surgical specialty (thoracic, neurological, and so on.). And when market rates do not vary by provider specialty, the QPA should not either, because—as all agree—the QPA is designed to reflect market rates. Requiring calculation of a specialty-by-specialty QPA,

9

even when it makes no market difference, would be an unwieldy addition to an already burdensome process, without increasing the fidelity of the QPA. *See* 86 Fed. Reg. at 36,891.

### B. The QPA Rightly Excludes Single Case Agreements that Do Not Reflect Normal Pre-Service Contract Negotiations.

As for all the other services covered by the Act, the QPA for air ambulance services is based on median "contracted rates," consistent with "the methodology established by the Secretary." 42 U.S.C. §§ 300gg-111(a)(3)(E), 112(b)(5)(C)(i)(I). Air ambulance services differ, however, in the degree to which air ambulance providers' business models, before the Act, exploited the ability to balance bill patients to exact exorbitant out-of-network payments. When establishing the QPA methodology for air ambulances, the Departments sensibly grappled with these unique—and uniquely inflationary—market dynamics by excluding from the QPA "ad hoc arrangement[s] with a nonparticipating provider" that cover "a specific … beneficiary … in unique circumstances." 86 Fed. Reg. at 36,889. In other words, they declined to allow the very surprise bills that the "No Surprises Act" was passed to prevent to serve as a starting point to establish rates. This rule applies to all providers, but only air ambulance providers challenge it here. *See* Air Ambulance Plaintiffs' Br. 20-25.

As the Departments recognized, "avoidance of insurance network participation combined with aggressive collection" was "a business strategy of some providers of air ambulance services" before the Act. 86 Fed. Reg. at 36,923. Under that business model, charges soared, nearly tripling over ten years. Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021), https://tinyurl.com/yxbzfpb7. The median bill for a fixed-wing transport in 2017 was $40,600—up from $24,900 just five years earlier. 86 Fed. Reg. at 36,923 (citing two extensive studies by the Government Accountability Office). Because air ambulance charges were extremely high, health insurance providers "place[d] a high value on preventing

10

enrollee surprise bills." Brown, *supra*. As a result, health insurance providers agreed, after an air ambulance service was provided, to pay air ambulance providers' full billed charges, to help protect their beneficiaries from surprise bills and debt collection suits. *See* 86 Fed. Reg. at 36,923. One study of data from 2014 and 2017 concluded that air ambulance transports were out-of-network about three-quarters of the time, and health plans paid full (and exorbitant) billed charges for about half of those transports. *Id.*

Air ambulance providers' business model of refusing to enter into pre-negotiated network agreements before the Act thus led to a correspondingly high volume of post-transport ad hoc arrangements that aimed only to resolve specific payment disputes under surprise-billing threat—the sort of "single case agreements" that the rule rightly excludes from the QPA. 86 Fed. Reg. at 36,889. As the Departments recognized, these one-off arrangements are completely different from network contracts, where health insurance providers and air ambulance providers reach agreement about reasonable market rates in advance of services. *Id.* Excluding after the fact extorted rates from the QPA "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

Air ambulance providers attempt to turn their former aggressive practices into a virtue, arguing that because they were so often out-of-network, the payment amounts they extorted by leveraging balance billing are more representative of market rates. *See* Air Ambulance Plaintiffs' Br. 24-25. But payments achieved *post hoc* by threatening to balance bill patients for tens of thousands of dollars are not representative of the "contracted rates" generated by *ex ante* negotiation—as the disparity between in-network rates and out-of-network payments indicates. *See* 86 Fed. Reg. at 36,923. And because a quarter of air ambulance transports were provided under network agreements, *id.*, those agreements provide sufficient QPA inputs. Any other approach

11

would not protect consumers from unpredictable and uncontrolled health care costs—rather, it would incorporate, and lock in, the market dysfunction generated by the very balance billing practice that Congress prohibited.

### III. QPA Calculations Are Subject to Extensive Scrutiny and Transparency, and Results Indicate the QPA Accurately Reflects Market Rates.

Health insurance providers are tasked with and have ensured that the QPA reflects reasonable, negotiated market rates, in accord with Congress's intent. The accuracy and reliability of this calculation matters for millions of plan enrollees for whom health insurance providers must determine cost sharing in accordance with the Act each year. In a very short time, health insurance providers were required to perform tens of millions of QPA calculations. They did so responsibly, using data validation and cross-check tools to ensure that their QPA calculations reflect legitimate rates. And they did so in recognition that QPAs must not only reflect reasonable, realistic market rates so that health insurance providers' beneficiaries' cost sharing is appropriately calculated, but also so that medical providers will accept near-QPA payments as reasonable out-of-network reimbursements, rather than initiating wasteful, costly IDR proceedings.

Beyond these imperatives, QPA calculations are subject to intense scrutiny, including regulatory audits and provider complaints. The Departments—to whom Congress assigned the responsibility to audit QPA calculations—are paying close attention to the implementation of the QPA and issuing clarifying guidance as needed. The Departments have added a new disclosure requirement and explained that they are "continuing to consider comments … about whether additional disclosures related to the QPA calculation methodology should be required." 87 Fed. Reg. 52,618, 52,626 (Aug. 26, 2022). The Departments have also issued the August 2022 FAQs discussed above, clarifying that $0 rates are excluded from the QPA and that QPAs must be calculated separately for different specialties when it makes a material difference.

In short, nothing indicates that the Departments are "asleep at the switch" as far as the QPA goes, as Plaintiffs seem to suggest, or that more disclosures are needed so that medical providers can police the QPA in the Departments' stead. Plaintiffs quibble over the number of planned audits (TMA Br. 28), but a single audit can encompass multiple QPA calculations. Those audits are now underway. In addition, the scores of QPA complaints filed by providers—all of which the Departments must address—undermine Plaintiffs' claims (TMA Br. 28) that providers lack sufficient information.

Considered in the context of this iterative regulatory process, Plaintiffs' arguments about the scope of QPA disclosures fall wide of the mark. Implicitly acknowledging that the Act mandates no particular disclosures, Plaintiffs' arguments boil down to the contention that it was arbitrary not to require health insurance providers to disclose every single aspect of their business—every rate they have negotiated, with which provider specialties; how often every rate has been paid; and details of their value-based contracts. *See* TMA Br. 28-29. But some of these items are wholly irrelevant to the QPA under the Departments' reasonable rules (*e.g.*, value-based adjustment amounts). And others are completely unnecessary because the required disclosures give providers everything they need to know. When making initial payments for out-of-network services, health insurance providers must provide the QPA and certify that it was calculated in accordance with the rules. 45 C.F.R. § 149.140(d)(1)(i), (iii). Given the extensive rules, this certification reveals a great deal about how the QPA was calculated. The only reason to demand disclosure of every rate would be to double check whether the QPA is the median, which the certification already indicates, and audits will confirm. But physicians don't need to know every rate an insurance provider has negotiated for a specific service to assess whether a payment amount is a reasonable market rate for the service they provided, or if they should dispute the payment

13

(*contra* TMA Br. 29).

The rules, the audit program, and the QPA certifications by health insurance providers are all designed to get the QPA rightly tied to market-based realities, given its lynchpin role in the Act. AHIP and its members fully support that objective. Plaintiffs' proposals would take the QPA farther away from market reality and generate additional (and unnecessary) administrative burdens for an already resource-intensive process. The QPA calculation process required each health insurance provider to consider billions of data points to generate tens of millions of QPAs. As it is, the government estimated health insurance providers would expend nearly $5 billion to get ready for the Act, including setting up the requisite information systems and calculating the QPA, among other tasks. 86 Fed. Reg. at 36,928.

There is no reason to disturb the Departments' reasonable choices in developing QPA methodology and disclosure requirements within the express grant of rulemaking authority by Congress. The first year's experience shows that the QPA is fulfilling its crucial statutory function. Patients were protected from approximately 12 million surprise medical bills in the Act's first year. *See* AHIP Survey, *supra*. Due to Congress's express role for the QPA, those same patients paid predictable cost sharing amounts based on reasonable market rates.

And, contrary to Plaintiffs' and their *amici*'s sky-is-falling predictions, *see, e.g.*, Am. Med. Ass'n Br. 11-15, medical providers were generally content with the QPA, too. Despite some problems—and the huge volume of IDR proceedings which swamped the system is a major issue—most medical providers appear to agree that out-of-network payments around the QPA reflect reasonable market rates. About 97% of out-of-network payments did *not* go to IDR. AHIP Survey, *supra*. And the lion's share (over 80%) of claims that did go to IDR involved emergency services, with over half of all IDR disputes relating to just five emergency department visit codes.

*See* IDR Report at 19. What's more, a single entity initiated one third of the total non-air-ambulance disputes. *Id.* at 16. Given this data, while IDR volume is still too high, it does not indicate fundamental problems with the QPA (*contra* EDPMA Amicus Br. 12).

For those few entities and services where IDR requests are common, moreover, providers receive and retain the full initial payment from insurance providers while seeking any additional payment through IDR. Gov. Br. 9; 42 U.S.C. § 300gg-111(a)(1)(C)(iv). In sum, if there are any QPA problems, they are far from widespread, and they do not affect the bulk of providers' cash flow. Plaintiffs' claims, which pick at the edges of the Departments' QPA methodology, would have at most a marginal effect on a marginal number of payments. Their requested vacatur, on the other hand, would hollow out guidance governing the millions of QPA calculations underpinning predictable costs for millions of patients, and bring the whole process to a "screeching halt" (Gov. Br. 50). Plaintiffs have provided no reason for the Court to superintend a well-functioning, ongoing regulatory process that Congress expressly delegated to the Departments, much less any justification for the industry-wide disruption and patient harm that vacatur would cause.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: March 17, 2023                    Respectfully Submitted,

/s/Hyland Hunt
Hyland Hunt (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

## CERTIFICATE OF SERVICE

On March 17, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served counsel for all parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Hyland Hunt  
Hyland Hunt