# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

TEXAS MEDICAL ASSOCIATION *et al.*,

        Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES *et al.*,

        Defendants.

Civil Action No. 6:22-cv-00450-JDK

Lead Consolidated Case

## BRIEF OF TEN PATIENT AND CONSUMER ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................. ii

INTEREST OF *AMICI CURIAE* ....................................................................................... 1

INTRODUCTION ............................................................................................................... 2

ARGUMENT ...................................................................................................................... 4

    I.   BEFORE THE NO SURPRISES ACT, SURPRISE MEDICAL BILLS IMPOSED
        STAGGERING FINANCIAL BURDENS ON PATIENTS AND CONSUMERS........... 4

        A.  Surprise Medical Bills for Hospital-Based Care and Air Ambulance Services by
            Out-of-Network Providers Harmed Millions of Patients and their Families. ............... 5

        B.  Prior to the No Surprises Act, Surprise Billing Increased Health Insurance
            Premiums and Overall Health Care Costs for Privately Insured Individuals. ............... 8

    II.  CONGRESS INTENDED TO PROTECT PATIENTS FROM SURPRISE BILLS
        AND ESCALATING HEALTH CARE COSTS. ................................................................ 9

        A.  Bipartisan Precursor Proposals to the No Surprises Act Shared the Goals of
            Reducing Out-of-Pocket Costs for Patients and Overall Health Expenses. ................. 9

        B.  The No Surprises Act Shared the Earlier Bills' Cost-Reduction Goals. .................... 11

    III. DEFENDANTS' QPA METHODOLOGY FURTHERS CONGRESS'S GOAL OF
        PROTECTING CONSUMERS FROM HIGH OUT-OF-POCKET COSTS. ................. 13

CONCLUSION ................................................................................................................. 15

APPENDIX (Descriptions of *Amici Curiae*).............................................................. A-1

# TABLE OF AUTHORITIES[1]

**STATUTES**

No Surprises Act of the 2021 Consolidated Appropriations Act,
Pub. L. No. 116-260, 134 Stat. 1182 ...........................................................................1

42 U.S.C. § 300gg-111 ....................................................................................................1


**LEGISLATIVE MATERIALS**

H. Energy & Commerce Comm., *Pallone & Walden on Committee Passage of
No Surprises Act* (July 17, 2019), https://bit.ly/3JOwDxV....................................10

H. Educ. & Labor Comm., *Committee Advances Bipartisan Solution to Ban
Surprise Billing* (Feb. 11, 2020), https://bit.ly/3LwUwep.......................................10

H. Educ. & Labor Comm., *Section-by-Section: The Ban Surprise Billing Act
(H.R. 5800) 1-2* (Feb. 11, 2020), https://bit.ly/3llgVke..........................................11

H. Ways & Means Comm., *Ways and Means Committee Surprise Medical Billing
Plan* (Dec. 11, 2019), https://bit.ly/3yKqXP2 ........................................................10

*How to Reduce Health Care Costs: Understanding the Cost of Health Care in
America: Hearing of the S. Comm. on Health, Educ., Labor & Pensions*,
115th Cong. 832 (June 27, 2018), https://bit.ly/33VO9xD .......................................9

H.R. Rep. No. 116-615, pt. 1 (2020) [AR 278-428].............................................4, 5, 6

S. Comm. on Health, Educ., Labor & Pensions, *Congressional Committee Leaders
Announce Surprise Billing Agreement* (Dec. 11, 2020),
https://bit.ly/3rSj1Ht.......................................................................................11, 12

S. Comm. on Health, Educ., Labor & Pensions, *Senate Health Committee Leaders
Introduce Bipartisan Legislation to Reduce Health Care Costs* (June 19, 2019),
https://bit.ly/33Zg3sA.............................................................................................9


**OTHER AUTHORITIES**

Loren Adler et al., *Understanding the No Surprises Act,* U.S.C.-Brookings Schaeffer
on Health Policy (Feb. 4, 2021) [AR 1372-82] ......................................................14

---

[1] For materials that are in the Administrative Record ("AR") lodged in this case, ECF No. 42, citations to the AR are provided for reference.

Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers,* Brookings Inst. (Oct. 13, 2020) [AR 4761-85]...........................................................7

Anna Almendrala, *The Air Ambulance Billed More Than The Lung Transplant Surgeon*, NPR (Nov. 6, 2019), https://n.pr/3GWrksd ..............................................................6

Julie Appleby, *The case of the $489,000 air ambulance ride*, NPR (Mar. 25, 2022), http://bit.ly/3A34kX5 ..............................................................................................................6

ALS Association *et al.*, *Surprise Medical Billing Principles* (Feb. 2020) [Ex. A] ..................1, 12

Ge Bai *et al., Air Ambulances With Sky-High Charges*, 38 Health Affairs (July 2019) (Abstract), https://bit.ly/33HmVeg.......................................................................................7

Bd. of Governors of Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2020*  (May 2021) [AR 2838-42]. ............................................................................5

Rachel Bluth, *In Combating Surprise Bills, Lawmakers Miss Sky-High Air Ambulance Costs*, Kaiser Health News (June 14, 2019), https://bit.ly/3fMJC35. ...................6

Debra Bozzi *et al.*, Health Care Cost Inst., *ESI Enrollees Paid $853 on Average Out-of-Pocket for Health Care in 2020, But Some People Paid Over Four Times as Much* (Dec. 20, 2022), http://bit.ly/3yJPWCe. ...................................................14

Christina Caron, *Families Fight Back Against Surprise Air Ambulance Bills*, N.Y. Times (Apr. 17, 2020), https://nyti.ms/3qRBgh6 [AR 779-86].  .....................................6

Karan R. Chhabra *et al.*, *Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery with In-Network Primary Surgeons and Facilities*, 323 J. Am. Med. Ass'n 538 (2020) [AR 1406-15]....................................................................8

Jen Christensen, *Sky-high prices for air ambulances hurt those they are helping*, CNN (Nov. 26, 2018), https://cnn.it/3KzcPN8 ......................................................................6

Kao-Ping Chua *et al.*, *Prevalence and Magnitude of Potential Surprise Bills for Childbirth*, JAMA Health F. 1 (July 2, 2021), https://bit.ly/3o7GTpL ...................................8

Cong. Budget Off., *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021 Public Law 116-260 Enacted on December 27, 2020* (Jan. 14, 2021) [AR 779-86] ...........................................................11, 13

Cong. Budget Off., *H.R. 2328, Reauthorizing and Extending America's Community Health Act* (Sept. 18, 2019), https://www.cbo.gov/publication/55640. ................................10

Cong. Budget Off., *H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020, Estimated Budgetary Effects* (Feb. 11, 2020), https://www.cbo.gov/publication/56122 ............................................ 10

Cong. Budget Off., *S.1895, Lower Health Care Costs Act 3* (July 16, 2019), https://www.cbo.gov/system/files/2019-07/s1895_0.pdf ......................................... 9

Zack Cooper *et al.*, *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 24 (2020) [AR 3045-53] ................................. 8

Erin Duffy *et al.*, *Policies to address surprise billing can affect health insurance premiums*, 26 Am. J. Managed Care 401 (2020) [AR 1383-88] ............................... 8

Erin Duffy *et al.*, Brookings Inst., *Surprise medical bills increase costs for everyone, not just for the people who get them* (Oct. 2, 2020), https://brook.gs/3FWoXnQ ................... 8

Fair Health, Inc., *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021), https://bit.ly/3tYAO2m. ..................................... 7

Matthew Fielder *et al.*, *Recommendations for Implementing the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Mar. 16, 2021) [AR 795-812]. ................... 14

Christopher Garmon & Benjamin Chartock, *One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills*, 36 Health Affairs 177 (2017) [AR 3418-22] .............................................................................................................. 6

John Hargraves & Aaron Bloschichak, *Air Ambulances – 10 Year Trends in Costs and Use*, Health Care Cost Inst. (Nov. 7, 2019), https://bit.ly/3GXKzSb. ............................. 7

Kaiser Family Found. *et al.*, *Employer Health Benefits: 2022 Annual Survey* 115 (2022), https://bit.ly/3JLzzLK. .................................................................................. 15

Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020), https://nyti.ms/3Iwrffs ...................................... 6

Raymond Kluender *et al.*, *Medical Debt in the US, 2009-2020*, 326 J. Am. Med. Ass'n 250 (2021), https://bit.ly/3KFqh23 ....................................... 5

Alison Kodjak, *Taken For A Ride: M.D. Injured In ATV Crash Gets $56,603 Bill For Air Ambulance Trip*, NPR (Sept. 25, 2018), https://n.pr/35g4DBq ................... 6

Letter from Families USA *et al.* to House Speaker Pelosi and House Minority Leader McCarthy (July 10, 2019), https://bit.ly/3tQAra6 ................................. 12, 13

Letter from Sen. Murray & Rep. Pallone to Hon. Xavier Becerra, Sec'y of Health & Human Servs. (Jan. 7, 2022), https://bit.ly/3qTHv45 ................................. 9

Letter from Jon Godfread, Comm'r, N.D. Ins. Dep't, *et al*. to Hon. Bobby Scott *et al*.
(Nov. 7, 2019), bit.ly/3AkFfau. ...........................................................................7

Celia Llopis-Jepsen, *A Kansan's $50k Medical Bill Shows That You Don't Always*
*Owe What You're Charged*, KCUR (May 26, 2020), https://bit.ly/3Isp2Bt ...........................6

Lunna Lopes *et al*., Kaiser Family Found., *Data Note: Public Worries About And*
*Experience With Surprise Medical Bills* (Feb. 28, 2020) [AR 4040-45] ..................................1

Karen Pollitz *et al.*, *An examination of surprise medical bills and proposals to*
*protect consumers from them*, Peterson-KFF Health System Tracker
(Feb. 10, 2020) [AR 4466-84] ......................................................................5, 6, 7

Karen Pollitz *et al.*, *Surprise bills vary by diagnosis and type of admission*,
Peterson-KFF Health Sys. Tracker (Dec. 9, 2019) [AR4486-91] ...........................5

Reps. Frank Pallone Jr. & Greg Walden, *It's time for Congress to protect patients*
*from surprise medical bills*, The Hill (Nov. 21, 2019), https://bit.ly/33E85FF ......................10

Ryan J. Rosso *et al*., Cong. Research Serv., *Surprise Billing in Private Health*
*Insurance: Overview and Federal Policy Considerations* (Dec. 12, 2019)
[AR 1533-79]..........................................................................................13

U.S. Dep't of Health & Hum. Servs., Office of Health Policy, *Evidence on*
*Surprise Billing: Protecting Consumers with the No Surprises Act*
(Nov. 22, 2021), https://bit.ly/3mU5AZ4.............................................................13

## INTEREST OF *AMICI CURIAE*

*Amici curiae* The Leukemia & Lymphoma Society, The ALS Association, Cancer*Care*, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Inc., The National Multiple Sclerosis Society, National Patient Advocate Foundation, and PIRG (collectively, "*Amici*"), are patient and consumer advocacy organizations that represent or work on behalf of millions of patients and consumers across the country, including those facing serious, acute, and chronic health conditions. Descriptions of *Amici* are in the Appendix.

*Amici* are committed to ensuring that all Americans have a high-quality health care system and access to comprehensive, affordable health insurance to prevent disease, manage health, cure illness, and ensure financial stability. Many patients served by *Amici* are among the one in six Americans who have received a surprise medical bill.[2] Given the impact of surprise bills on those served by *Amici*, many *Amici* joined community principles for surprise billing reforms[3] and worked with Congress to develop the bipartisan, bicameral No Surprises Act of the 2021 Consolidated Appropriations Act (the "No Surprises Act" or the "Act"), Pub. L. No. 116-260, 134 Stat. 1182 (2020) (codified at 42 U.S.C. § 300gg-111). With these community principles as our guide, many *Amici* were heavily engaged throughout the legislative process leading to the Act's passage and Defendants' rulemaking to implement the Act.

*Amici* submit this brief to assist the court in understanding the nature and extent of the harms that surprise billing has caused to patients and consumers—harms that the No Surprises Act was designed to address. A key provision of the Act was the qualified payment amount, or QPA, which plays a major role in keeping health care costs down for patients and consumers by,

---

[2] *See* Lunna Lopes *et al.*, Kaiser Family Found., *Data Note: Public Worries About And Experience With Surprise Medical Bills* (Feb. 28, 2020) [AR 4040, 4041].
[3] *See* ALS Ass'n *et al.*, *Surprise Medical Billing Principles* (Feb. 2020) [attached as Ex. A].

among other things, serving as the benchmark by which patients' cost-sharing responsibilities for out-of-network services are calculated. Based on *Amici*'s experience advocating for patients and consumers during the legislative and rulemaking processes, *Amici* are uniquely positioned to explain to the Court why Defendants' QPA methodology is consistent with the text of the No Surprises Act and furthers Congress's two primary goals in enacting the Act: (1) protecting patients from the most pervasive types of surprise out-of-network bills; and (2) lowering health care costs overall. Because the patients and consumers whom *Amici* serve have a strong interest in the outcome of this case, *Amici* submit this brief in support of Defendants.

## INTRODUCTION

Effective implementation of the No Surprises Act is necessary to reduce the financial burden of illness on patients and help contribute to longer, healthier lives. Through the Act, Congress prohibited out-of-network providers from sending surprise balance bills to patients for hospital-based care and air ambulance services. But the Act went further: not only did it ban surprise bills in these contexts, but it also incorporated various consumer protections designed for the express purposes of keeping individual and overall health care costs down. The legislative history of the Act demonstrates that Congress intended that the Act would serve to protect consumers by curbing escalating costs associated with out-of-network health care. An essential provision of the Act is the qualifying payment amount, or QPA. Although patients who unknowingly receive out-of-network care in emergency situations and when receiving hospital-based care can no longer be subjected to potentially devastating surprise bills, many patients remain responsible for certain cost-sharing requirements, including coinsurance payments or payments for services made before a deductible has been satisfied. Thanks to the No Surprises Act, the QPA—which, under the statute, approximates the median in-network payment amount

for a service—generally serves as the basis on which a patient's cost-sharing amount is now calculated. Defendants, in the reasonable exercise of their statutory obligation to promulgate rules to implement the Act, have adopted the QPA methodology that Plaintiffs challenge in this case. That methodology, as explained in this brief, furthers the Act's central purpose of controlling health care costs.

Plaintiffs—which include providers from specialties that are most likely to provide out-of-network care and frequently levied surprise bills on patients before the No Surprises Act—surely have a financial interest in higher payments for out-of-network services and, in turn, in patients paying more for care through higher cost-sharing. As Defendants rightly point out, however, the Act was designed precisely to control such cost burdens on patients and the health care system in general. Put another way, Congress intended for the Act primarily to protect the economic interests of *consumers*, not providers.

As *Amici* argue in this brief, Defendants correctly assert that (1) Congress, in banning surprise bills and adding other consumer protections in the No Surprises Act, plainly intended to reduce individual and overall health care costs, and (2) surprise billing practices curtailed by the No Surprises Act imposed staggering financial burdens on patients and their families and drove up out-of-pocket health care costs and overall health care costs ultimately borne by consumers in the form of higher premiums. Now that the Act has been in effect for over a year, the benefits to patients and consumers are clear. As Defendants note, the law has prevented over a million surprise bills a month since it went into effect. Defs.' Mem. of Law ("Defs.' Mem."), ECF No. 41, at 1. The consideration of the QPA is essential to minimizing cost-sharing exposure for consumers and preventing the rise of insurance premiums that would likely result if the Act is not implemented in a way that controls costs, as Congress intended.

Defendants—the federal agencies charged by statute with implementing the No Surprises Act and its key provisions, including establishing the QPA methodology—acted reasonably and within the bounds of their statutory authority to devise a QPA methodology that helps control health care costs, as the No Surprises Act demands. Plaintiffs' sustained effort to stymie the effective implementation of the law through serial lawsuits challenging the government's rulemaking—now, in this latest iteration, challenging Defendants' QPA methodology based on a bare desire to drive up the QPA and, in turn, increase payments to providers. Such a policy disagreement is not a sufficient basis for a challenge to the government's reasonable exercise of its rulemaking authority. Accordingly, *Amici* agree with Defendants that Plaintiffs' arguments lack merit and should be rejected by this Court.

## ARGUMENT

## I.   BEFORE THE NO SURPRISES ACT, SURPRISE MEDICAL BILLS IMPOSED STAGGERING FINANCIAL BURDENS ON PATIENTS AND CONSUMERS.

As Congress recognized in passing the No Surprises Act, surprise medical bills can impose "staggering" financial burdens on patients and their families.[4] Before the Act, patients routinely received out-of-network bills, through no fault of their own, when they unknowingly received care from a provider that was not in their insurance network. This was especially true in emergencies when patients often have no way to choose their hospital, physician, or air ambulance provider. But even for non-emergency hospital-based services, patients often received surprise bills when, unbeknownst to them, they received care from out-of-network specialists, such as anesthesiologists or radiologists, during a visit to an in-network hospital. Patients with

---

[4] *See* H.R. Rep. No. 116-615, pt. 1, at 52 (2020) [AR 278, 329].

chronic or serious conditions, such as those with cancer, chronic respiratory disease, or at risk of a heart attack, faced an elevated risk of receiving out-of-network bills.[5]

### A. Surprise Medical Bills for Hospital-Based Care and Air Ambulance Services by Out-of-Network Providers Harmed Millions of Patients and their Families.

Before the No Surprises Act, surprise bills were common and resulted in significant out-of-pocket costs for patients and higher premiums for all consumers.[6] These bills added up. Before the Act took effect, Americans owed more than $140 billion dollars in medical debt, and unpaid medical bills were the largest driver of that debt.[7] Surprise bills hit low-income consumers the hardest: over a quarter of adults could not pay their monthly bills or were one $400 financial setback away from being unable to pay them in full.[8] The added burden of unexpected medical expenses spelled financial ruin for many families.

Surprise bills were particularly common in emergency care settings. In a typical scenario, a patient risked receiving a surprise bill in an emergency if the closest hospital was out-of-network or if the patient was seen by an out-of-network provider at an in-network hospital. One study found that 18 percent of all emergency visits by patients in large employer plans in 2017

---

[5] *See* Karen Pollitz *et al.*, *Surprise bills vary by diagnosis and type of admission*, Peterson-KFF Health Sys. Tracker (Dec. 9, 2019) [AR 4486, 4488]; Karen Pollitz *et al.*, *An examination of surprise medical bills and proposals to protect consumers from them*, Peterson-KFF Health System Tracker (Feb. 10, 2020) [AR 4466, 4468].

[6] *See* H.R. Rep. No. 116-615, pt. I, *supra* note 4, at 53 [AR 278, 330] (summarizing surprise billing data and noting that the cost of inflated payment rates from certain specialties "are directly felt through higher out-of-pocket expenses and exorbitant surprise bills for out-of-network care, as well as by all consumers who share in rising overall health care costs through higher premiums").

[7] Raymond Kluender *et al.*, *Medical Debt in the US, 2009-2020*, 326 J. Am. Med. Ass'n 250, 255 (2021), https://bit.ly/3KFqh23.

[8] Bd. of Governors of Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2020* 4, 33 (May 2021) [AR 2837, 2838].

had at least one out-of-network charge that could result in a surprise bill.[9] Another study

estimated that one in five inpatient emergency room visits could lead to a surprise bill.[10]

Critically ill or injured patients who required emergency transportation from air

ambulance providers were even more likely to face surprise medical bills. While air ambulance

services often reduce transport time for patients during life-threatening situations and are a

critical component of successful treatment for individuals experiencing serious health events,

these patients generally have no choice over whether to use an air ambulance or who provides

that service. Consequently, nearly 70 percent of air ambulance transports are likely to be out-of-

network.[11] There are many harrowing stories from patients who received surprise five-figure

bills for out-of-network air ambulance services.[12] The risk that a patient might receive a surprise

bill from an air ambulance provider also grew over time. The prices charged by air ambulance

providers—and thus the out-of-network bills that these companies send to patients—increased

---

[9] Karen Pollitz *et al.*, *An examination of surprise medical bills and proposals to protect consumers from them*, Peterson-KFF Health System Tracker (Feb. 10, 2020) [AR 4466].

[10] Christopher Garmon & Benjamin Chartock, *One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills*, 36 Health Affairs 177, 177-81 (2017), [AR 3418, 3421].

[11] *See* H.R. Rep. No. 116-615, pt. 1, *supra* note 4, at 52 [AR 278, 329].

[12] *See, e.g.*, Julie Appleby, *The case of the $489,000 air ambulance ride*, NPR (Mar. 25, 2022), http://bit.ly/3A34kX5; Jen Christensen, *Sky-high prices for air ambulances hurt those they are helping*, CNN (Nov. 26, 2018), https://cnn.it/3KzcPN8; Christina Caron, *Families Fight Back Against Surprise Air Ambulance Bills*, N.Y. Times (Apr. 17, 2020), https://nyti.ms/3qRBgh6; Anna Almendrala, *The Air Ambulance Billed More Than The Lung Transplant Surgeon*, NPR (Nov. 6, 2019), https://n.pr/3GWrksd; Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020), https://nyti.ms/3Iwrffs; Celia Llopis-Jepsen, *A Kansan's $50k Medical Bill Shows That You Don't Always Owe What You're Charged*, KCUR (May 26, 2020), https://bit.ly/3Isp2Bt; Alison Kodjak, *Taken For A Ride: M.D. Injured In ATV Crash Gets $56,603 Bill For Air Ambulance Trip*, NPR (Sept. 25, 2018), https://n.pr/35g4DBq; Rachel Bluth, *In Combating Surprise Bills, Lawmakers Miss Sky-High Air Ambulance Costs*, Kaiser Health News (June 14, 2019), https://bit.ly/3fMJC35.

significantly in the years leading up to the passage of the No Surprises Act.[13] According to one study, the use of helicopter ambulances declined by 14.3 percent from 2008 to 2017 while the average price per trip more than doubled, rising 144 percent.[14] Use of airplane ambulances remained steady during this time, even as the average price increased by 166 percent.[15] These spiking prices were partly due to market concentration and greater private equity ownership of air ambulance providers.[16] As 35 state insurance commissioners wrote to Congressional leaders, surprise billing for air ambulance services had, for many providers, become "a business model to prey on people during their most vulnerable time" by "pass[ing] on massive surprise bills to private market consumers and expect[ing] them to make up the claimed difference."[17]

Surprise bills also affected patients in non-emergency contexts (such as surgery or maternity care) at in-network facilities. Among patients in large employer plans, 16 percent of in-network hospital stays in 2017 included at least one out-of-network charge that could have led to a surprise bill.[18] Another study found that 20 percent of all patients who had an elective procedure—such as a hysterectomy, knee replacement, or heart surgery—with an in-network primary surgeon at an in-network facility were still at risk of a surprise bill from an out-of-

---

[13] *See id.*; Ge Bai *et al.*, *Air Ambulances With Sky-High Charges*, 38 Health Affairs (July 2019) (Abstract), https://bit.ly/33HmVeg; Fair Health, Inc., *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021), https://bit.ly/3tYAO2m.

[14] John Hargraves & Aaron Bloschichak, *Air Ambulances – 10 Year Trends in Costs and Use*, Health Care Cost Inst. (Nov. 7, 2019), https://bit.ly/3GXKzSb.

[15] *Id.*

[16] *See* Loren Adler *et al.*, *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020) [AR 4761, 4779-84].

[17] Letter from Jon Godfread, Comm'r, N.D. Ins. Dep't, *et al.* to Hon. Bobby Scott *et al.* 2 (Nov. 7, 2019), bit.ly/3AkFfau.

[18] Karen Pollitz *et al.* (Feb. 10, 2020), *supra* note 5 [AR 4466, 4470].

network specialist.[19] Of these, potential surprise bills averaged more than $1,200 for anesthesiologists and more than $3,600 for surgical assistants.[20] Over 18 percent of families with in-network childbirths in 2019 potentially received a surprise bill for maternal or newborn care, with one-third of these families facing potential surprise bills exceeding $2,000.[21]

### B. Prior to the No Surprises Act, Surprise Billing Increased Health Insurance Premiums and Overall Health Care Costs for Privately Insured Individuals.

Surprise medical bills also increased overall health care costs—which were passed along to consumers through increased premiums.[22] A 2020 study found that health care spending for people with employer-based insurance would have been reduced by 3.4 percent (about $40 billion annually) if certain hospital-based specialists—anesthesiologists, pathologists, radiologists, and assistant surgeons—had been barred from sending surprise bills.[23] Another study concluded that because about 12 percent of health plan spending is attributable to ancillary and emergency services— settings where surprise bills were prevalent—policies to address surprise bills were predicted to reduce premiums by 1 to 5 percent.[24] These studies made clear that all consumers, not just patients who received a surprise bill, paid the price for this practice through higher health costs and premiums.

---

[19] Karan R. Chhabra *et al.*, *Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery with In-Network Primary Surgeons and Facilities*, 323 J. Am. Med. Ass'n 538, 538-47 (2020) [AR 1406, 1407-10].

[20] *Id.*

[21] Kao-Ping Chua *et al.*, *Prevalence and Magnitude of Potential Surprise Bills for Childbirth*, JAMA Health F. (July 2, 2021), https://bit.ly/3o7GTpL.

[22] *See* Erin Duffy *et al.*, Brookings Inst., *Surprise medical bills increase costs for everyone, not just for the people who get them* (Oct. 2, 2020), https://brook.gs/3FWoXnQ.

[23] Zack Cooper *et al.*, *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 24, 24 (2020) [AR 3045, 3049, 3051-52].

[24] Erin L. Duffy *et al.*, *Policies to address surprise billing can affect health insurance premiums*, 26 Am. J. Managed Care 401, 401-04 (2020) [AR 1383].

## II.     CONGRESS INTENDED TO PROTECT PATIENTS FROM SURPRISE BILLS AND ESCALATING HEALTH CARE COSTS.

Protecting patients from surprise medical bills is at the heart of the No Surprises Act. But the law did more than just protect patients from these potentially catastrophic out-of-pocket costs associated with balance billing. The legislative history of the Act, including four major precursor proposals, highlights Congress's consistent and bipartisan objectives of protecting patients from surprise bills *and* protecting consumers from rising health care costs overall. While these proposals varied, lowering costs was a unifying feature of these proposals, underscoring Congress's intent that surprise billing protections should reduce (or at least not increase) out-of-pocket costs and insurance premiums borne by consumers.[25]

### A.    Bipartisan Precursor Proposals to the No Surprises Act Shared the Goals of Reducing Out-of-Pocket Costs for Patients and Overall Health Expenses.

1.    *Lower Health Care Costs Act ("LHCA").* Congressional focus on surprise billing began in earnest in 2018 during hearings held by the Senate Committee on Health, Education, Labor & Pensions ("HELP Committee") on how to reduce health care costs.[26] These hearings led Chair Lamar Alexander (R-Tenn.) and Ranking Member Patty Murray (D-Wash.) to introduce the LHCA,[27] which the Congressional Budget Office ("CBO") estimated would reduce premiums by just over 1 percent relative to then-current law.[28]

---

[25] *See* Letter from Sen. Murray & Rep. Pallone to Hon. Xavier Becerra, Sec'y of Health & Human Servs. (Jan. 7, 2022), https://bit.ly/3qTHv45.

[26] *See, e.g.*, *How to Reduce Health Care Costs: Understanding the Cost of Health Care in America: Hearing of the S. Comm. on Health, Educ., Labor & Pensions*, 115th Cong. 832 (June 27, 2018), https://bit.ly/33VO9xD.

[27] S. Comm. on Health, Educ., Labor & Pensions, *Senate Health Committee Leaders Introduce Bipartisan Legislation to Reduce Health Care Costs* (June 19, 2019), https://bit.ly/33Zg3sA.

[28] Cong. Budget Off., *S.1895, Lower Health Care Costs Act* 3 (July 16, 2019) ("CBO S.1895 Cost Est."), https://www.cbo.gov/system/files/2019-07/s1895_0.pdf.

2. *No Surprises Act of 2019 ("NSA of 2019")*. At the same time the Senate HELP Committee debated the LHCA, the House Committee on Energy and Commerce debated its own proposal, the NSA of 2019, introduced in July 2019 by Committee Chair Frank Pallone, Jr. (D-N.J.) and Ranking Member Greg Walden (R-Ore.).[29] Here too, the CBO estimated that premiums would be about 1 percent lower than under then-current law.[30] The bill's sponsors touted both its surprise billing protections and associated health care cost savings, citing the CBO estimate that the government would save $20 billion in the first decade after the bill's passage.[31]

3. *Consumer Protections Against Surprise Medical Bills Act ("CPASMBA")*. In December 2019, bipartisan leaders of the House Ways and Means Committee—Chair Richard E. Neal (D-Mass.) and Ranking Member Kevin Brady (R-Tex.)—agreed on a strategy to address surprise bills that included an IDR process "[d]esigned to protect against inadvertently raising health care costs."[32] The agreement led to the introduction of the CPASMBA in February 2020. The CBO estimated that this bill would reduce insurance premiums by 0.5 to 1 percent.[33]

4. *Ban Surprise Billing Act*. In February 2020, the House Education and Labor Committee advanced its own bipartisan legislative proposal, the Ban Surprise Billing Act, introduced by Chair Robert C. Scott (D-Va.) and Ranking Member Virginia Foxx (R-N.C.).[34] In

---

[29] *See* H. Energy & Commerce Comm., *Pallone & Walden on Committee Passage of No Surprises Act* (July 17, 2019), https://bit.ly/3JOwDxV.

[30] Cong. Budget Off., *H.R. 2328, Reauthorizing and Extending America's Community Health Act* 6 (Sept. 18, 2019) ("CBO H.R. 2328 Cost Est."), https://www.cbo.gov/publication/55640.

[31] Reps. Frank Pallone Jr. & Greg Walden, *It's time for Congress to protect patients from surprise medical bills*, The Hill (Nov. 21, 2019), https://bit.ly/33E85FF.

[32] H. Ways & Means Comm., *Ways and Means Committee Surprise Medical Billing Plan* (Dec. 11, 2019), https://bit.ly/3yKqXP2.

[33] Cong. Budget Off., *H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020, Estimated Budgetary Effects* (Feb. 11, 2020) ("CBO H.R. 5826 Cost Est."), https://www.cbo.gov/publication/56122.

[34] H. Educ. & Labor Comm., *Committee Advances Bipartisan Solution to Ban Surprise Billing* (Feb. 11, 2020), https://bit.ly/3LwUwep.

a summary of that proposal, the Committee noted that it included "several commonsense guardrails" to prevent higher health care costs for consumers.[35] The CBO agreed, estimating that the Ban Surprise Billing Act would reduce premiums by roughly 1 percent.[36]

### B.  The No Surprises Act Shared the Earlier Bills' Cost-Reduction Goals.

Congress's commitment to protecting patients from surprise medical bills and reducing health care costs culminated in a bipartisan, bicameral compromise that became the version of the No Surprises Act ultimately passed in 2021. In December 2020, leaders of the Senate HELP Committee and the House Committees on Energy and Commerce, Ways and Means, and Education and Labor announced this bipartisan agreement.[37] As with the earlier committee bills, lowering health care costs remained a high priority. The joint statement noted that the compromise bill would "protect patients from surprise medical bills and promote fairness in payment disputes between insurers and providers, *without increasing premiums for patients*."[38] The CBO confirmed this intent and estimated that, similar to the precursor proposals, the Act would reduce premiums by 0.5 to 1 percent.[39]

It was no mystery why these bills would reduce premiums. The CBO assumed for each bill that premiums would decline because payments to some providers would be lower than

---

[35] H. Educ. & Labor Comm., *Section-by-Section: The Ban Surprise Billing Act (H.R. 5800)* 1-2 (Feb. 11, 2020), https://bit.ly/3llgVke.

[36] Cong. Budget Off., *H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Estimated Budgetary Effects* (Feb. 13, 2020) ("CBO H.R. 5800 Cost Est."), https://www.cbo.gov/publication/56134.

[37] S. Comm. on Health, Educ., Labor & Pensions, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), https://bit.ly/3rSj1Ht.

[38] *Id.* (emphasis added).

[39] Cong. Budget Off., *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021 Public Law 116-260 Enacted on December 27, 2020* 3 (Jan. 14, 2021) ("CBO H.R. 133 Estimate") [AR 779, 780-81].

current average rates.[40] The CBO analyses of these bills reflected the same conclusion: average payment rates for both in- and out-of-network care would move toward the median in-network rate under the proposed laws.[41] Since the median in-network rate tends to be lower than average rates, premiums would be reduced by up to 1 percent in most affected markets in most years.[42]

### C.  In Passing the No Surprises Act, Congress Embraced the Core Principle That Surprise Billing Protections Should Keep Patients' Out-of-Pocket Costs Down.

A core principle adopted by coalitions of patient and consumer advocates, including many *Amici*, was that surprise billing protections should "ensure costs are not simply passed along to patients through higher premiums or out-of-pocket costs"[43] and "hold costs down."[44]

Congress heeded this call: In a joint statement announcing the bipartisan agreement that would become the Act, the chair and ranking members of the Senate HELP Committee and the House Committees on Energy and Commerce, Ways and Means, and Education and Labor explained that lowering health care costs was a high priority. These Congressional leaders noted that the "bipartisan, bicameral deal" would "protect patients from surprise medical bills and promote fairness in payment disputes between insurers and providers, without increasing premiums for patients."[45] The CBO confirmed this intent and estimated that the Act would

---

[40] *See* CBO S.1895 Cost Est., *supra* note 28, at 3; CBO H.R. 2328 Cost Est., *supra* note 30, at 6; *see* CBO H.R. 5826 Cost Est., *supra* note 33; CBO H.R. 5800 Cost Est., *supra* note 36.

[41] *See* CBO H.R. 5826 Cost Est., *supra* note 33; CBO H.R. 5800 Cost Est., *supra* note 36.

[42] *See* CBO H.R. 5826 Cost Est., *supra* note 33; CBO H.R. 5800 Cost Est., *supra* note 36.

[43] ALS Ass'n *et al.*, *supra* note 3, at 2.

[44] Letter from Families USA *et al.* to House Speaker Pelosi and House Minority Leader McCarthy, at 2 (July 10, 2019), https://bit.ly/3tQAra6.

[45] S. Comm. on Health, Educ., Labor & Pensions, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), https://bit.ly/3rSj1Ht.

reduce premiums by 0.5 to 1 percent.[46] This dual focus on out-of-pocket costs and premiums is also reflected in the comments that many *Amici* and others made to Congress.[47]

Throughout the legislative process for the No Surprises Act and its predecessor bills, Congress was also focused on reducing patients' out-of-pocket costs by limiting the amount patients paid through cost-sharing (i.e., copayments, coinsurance, payments toward deductibles) for individual services. The various proposals did so "by tying consumer cost sharing (in some capacity) to what cost sharing would be had specified services been provided in network."[48]

## III.   DEFENDANTS' QPA METHODOLOGY FURTHERS CONGRESS'S GOAL OF PROTECTING CONSUMERS FROM HIGH OUT-OF-POCKET COSTS.

Based on this history, there is no question that Congress's intent in passing the No Surprises Act was both to protect patients from surprise medical bills and lower health care costs. The qualifying payment amount, or QPA, is a key part of these protections.

The way the QPA is calculated has direct and immediate financial consequences on patients. The No Surprises Act "generally requires that cost-sharing for [out-of-network] services . . .  not be greater than what would be charged on an in-network basis."[49] Consistent with this general requirement, the Act establishes that the amount a patient pays for an out-of-network service through cost-sharing (such as through coinsurance or payments made toward a deductible) is based on the "recognized amount," which, in most cases, is the same as the QPA.[50]

---

[46] Cong. Budget Office, *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021, Public Law No. 116-260, Enacted on December 27, 2020* 3 (Jan. 14, 2021) [AR 779, 780-81].

[47] *See, e.g.*, *id.*; Letter from Families USA *et al.* to House Speaker Pelosi and Leaders McConnell, McCarthy, and Schumer (Nov. 12, 2019), https://bit.ly/3tWPCP9.

[48] Ryan J. Rosso *et al*., Cong. Research Serv., *Surprise Billing in Private Health Insurance: Overview and Federal Policy Considerations*, at 12 (Dec. 12, 2019) [AR 1533, 1548-49].

[49] U.S. Dep't of Health & Hum. Servs., Office of Health Policy, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act* 5 (Nov. 22, 2021), https://bit.ly/3mU5AZ4.

[50] Defs.' Mem. at 1-2, 28.

In a nutshell, if the QPA for the service at issue is lower, the patient's cost-sharing portion will be lower; a higher QPA would result in a higher cost-sharing burden for the patient.[51]

Coinsurance and pre-deductible health care payments contribute to substantial out-of-pocket health care costs that can be financially devastating for families, with particularly harmful impacts on Black, Latino, and low-income individuals and households.[52] One study found that, in 2020, the average person on an employer-based health plan had $853 in out-of-pocket costs—an amount that exceeds many households' basic monthly living expenses; the average for people with at least one inpatient hospital stay was nearly four times that, at $3,161.[53] Individuals unable to afford these costs often delay or skip necessary care, with detrimental consequences.[54]

In this case, Plaintiffs improperly ask the Court to displace the government's reasonable approach to the QPA methodology with their own preferred formula—which would almost surely drive up the QPA in many cases and increase already high out-of-pocket costs for patients and their families. If, for example, the QPA factored in bonuses and incentive payments (which bear no relation to the cost of individual services or patients' cost-sharing), as Plaintiffs would prefer, the higher resulting QPAs would increase patients' cost-sharing burdens.[55] This would harm many Americans: 78 percent of workers with employer health plans have coinsurance obligations for inpatient hospital admissions, with another 10 percent having both copayment

---

[51] *See* Loren Adler *et al.*, *Understanding the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Feb. 4, 2021) [AR 1372, 1375]; Matthew Fielder *et al.*, *Recommendations for Implementing the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Mar. 16, 2021) [AR 795, 801].

[52] Debra Bozzi *et al.*, Health Care Cost Inst., *ESI Enrollees Paid $853 on Average Out-of-Pocket for Health Care in 2020, But Some People Paid Over Four Times as Much* (Dec. 20, 2022), http://bit.ly/3yJPWCe.

[53] *Id.*

[54] *Id.*

[55] *See* Defs.' Mem. at 28-29.

and coinsurance obligations for that inpatient care, in addition to any general annual deductible.[56]

A hypothetical example illustrates the point: A patient receives care from an out-of-network anesthesiologist during an emergency surgery. The patient's plan has a 30 percent coinsurance requirement. Under the current QPA methodology, the recognized amount for the anesthesiologist's services is $6,000. The patient would be responsible for $1,800 in coinsurance. At a higher QPA—say, $8,000—the patient's coinsurance would be $2,400, a $600 increase. In situations like this, the potential windfall to providers would expose patients to greater financial burdens, an outcome that would flip the No Surprises Act on its head.

Plaintiffs' requested vacatur of the current QPA methodology would harm the very patients and consumers the No Surprises Act was intended to protect. Contrary to the statute's dual purpose of ending surprise billing and otherwise protecting consumers from rising health care costs associated with out-of-network care, a vacatur of the QPA methodology would expose patients to higher cost-sharing and, ultimately, higher insurance premiums. These are precisely the types of burdens that Congress designed the No Surprises Act to prevent and mitigate.

## CONCLUSION

Defendants' QPA methodology adheres to the text and purpose of the No Surprises Act. Because Defendants reasonably exercised their statutory authority to develop the QPA methodology and did so in a way that furthers Congress's goals of reducing patients' out-of-pocket health care costs and overall health care expenses, Defendants' methodology is not arbitrary and capricious. *Amici* respectfully request that the Court deny Plaintiffs' summary judgment motions and grant Defendants' cross-motion for summary judgment.

---

[56] Kaiser Family Found. *et al.*, *Employer Health Benefits: 2022 Annual Survey* 115 (2022), https://bit.ly/3JLzzLK.

DATED: March 17, 2023

Respectfully submitted,

/s/ Joseph J. Wardenski
Joseph J. Wardenski (admitted *pro hac vice*)
WARDENSKI P.C.
195 Plymouth Street, Suite 519
Brooklyn, NY 11201
(347) 913-3311
joe@wardenskilaw.com

*Counsel for The Leukemia & Lymphoma Society, The ALS Association, CancerCare, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Inc., The National Multiple Sclerosis Society, National Patient Advocate Foundation, and PIRG*

**APPENDIX**

**Descriptions of *Amici Curiae***

*The Leukemia & Lymphoma Society* ("LLS") is the world's largest voluntary health agency dedicated to fighting blood cancer and ensuring that the more than 1.3 million blood cancer patients and survivors in the United States have access to the care they need. LLS's mission is to cure leukemia, lymphoma, Hodgkin's disease, and myeloma, and to improve the quality of life of patients and their families. LLS advances that mission by advocating that blood cancer patients have sustainable access to quality, affordable, coordinated health care, regardless of the source of their coverage.

*The ALS Association* is the only national nonprofit organization fighting ALS on every front. The mission of The ALS Association is to discover treatments and a cure for ALS, and to serve, advocate for, and empower people affected by ALS to live their lives to the fullest. By leading the way in global research, providing assistance for people with ALS through a nationwide network of chapters, coordinating multidisciplinary care through certified clinical care centers, and fostering government partnerships, The Association builds hope and enhances quality of life while aggressively searching for new treatments and a cure.

The *Cancer Support Community* ("CSC"), as the largest professionally led nonprofit network of cancer support worldwide, is dedicated to ensuring that all people impacted by cancer are empowered by knowledge, strengthened by action, and sustained by community. CSC delivers more than $50 million in free support and navigation services to cancer patients and their families. CSC also conducts cutting-edge research on the emotional, psychologic, and financial journey of cancer patients and advocate at all levels of government for policies to help individuals whose lives have been disrupted by cancer.

*CancerCare* is the leading national organization providing free, professional support services and information to help people manage the emotional, practical, and financial challenges of cancer.

The *Epilepsy Foundation* is the leading national and voluntary health organization that speaks on behalf of more than 3.4 million Americans with epilepsy and seizures. Uncontrolled seizures can lead to disability, injury, or death. Epilepsy medications are the most common use for seizure treatment and is a cost-effective treatment for controlling and/or reducing seizures. So, making access to quality, affordable, physician-directed care, and effective coverage for epilepsy medications critically vital for people living with epilepsy.

*Families USA Action* is a 501(c)(4) social welfare organization with the mission of creating a system that delivers the best health and health care for all people in the United States. On behalf of health care consumers, working people, and patients, Families USA Action has led the No Surprises: People Against Unfair Medical Bills campaign since 2019, and has advocated for legislation and rulemaking that fully protect consumers from surprise bills while ensuring health care costs do not inflate overall. The organization's work on these issues emerged from consumers' reports of unaffordable surprise billing, and from reports by consumer advocates of their inability to address these issues in the past.

*Hemophilia Federation of America* ("HFA") is a community-based, grassroots advocacy organization that assists, educates, and advocates for people with hemophilia, von Willebrand disease, and other rare bleeding disorders. Bleeding disorders are serious, life-long, and expensive. HFA seeks to ensure that individuals affected by bleeding disorders have timely access to quality medical care, therapies and services, regardless of financial circumstances or place of residence.

The *National Multiple Sclerosis Society* mobilizes people and resources so that the nearly one million people affected by multiple sclerosis ("MS") can live their best lives while the Society works to stop MS in its tracks, restore what has been lost, and end MS forever.

*National Patient Advocate Foundation* is the advocacy affiliate of the Patient Advocate Foundation, a national charitable organization that provides direct assistance and support service for patients and families coping with complex and chronic conditions. The Foundation works to improve equitable health care access and mitigate distressing financial and other burdens these populations often experience.

*PIRG* is a not-for-profit organization that advocates for the public interest, working to win concrete results on real problems that affect millions of lives, and standing up for the public against powerful interests when they push the other way. It employs grassroots organizing and direct advocacy for the public on many different issues including healthcare, preserving competition, and protecting consumer welfare.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2023, I electronically filed the foregoing Brief of Ten Patient and Consumer Advocacy Organizations as *Amici Curiae* in Support of Defendants with the Clerk of Court and served the same on all counsel of record using the Court's CM/ECF electronic filing system.

/s/ Joseph J. Wardenski
Joseph J. Wardenski