**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Civil Action No. 6:22-cv-00450-JDK <br><br> Lead Consolidated Case |

**BRIEF *AMICI CURIAE* OF
THE AMERICAN BENEFITS COUNCIL, BUSINESS GROUP ON HEALTH, COUNCIL
OF INSURANCE AGENTS AND BROKERS, DFW BUSINESS GROUP ON HEALTH,
ERISA INDUSTRY COMMITTEE, HOUSTON BUSINESS COALITION ON HEALTH,
HR POLICY ASSOCIATION, NATIONAL ALLIANCE OF HEALTH CARE
PURCHASER COALITIONS, NATIONAL RETAIL FEDERATION, PURCHASER
BUSINESS GROUP ON HEALTH, SELF-INSURANCE INSTITUTE OF AMERICA,
TEXAS BUSINESS GROUP ON HEALTH, TEXAS EMPLOYERS FOR AFFORDABLE
HEALTHCARE
IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
<u>AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF THE AMICI CURIAE ............................................................................ 1

INTRODUCTION ........................................................................................................... 4

ARGUMENT ................................................................................................................... 6

    I.    The IFR Properly Implements the QPA as a Proxy for In-Network Rates ......................... 6

        a.    The Tri-Agencies' Regulations Properly Excluded Bonus Payments From the QPA Calculation ................................................................................................. 7

        b.    The Tri-Agencies' Regulations Properly Account for All Negotiated Rates, One-off Agreements and Provider Specialty in the QPA Calculation ..................................... 10

    II.    The Tri-Agencies' Regulations Align with the NSA's Goal to Drive Down Healthcare Costs .................................................................................................................. 12

    III.  Remand With Vacatur Exposes Participants to Irreparable Harms ................................. 15

CONCLUSION ............................................................................................................... 15

    Appendix ..................................................................................................................... I

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................ 11

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
   No. 6:22-CV-372-JDK, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) ................................ 9, 10

**Statutes**

29 U.S.C. § 1185e(a)(1) ................................................................................ 7

29 U.S.C. § 1185e(a)(1)(C)(ii) ................................................................................ 7

29 U.S.C. § 1185e(a)(3)(E) ................................................................................ 6, 8, 10

29 U.S.C. § 1185e(a)(3)(E)(i) ................................................................................ 12, 13

29 U.S.C. § 1185e(a)(3)(E)(iii) ................................................................................ 14

29 U.S.C. § 1185e(a)(3)(E)(iv)(IV) ................................................................................ 13

29 U.S.C. § 1185e(a)(3)(H) ................................................................................ 7, 15

29 U.S.C. § 1185e(b)(1)(A) ................................................................................ 7

29 U.S.C. § 1185e(b)(1)(B) ................................................................................ 5, 7

29 U.S.C. § 1185e(c) ................................................................................ 10

29 U.S.C. § 1185e(c)(5)(C)(i) ................................................................................ 5

42 U.S.C. § 300gg-111(a)(2)(B)(a)(1) ................................................................................ 6

42 U.S.C. § 300gg-131 ................................................................................ 7

42 U.S.C. § 300gg-132 ................................................................................ 7

42 U.S.C. § 300gg-135 ................................................................................ 7

**Rules**

Fed. R. App. 29(a)(2) ................................................................................ 1

Fed. R. App. 29(a)(4)(E) ................................................................................ 1

**Regulations**

45 C.F.R. § 149.140(b)(2)(iv) ............................................................................................ 7

45 C.F.R. § 149.140(d)(1)(i) ............................................................................................. 5

*Requirements Related to Surprise Billing; Part I,*
    86 Fed. Reg. 36,872 (July 13, 2021) ...................................................................... 1, 7

## INTEREST OF THE AMICI CURIAE[1]

*Amici* are a group of entities comprised of trade organizations, employer and industry groups and coalitions that collectively represent thousands of employers that together provide health insurance coverage for many millions of employees and their families. In fact, *Amici*, which include both national and Texas-based organizations, are involved in some way in the provision of health insurance coverage for nearly all Americans covered by employer-sponsored group health plans.[2] And as payers of healthcare services, *Amici* and their members have an immense interest in the implementation of the No Surprises Act ("NSA") (H.R. 133, Consolidated Appropriations Act, Division BB), including the *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872 (July 13, 2021) ("IFR") and subsequent guidance ("Regulations").

As Defendants ably explain, the NSA protects participants for good reason; surprise medical bills can be financially and emotionally devastating to participants already dealing with the challenges of a medical emergency or serious health condition. Prior to the NSA, participants had no meaningful way to avoid surprise bills, especially with respect to emergency care, and the financial burden imposed by surprise bills was in many cases extraordinary. *See, e.g.* ECF 41 at 3–6 (summarizing the profound cost of surprise medical bills). This is why, prior to the NSA, plan sponsors (such as *Amici* and their members) often bore this burden, stepping in to provide financial protection for employees and their families facing surprise bills.

---

[1] No party's counsel authored this brief either in whole or in part, and no party or party's counsel, or person or entity other than *Amici*, their members, and their counsel, contributed money intended to fund preparing or submitting this brief. Counsel for both parties have consented to the filing of this brief. *See* Fed. R. App. 29(a)(2), (a)(4)(E).

[2] See the attached appendix for a more detailed description of each amicus.

The NSA has already protected patients from many millions of surprise bills, despite extensive efforts by some providers, including Plaintiffs, to undermine the NSA and its important twin policy goals of protecting patients and reducing healthcare costs. AHIP, *New Study: No Surprises Act Protects 9 Million Americans from Surprise Medical Bills* (Nov. 17, 2022), https://www.ahip.org/news/press-releases/new-study-no-surprises-act-protects-9-million-americans-from-surprise-medical-bills ("The No Surprises Act has now protected 9 million Americans from [surprise bills]"). As a general matter, *Amici* are gravely concerned about Plaintiffs' repeated efforts to dismantle the NSA through near-constant litigation, due to the potential impacts on participants and the healthcare system. More specifically, *Amici* have substantial interests in the specific focus of the case at hand—the calculation of the qualifying payment amount ("QPA"). This is because it is *Amici's* members who must calculate the QPA, which is a complex undertaking, and also because the QPA plays an important role in all the key elements of the NSA—it is the basis for participant cost-sharing, it can be used to determine initial payments to providers, it is often raised in open negotiation, and it is a factor that must be considered in independent dispute resolution (IDR), each of which involve *Amici*.

Moreover, seeking to manipulate the QPA in their favor—as Plaintiffs do here—frustrates not only the NSA's goal of protecting participants, but also its goal of reducing healthcare costs. In addition to exposing patients to highly disruptive and financially damaging balance bills, providers' surprise billing practices undermined plans' efforts to develop high-quality, cost-effective network designs that allow plans to effectively manage the cost of healthcare. The pre-NSA payment environment gave providers an opportunity to leverage participants' lack of choice to remain out-of-network with plans and issuers so they could charge above-market, and in many cases exorbitant, rates on unsuspecting patients, or to demand

extremely inflated rates to join provider networks—resulting in a clear market failure. Of course, this market failure had beneficiaries, *i.e.*, the providers that view surprise balance billing as a source of revenue. This economic distortion resulted in unnecessary and increased costs for the healthcare system generally, but most specifically, for plan sponsors (such as *Amici* and their members) and the individuals enrolled in the related plans, through higher premium contributions, reduced benefits, or both. And Plaintiffs' ongoing litigation seeks to undo the NSA's correction of this economic distortion. In this case, the changes Plaintiffs seek in this case would undermine the reliability of the QPA calculations, drive up administrative costs associated with calculating the QPA, and alter the QPA calculation in an effort to materially increase the providers' payments under the NSA. The collective effect of these changes directly increase participant cost share, and further increase plan overhead and payments to out-of-network providers.

Collectively, *Amici* have expended considerable efforts to support a federal solution to the scourge of surprise medical bills. Many of the *Amici* engaged with Congress, including its individual members and various committees, for over three years regarding a potential federal legislative solution and were extensively involved in the legislative process that resulted in the NSA. *Amici* not only worked with members of Congress to develop and refine federal legislation they also testified before congressional committees regarding the harmful effects of surprise medical billing on group health plans and their participants, the need for a comprehensive and effective solution to surprise bills, and how a well-designed and implemented solution could help bring down health plan costs caused by surprise billing practices.[3] *Amici* also advocated on

---

[3] *See Testimony of Ilyse Shuman before the House of Representatives Comm. on Educ. and Labor, Subcommittee on Health, Emp., Labor, and Pensions* (Apr. 2, 2019), https://edworkforce. house.gov/uploadedfiles/ilyse_schuman_-_testimony.pdf; *Witness Statement of James Gelfand*

behalf of their members and employees during the rulemaking process that followed the enactment of the NSA. For all these reasons, *Amici* are uniquely positioned to assist the Court by providing insight into the requirements under the statute and its impact on the American people.

## INTRODUCTION

The case before the Court represents yet another effort by a very small subset of providers to undermine a duly enacted federal statute through a strategy best summarized as death by a thousand cuts. The NSA resulted from a multi-year process of legislative give and take, culminating in a carefully crafted solution that aimed to both protect patients against surprise balance bills and, in doing so, lower healthcare costs to the system. The bargained outcome achieved the goal of protecting patients from unscrupulous provider billing practices, while also ensuring that providers receive reasonable payment for the out-of-network services they render, including through the IDR process. Notably, providers prevailed in obtaining a system that included the IDR process, having opposed the adoption of a benchmark payment rate for which payers advocated.  *See* Lower Health Care Costs Act, S. 1895, 116th Congress (2019), https://www.congress.gov/bill/116th-congress/senate-bill/1895. However, rather than adapt to the new regulatory landscape imposed by the NSA, the Plaintiffs turn to this court, again, to revise the policy decisions of Congress and to convert the NSA from a patient-protection statute to a provider-focused payment system—one in which they seek to preserve and codify the excessive amounts they were able to charge and collect by remaining out of network and balance bill patients necessitating the passage of the NSA. In so doing, Plaintiffs fail to acknowledge the

---

*for Testimony before House Ways and Means Health Subcommittee* (May 21, 2019), https://docs. house.gov/meetings/WM/WM02/20190521/109508/HHRG-116-WM02-Wstate-GelfandJ-20190521.pdf.

intent of Congress in adopting the NSA, and the interpretive authority of the Tri-Agencies in implementing the NSA.

The Plaintiffs' claims cannot be properly weighed without understanding the multifaceted role the QPA plays in the NSA's carefully crafted solution to surprise balance bills. Under the NSA, the QPA is primarily used by group health plans and issuers to determine an enrollee's cost-sharing or out-of-pocket costs. *See* 29 U.S.C. §§ 1185e(a)(1)(C)(ii), (b)(1)(B). Further, where the Recognized Amount is based on the QPA, the QPA must be disclosed to the provider and in many cases will be the basis for the initial payment amount itself. 45 C.F.R. § 149.140(d)(1)(i).  Additionally, the QPA is one of the factors that must be considered by the IDR entity as part of the IDR process. *See* 29 U.S.C. § 1185e(c)(5)(C)(i). Given its multifaceted role, it is imperative that there be both consistency and predictability in the determination of the QPA.

Unfortunately, Plaintiffs now seek to undermine the methodology used to determine the QPA in an effort to upset the considered judgement of Congress and the NSA as a whole. Furthermore, rather than acknowledge that a principal goal of the NSA is to bring down healthcare costs, Plaintiffs seek to increase the administrative complexities and associated costs with calculating the QPA. This series of assaults, taken together, would untether the operation of the NSA from its text as well as Congress' intent. In short, having disagreed with the carefully crafted Congressional bargain struck in the form of the NSA, Plaintiffs now seek to prevent its implementation through an obvious litigation strategy of dismantling the NSA, piece by piece. In light of the foregoing, we urge this court carefully consider the actual motives of plaintiffs in bringing yet another challenge to the NSA's regulatory implementation.  Nonetheless, regardless of Plaintiffs' motives, each of the challenged regulations is fully supported by the text of the NSA, and also accords with the larger policy goals undergirding the NSA. The challenged

regulations represent the Tri-Agencies' reasonable interpretation of a statute that governs a complex payment scheme for which Congress specifically delegated implementation and enforcement authority to the Tri-Agencies.

Importantly, given the centrality of the QPA in processing participant claims, if the court agrees with Plaintiffs on the merits, the appropriate remedy should be remand without vacatur. Vacating the rule, as Plaintiffs request, will not only impact future decisions reached in the IDR process, but will cause patients to face increased cost shares while the Tri-Agencies seek to re-implement the provisions of the IFR. In contrast, remanding *without* vacatur will ensure that the millions of individuals covered under employer-sponsored group health plans do not face financial harm as the courts continue to evaluate the parade of litigation brought by the Plaintiffs.

## ARGUMENT

### I.    The IFR Properly Implements the QPA as a Proxy for In-Network Rates

The NSA protects participants against surprise medical bills by preventing providers from balance billing in certain circumstances and limiting the participant's financial exposure to roughly the same level of cost-sharing they would face if they were able to choose an in-network provider. The QPA accomplishes the latter, and it is designed as a proxy for an in-network rate that would apply for the same or similar service in a similar geography. *See* 42 U.S.C. § 300gg-111(a)(2)(B) (requiring rulemaking to establish the QPA calculation methodology taking into account geography); 29 U.S.C. § 1185e(a)(3)(E) (defining the QPA as the "…the median of the *contracted* rates recognized by the plan or issuer…" which necessarily only accounts for in-network rates) (emphasis added).  The regulatory framework developed by the Tri-Agencies implements the QPA provisions of the NSA consistent with the statutory directive that the QPA reflect the median in-network rate, not some higher rate that incentivizes undesirable market

behavior. Congress's intent to establish a system that mirrors a patient's in-network obligations is evident on the face of the NSA, which explicitly aligns cost-sharing for participants receiving NSA-covered services to the same cost share that would apply if the provider was in-network. *See* 29 U.S.C. §§ 1185e(a)(1)(C)(ii), (b)(1)(A), 1185e(a)(1). The statute bases the cost-sharing applicable to a participant charge not on the billed amount or the amount paid under the terms of the plan, but rather on the "recognized amount" which is either the rate set by state law (as applicable) or the QPA. *See* 29 U.S.C. §§ 1185e(a)(1)(C)(ii), (b)(1)(B); 29 U.S.C. § 1185e(a)(3)(H). The mechanism for determining cost share, when coupled with the prohibition on balance billing results in the patient facing nearly identical financial circumstances as though treated by an in-network provider. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135.

In light of this clear statutory directive, to give credence to Plaintiffs' allegations would, in many instances, cause inflated QPA determinations resulting in excessive cost-sharing to participants, additional costs to the system as a whole, and a return to the market distortion that required Congress to act initially.  Clearly, such a result would be contrary to both Congress's intentions when designing and enacting the NSA and to the policy goals underlying the NSA's carefully calibrated legislative bargain.

### a. The Tri-Agencies' Regulations Properly Excluded Bonus Payments From the QPA Calculation

The IFR provides that the QPA calculation "[e]xclude[s] risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). The Tri-Agencies explained they implemented this design because "excluding these payments and payment adjustments from the median contracted rates used to determine cost sharing . . . is consistent with how cost sharing is typically calculated for in-network items and services." 86 Fed. Reg. at 36,894. Plaintiffs ask the court to reject this view of the NSA, and

instead to effectively create incentives for providers to avoid network participation, by leveraging the QPA to gain payment commensurate with that available through value-based insurance arrangements, and without being required to provide the same value offered by in-network participating providers. Moreover, the Plaintiffs' preferred reading of the statute would cause participants to confront higher cost-sharing in absolute dollars, as well as higher cost-sharing for NSA-covered, out-of-network services when compared to in-network services, both in direct contrast to the clear Congressional intent as embodied by the text of the statute. 29 U.S.C. § 1185e(a)(3)(E).

Excluding bonus payments from the QPA mirrors current day market practice. In-network cost sharing does not typically account for bonus or incentive payments.  This is because bonus and incentive payments do not typically reflect the provision of specific services, but rather whether or not the provider met certain metrics over the course of time. Further, bonus and incentive payments are core to the value-based insurance designs at the heart of most plan's efforts to maintain high-quality, high-value provider networks. Bonus and incentive payments are amounts paid by plans and issuers to providers that elect to negotiate an in-network contract and are typically awarded when providers deliver a certain level of service, quality or care to plan participants.  These bonus or incentive payments are usually highly contingent and separate and apart from the negotiated service rate payable by the plan or issuer to the provider. A rule that requires the QPA to account for these payments would provide an incentive to providers to remain outside of networks as these providers would be able to enjoy the same economic rewards as network providers without having to otherwise meet the service and quality of care metrics required of a network provider.

Moreover, bonus and incentive payments are not guaranteed. By their very nature, such payments are contingent on factors that may be at least partially outside of the control of the provider, such as overall utilization, improved outcomes, or patient satisfaction—all of which are measured over significant periods of time. Thus, while bonus and incentive payments are ascertainable after the fact, they do not naturally apply on a claim-by-claim basis, but rather reflect a provider's performance over a period of time. As a result, these payments are not included in the in-network calculation of cost sharing for specific claims, and no plans of which *Amici* are aware retrospectively adjust participant cost share to reflect additional bonus or incentive payments made to the provider. Moreover, including these payments in the QPA calculation would: drive up participant costs above the costs participants experience in-network; increase the administrative burden associated with the QPA calculation; and disproportionately favor providers in the IDR process. This court has already held that rules which improperly favor an outcome in ways not expressly provided for in the statute should be struck down. *See, e.g. Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-CV-372-JDK, 2023 WL 1781801, at *4 (E.D. Tex. Feb. 6, 2023) (noting that the Court vacated a rule where it "improperly 'places its thumb on the scale for the QPA'").

*Amici* note for the court that there should be little to no chance of plans gaming the system due to bonuses and incentives being excluded from the rates used to calculate the QPA. This is because the NSA bases its rates on a year prior to its enactment (*i.e.*, 2019 rates). Accordingly, plans cannot now recharacterize their network provider compensation into bonus and incentive payments in order to arbitrarily depress the QPA.

### b.  The Tri-Agencies' Regulations Properly Account for All Negotiated Rates, One-off Agreements and Provider Specialty in the QPA Calculation

Plaintiffs lodge a series of complaints regarding specific elements of the QPA calculation that they believe each act to improperly depress the resulting QPA. Plaintiffs, however, fundamentally misunderstand the purpose of the QPA: it is not a proxy for market rates writ large (i.e., as an average of in and out-of-network rates for a given service in a given geographic region); instead, the QPA is simply a proxy for in-network rates for a given service in a given geographic region. *See* 29 U.S.C. § 1185e(a)(3)(E) (defining the QPA as the "…the median of the *contracted* rates recognized by the plan or issuer…") (emphasis added). Indeed, if a plan pays an out-of-network provider less than the provider believes is reasonable, the only portion of that provider's payment that is fixed upon the QPA (where there is no state database) is the patient cost share. Congress designed the statutory scheme to ensure that each provider has the ability to seek additional payment amounts through the mandatory negotiation process, and, if necessary, through the IDR process before an independent third-party arbiter.  As recent decisions have provided, the QPA must be considered in IDR process but the IDR entity must not privilege the QPA over any of the other specified evidence in determining the reasonable payment amount. *See, e.g. Texas Med. Ass'n*, 2023 WL 1781801.

In each of the instances of which Plaintiffs complain, the Tri-Agencies developed a reasonable rule that aligns with the text of the NSA and supports the underlying policy Congress sought to promote in defining the QPA: to put participants in the same position they would be if they had been able to choose an in-network provider rather than being forced to go out of network. As noted, Congress anticipated there would be instances where a provider believes they may be entitled to an additional payment beyond the amount paid under the terms of the plan and thus established the negotiation and arbitration components to the NSA. *See* 29 U.S.C. §

1185e(c).  The existence of these statutory rights is proof that Congress understood the QPA itself may not in all instances be reflective of the market value (even when measured on an in-network basis) of the services being provided by an out-of-network provider with respect to NSA-covered services.

The Tri-Agencies regulations reasonably included all negotiated rates and accounted for provider specialty. The Tri-Agencies require that rates be calculated separately for each specialty where those rates differ. IFR at 36,891. This serves two purposes: first, it ties the QPA to the rates actually received by in-network specialists; second, it limits the administrative burden on plans by preventing additional, unnecessary calculations where the rate would not vary. Structuring the IFR in that way, which is consistent with the NSA's text, is not improper just because Plaintiffs can imagine an alternative calculation they would prefer. The rule need only be "reasonable", not the perfect or preferred reading of the statute  by one stakeholder, *i.e.*, the out-of-network providers. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (finding that a court need accept an agency's reasonable reading even if it "differs from what the court believes is the best statutory interpretation").

Plaintiffs are also incorrect that one-off agreements should be factored into the QPA. One-off agreements are not arms-length agreements negotiated in the free market. Instead, such agreements often result because a plan sponsor is forced to make a choice between paying an exorbitant rate charged by a provider exploiting the vagaries of a pre-NSA system or allowing a greater out-of-pocket cost to fall on the shoulders of one of its employees. The fact that plan sponsors often chose to step in and protect their participants from that injustice should not now be rolled into the QPA calculation with the express purpose of driving it up, thereby increasing participant costs and out-of-network provider leverage in the IDR process. Again, the Plaintiffs

argue for a rule that would revert towards the market inefficiencies that drove Congress to act in adopting the NSA.

## II.    The Tri-Agencies' Regulations Align with the NSA's Goal to Drive Down Healthcare Costs

Congress sought to address the cost of healthcare coverage by enacting the NSA. In scoring the budgetary impact of the NSA (and its predecessor legislation), the Congressional Budget Office (CBO) determined that the IDR provision would generate significant savings as the result of lower premium rates (which thus reduces federal tax expenditures through lower tax subsidies). *See CBO Estimate for Divisions O through FF of H.R. 133, Consolidated Appropriations Act, 2021* (Jan. 14, 2021), https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-FF.pdf. The legislative history of the NSA makes clear that Congress sought to address not only patients' exposure to exorbitant balance billing, but also address the systemic costs associated with providers' demand for inflated in-network rates, which in turn impact participants, employers, and the federal government in the form of increased premiums. *See* R. Temme Decl. Ex. A, Jan. 7, 2022 Letter from Sen. Murray and Rep. Pallone. to Xavier Becerra, Sec. of U.S. Dep't of Health and Human Servs. at 4. Further, Congress sought to prevent gaming of the NSA's payment structures by looking to contracted rates in effect in a year prior to the NSA having taken effect, which works to prevent either party from gaming the system. *See* 29 U.S.C. § 1185e(a)(3)(E)(i)(I).  Against the backdrop of the NSA's focus on reducing the overall cost of healthcare, the challenged provisions are shown to be not only reasonable, but desirable.

Allowing third party administrators (TPAs) to calculate the QPA across their book of business instead of limiting it to a customer-by-customer analysis, is completely consistent with the NSA.  It also drives down administrative costs, which, in turn, helps reduce costs to the system, one of the twin goals of Congress in enacting the NSA. To begin with, the statutory text

of the NSA focuses on "insurance market[s]" in its calculation of the QPA and in the case of self-insured health plans, it provides that the applicable market is "other self-insured group health *plans*." 29 U.S.C. § 1185e(a)(3)(E)(iv)(IV) (emphasis added). Thus, where the IFR allows TPAs to calculate the QPA for a given service across all of the TPA's book of business, it aligns with the text of the NSA. IFR at 36,890. Moreover, the statute's focus for insured group health plans, where the QPA is calculated across a given market (*e.g.*, small group market), not a specific group health plan, produces a result that is both practically desirable and consistent with the text of the statute. 29 U.S.C. § 1185e(a)(3)(E)(i).

But more than simply being in line with the statutory text, allowing a calculation across all of a TPA's administered plans reduces administrative costs which would otherwise be reflected in costs to the system as a whole. Instead of requiring separate QPAs for each specific plan, the IFR permits plans to avoid the administrative cost associated with this complex calculation. Given the complexity of calculating the QPA, as well as the multitude of times the calculation must be done, allowing for TPA-level aggregation reduces administrative complexity and unreasonable administrative costs to plan sponsors and the healthcare system as a whole, each of which benefits participants.

Moreover, contrary to Plaintiffs' assertions, the IFR does not in fact allow TPAs to game the system to Plaintiffs' harm. Although the IFR permits plans a choice in how they calculate the QPA, they are not permitted to slice and dice the TPA's book of self-insured business to advantage payers and to the disadvantage of providers. Indeed, were all TPAs forced to calculate the QPA on a plan-by-plan basis, there undoubtedly would be instances where the QPA would actually *harm* Plaintiffs, especially where the plan at issue utilizes a more narrow network. Further, the broader the set of data drawn on by a calculation, the more accurate the median is

likely to be, whereas calculation on a plan-by-plan basis is more likely to produce statistically unreliable results (in both directions). Thus, in this way, the aggregation rule is in many respects more protective of provider interests by determining the QPA across a broader set of rates.

Further, as Defendants correctly note, even if TPAs have the option to aggregate, this should have no effect in many instances other than reducing the administrative burden on the TPA and the underlying plan as well as related costs. This is true because the vast majority of plan sponsors work with a TPA that leverages the same network or providers and negotiated rates across its entire book of payer clients. Thus, contrary to Plaintiffs' assertions, the aggregation rule should not be expected on the whole to result in deflated QPA determinations—and while this could occur in isolated instances, this fact alone does not render the IFR provision unreasonable. Plan sponsors must choose between aggregating or not (without being able to cherry pick favorable plans), accordingly we can expect that any depressed QPAs will also be accompanied by some increased QPAs. Moreover, any incentive to artificially depress the QPA has been eliminated by this court's decisions regarding the role of the QPA in the IDR process. Because the QPA is just one piece among many which must be considered in the IDR process, and because the QPA carries identical weight as other evidence submitted to the IDR entity, there is little incentive to attempt to undertake the extra burden of a plan-by-plan QPA calculation in order for the QPA to be slightly lower than the TPA's broader QPA. Rather, payers are incentivized to create an objective, defensible QPA that accurately reflects in-network rates and can be defended during the IDR process. Finally, Congress understood the value in determining the QPA based on actual market conditions, not the third-party databases that may have relevant information, but not reflect the market conditions that ground reimbursement rates paid to network participating providers. *See* 29 U.S.C. § 1185e(a)(3)(E)(iii) (specifying that

databases are to be used only when the plan lacks the requisite number of contracts to calculate a QPA).

### III.    Remand With Vacatur Exposes Participants to Irreparable Harms

The regulations specifically rely on the QPA calculation for calculating cost share, as required by the statute. *See* 29 U.S.C. § 1185e(a)(3)(H) (defining "Recognized Amount" to be an amount set by a state database if available or the QPA if not). Moreover, the Tri-Agencies adopted a combination of regulatory requirements that, taken together, increase the likelihood that similarly situated participants will face similar cost shares for similar services.  Removing the Tri-Agencies' regulations via a complete vacatur would produce uncertainty for participants because it would upend a central element underpinning the NSA's regulatory scheme. The NSA has been in effect for over a year. Plan participants have paid cost share amounts based on the QPA as it currently stands. Further, IDR decisions have come down which factored the QPA amount into their reasoning. To re-open all cost-sharing and IDR determinations over the last year-plus would be burdensome and chaotic, for participants, plans and providers themselves (whose claims are likely to add to the existing backlog of claims subject to the IDR process). And to send plans back to the drawing board while they await a new formula would unnecessarily burden participants who may then face varied, and more burdensome, cost shares should the core elements of the QPA calculation be abruptly upended.

## <u>CONCLUSION</u>

The IFR is not only fully consistent with the text and structure of the NSA, it is also essential to effectuate Congress's intent that lower healthcare costs result from the prohibition on surprise bills. The Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and uphold the IFR.

Dated: March 17, 2023

Respectfully submitted,

*/s/ Seth T. Perretta*
Seth T. Perretta (admitted *pro hac vice*)
Ryan C. Temme (admitted *pro hac vice*)
Matthew W. Lanahan (admitted *pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 867-0620
Fax: (202) 659-4503
sperretta@groom.com
rtemme@groom.com
mlanahan@groom.com

*Counsel for Amici*


## CERTIFICATE OF SERVICE

On March 17, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served counsel for all parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Seth T. Perretta*
Seth T. Perretta

16

**Appendix**

| Organization | Brief Description |
|---|---|
| American Benefits Council | The American Benefits Council is a national non-profit organization dedicated to protecting and fostering privately sponsored employee benefit plans. Its approximately 440 members are primarily large, multistate employers that provide employee benefits to active and retired workers and their families. The Council's membership also includes organizations that provide employee-benefit services to employers of all sizes. Collectively, the Council's members either directly sponsor or provide services to retirement and health plans covering virtually every American who participates in employer-sponsored benefit programs. The American Benefits Council regularly participates as amicus curiae in cases affecting employee benefits. |
| Business Group on Health | Business Group on Health is the leading non-profit organization representing large employers' perspectives on optimizing workforce strategy through innovative health, benefits and well-being solutions and on health policy issues. The Business Group keeps its membership informed of leading-edge thinking and action on health care cost and delivery, financing, affordability and experience with the health care system. The Business Group's over 440 members include 74 Fortune 100 companies as well as large public sector employers, who collectively provide health and well-being programs for more than 60 million individuals in 200 countries. |
| Council of Insurance Agents and Brokers | The Council of Insurance Agents & Brokers represents over 200 employee benefits and property/casualty agencies and brokerage firms. Council member firms annually place more than $300 billion in commercial insurance business in the United States and abroad. They place 90 percent of all U.S. insurance products and services as well as administer billions of dollars in employee benefits. Council members conduct business in some 30,000 locations and employ upward of 350,000 people worldwide, specializing in a wide range of insurance products and risk management services for business, industry, government, and the public. |

I

| Organization | Brief Description |
|---|---|
| DFW Business Group on Health | The DFW Business Group on Health (DFWBGH) is a regional coalition of 65 large and mid-size DFW area employers committed to improving health care quality, costs and outcomes in North Texas. DFWBGH members spend over $4 billion annually on healthcare for nearly 1 million local employees and their families. DFWBGH's mission is to educate and empower DFW area employers and their employees to make informed healthcare decisions and to encourage healthcare providers to continuously improve their performance. |
| ERISA Industry Committee | The ERISA Industry Committee (ERIC) is a national nonprofit organization advocating exclusively for large plan sponsors that provide health, retirement, paid leave, and other benefits to their nationwide workforces. With member companies that are leaders in every sector, ERIC advocates on the federal, state, and local levels for policies that promote flexibility and uniformity in administering their employee benefit plans, while fighting against a patchwork of conflicting and burdensome rules. ERIC also fights in federal court against state and local laws that conflict with ERISA and joins legal cases as amicus curiae to support large plan sponsors in litigation impacting critical employee benefit plan design or administration. |
| Houston Business Coalition on Health | HBCH is a multi-stakeholder but employer centric coalition. HBCH is the leading resource for Houston employer purchasers and their provider partners dedicated to improving the price, quality and consumer experience in healthcare delivery. HBCH represents more than 70 organizations and 1 million employer-sponsored lives. Our members include many of the largest private, governmental and educational employers in the Houston market. HBCH accomplishes its mission through the collective influence of its member organizations. HBCH's NorthStar strategic inputs consist of the use and promotion of transparency tools for hospital costs as a function of its financial sustainability needs, and provider quality. NorthStar outputs include the development and promotion of clinically integrated network models with primary care as their foundation, integrated with behavioral health, and referral to specialists based on value. |

| Organization | Brief Description |
|---|---|
| HR Policy Association | HR Policy Association is the lead organization representing Chief Human Resource Officers at major employers. The Association consists of over 400 of the largest corporations doing business in the United States and globally, and these employers are represented in the organization by their most senior human resource executive. Collectively, their companies employ more than 10 million employees in the United States, over nine percent of the private sector workforce, and 20 million employees worldwide. These senior corporate officers participate in the Association because of their commitment to improving the direction of human resource policy. |
| National Alliance of Health Care Purchaser Coalitions | The National Alliance of healthcare purchaser coalitions is an alliance of approximately 45 regional coalitions of employers and other plan sponsors. It supports over 12,000 healthcare purchasers ranging from 60% of the Fortune 100 companies, many midsized companies, public sector employers (cities, states, school districts, federal employees) and union groups (e.g. UAW, 32BJ) who collectively provide health coverage to over 45 million Americans. The National Alliance helps to lead improvements in health, equity and value for organizations and communities across the country. |
| National Retail Federation | The National Retail Federation ("NRF") is the world's largest retail trade association, representing all aspects of the retail industry. NRF's membership includes discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers. Retail is the nation's largest private sector employer, supporting one in four U.S. jobs – 52 million working Americans. Contributing $3.9 trillion to annual GDP, retail is a daily barometer for the nation's economy. NRF regularly advocates for the interests of retailers, large and small, in a variety of forums, including before the legislative, executive, and judicial branches of government. |

III

| Organization | Brief Description |
|---|---|
| Purchaser Business Group on Health | PBGH is a nonprofit coalition representing nearly 40 private employers and public entities across the U.S. that collectively spend $100 billion annually purchasing health care services for more than 15 million Americans and their families. PBGH has a 30-year track record of incubating new, disruptive operational programs in partnership with large employers and other health care purchasers. Our initiatives are designed to test innovative methods and scale successful approaches that lower health care costs and increase quality across the U.S.. |
| Self-Insurance Institute of America | The Self Insurance Institute of America, Inc. ("SIIA") is an association of self-insured employers and industry participants, including third-party administrators, captive managers, and excess carriers. See SIIA, About SIIA, https://www.siia.org/i4a/pages/index.cfm?pageid=4451. |
| Texas Business Group on Health | The Texas Business Group on Health is a statewide association of Texas employers and regional employer-led healthcare coalitions, including DFW Business Group on Health, Houston Business Coalition on Health, and San Antonio Business Group on Health. TBGH represents Texas employers' interests as key purchasers of healthcare for employees and serves its members by promoting innovation, accountability, quality and value in the design, financing, and delivery of health care. TBGH also serves as a valuable resource for employers in health benefits design and purchasing issues, and provides guiding influence and leadership in state healthcare policy development. |
| Texas Employers for Affordable Healthcare | Texas Employers for Affordable Healthcare is a 501(c)(4) established to mobilize employers, employees and their families, and other healthcare stakeholders across the state to rein in the excessive prices paid for employer-sponsored healthcare for almost half of all Texans and approximately 14 million people. |

IV