**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

---

| | | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No.: 6:22-cv-00450-JDK |
| v. | ) | |
| | ) | Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**TMA PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

ARGUMENT ..... 3

I. The Departments' QPA Methodology is Unlawful. ..... 3

A. The Act does not allow ghost rates to be included in QPA calculations ..... 3

B. The Act does not allow for providers in different specialties to be included in QPA calculations. ..... 8

C. The Act does not allow exclusion of bonuses and incentive payments ..... 14

D. The Act does not allow the Departments' third-party administrator rule ..... 18

II. The Departments' Disclosure Rule is Unlawful. ..... 21

A. The Departments' threshold arguments fail. ..... 21

B. The Departments' disclosure rule is substantively unreasonable. ..... 23

C. The Departments' disclosure rule is procedurally unreasonable. ..... 25

III. The Challenged Provisions Should Be Declared Unlawful, Vacated In Part, And Remanded For Further Rulemaking Consistent With The NSA And APA. ..... 26

CONCLUSION ..... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carter v. Welles-Bowen Realty, Inc*,
736 F.3d 722 (6th Cir. 2013) ....................11

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
846 F.3d 492 (2d Cir. 2017)....................9

*CEI v. FCC*,
970 F.3d 372 (D.C. Cir. 2020) ....................21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................23

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) ....................26

*Cigar Ass'n v. FDA*,
964 F.3d 56 (D.C. Cir. 2020)....................23

*Clark v. Martinez*,
543 U.S. 371 (2005)....................11

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
466 F.3d 134 (D.C. Cir. 2006) ....................9

*Cooper v. Tex. Alcoholic Beverage Comm'n*,
820 F.3d 730 (5th Cir. 2016) ....................21

*Dish Network Corp. v. NLRB*,
953 F.3d 370 (5th Cir. 2020) ....................7, 19

*Djie v. Garland*,
39 F.4th 280 (5th Cir. 2022) ....................9

*Earl v. Boeing Co.*,
515 F. Supp. 3d 590 (E.D. Tex. 2021)....................22

*Env't Def. Fund, Inc. v. Adm'r of EPA*,
898 F.2d 183 (D.C. Cir. 1990)....................22

*Hibbs v. Winn*,
542 U.S. 88 (2004)....................4, 18

*MCI Telecomms. Corp. v. AT&T*,
512 U.S. 218 (1994)....................7, 9, 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................17, 21, 25

*Nat. Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988)....................25

*Nat'l Auto. Dealers Ass'n v. FTC*,
864 F. Supp. 2d 65 (D.D.C. 2012)....................9

*PDK Lab'ys Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004)....................6, 20

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006)....................14

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................7, 15, 19

*Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*,
132 F.3d 775 (D.C. Cir. 1998)....................11

*Sierra Club v. EPA*,
884 F.3d 1185 (D.C. Cir. 2018)....................22

*Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021)....................6

*Tex. Med. Ass'n v. HHS*,
587 F. Supp. 3d 528 (E.D. Tex. 2022)....................1, 13, 14, 26, 27

*Tex. Med. Ass'n v. HHS*,
No. 6:22-CV-372-JDK, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023)....................1, 13, 26

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007)....................23

*Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*,
791 F.2d 202 (D.C. Cir. 1986)....................4

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004)....................11, 12

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989)....................7

*United States v. Santos*,
553 U.S. 507 (2008) ... 11

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ... 26

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ... 4, 6

*Vonage Holdings Corp. v. FCC*,
489 F.3d 1232 (D.C. Cir. 2007) ... 4

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ... 25

*Yakima Valley Cablevision, Inc. v. FCC*,
794 F.2d 737 (D.C. Cir. 1986) ... 25

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
609 F. Supp. 3d 504 (E.D. Tex. 2022) ... 14, 21

**Statutes**

5 U.S.C. § 551(13) ... 22

5 U.S.C. § 706(2)(A) ... 22

42 U.S.C. § 300gg-111(a)(2)(B) ... 12, 16, 17

42 U.S.C. § 300gg-111(a)(2)(B)(ii) ... 22

42 U.S.C. § 300gg-111(a)(3)(E)(i) ... 7

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ... 3, 4, 5, 14, 15, 18, 19, 20

42 U.S.C. § 300gg-111(a)(3)(E)(ii) ... 20

42 U.S.C. § 300gg-111(a)(3)(E)(iii) ... 20

42 U.S.C. § 300gg-111(a)(3)(E)(iv)(IV) ... 18

42 U.S.C. § 300gg-111(c)(5)(C)(i) ... 13, 27

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I) ... 18

**Other Authorities**

45 C.F.R. § 149.140(a)(1) ... 26

45 C.F.R. § 149.140(b)(1)....................26

45 C.F.R. § 149.140(b)(2)(iv)....................14

86 Fed. Reg. 36,872 (July 13, 2021)....................5, 11, 16, 17, 23, 25

86 Fed. Reg. 55,980 (Oct. 7, 2021)....................1

87 Fed. Reg. 52618 (Aug. 26, 2022)....................13

*American Heritage Dictionary of the English Language* 1824 (4th ed. 2009)....................15

*Oxford Eng. Dict. Online* (Dec. 2022 ed.), https://www.oed.com/view/Entry/115275?redirectedFrom=maximum#eid....................14

## INTRODUCTION

Plaintiffs have no quarrel with the NSA's goal of protecting patients from balance bills for out-of-network care. Their objections are to implementation decisions the Departments have made in an effort to advance a goal not contained in the NSA—driving down physician reimbursement. In fact, the common thread uniting the Departments' rulemakings to date has been a two-pronged strategy to drive down provider reimbursement: first by devising a QPA methodology that ensures QPAs will understate the fair market value of healthcare services; and second by requiring arbitrators to anchor to the QPA when making payment determinations. As this Court has now twice held, however, the NSA forbids the Departments to pursue "their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payment to providers." *Tex. Med. Ass'n v. HHS* (*"TMA II"*), No. 6:22-CV-372-JDK, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023); *see also Tex. Med. Ass'n v. HHS* ("*TMA I*"), 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022).

Congress carefully crafted a definition of the QPA that balances the interests at stake when a patient receives out-of-network care. The Departments have departed from that definition repeatedly, blatantly, and sometimes without any explanation at all, in ways that betray policy choices that again and again benefit insurers at the expense of providers. Just as in *TMA I* and *TMA II*, however, the Departments' policy preferences must yield to Congress's clear commands.

But even if this case were about policy, Congress's choices are well grounded in important policy interests. As the Departments once recognized, if out-of-network providers are not adequately compensated for their services, that "undercompensation could threaten the viability of these providers," which "could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021). The Departments' failure to follow Congress's commands has led to the predicted result: providers are routinely undercompensated, which "threaten[s] serious harm to patients and

to the provision of healthcare in this country," Br. of Am. Med. Ass'n, Doc. 34, at 4, and has exacerbated the "crisis in the emergency medical delivery system and the availability of emergency medical physicians," Br. of Emergency Dep't Practice Mgmt. Ass'n ("EDPMA"), Doc. 38, at 1.

The Departments worry that adhering to the NSA's text as plaintiffs ask will "increas[e] costs borne by patients," because, in addition to impacting provider compensation, QPAs also sometimes impact patient cost-sharing. Under the NSA, absent an All-Payor Model Agreement or applicable state law, patients' cost-sharing obligation is generally the amount they would have paid had the service been provided by an in-network provider. Often, this amount is a fixed fee, such as a $40 copay, that does not vary with the QPA. In other instances, the patient's cost sharing may be a coinsurance payment calculated as a percentage of the QPA. If the QPA accurately reflects the market rate a typical in-network provider would have charged, therefore, patients are in the same position they would have been in had the service been provided by a typical in-network provider. The NSA was not intended to protect patients from cost-sharing obligations they negotiated with their insurers for *in-network* services. To the extent the Departments have manipulated the QPA below market rates to protect patients from such costs, that is yet another unreasonable basis for the Departments' behavior, and not a reason to uphold the July Rule.

For all the reasons stated in the TMA plaintiffs' motion for summary judgment, the challenged portions of the July Rule and the August 2022 FAQs are unlawful. The Departments offer no construction of the NSA that could permit their repeated decisions to skew the QPA methodology below fair market rates. And they cannot justify their rule permitting insurers to make no meaningful disclosures to providers about their secret QPA calculations. The Court should grant plaintiffs' motion for summary judgment and deny the Departments' motion.

# ARGUMENT

## I. The Departments' QPA Methodology Is Unlawful.

### A. The Act does not allow ghost rates to be included in QPA calculations.

A rate included in a QPA calculation must be for an item or service "*that is provided* by a provider in the same or similar specialty *and provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). Yet the Departments argue that rates for items or services that are *not provided* can and should factor into QPA calculations.

The Departments begin with a strawman: "Plaintiffs insist," they say, that "the QPA *should not be based on the contracted rates recognized under … agreements* negotiated between providers or facilities and payers," and should instead be based only on rates paid for services provided. Opp. 19 (emphasis added). That is not what plaintiffs argue. Plaintiffs agree that QPAs must be derived from "contracted rates recognized" in agreements between providers and insurers. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But it does not follow that QPAs are based on *all* the rates that happen to be listed in a contract between an insurer and a provider, regardless of whether the provider provides the relevant service. As the Departments have recognized, insurers often present providers with form contracts that include "rates established by plans or issuers for service codes that … are not utilized" by the provider and that the provider therefore "ha[s] little incentive to negotiate fair reimbursement rates for." August 2022 FAQs at 16 (FAQ 13). Even assuming these "ghost rates" qualify as "contracted rates" by virtue of their inclusion in the contract, the statute does not say that every rate listed in every contract necessarily qualifies for inclusion in the QPA.

To the contrary, the statute's QPA definition goes on to expressly *exclude* certain recognized rates: those for items or services that are not (1) "provided" (2) "by a provider in the same or similar specialty" (3) "in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The Departments act as though the first limiting term does not exist. But the Departments cannot

selectively read that limitation out of the statute. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms."). In the same way that rates in contracts with providers who are not in the "same or similar specialty" or not in the relevant "geographic region" must be excluded from the "contracted rates recognized by the plan or issuer" that are used to calculate the QPA, so must rates for items or services that are not "provided" by any provider covered by the contract. For an item or service to be "provided by a provider in the same or similar specialty and provided in the geographic region," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the item or service must, at a minimum, be "provided."

The Departments offer no explanation for what work the term "provided" does in the NSA. But a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). If, as the Departments assert, recognized rates for items and services, provided or not, go into QPA calculations, the NSA "would not need" the word "provided." *Id.* The term "recognized" "alone, would do all the necessary work." *Id.* The NSA does not say that the QPA is the "median of the contracted rates recognized by the plan or issuer … for the same or similar item or service that is *recognized in a contract with* a provider in the same or similar specialty" or "*recognized* in the geographic region." Congress chose a different term, with its own independent meaning. "[W]here different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007); *Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986) (rejecting agency's view that Congress gave "two quite different words in the same section" "identical meanings"). Reading "provided by" as "recognized in a contract with"

would also be inconsistent with the Department's own recognition that contracted rates may include rates for services "providers do not provide." August 2022 FAQs at 17 (FAQ 14).

Nor does giving effect to the word "provided" "impermissibly read the 'on January 31, 2019' directive entirely out of the statute." Opp. 22. Congress undisputedly mandated that the rates that factor into QPA calculations be rates recognized on January 31, 2019. That limitation does the same work on plaintiffs' reading of the statute as it does on the Departments' reading—it identifies which contracts count. *See* 86 Fed. Reg. 36,872, 36,895 (July 13, 2021) (stating that QPAs are generally "based on January 31, 2019 contracted rates"). But identifying the relevant contracts is only the first step. Rates must be "recognized" on that date, but they also must be for items or services that are "provided" by providers covered by the contract. And plaintiffs do not substitute the word "paid" for "recognized." Opp. 21. Instead, they look to the NSA's text, which requires that rates be *both* "recognized" *and* for items or services that are "provided." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). It is the Departments who read "provided" out of the statute.

The Departments nonetheless say that "provided" cannot mean "provided" because plaintiffs do not specify how many times or during what time period an item or service must be provided. Opp. 21. This, they say, makes the statute's "provided" requirement too "indeterminate." Opp. 19. To be clear, plaintiffs have never suggested that an item or service must be provided more than once to be "provided."[1] That said, the term "provided" may be subject to a range of reasonable

[1] The Departments wrongly claim that plaintiffs "suggest not only that the QPA must be based on rates for services that were provided …, but also that the services must not have been provided 'rarely.'" Opp. 22 (quoting TMA Br. 27). The Departments quote plaintiffs out of context, citing a portion of plaintiffs' brief addressing not the impermissible inclusion of ghost rates in QPAs, but the Departments' deficient *disclosures* about QPA calculations. Plaintiffs there explained that to advocate effectively, a provider needs information about how a QPA was calculated: one thing disclosures might reveal is "that a QPA was not correctly calculated"; a *different* thing disclosures could reveal is that even a correctly calculated QPA was "calculated based on rates that were rarely

interpretations. And, as the Departments recognize, Congress directed *them* to engage in rulemaking to establish a QPA methodology consistent with the statute. Opp. 23. It is therefore the Departments' job to address these issues. *See PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (before exercising discretion agency "necessarily had to decide what [the statute] meant").

In doing so, the Departments may consider Congress's use of "*is* provided." Opp. 21. One possibility is that Congress, when legislating in 2020, spoke from the perspective of January 31, 2019, and intended to encompass rates for services provided in the present and future from that vantage point. Or Congress may have left it to the Departments to determine through rulemaking the relevant timeframe during which the service must have been provided. In all events, the Departments' "failure to offer answers to any of those questions" is their failure, not plaintiffs'. Opp. 23. And whatever the range of permissible interpretations, what the Departments cannot do is pretend "provided" is not in the statute at all. *See Util. Air*, 573 U.S. at 326 ("Agencies exercise discretion only in the interstices created by statutory silence or ambiguity."); *Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 387 (5th Cir. 2021) ("Even under the deferential lens of *Chevron*, the Commission cannot ignore Congress's directive."). Having failed to grapple with the meaning of "provided," the Departments have not developed an interpretation of the term that would be entitled to the deference they claim. *See PDK Lab'ys*, 362 F.3d at 798.

The Departments also claim, for the first time, that the QPA should be based only on "information contained within the four corners of the contracts themselves," because a method that would require insurers to determine which items or services are "provided" would be too "burdensome." Opp. 21. But the Departments cannot rely on this justification, which was not offered in

---

paid, such that they are not reliable indicators of market value." TMA Br. 27. It is important for providers to be able to tell arbitrators when even a correctly calculated rate may not be reliable.

the rule. *See SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943); *Dish Network Corp. v. NLRB*, 953 F.3d 370, 379–80 (5th Cir. 2020).[2] Regardless, the Departments' concerns about burdens on insurers cannot justify rewriting the statutory text. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994); *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989).

Even if this were a proper venue for evaluating the reasonableness of Congress's choices, it was eminently reasonable for Congress to exclude rates that providers nominally agreed to in form contracts for items and services they do not provide. Under the NSA, the 2019 contracted rates that are included in QPA calculations will be a factor in determining what providers are paid every year, adjusting only for inflation. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i) (providing for QPAs to be calculated and then adjusted annually based on the consumer price index). Ensuring that ghost rates are identified and excluded is important to getting these permanent reference points right. Congress therefore had a good reason for requiring insurers to expend the effort and resources necessary to identify and exclude rates that artificially depress QPAs.

Finally, the Departments claim that including rates for not-provided services "would not necessarily have the effect of driving the QPA below the median of in-network rates for services actually provided" because of the Departments' separate interpretation of "same or similar specialty." Opp. 24. That is wrong. For one thing, as explained below, the Departments' "same or similar specialty" rules themselves violate the statute and drive down QPAs. *See infra*, Part I.B.

But regardless, the "same or similar specialty" rules do not address the separate problem Congress addressed by requiring that services be "provided." Not all specialists within a particular specialty provide identical services. For example, some heart surgeons provide more commonly

---

[2] Nor do the Departments explain the basis for their novel contention that insurers would need to request from providers and review patient "medical records," Opp. 21, rather than relying on their own claims data, to understand whether services are "provided."

needed procedures, while others are able to perform rarer and more complex procedures. Surgeons who do not perform a more complex procedure may agree to a lower rate for the procedure, understanding that they will not provide it. For example, ten heart surgeons who do not perform a rare and complex procedure may agree to a $1,000 rate for the procedure, while the three providers who do perform that procedure negotiate a $1,500 rate. Because a median is the middle of a range of rates, not an average, the QPA under the Departments' approach will be $1,000—the ghost rate for a service not provided—rather than the $1,500 negotiated rate for provided services.

As this simplified example shows, including ghost rates in violation of the statute leads to artificially depressed QPAs in ways that even a rule faithfully implementing the statute's separate "same or similar specialty" requirement would not address. Far from salvaging their interpretation, therefore, the Departments' failure to address how ghost rates depress QPAs below negotiated market rates was itself arbitrary and capricious. *See* TMA Br. 23–24.

**B. The Act does not allow rates for providers in different specialties to be included in QPA calculations.**

The Departments recognize that the "statute bases the QPA on rates from providers '*in the same or similar specialty*.'" Opp. 25 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i) (emphasis added)). They also acknowledge that the July Rule instead sometimes "permits payers to calculate the QPA *without regard to provider specialty*." Opp. 25 (emphasis added); *see also* Opp. 27 ("Payers may include out-of-specialty rates in the QPA calculation …."). That should be the end of the matter. The Departments offer no straight-faced explanation for how including out-of-specialty rates is consistent with the NSA. Instead, they argue that calculating QPAs based on only in-specialty rates is "administratively burdensome" and "pointless," and that the July Rule's departure from the NSA's text "would have no material impact on the QPA." Opp. 25.

The Departments may not decide that a different method than the one Congress chose would better achieve Congress's goals. Agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp.*, 512 U.S. at 231 n.4; *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 140 (D.C. Cir. 2006) (when Congress chose to achieve an end "in a particular way," an agency cannot pick a different way). So while agencies may consider administrative burdens when crafting regulations, they cannot ignore statutory commands that they deem too burdensome. *See MCI Telecomms. Corp.*, 512 U.S. at 234. Each of the cases the Departments cite regarding burden therefore unsurprisingly involved agency interpretations that were consistent with the statutory text. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 519 (2d Cir. 2017); *Nat'l Auto. Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 78 (D.D.C. 2012). Here, Congress said that QPAs must *always* be based solely on in-specialty rates. The Departments' rule, which provides that QPAs must only *sometimes* be based solely on in-specialty rates, is flatly inconsistent with the statute and cannot stand. *See Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022) ("When a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down.").

The Departments are also wrong about the impact of their methodology on QPAs. Following the NSA's text is not "pointless," however you understand the Departments' "material difference" methodology. It is not clear what metric the Departments believe should be used to determine whether there is a "material difference" between in-specialty and out-of-specialty rates. The Departments vacillate between suggesting the issue is whether a "material difference" exists between (1) *median* contracted rates by specialty, or (2) contracted rates by specialty (perhaps the range of rates accepted by different specialties, or where specialty rates are "clustered"). *Compare*

August 2022 FAQ at 17 (FAQ 14) (asking whether "there is a material difference in *the median* contracted rates … between providers of different specialties" (emphasis added)), *and* Opp. 27 (asking whether including out-of-specialty rates has a "material impact on *the QPA*" (emphasis added)); *with* August 2022 FAQ at 17 (FAQ 14) (asking whether "*contracted rates* for a … service *are clustered* at one rate for anesthesiologists and at another rate for all other provider specialties" (emphasis added)), *and* Opp. 25 (asking whether there is a "material difference in *the contracted rates* by specialty" (emphasis added)). Neither method is reasonable.

The first method—comparing specialty-specific medians—is, itself, pointless. If insurers must look to whether using out-of-specialty rates materially affects the *median*, or QPA, insurers first have to calculate a QPA using only in-specialty rates. Without knowing what that QPA is, an insurer cannot evaluate whether it materially differs from a QPA based in part on out-of-specialty rates. And once the insurer has calculated the QPA using only in-specialty rates, what is the justification for departing from the statutory text by using the QPA based in part on out-of-specialty rates? The "burden" of calculating the correct QPA has already been borne. Opp. 25.

The second method—comparing rates without calculating medians—is even worse. If insurers are only required to look generally to ranges or "clusters" of rates in deciding whether they can include out-of-specialty rates, the Departments' methodology will produce medians (QPAs) that differ significantly from what the median would be using only in-specialty rates. Different specialties may have similar rate *ranges*, or *clusters*, but materially different *median* rates. For example, imagine that the most common negotiated market rate for an emergency physician to perform stitches ranges from $200 to $300, with a median rate of $275. Primary care physicians may also be able to provide stitches, but not provide them as often, and therefore may agree to rates in the same range, but with a slightly greater percentage of physicians agreeing to rates on

the lower end. The median rate when primary care physicians' rates are used together with emergency physicians' rates could easily be $225, despite the range and "cluster" of rates looking quite similar. This is especially true because there are substantially more primary care physicians than emergency physicians. *See* Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* (Aug. 2, 2022), EDPMA Br., Ex. 4, at 5 (reporting there are 500,000 primary care physicians compared to 60,000 emergency physicians).

The Departments' methodology is even further skewed against providers because the Departments punt crucial questions of statutory interpretation *to insurers*. Insurers are allowed to define "same or similar specialty" for themselves, based on their own "usual business practice." 86 Fed. Reg. at 36,891. The Departments say this "recognizes that different plans and issuers define 'same or similar specialty' differently in their business practices." Opp. 25–26. Providers therefore may be in the "same or similar specialty" according to one insurer but not another. This is not a tenable interpretation of the Act. An agency cannot "interpret" a statute to have two contradictory meanings, let alone meanings that change at the option of regulated parties. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (warning against "the dangerous principle" that "the same statutory text" could carry "different meanings in different cases"); *United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality opinion). "A single law should have one meaning." *Carter v. Welles-Bowen Realty, Inc*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring). Nor can the Departments delegate to insurers the authority to interpret "same or similar specialty." This kind of subdelegation "to outside parties [is] assumed to be improper absent an affirmative showing of congressional authorization." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004); *see also Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 783–84 & n.6 (D.C. Cir.

1998). There is no such "affirmative showing" here. Allowing each insurer to "define 'same or similar specialty' differently," Opp. 25–26, is itself arbitrary and capricious.

Further, the Departments unreasonably rely on insurers to exercise "good faith reasonable judgment," Opp. 26, in determining, without guidance, whether "there is a material difference in the median contracted rates … between providers of different specialties." August 2022 FAQs at 16–17 (FAQ 14).[3] But Congress did not rely on insurers' "good faith" or their "reasonable judgment." It delegated the task of implementing the NSA's QPA methodology to the Departments. *See* 42 U.S.C. § 300gg-111(a)(2)(B). Leaving to self-interested insurers what a "material difference" is creates an unacceptably high "risk that [insurers] will not share the agency's 'national vision and perspective,' and thus may pursue goals inconsistent with those of the agency and the underlying statutory scheme"—namely, their own profits. *U.S. Telecom Ass'n*, 359 F.3d at 566 (citation omitted); *see also* AR 2946 (quoting Richard Neal, Chairman of the House Ways & Means Committee: "insurers are looking for any way they can to pay the least amount possible" and "will work to push those rates down, regardless of what it means for community providers like physicians, hospitals, and our constituents who they employ").

The Departments claim they are not relying on the unsupervised "good faith" of self-interested insurers alone because providers may submit complaints regarding QPA calculations. Opp. 26. But, of course, the Departments' disclosure requirements do not give providers access to the information they need to determine that an insurer acted in bad faith or was otherwise wrong about whether a material difference exists. Providers cannot know whether an insurer used out-of-

[3] While the Departments claim they instructed insurers to use "good faith" in the August 2022 FAQs, they do not cite any portion of the FAQs that does so.

specialty rates in a QPA calculation, much less how a median based only on in-specialty rates compared to a median that included out-of-specialty rates. *See* TMA Br. 12–13, 28–30.

Unable to justify their clear violation of the statute, the Departments retreat to arguing that the inclusion of out-of-specialty rates in QPAs will not harm plaintiffs. Opp. 27–28. But that argument goes only to plaintiffs' standing, not to the meaning of the statute. And there is no serious question about plaintiffs' standing to challenge this aspect of the July Rule and the August 2022 FAQs. At a minimum, the rule causes plaintiffs a procedural injury. The NSA requires arbitrators to consider the QPA "as defined in subsection (a)(3)(E)" of the NSA. 42 U.S.C. § 300gg-111(c)(5)(C)(i). By departing from that statutory definition, the July Rule "deprive[s] [plaintiffs] of the arbitration process established by the Act." *TMA II*, 2023 WL 1781801, at *8. As the Court has now held twice, this "procedural injury"—which the Departments ignore—is, by itself, "sufficient to confer Article III standing." *TMA I*, 587 F. Supp. 3d at 537 (citing cases).

Plaintiffs need "merely show a 'reasonable claim of minimal impact'" in failing to adhere to proper procedure, and "need not prove that following proper procedure will necessarily create different outcomes." *Id.* (quoting *Kinetica Partners, LLC v. Dep't of Interior*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020)). Here, it is reasonable to expect that use of QPAs calculated by insurers with substantial discretion to include out-of-specialty rates will have at least a minimal impact on IDR proceedings. Out-of-specialty rates, by their nature, tend to drive down QPAs. *See* TMA Br. 10–11. Indeed, the Departments agree that the changes plaintiffs requests would raise QPAs. *See* Opp. 1 (arguing the relief requested would "drive up the costs of out-of-network medical care" by raising QPAs). And, as the Departments nowhere dispute, lower QPAs predictably result in lower payments to providers who rely on the open negotiation and IDR processes to obtain reimbursement for their services. Insurers generally offer the QPA as their proposed payment for an item or

service during negotiation and arbitration. *See* 87 Fed. Reg. 52,618, 52,625 n.29 (Aug. 26, 2022); Cook Decl. ¶¶ 9–11; Ford Decl. ¶ 11. The QPA colors those processes, *see, e.g.*, Ford Decl. ¶¶ 13–14, and the influence it exerts means that, at least in some cases, lower QPAs mean lower payments to providers, *see* Cook Decl. ¶ 23; Ford Decl. ¶ 23; Tyler Hosp. Dec. ¶ 16; Corley Decl. ¶ 23.

Plaintiffs have thus "show[n] a 'reasonable claim of minimal impact'" from the Departments' rule. *TMA I*, 587 F. Supp. 3d at 537. In fact, the economic harm flowing from including out-of-specialty rates in QPA calculations is an independent basis for standing. *See id.* at 538 ("[E]conomic injury is a quintessential injury upon which to base standing." (quoting *El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2010))). And that is true even if the resulting QPA is lower by only an "immaterial" amount (whatever that means) than a properly calculated QPA. That lower QPA—and potentially millions of others like it—will feed into countless reimbursement disputes going forward, financially injuring plaintiffs and TMA's members every time it serves as a basis for determining the amount they are reimbursed for their services. *See Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, 609 F. Supp. 3d 504, 511 (E.D. Tex. 2022) (even "a few pennies" of "economic harm" is enough); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895–96 (D.C. Cir. 2006) (finding associational standing where it was "inconceivable" that the regulation "would fail to affect ... even a single" member of the association).

**C. The Act does not allow exclusion of bonuses and incentive payments.**

The NSA's text is clear: each contracted rate in a QPA calculation must be based on "the *total maximum* payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). Yet the July Rule requires insurers *not* to use the total maximum payment by excluding "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). The Departments do not explain what they think the terms "total" and "maximum" mean, treating them as meaningless surplusage.

The Departments' criticisms of plaintiffs' reading are unpersuasive. Plaintiffs do not need to read the word "potential" into the Act. Opp. 29. The "maximum" payment under a contract *is* the maximum *potential* payment under the contract. *See Oxford Eng. Dict. Online* (Dec. 2022 ed.) https://www.oed.com/view/Entry/115275?redirectedFrom=maximum#eid (defining "maximum" as the "highest value or extreme limit," the "greatest value which a variable or function takes," or the "highest possible magnitude or quantity of something which is attained, attainable, or customary"). And by defining the recognized rate used in the QPA as the "total maximum payment" under a contract, Congress did not require any "temporal leap" or later-in-time adjustment. Opp. 30. It does not matter whether a bonus or other incentive was ever paid under the contract. An insurer need only look at the four corners of the contract to determine what the "total maximum payment" is "under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Without any reasonable alternative reading of the Act to offer, the Departments resort to "practical[ities]" that cannot supersede unambiguous statutory text. Opp. 30. The Departments argue that "[b]onus and incentive payments are rarely tied to specific contracted rates for particular items and services" and "are more often paid as an annual lump-sum." Opp. 29. As an initial matter, the Departments did not make this point in the July Rule and so cannot rely on it here. *See Chenery Corp.*, 318 U.S. at 87. Also, "rarely" is not "never," and the Departments do not explain why bonuses and other incentive payments that *are* tied to specific items and services do not factor into QPAs. It is easy enough to structure a contract in a way that ties a bonus to a particular service: For example, a provider may receive a productivity bonus; if the provider performs a particular service X times, she will get a bonus of Y amount. Dividing Y by X gives a per-service bonus amount that can be added to the base rate to derive a "total" maximum payment for the service. Congress's use of "total" indicates that such addition may be necessary. *See American Heritage*

*Dictionary of the English Language* 1824 (4th ed. 2009) (defining the noun "total" as "[a]n amount obtained by addition; a sum," and the adjective as "[o]f, relating to, or constituting the whole; entire"). Indeed, insurers have themselves explained that some incentive payments "cannot be separately parsed" from other amounts and therefore urged the Departments not to require their exclusion from QPAs. AR 5310. The Departments have not explained why such a bonus would not fit squarely within what the NSA says must be included in a rate used in a QPA calculation.

In any event, payments need not be directly linked to a particular item or service to be included in the "total maximum payment" for an item or service. Congress ordered that the Departments "shall take into account payments that … are *not* on a fee-for-service basis" in establishing the QPA methodology. 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added). And, in fact, the Departments did take into account other non-fee-for-service payments in the July Rule. They considered "many types of alternative reimbursement models … that are not standard fee-for-service arrangements" and decided that rates under such alternative models should be included in QPA calculations to "ensure that the median contracted rate calculation accounts for a range of different contractual arrangements." 86 Fed. Reg. at 36,893. The Departments therefore came up with a method to "convert … non-fee-for-service contracts into fee-for-service arrangements for purposes of calculating the median contracted rate." *Id.* But they chose not to do something similar for bonuses and other incentive payments, without explanation. The Departments again improperly paint *their* failure to address an important aspect of the problem before *them* as a failure of plaintiffs. Opp. 29 ("*Plaintiffs* have failed to show that it would even be possible to calculate the impact of bonus and incentive payments on a particular median rate." (emphasis added)). It was *their* job, not plaintiffs', to implement the NSA consistent with Congress's directions.

The Departments were therefore required to find a reasonable way to factor bonus and other incentive payments into QPA calculations. Congress told them to "take into account" non-fee-for-service payments in establishing the QPA methodology while also instructing them to treat the total maximum payment under each contract as the recognized rate. Bonus and incentive amounts are also an important component of negotiated market compensation. They "can total 10 to 15 percent of total payments" under some contracts, and "the underlying fee schedule amount is adjusted downward to reflect the potential for an incentive." AR 2201. The Departments departed from the statute and acted unreasonably in excluding these payments despite recognizing that the QPA should "accoun[t] for a range of different contractual arrangements," including those in which fees are not directly tied to particular items or services. 86 Fed. Reg. at 36,893.

The only rationale the Departments gave in the July Rule for excluding bonus and incentive amounts was that patient cost sharing is typically determined at the time an item or service is provided, so that the patient's cost sharing is generally not affected by later adjustments. *Id.* at 36,894. This rationale is incomplete at best, and the Departments fail to explain how it justifies their choice. The QPA is not *only* used to determine patients' cost-sharing obligations in certain circumstances. It also plays a role in determining provider compensation, and when it excludes elements of compensation, it depresses QPAs below fair market rates. At a minimum, the Departments entirely failed to consider this important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); TMA Br. 22–23.

The Departments now imply, for the first time, that their choice was based on the NSA's text, because "[w]hen Congress defined the QPA using the term 'total maximum payments' it did so with reference to 'the cost-sharing amount imposed for such item or service.'" Opp. 29. It is true that Congress specified that any cost-sharing amount must be included in the total maximum

payment. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But that does not support the Departments' reading. Specifying that any cost-sharing amount is part of the total maximum amount is a far cry from saying that the rate must be calculated the way a cost-sharing obligation is typically calculated.

Finally, the Departments argue that "there is no indication that Congress would have intended" to "only includ[e] [upward] adjustments" and not penalties. Opp. 30 n.10. But they can make that argument only by continuing to ignore the words "total" and "maximum." By using these words, Congress did in fact instruct that to the extent provider compensation in a contract is based on merit, the QPA is based on the rates of "the very best performing in-network providers." Br. of America's Health Ins. Plans ("AHIP"), Doc. 44, at 6. Insurers are of course always free to argue in IDR that a particular provider's "quality and outcome measurements" warrant a lower rate. 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I). But the Departments are not free to read the words "total maximum payment" out of the statute. *See Hibbs*, 542 U.S. at 101.

**D. The Act does not allow the Departments' third-party administrator rule.**

The Departments also cannot justify their rule permitting third-party administrators to calculate a plan sponsor's QPAs based on the rates of *other* plans and/or the rates of only *some* of the sponsor's plans. The NSA clearly forbids this: without exception, it requires QPAs to be "determined with respect to *all* such plans *of such sponsor*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The Departments have no answer to this crystal clear statutory text.

In fact, the Departments again have almost nothing to say about the NSA's text. And what they do say is unresponsive to the statute's clear command to plan sponsors to calculate QPAs based on "all such plans of such sponsor." *Id.* The Departments point out, Opp. 30, that the QPA is calculated based on the sponsor's plans "that are offered within the same insurance market," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), and that the Act defines "[i]nsurance market" to mean "[i]n the case of a self-insured group health plan, other self-insured group health plans," *id.* § 300gg-

111(a)(3)(E)(iv)(IV). The Departments are correct, then, that the QPA may be calculated "with reference to other self-insured group health plans." Opp. 30. But those other plans must still be limited to other "*plans of such sponsor*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The definition of "insurance market" does not erase that limitation.

Further, the Departments do not even argue that this definition excuses another fatal flaw in their rule. The rule permits plans that offer multiple benefits packages administered by different administrators to allow each administrator to calculate separate QPAs, based *only* on those plans of the sponsor that the administrator runs—not on "*all*" the sponsor's plans. *See* August 2022 FAQs at 18 (FAQ 15). Nothing in the statute (in the definition of "insurance market" or elsewhere) creates such an exception to the unqualified command that the QPA must be based on the rates of "*all* such plans of such sponsor." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).

The Departments' policy arguments cannot overcome the rule's direct conflict with the statute, and in any event only underscore the rule's unreasonableness. To start, the Departments claim for the very first time that their rule does not "affec[t] the QPA," because the rates for all plans run by a particular administrator "will likely be identical." Opp. 31. But the rule cannot be upheld on a ground not given in the rule itself. *See Chenery Corp.*, 318 U.S. at 87; *Dish Network Corp.*, 953 F.3d at 379–80. This rationale is deficient in any event. Real-world impact (whether good, bad, or neutral) cannot redeem a regulation that unlawfully implements the statute's text. And, in any event, even if the Departments are correct about how third-party administrators set their rates, the rule will plainly affect the QPAs of at least one set of sponsors—those that offer multiple benefit-package options through different third-party administrators. The rates under different benefits packages administered by different entities will not be "identical."

Nor can the Departments show that their rule is reasonable based on what they have said previously. Plaintiffs have already outlined why each of the justifications in the Departments' rule is inadequate, *see* TMA Br. 24–26, and the Departments do not meaningfully respond to plaintiffs' points. Instead, they repeat their earlier assertion that the rule "reduce[s] the burden imposed" on self-insured group health plans. Opp. 33 (quoting 86 Fed. Reg. at 36,890). The Departments do not explain, and they did not explain in the rule, how this goal can override the statutory text.

The same problem dooms the Departments' related claim that requiring sponsors to calculate QPAs "with respect to all … plans of such sponsor," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), may in some cases be "impractical," Opp. 33. Compliance with congressional directives may be "difficult and burdensome," *id.*, but that is no excuse not to implement the statute as written, *see MCI Telecomms. Corp.*, 512 U.S. at 231 n.4. At the very least, the Departments were required to examine the statutory text and explain why and in what way it was ambiguous before adopting an approach driven by these policy considerations. *See PDK Lab'ys*, 362 F.3d at 798.

The Departments also revive their argument that "[r]equiring self-funded plans to calculate the QPA" based on the "plans they sponsor" would "problematically increase reliance on third-party databases" to determine QPAs. Opp. 33–34. But as plaintiffs already discussed, TMA Br. 24–25, the NSA simply provides that QPAs are derived from independent databases when there is insufficient information. 42 U.S.C. § 300gg-111(a)(3)(E)(ii), (iii). Congress expressed no preference, either for or against, this alternative methodology. The Departments still cannot point to anything in the statute so much as implying that the use of third-party databases is disfavored. A desire to minimize reliance on those databases therefore cannot support the Departments' rule.

Finally, there is, once again, no merit to the Departments' contention that plaintiffs lack standing to challenge the third-party administrator rule. Opp. 31–32. Plaintiffs clearly have

standing to challenge the rule both because it causes them procedural injury, *see supra*, at 13, and because it depresses QPAs, thereby financially injuring plaintiffs and TMA's members. Plan sponsors can be expected to opt in to a third-party administrator's calculations if doing so generally lowers the plan's QPAs. Far from "wild speculation," Opp. 31, this expectation is "firmly rooted in the basic laws of economics," *CEI v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) (explaining that these laws can be the basis for standing); *see also Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) (finding standing based on a "'basic law of economics' that … leads to actual economic injury"). Those laws tell us that firms maximize their profits. And here, the profit-maximizing choice is the option that yields lower QPAs and thus likely reduces the plan's costs associated with reimbursing providers. So the third-party administrator rule "actually affects the QPA," Opp. 32, and is virtually certain to cause plaintiffs and TMA's members at least "a few pennies" of "economic harm." *Young Conservatives of Tex. Found.*, 609 F. Supp. 3d at 511.

## II. The Departments' Disclosure Rule Is Unlawful.

Finally, the Departments' disclosure rule fails to reasonably implement the NSA and is arbitrary and capricious. The rule requires no meaningful disclosures. *See* TMA Br. 28–29. And in adopting it, the Departments failed to consider the most important "aspect of the problem"—how the disclosures would provide the transparency that all agree is necessary—and failed to consider even a single alternative to their minimalist approach. *State Farm*, 463 U.S. at 43, 51.

### A. The Departments' threshold arguments fail.

Before attempting to defend their rule, the Departments again raise unpersuasive threshold arguments. Plaintiffs' request for a remand without vacatur does *not* indicate that plaintiffs are "currently … [un]harm[ed]" by the rule. Opp. 46. The rule injures plaintiffs because the disclosures it requires are unreasonably limited, denying providers the insight into the QPA they need to advocate for their offers before arbitrators in IDR and to use the statutory complaint process to police

insurers' QPA calculations. *See* TMA Br. 27–28. To serve these purposes, plaintiffs want *more*, not *fewer*, disclosures. But vacating the existing regulation, which is the only source of insurers' disclosure obligations, would mean that insurers would have to disclose *nothing* about the QPA until the Departments issued a replacement disclosure rule. Vacatur would therefore "defeat [plaintiffs'] purpose[s]," and for that reason plaintiffs instead request a remand. *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990) (granting remand of agency action at challengers' request); *see also Sierra Club v. EPA*, 884 F.3d 1185, 1198 (D.C. Cir. 2018) (same).

The Departments also wrongly contend that plaintiffs' challenge to the disclosure rule is a request to "compel agency action unlawfully withheld" or for "review of a denial of a petition for rulemaking"—apparently because plaintiffs favor a rule requiring additional disclosures. Opp. 46–47. Plaintiffs obviously do not challenge agency "inaction," Opp. 47: the Departments took "action" as defined in the APA when they issued the July Rule. *See* 5 U.S.C. § 551(13) (defining "agency action" to include a "rule"). And that rule is what plaintiffs claim is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). If this Court agrees and declares the Departments' current disclosure rule unlawful, the Departments will be obligated, both by statute and by this Court's mandate, to issue a new, nonarbitrary disclosure rule. *See* 42 U.S.C. § 300gg-111(a)(2)(B)(ii) (requiring the Departments to promulgate a disclosure rule). Nothing about this transforms plaintiffs' challenge into anything other than a routine request for review of agency action under the APA or requires them to meet a heightened burden.

**B. The Departments' disclosure rule is substantively unreasonable.**

On the merits, the Departments seek to hide behind the "broad" language, Opp. 46, of the statutory provision directing them to adopt rules specifying the information insurers "shall share" with providers about their QPA calculations, 42 U.S.C. § 300gg-111(a)(2)(B)(ii). But "[e]ven

broad rulemaking power must be exercised within the bounds set by Congress." *Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 620 (E.D. Tex. 2021). And here, the Departments have unreasonably implemented Congress's directive, "'in a manner that is inconsistent with the administrative structure that Congress enacted into law,' and [that] … constitutes an unreasonable interpretation of Congress's intent." *Texas v. United States*, 497 F.3d 491, 509 (5th Cir. 2007) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)); *see also Cigar Ass'n v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (rule that did not achieve Congress's purposes was arbitrary and capricious).

It was inconsistent with the structure of the Act and with Congress's intent for the Departments to adopt a disclosure rule that prevents providers from effectively using the NSA's complaint, open negotiation, and arbitration processes. As the Departments themselves recognize, meaningful disclosures about the QPA are necessary to facilitate negotiation over, and dispute-resolution regarding, the appropriate out-of-network rate. Opp. 48; *see also* 86 Fed. Reg. at 36,898. Further, as the Departments do not dispute, the statutory complaint process to challenge QPAs can work as Congress intended only if providers have sufficient information to meaningfully evaluate whether a QPA calculation satisfies the statutory definition. *See* TMA Br. 28. Despite the administrative structure's emphasis on transparency, the Departments unreasonably failed to require insurers to reveal even basic information about their QPAs—such as the contracted rates that go into the calculation, the geographic region, or the specialty of the provider who agreed to the rate.

The Departments' defenses are inadequate. First, the Departments rest heavily on a goal—"reducing burden[s] on plans and issuers by minimizing potentially voluminous disclosure requirements," Opp. 46, 49—that the Departments make no attempt to root in the statutory language, structure, or purpose. That goal (if it were even implicit in the Act) cannot reasonably be elevated over the statutory purpose—transparency—that all agree is clearly reflected in the Act's structure.

*See* Opp. 48 (noting this is "common ground"); *see also Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 188 (1994) (agency's policy goals cannot override statute).

Second, the Departments' brief asserts that the rule serves transparency, but they still do not explain *how* it does so, *see* Opp. 46, 48—just as they arbitrarily failed to explain in the rule itself, *see infra*, Part II.C. Instead, the Departments assert for the first time that the "QPA calculation is itself transparent"—that is, that the statute and regulations, by prescribing a formula for calculating the QPA, provide sufficient transparency. Opp. 49. Even if this justification appeared in the rule, the statutory and regulatory instructions about the formula reveal only a sliver of the necessary information about insurers' secret calculations. The formula is not without ambiguity (as the Departments' regulations and clarifications to those regulations show) or room for interpretation. *See* Compl., *LifeNet III*, Doc. 1, ¶ 91. And the Departments cannot actually expect that anyone would be able to understand and evaluate a QPA without meaningful information about the *inputs* into the calculation. Congress obviously understood this. If it had thought the formula itself was enough, it would not have directed the Departments to adopt disclosure rules.

Third, the Departments claim that their disclosure rule is reasonable because it is "bolstered" by the statute's audit and complaint processes and by statutory penalties. Opp. 48–49. But plaintiffs have already explained why these backstops are wholly inadequate to ensure the accuracy of QPAs. *See* TMA Br. 28. The Departments' contention that nine annual audits of QPAs is a sufficient check on QPA calculations, Opp. 48, is impossible to take seriously. Nine audits a year cannot cover a meaningful sample of the "*tens of millions*" of QPAs. AHIP Br. 12, 14 (emphasis added). No doubt recognizing that the Departments could not police this many QPAs through their own audits, Congress directed the Departments to promulgate disclosure rules and to establish the

complaint process. But the Departments' barebones disclosure rules make the complaint process toothless, *see* TMA Br. 28, and the Departments do not even attempt to argue otherwise.

In short, the Departments' disclosure rule is unlawful first of all because it does not serve the statute's, and the Departments' own, goal of transparency.

**C. The Departments' disclosure rule is procedurally unreasonable.**

The glaring gaps in the rule's reasoning are also independently fatal. The Departments miss the point in defending the "clarity" of their reasoning. Opp. 48. Plaintiffs do not contend that the rule's reasoning is unclear; they contend it is deficient, *see* TMA Br. 29–30, because (1) the Departments "entirely failed to consider an important aspect of the problem"—whether their disclosures would provide the necessary transparency, *State Farm*, 463 U.S. at 43, and (2) the Departments did not consider a single alternative to their meagre disclosures, *see id.* at 50–51.

The APA required the Departments to do more. The Departments should have addressed *how* their rule could provide the necessary transparency. Instead, they simply asserted this. Conclusory assertions are no substitute for reasoned explanation. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1137 (5th Cir. 2021). And although the Departments paid lip service to the need for visibility into the QPA during negotiation and arbitration, *see* 86 Fed. Reg. at 36,898, they entirely ignored the statutory complaint process, never asking what impact requiring so few disclosures would have on access to that process or on its workability, *see Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 209–10 (D.C. Cir. 1988) (faulting agency for failing to "come to grips with the obvious ramifications of its approach and address them in a reasoned fashion").

The APA also required the Departments to consider alternatives to their minimalist approach. *See, e.g., Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 & n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

Instead of adopting a rule that achieved minimal transparency, the Departments could have promulgated one that achieved maximum transparency—by requiring insurers to disclose everything or virtually everything underlying their calculations. Or the Departments could have found a middle ground. Yet they said nothing about any alternative path. It is no excuse that the statutory text does not specifically compel any one of these options. *Contra* Opp. 49. Where multiple alternative paths are plainly evident and encompassed by the statute, failure to consider alternatives is arbitrary and capricious. *See Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 264 (5th Cir. 1989) (invalidating rule for failure to consider an alternative that "easily fits" applicable statutory definition).

**III. The Challenged Provisions Should Be Declared Unlawful, Vacated In Part, And Remanded For Further Rulemaking Consistent With The NSA And APA.**

Finally, the Court should—yet again—reject the Departments' requests for "limited" remedies for their unlawful rules. *See* Opp. 49–50.

For the provisions relating to the QPA methodology, the appropriate remedy is vacatur and a declaration that arbitrators may not consider QPAs affected by the unlawful provisions. TMA Br. 30.[4] The Departments raise no objection to the requested declaration. They do argue that if the provisions are "set aside," they should be vacated only as to plaintiffs. Opp. 49. But this Court has already rejected that argument twice. The "ordinary result" when a court sets aside a rule under the APA "is that the rules are vacated—not that their application to the individual petitioners is proscribed." *TMA I*, 587 F. Supp. 3d at 549; *see also TMA II*, 2023 WL 1781801, at *13.

[4] In their proposed order, plaintiffs requested vacatur of the July Rule's definition of "[c]ontracted rate," 45 C.F.R. § 149.140(a)(1), as a remedy for the improper inclusion of ghost rates. Plaintiffs no longer believe that is necessary. While that definition does not exclude rates for items or services that are not provided, the methodology laid out at 45 C.F.R. § 149.140(b)(1) includes the "provided" language from the statute. The Departments' error is therefore their interpretation of the statute in the July Rule's preamble and the August FAQs to permit the inclusion of ghost rates. *See* TMA Br. 19 (citing 86 Fed. Reg. at 36,889 and August 2022 FAQs at 17 (FAQ 14)).

The Departments also claim that "[a]t most," the Court should remand the QPA methodology provisions without vacating them. Opp. 50. This is not one of the "rare cases" when remand, rather than vacatur, is warranted. *United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1287 (D.C. Cir. 2019). The Departments do not try to argue that the errors here are not serious enough to warrant vacatur; nor can they claim there is anything they can do "to rehabilitate or justify the challenged portions of the Rule as written." *TMA I*, 587 F. Supp. 3d at 548.

Instead, the Departments insist that vacatur would be "highly disruptive" because they would need to "halt" patient cost-sharing calculations and IDR proceedings until they issue new rules and insurers recalculate their QPAs. Opp. 50. Not so. For patient cost sharing, the Departments can exercise enforcement discretion to allow insurers to continue using their existing QPAs until they can calculate compliant ones. *See* August 2022 FAQs at 17 (FAQ 14) (allowing insurers 90 days to recalculate QPAs in accordance with guidance). And while that option is not available for IDR proceedings—because the statute requires arbitrators to consider the QPA "as defined in subsection (a)(3)(E)" of the NSA, 42 U.S.C. § 300gg-111(c)(5)(C)(i)—if there is not a compliant QPA to be considered, arbitrations can go forward without a QPA, just as they can go forward if the parties do not submit information on any of the other enumerated statutory factors.

On the other hand, leaving the Departments' unlawful QPA methodology rules in place and allowing improperly calculated QPAs to continue to be used in IDR—for however long it takes the Departments to issue final QPA regulations (on which they have supposedly been working since they issued the July Rule almost two years ago)—would unfairly prolong the harms to providers from unlawfully depressed QPAs. The Departments have not shown that vacating the rules need cause any disruption, let alone sufficient disruption to outweigh the harms to providers

or overcome the default rule that a court must "'hold unlawful *and set aside* agency action' found to be unlawful." *TMA I*, 587 F. Supp. 3d at 548 (emphasis added; quoting 5 U.S.C. § 706(2)).

Finally, the Departments raise no objection to plaintiffs' request to declare the disclosure rule unlawful and remand it for further rulemaking consistent with the NSA and APA.

## CONCLUSION

The Court should grant plaintiffs' motion, declare the challenged provisions unlawful, vacate them in part, and remand the QPA disclosure regulations for further rulemaking.

Dated: March 24, 2023

Respectfully submitted,

/s/ *Eric D. McArthur*

Eric D. McArthur (*pro hac vice*)
emcarthur@sidley.com
Brenna E. Jenny (*pro hac vice*)
bjenny@sidley.com
Jillian Stonecipher (*pro hac vice*)
jstonecipher@sidley.com
Madeleine Joseph† (*pro hac vice*)
mjoseph@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8018
Fax: (202) 736-8711

Penny P. Reid
Texas Bar No. 15402570
preid@sidley.com
Kelsey M. Taylor
Texas Bar No. 24098507
ktaylor@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Tel: (214) 981-3413
Fax: (214) 981-3400

Jaime L.M. Jones (*pro hac vice*)
jaime.jones@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036

†Admitted only in Massachusetts; pending approval of application for admission to the D.C. Bar, practicing law in the District of Columbia under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system on March 24, 2023.

/s/ *Eric D. McArthur*
Eric D. McArthur