# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

|  |  |  |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:22-cv-00450-JDK |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND | ) | Lead Consolidated Case |
| HUMAN SERVICES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR
# CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...............................................................................................................................2

I.    The Departments Adopted A Reasonable Methodology To Calculate The QPA That Is Not Arbitrary Or Capricious. ........................................................................................2

        A.    The Departments Established A Reasonable Methodology For Calculating The QPA Based On The Contracted Rates Recognized For Services Provided Under The Terms Of The Plans Or Coverage. ......................................3

        B.    The Departments Reasonably Required Payers To Differentiate By Specialty In Calculating The QPA Only Where Real Market Contracting Practices Differentiate By Specialty. ........................................................................6

        C.    The Departments Reasonably Reflected Industry Standard Cost Sharing Calculations By Excluding Bonus And Incentive Payments The QPA. .....................10

        D.    Plaintiffs Have Still Failed To Substantiate Their Baseless Allegation Regarding Third-Party Administrators. .............................................................12

        E.    The Departments Reasonably Excluded Single Case Agreements From The Calculation Of The QPA, Which Is Meant To Reflect In-Network Rates ...............13

        F.    The Departments Reasonably Defined Geographic Areas Within Their Discretionary Authority And Doing So Maximizes Reliance On Real-World Contracts Instead Of Third-Party Databases. .................................................17

II.    The QPA Disclosure Requirements Were Within the Departments' Authority, And The Court Should Reject Plaintiffs' Invitation To Re-Write The Regulations. .......................19

III.    The Departments Explained Their Reasonable Interpretation Of The Payment Deadline, And Some Payers' Alleged Failure To Follow The Departments' Guidance Does Not Make The Regulation Arbitrary Or Capricious. .........................................22

IV.    The Departments Reasonably Interpreted Their Regulation To Require Each Air Ambulance Service Code Be Resolved In A Separate IDR Proceeding. ...................................24

V.    Every Air Ambulance Plaintiff Is A Member Or A Close Affiliate Of AAMS, And They Should Not Be Permitted To Advance Identical Claims In This Duplicative Litigation. .........................................................................................................25

VI.    Plaintiffs' Requested Remedies Are Improper And Unnecessary ...........................................26

CONCLUSION .............................................................................................................................28

## TABLE OF AUTHORITIES

**CASES**

*A.L. Pharma, Inc. v. Shalala,*
   62 F.3d 1484 (D.C. Cir. 1995) ................................................................................27

*Ameritox, Ltd. v. Aegis Scis. Corp.,*
   No. 3:08-CV-1168-D, 2009 WL 305874 (N.D. Tex. Feb. 9, 2009) ....................................26

*AAMS v. U.S. Dep't of Health & Hum. Servs.,*
   No. 1:21-cv-3031-RJL (D.D.C.) ......................................................................... 19, 25

*Ardestani v. INS,*
   502 U.S. 129 (1991) ....................................................................................... 15, 16

*Aransas Proj. v. Shaw,*
   775 F.3d 641 (5th Cir. 2014) ..............................................................................22

*Barnhart v. Walton,*
   535 U.S. 212 (2002) ..........................................................................................20

*Becerra v. Empire Health Found.,*
   142 S. Ct. 2354 (2022) .......................................................................................23

*Benefit Recovery, Inc. v. Donelon,*
   521 F.3d 326 (5th Cir. 2008) ............................................................................. 8, 9

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ..........................................................................................22

*City of Dallas v. FCC,*
   118 F.3d 393 (5th Cir. 1997) ........................................................................... 11, 23

*Davis v. Dallas Area Rapid Transit,*
   383 F.3d 309 (5th Cir. 2004) ..............................................................................26

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ...................................................................................... 2, 3

*In re Stewart,*
   647 F.3d 553 (5th Cir. 2011) ..............................................................................22

*Johnson v. BOKF Nat'l Ass'n,*
   15 F.4th 356 (5th Cir. 2021) ..............................................................................24

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ......................................................................................24

*Kitty Hawk Aircargo, Inc., v. Chao,*
    418 F.3d 453, 458 (5th Cir. 2005) ......................................................................... 9, 12, 18

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................................................. 13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................... 15

*Nat'l Auto Dealers Ass'n v. FTC,*
    864 F. Supp. 2d 65 (D.D.C. 2012) ............................................................................. 8

*Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy,*
    654 F.3d 496 (4th Cir. 2011) ..................................................................................... 6

*Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.,*
    503 U.S. 407 (1992) ................................................................................................... 4

*Nicholson v. Brown,*
    599 F.2d 639 (5th Cir. 1979) .............................................................................. 23, 24

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................................... 21

*Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue,*
    28 F.4th 700 (6th Cir. 2022), *cert. denied,* 143 S. Ct. 626 (2023) ........................... 15

*O'Reilly v. U.S. Army Corps of Eng'rs,*
    477 F.3d 225 (5th Cir. 2007) .................................................................................... 27

*Palisades Gen. Hosp. Inc., v. Leavitt,*
    426 F.3d 400 (D.C. Cir. 2005) ........................................................................... 26, 27

*Richards v. Jefferson Cnty.,*
    517 U.S. 793 (1996) ................................................................................................. 26

*Sierra Club v. ICG Hazard, LLC,*
    781 F.3d 281 (6th Cir. 2015) ..................................................................................... 5

*State v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ............................................................................... 9, 10

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................................... 8

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940) ................................................................................................... 9

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) ............................................................................ 12, 21

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ........................................................................................... 25, 26

*Tearney v. Nat'l Transp. Safety Bd.,*
  868 F.2d 1451 (5th Cir. 1989) ........................................................................... 23, 24

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021) .................................................................................. 27

*Tex. Med. Ass'n v. HHS,*
  587 F. Supp. 3d 528 (E.D. Tex. 2022) .................................................................... 13

*United States ex rel. Dunlap v. Black,*
  128 U.S. 40 (1888) ................................................................................................... 21

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004) ................................................................................... 9

*Univ. of Colo. Health at Mem'l Hosp. v. Burwell,*
  164 F. Supp. 3d 56 (D.D.C. 2016) ........................................................................... 15

**STATUTES**

1 U.S.C. § 1 ....................................................................................................................... 4

26 U.S.C. § 9833 ............................................................................................................ 22

29 U.S.C. § 1104(a)(1)(A) ............................................................................................. 16

29 U.S.C. § 1191c ........................................................................................................... 22

42 U.S.C. § 300gg-92 ..................................................................................................... 22

42 U.S.C. § 300gg-111 ............................................................................................ *passim*

42 U.S.C. § 300gg-112 ............................................................................................ *passim*

**LEGISLATIVE MATERIALS**

S. 1266, 116th Cong. (2019) ......................................................................................... 28

H.R. 4223, 116th Cong. (2019) ..................................................................................... 28

**REGULATIONS**

45 C.F.R. § 149.140 ................................................................................................. *passim*

45 C.F.R. § 149.510...........................................................................................................9, 24

*Requirements Related to Surprise Billing; Part I*, ("July 2021 IFR")
    86 Fed. Reg. 36,872 (July 13, 2021) ...............................................................................*passim*

*Requirements Related to Surprise Billing*,
    87 Fed. Reg. 52,618 (Aug. 26, 2022).............................................................................20

## OTHER AUTHORITIES

Erin C. Fuse Brown *et al.*, *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) ..........................................................................................................................18

Erin C. Fuse Brown et al., *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions*, 98 MILBANK Q. 747 (2020)...........................................................................................15, 18

FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021
Implementation Part 55 ("Aug. 2022 FAQs") .......................................................................*passim*

Felix Frankfurter, *Some Reflections on the Reading of Statutes*,
    47 COLUM. L. REV. 527 (1947) ........................................................................................23

Zack Cooper et al*., Surprise! Out-of-Network Billing for Emergency Care in the United States,* 128 J. POL. ECON. 3626  (2020) ..........................................................................................................15

## INTRODUCTION

Congress enacted the No Surprises Act ("Act") to address a market failure. In a free market, parties negotiating at arm's length should arrive at a fair price for a given product. The health care market, however, often has not worked this way. In an emergency, a patient may have no way to choose the air ambulance that transports him or the facility that treats him. Or a patient might schedule a procedure at an in-network facility, only later to find out that part of their care was performed by an out-of-network physician. Such cases have often led to staggering, and sometimes ruinous, medical bills for patients, driving up health insurance premiums and increasing the federal deficit.

Congress addressed this crisis through several interlocking reforms. The Act bans providers from balance billing their patients in these and other circumstances and limits the patient's cost sharing. It limits patient cost sharing by basing the patient's cost sharing amount on the Qualifying Payment Amount ("QPA"), assuming no All Payer Model Agreement or applicable state law is in place. The QPA serves as a rough proxy for what the in-network rate would have been for the medical service in a functioning market and is generally calculated using contracted rates for in-network services from 2019, adjusted for inflation. The QPA also plays an indirect role in other procedures created by the Act, including the process for negotiating and arbitrating payment disputes between payers and providers, but for all purposes other than patient cost-sharing, the QPA is merely a reference point.

Plaintiffs here challenge several regulations setting forth a methodology for calculating the QPA, claiming those regulations conflict with the Act and are arbitrary or capricious. But the regulations issued by Defendants the Departments of Health and Human Services, Labor, and the Treasury ("Departments") reflect a reasonable interpretation of the Act. Furthermore, none of the challenged provisions have the intent or effect of driving the QPA below the median of in-network rates. Instead, nearly all of the challenged provisions bring the QPA closer in line with real-world rates by basing the QPA on actual market conditions, furthering Congress's goal of remedying a market failure.

The Air Ambulance Plaintiffs' additional demands should likewise be rejected. Their challenge to the payment deadline regulation is based on a willful rejection of the Departments' explanation of the regulation, which prohibits the behaviors Plaintiffs complain of. Similarly, the Air Ambulance Plaintiffs' request for an exception to the generally applicable rule requiring each billing code to be resolved in a separate independent dispute resolution ("IDR") proceeding should be rejected. In any event, the Air Ambulance Plaintiffs are all members or close affiliates of members of a trade association whose case, raising several of the exact same claims as are at issue here, has been pending in another court for over a year. The rule against claim splitting should bar their attempts to obtain potentially conflicting relief from this court.

Each of Plaintiffs' demands, based on incorrect, incomplete, or out-of-context interpretations of the Act, would impose such significant burdens on the Departments and on payers that would threaten to bring the system to its knees. As the Departments have explained, vacating the regulations setting the methodology for calculating the QPA, as Plaintiffs request here, would bring virtually every aspect of the Act's implementation to a screeching halt. And Plaintiffs' request that the IDR process simply continue without any consideration of the QPA is blatantly inconsistent with the statutory text.

While Plaintiffs might prefer that in-network rates play no role whatsoever in determining the appropriate payment for out-of-network medical services, Congress itself has already rejected that vision of the Act, and Plaintiffs cannot achieve through litigation what they failed to achieve through the legislative process. This Court should grant Defendants' cross-motion for summary judgment.

## ARGUMENT

### I.     The Departments Adopted A Reasonable Methodology To Calculate The QPA That Is Not Arbitrary Or Capricious.

Congress instructed the Departments to issue regulations establishing the "methodology . . . to determine the qualifying payment amount." 42 U.S.C. §§ 300gg-111(a)(2)(B)(i), 300gg-112(c)(2). The Departments reasonably exercised this statutory authority to ensure the QPA for a given service is a fair approximation of the amount that would have been paid if the parties had negotiated an in-network price beforehand. They acted "within a zone of reasonableness" in doing so, and Plaintiffs'

challenges to their rulemaking should accordingly be rejected. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

### A.     The Departments Established A Reasonable Methodology For Calculating The QPA Based On The Contracted Rates Recognized For Services Provided Under The Terms Of The Plans Or Coverage.

The Act defines the term "qualifying payment amount" as "the median of the contracted rates recognized by the plan or issuer, respectively . . . under such plans or coverage, respectively, on January 31, 2019, for the same or similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished, consistent with the methodology established by the Secretary," adjusted for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Consistent with the statutory text, the regulations base the QPA calculations on the total amount a payer has contractually agreed to pay a participating provider for items or services provided under the generally applicable terms of the plan or coverage. 45 C.F.R. § 149.140(a)(1); 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In doing so, the regulation does not, as Plaintiffs claim, read the word "provided" out of the statutory text. TMA Plaintiffs' Opp. to Defs.' Mot. for Summ. J. & Reply in Support of Summ. J. 6-7, ECF No. 54 ("TMA Reply Br."). Consistent with the contract terms, the QPA is based on the rates resulting from arms-length negotiations between providers and payers for items and services provided under the contract and reflects accurate real-world market conditions. Negotiated rates in real contracts are legitimate, actual rates: providers accepted them in the marketplace, regardless of whether the provider happened to provide that service during an unspecified time period or provides that service frequently.[1]

Plaintiffs' attempt to fault the Departments for not issuing an interpretation of the word "provided," TMA Reply Br. 6, is a red herring. The contracts themselves make clear that these are the rates that apply every time a service "is provided" under the contract—whether the provider expected

---

[1] The Departments have previously explained that $0 rates should never be included in the QPA calculation. Plaintiffs have provided no evidence that "not-quite-zero" placeholder rates are being used in the QPA calculation, or that such rates would not be excluded under the requirement that the QPA should be calculated in a specialty-specific manner when rates vary by specialty. *See infra* Section I.B; Aug. 2022 FAQs at 17 n.29.

herself to provide that service frequently or not. *See e.g.*, *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 420 (1992) (deferring to agency's interpretation even though the agency "did not in so many words articulate its interpretation of the word 'required'"). As the Departments explained in their opening brief, Defs.' Cross-Mot. for Summ. J. & Mem. in Opp'n to Pls.; Summ. J. Mots. 20, ECF No. 41 ("Defs.' Br."), in the insurance market, contracted rates are generally negotiated prospectively, with a provider and plan typically agreeing on the prices that will be paid under the plan or coverage for various items and services that may be furnished in the forthcoming year. Thus, the contracted rates will apply to any item or service that "is provided" under the contract terms, even though neither the providers nor the payers can know for certain how many times a particular item or service will be provided. And this is consistent with ordinary principles of statutory construction. *See* 1 U.S.C. § 1 ("[W]ords used in the present tense include the future as well as the present."). It is therefore reasonable to use the contracted rates that will apply to a service any time it is provided under the terms of the plan or coverage, without any need to look beyond the four corners of the contracts and into the past to determine whether or how often a service has been provided by a particular provider. Plaintiffs try to re-write the statutory phrase "is provided" into "was provided." But Congress did not impose requirements on how often, or within what time period, a service must have been provided because, by the very nature of the contracts, *any* time the service is provided during the term of the contract, the terms of the plan or coverage supply the rate that must be paid. Agreed-upon rates do not become illegitimate just because, due to shifting demand, a changing market, or personal preference, a provider may not negotiate aggressively over every single rate for every single service in their contract. Negotiated network rates are valid evidence of real-world market rates, regardless of whether or how often a provider has provided that service.

Plaintiffs have still failed to offer any realistic or workable explanation of how their QPA definition based on contracted rates for only those items or services that a provider provided during some unspecified time period would actually work. TMA Reply Br. 5. According to Plaintiffs' example, even heart surgeons whose practices differ slightly in terms of the services that they typically provide are not appropriate comparators whose rates should be included in the QPA for heart surgery services.

*Id.* at 7-8. Missing from Plaintiffs' "simplified example" is how any payer would be able to determine which of the ten heart surgeons who have valid contracts to provide a variety of heart surgery procedures regularly provide each of those procedures. *Id.* But short of conducting a nationwide survey of every health care professional to determine which of the services listed in their own contracts they have provided during their careers, there is no way to discern which legally valid contracted rates for items and services, under Plaintiffs' interpretation, should be included in the QPA—even if it is a service, like heart surgery, that one would expect to see in a heart surgeon's contract.[2] Administrative burdens and impossibility or impracticality of alternative interpretations may factor into an agency's decision-making process. *See, e.g.*, *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 287 (6th Cir. 2015) (holding that "practical impossibility" of alternative interpretations "bolsters the EPA's interpretation of what Congress intended in the statute, at least enough to make that interpretation reasonable under *Chevron*").

In the absence of any realistic way to determine which of the services that providers contract for were "provided" during some unspecified time period, the Departments reasonably devised a practical and workable regulation that would look at the contracts themselves—negotiated at arm's length between sophisticated business entities in the real market—to determine what rates those providers agreed to accept for the services that they provide under the terms of the plan or coverage. And the Departments' response to Plaintiffs' unworkable interpretation of the statute, explaining that the relevant universe of rates should be discernable from the four corners of the contracts themselves, is not a post-hoc rationalization. TMA Reply Br. 6-7. The fact that discerning contracted rates based

---

[2] Plaintiffs claim not to understand why the Departments assert that determining whether a provider actually provided a particular service during some unspecified time period is not as simple as looking through a payer's own claims data and might require a review of the provider's patient medical records. TMA Reply Br. 7 n.2. But each plan or issuer's claims data only reveal what services were provided to their own plan members or beneficiaries—they have no source of information as to what services a provider may have provided to patients covered by *other* plans or issuers. Take the example of a heart surgeon has performed a particular heart surgery on ten Aetna patients but has never performed that particular heart surgery on a BlueCross patient. Even if BlueCross has a contract with that provider that includes a contracted rate for that particular heart surgery, BlueCross would have no way of knowing whether the rate in *its own* contract with that surgeon for that particular surgery is one that should be included in the QPA under Plaintiffs' interpretation, because it would not know whether that surgeon has "provided" that particular surgery under Plaintiffs' standard.

on anything outside of the four corners of the contracts themselves would be administratively impracticable, if not impossible, is supported by the preamble's repeated references to basing the QPA on the contracts themselves, rather than analysis of past services provided. *See Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) ("July 2021 IFR") (explaining that the QPA is calculated by "arranging in order from least to greatest the contracted rates of all plans of the plan sponsor" and "the rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate"). And it is well established that, when an agency's decision is challenged, it may expound upon its reasoning and make "more sophisticated legal arguments" in litigation. *Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 514-15 (4th Cir. 2011).

Finally, Plaintiffs criticize the Departments' explanation that separate QPAs must be calculated whenever there is a material difference in the rates between a specialty that regularly provides a service and all others, thus minimizing the problem of "ghost rates." TMA Reply Br. 7-8. But this requirement ensures the QPA will not be artificially deflated by the inclusion of rates from specialties that do not provide a particular item or service. *See* FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55 ("Aug. 2022 FAQs") at 16-17 (AR 10860-61). There will always be some variation in in-network rates for items and services, but nothing in the statute or regulations permits inclusion of rates that are "artificially" low as Plaintiffs claim. TMA Reply Br. 7. Plaintiffs' attempt to slap any rate they deem insufficiently high with the label "ghost rate" fails to acknowledge this reality: the Departments crafted regulations to calculate the QPA that are consistent with both the statutory text and Congress's goal that the QPA serve as a rough proxy for in-network rates.

## B. The Departments Reasonably Required Payers To Differentiate By Specialty In Calculating The QPA Only Where Real Market Contracting Practices Differentiate By Specialty.

The Departments reasonably designed the QPA calculation to replicate real-world market conditions, and therefore the QPA calculation must differentiate by specialty only where plans and

issuers' contracting practices do so as well. This does not itself drive prices below market rates; it mimics market contracting practices. And it is consistent with Congress's goal of fixing a market failure by looking to real-world contracts as a reference point. By basing the QPA on market-based rates that reflect real-world contracting practices, the Departments have crafted a QPA calculation methodology that is consistent with the statute, reasonable, and, unlike Plaintiffs' interpretation, administratively practical. As explained in the preamble to the July 2021 IFR, requiring payers to calculate the QPA on a specialty-specific basis even where the plan or issuer does not differentiate by specialty would add significant burdens to the QPA calculation process, without adding any specificity to the QPA or bringing it any closer in line with real market practices. 86 Fed. Reg. at 36,891.

Contrary to Plaintiffs' contention, the Act does not require that separate QPAs must always be calculated for every provider specialty. TMA Reply Br. 8. The statute defines the QPA with reference to the median of the "contracted rates" "for the same or a similar item or service that is provided by a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July 2021 IFR defines "provider in the same or similar specialty" by reference plan's or issuer's usual business practice regarding contracted rates for an item or service. 86 Fed. Reg. at 36,891. When the rates for an item or service do not vary by provider specialty, basing the QPA on the contracted rates for that item or service is consistent with the statute, because the contracting practices treat providers the same and the contracted rates for that item or service are inherently the same as the rates for the item or service provided by a provider in the same or similar specialty. Plaintiffs' argument that the regulation lacks a statutory basis is therefore incorrect. TMA Reply Br. 8.

Plaintiffs profess confusion at how a payer determines that contracted rates differ by specialty, *id*, at 9, but as the August 2022 FAQs and the preamble to the July 2021 IFR explain, the "metric" that should be used is whether the plan or issuer has contracted rates that vary based on provider specialty for a service code. *See* 86 Fed. Reg. at 36,891 (looking at whether "contracted rates for a service code . . . vary based on provider specialty"); *see also* Aug. 2022 FAQs at 16 ("Plans and issuers are required to calculate separate median contracted rates by provider specialty both in instances where their contracting process purposefully sets different rates for different specialties and in instances

where the contracting process otherwise results in different rates for different specialties."). "The Departments considered requiring a plan or issuer to calculate separate median contracted rates for every provider specialty, but concluded that this approach would lead to more instances in which the plan or issuer would not have sufficient information to calculate the QPAs using its contracted rates . . . [and] would increase the burden associated with calculating the QPA without adding specificity to the QPA." 86 Fed. Reg. at 36,891. The Departments have therefore adequately addressed Plaintiffs' concern about how providers determine whether there is a material difference in the contracted rates across provider specialties. Aug. 2022 FAQs at 16-17. And this interpretation avoids unnecessarily burdening payers by making the QPA calculation more onerous without producing any added benefit. *See, e.g.*, *Nat'l Auto Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 80 (D.D.C. 2012) (explaining that it is "reasonable and desirable" to interpret a regulation in a way that avoided burdensome "practical effects").

Plaintiffs now argue, for the first time, that they suffer a procedural injury as a result of the challenged regulation. TMA Reply Br. 13. This argument has been waived or forfeited. *See Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) (explaining that "arguments cannot be raised for the first time in a reply brief"). Regardless, the suggestion that Plaintiffs suffer a procedural injury any time an arbitrator considers a QPA that they believe was calculated in a manner inconsistent with the statutory definition—even when it does not have the effect of resulting in a higher or lower QPA—is fundamentally mistaken. A procedural injury "*in vacuo*," without any other concrete harm, is insufficient to establish standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Plaintiffs appear to have de-emphasized their argument that calculating the QPA in a specialty-specific manner whenever rates differ by specialty will necessarily result in a lower QPA. TMA Reply Br. 13. Rightly so. Because the regulation reasonably requires payers to differentiate by specialty in calculating the QPA whenever the real market contracting practices likewise differentiate by specialty, this regulation does not have the effect of driving down the QPA below market rates but instead brings it closer to reflecting real market conditions. In any event, the QPA calculation methodology does not itself drive down the QPA, as Plaintiffs suggest. *Id.* at 14. It can go either way. For example,

when calculating the QPA for anesthesia services, if the rates for anesthesiologists are all at the high end and the rates for primary care physicians are all at the low end, calculating the QPA on a specialty-specific basis would result in a higher QPA for the anesthesiologists (by excluding the primary care physicians) and a lower QPA for the primary care physicians (by excluding anesthesiologists). Thus, Plaintiffs' contention that excluding out-of-specialty rates whenever contracted rates vary by specialty will inevitably skew the QPA in one direction—lower—is incorrect. And Plaintiffs' assumption that QPAs calculated under the current regulation necessarily result in lower payments to providers, *id.* at 13, is also inaccurate: the QPA is a reference point, during both the open negotiation process and the IDR process, but neither a provider nor an IDR entity is obligated to accept an offer of payment that it feels does not reflect the value of the item or service at issue. 45 C.F.R. § 149.510(c)(4)(ii). Because the regulation does not harm Plaintiffs, and Plaintiffs have not shown that vacating it would actually have the effect of raising QPAs, they lack standing to challenge it. *See Kitty Hawk Aircargo, Inc. v. Chao* 418 F.3d 453,  458 (5th Cir. 2005).

Plaintiffs' novel contention that the Departments impermissibly "punted" rulemaking authority to payers when they calculate the QPA is both unfounded and waived or forfeited. TMA Reply Br. 11; *see Benefit Recovery, Inc.*, 521 F.3d at 329. Congress expressly required that plans and issuers "determine the qualifying payment amount" using the methodology established by the Departments. 42 U.S.C. § 300gg-111(a)(2)(B)(i). The QPA calculation is not a "subdelegation of authority" but instead is an appropriate regulatory burden imposed on private entities. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564 (D.C. Cir. 2004). Federal agencies are permitted to task private entities with compiling, calculating, and transmitting information, like the calculation of the QPA here. *See id.* at 567. And even if the Departments had subdelegated to payers, such delegation would be permissible because "agencies may subdelegate to private entities so long as . . . the federal agency 'has authority and surveillance over [their] activities.'" *State v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). Here, following Congress's direction, the Departments established a methodology that payers must use to determine the QPA, and the Departments must audit group health plans and health insurance issuers to ensure compliance with

9

that methodology. *See* 42 U.S.C. § 300gg-111(a)(2). In other words, the Departments have "authority and surveillance" over the QPA calculation. *Rettig*, 987 F.3d at 532.

Congress directed that the QPA be based on the terms of the plans or coverage that payers offer in the insurance market. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The regulation is consistent with both the statutory text and the congressional purpose by reflecting real-world market practices and bringing the QPA closer in line with, not farther from, real market contracting practices.

## C.   The Departments Reasonably Reflected Industry Standard Cost Sharing Calculations By Excluding Bonus And Incentive Payments The QPA.

The Act states that the QPA calculation must be based on the "the total maximum payment . . . under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Plaintiffs make much of the fact that Defendants do not define "total maximum payment." But Plaintiffs themselves would define only "maximum" and leave the word "total" undefined, ignoring the concrete nature of a "total," which must be calculated at a particular point in time. But even under Plaintiffs' preferred definition of just "maximum," *see* TMA Reply Br. 15-16 ("highest value"), bonus and incentive payments, themselves *potential future* payments and not part of any actual "total maximum," would not be included. Plaintiffs continue to read the word "potential" into the statute in hopes that bonus and incentives payments that have not been earned and may never be realized would be included as part of the QPA. This cannot be.

As Defendants have explained, *see* Defs.' Br. 28-29, the July 2021 IFR, in setting out the methodology for calculating the median contracted rates used to calculate the QPA, "[e]xclude[s] risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments," 45 C.F.R. § 149.140(b)(2)(iv). Under the Act, a patient's cost-sharing obligations for out-of-network emergency services, air ambulance services, and nonemergency services furnished by out-of-network providers at in-network facilities are determined by reference to the "recognized amount." 42 U.S.C. § 300gg-111(a)(1)(C)(iii). When there is no applicable specified state law or All-Payer Model Agreement in place, the "recognized amount" is defined as the lesser of the billed charges or the QPA. *Id.* § 300gg-111(a)(3)(H). The Departments excluded incentive-based or retrospective payments from

the calculation of the QPA because "excluding these payments and payment adjustments from the median contracted rates used to determine cost sharing . . . is consistent with how cost sharing is typically calculated for in-network items and services." 86 Fed. Reg. at 36,894.

Plaintiffs brush aside that cost-sharing explanation and do not grapple with it in earnest. TMA Reply Br. 17-18. The July 2021 IFR simply incorporated long-standing industry norms for calculating patient cost-sharing amounts. 86 Fed. Reg. at 36,894 (for in-network cost-sharing, the "amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process"); *see City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997) (agency regulation interpreting statute to align with industry standards was reasonable). And, indeed, Plaintiffs do not dispute as much. Here, the Departments defined the QPA in the context of its primary function: setting patient cost-sharing.

At bottom, Plaintiffs again seek to inflate the QPA as much as possible. Many bonus and incentive payments are designed to achieve quality and outcomes-based goals and offer pay-for-performance incentives linked to the quality of patient outcomes. Other bonuses are based on efficient and cost-effective delivery of care. *See* Br. of America's Health Ins. Plans as Amicus Curiae in Support of Defs.' Cross-Mot. for Summ. J. & Opp. To Pls.' Summ. J. Mots. 4-6, ECF No. 44. These bonuses are not easily translatable to the fee-for-service model. *See* Defs.' Br. 29. But even worse, with this particular tack, Plaintiffs seek to benefit from quality and outcomes-based bonus metrics without actually earning those benefits. Plaintiffs seek to require out-of-network providers be paid as though they are all the very best-performing in-network providers without requiring those out-of-network providers to meet any of the quality and outcome standards that in-network providers must meet to earn those bonus and incentive payments. Indeed, Plaintiffs' project here undermines Congress's broader goal to ensure that out-of-network care would not cost more for patients than if the same care had been provided in-network. *See* 42 U.S.C. §§ 300gg-111(a)(1), 300gg-112(a)(1). The QPA is used first and foremost to determine patient cost-sharing. Including additional potential bonus and incentive payments in the patient cost-sharing calculation for out-of-network services when those

same payments are not normally included in the patient cost-sharing calculation for in-network services would make out-of-network care more expensive for patients than in-network care, thus defeating Congress's purpose in passing the Act. *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1028 (5th Cir. 2019) (explaining that courts should not adopt an interpretation that "is contrary to clear congressional intent or frustrates the policy Congress sought to implement").

### D. Plaintiffs Have Still Failed To Substantiate Their Baseless Allegation Regarding Third-Party Administrators.

The Departments reasonably permitted third-party administrators to calculate the QPA for all the third-party administrator's self-insured plans—and Plaintiffs have still failed to provide any support for their contention that this practice drives down the QPA or injures them in any way. *See Kitty Hawk Aircargo, Inc.*, 418 F.3d at 458.

As argued earlier, Defs.' Br. 30-34, the Act specifies that the QPA must be "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). To that end, the QPA is calculated based on plans offered "within the same insurance market," which the statute defines "in the case of a self-insured group health plan, other self-insured group health plans." *Id.* § 300gg-111(a)(3)(E)(iv)(IV). The statute, then, contemplates that the QPA for self-insured plans may be calculated with reference to *other* self-insured group health plans. This interpretation is also consistent with the congressional goal of basing the QPA on real-world contracts, as it makes it more likely that self-insured plans have sufficient numbers of contracted rates to calculate a QPA, thus minimizing reliance on third-party databases. *See* 86 Fed. Reg. at 36,888.

The July 2021 IFR, in turn, permits self-insured health plans to "allow their third-party administrators to determine the QPA for the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)." 86 Fed. Reg. at 36,890; *see* 45 C.F.R. § 149.140(a)(8)(iv).

12

Plaintiffs principally argue that this rule "depresses QPAs," thus "financially injuring plaintiffs and TMA's members." TMA Reply Br. at 21. But they still offer no support for the theory that allowing third-party administrators to calculate the QPA has any impact on the QPA, driving it either higher or lower. Plaintiffs state generally that "[p]lan sponsors can be expected to opt in to a third-party administrator's calculation if doing so generally lowers the plan's QPAs." *Id.* And they support this baseless expectation with generalized assertions that the basic laws of economics tell us that "firms maximize their profits." *Id.* But Plaintiffs still offer no evidence, other than sheer speculation, that self-insured plans and third-party administrators are actually engaging in this behavior. It is not clear that anyone would undertake the costly and time-consuming burden of calculating two sets of QPAs just to obtain a QPA that might be slightly lower—of perhaps not even lower at all. In fact, because a third-party administrator typically makes the same network rates available to all the self-insured plans that it administers, the QPAs would likely be identical for each of the self-insured plans regardless of whether the QPAs were determined separately for each self-insured plan or in the aggregate at the administrator level. *See* Defs.' Br. 32. Either way, Plaintiffs offer no evidentiary support whatsoever for their theory that allowing third-party administrators to calculate the QPA for the self-insured plans they administer will affect the QPA, or even injure Plaintiffs at all. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (a plaintiff may not meet its burden to establish Article III standing at summary judgment through "conclusory allegations of an affidavit").

### E.  The Departments Reasonably Excluded Single Case Agreements From The Calculation Of The QPA, Which Is Meant To Reflect In-Network Rates.

As this Court has recognized, "the QPA is typically the median rate the insurer would have paid for the service if provided by an *in-network* provider or facility." *Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 535 (E.D. Tex. 2022) (emphasis added). The July 2021 IFR appropriately bases the calculation of the QPA for a given medical service on the contracted payment rate for that service under each of the plans or policies that the plan sponsor or issuer negotiated in advance with a provider of that service, *i.e.*, the in-network contracts. 45 C.F.R. § 149.140(a)(1). By limiting the calculation to the generally applicable contract rates under plans and policies that have been negotiated

in advance, the rule excludes "single case agreements" that may be negotiated between a provider and a plan or issuer, either at the time that a service is performed, or after the fact. *See* 86 Fed. Reg. at 36,889. Because these "single case agreements" have often set payments that are greatly inflated above what the in-network price would have been for a given service, the Air Ambulance Plaintiffs seek to include these agreements in the calculation of the QPA. Air Ambulance Pls.' Opp. to Defs.' Mot. for Summ. J. & Reply in Supp. of Summ. J. 12, ECF No. 55 ("AA Reply Br.").

As the Departments have explained, the exclusion of single case agreements from this calculation flows from the text of the statute. The Act does not base the QPA on every possible type of contractual agreement that a provider and a payer might enter into. Instead, this amount is the "median of the contracted rates," determined with respect to all plans of the plan sponsor or all coverage of the health insurance issuer, recognized as the maximum payment "under such plans or coverage, respectively, on January 31, 2019," adjusted for inflation. 42 U.S.C. §§ 300gg-111(a)(3)(E)(i), 300gg-112(c)(2). A payment amount established by a single case agreement is not a "contracted rate" that is recognized "under such plans or coverage." *Id.* § 300gg-111(a)(3)(E)(i). The Departments reasonably adopted a methodology for the QPA calculation that "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Although the Air Ambulance Plaintiffs refer to "market rates" that may be set by single case agreements, AA Reply Br. 19, the preamble's reference was plainly to typical contract negotiations between providers and payers over in-network rates. *See, e.g.*, 86 Fed. Reg. at 36,884 (explaining that the QPA is based on "median contracted rates, as opposed to rates charged by *nonparticipating* providers" (emphasis added)). One of Congress's central purposes in enacting the No Surprises Act, after all, was to ensure that patients would not owe more for out-of-network medical services than what their cost-sharing responsibilities would have been if those services had been provided in-network. *See* 42 U.S.C. §§ 300gg-111(a)(1), 300gg-112(a)(1). Including out-of-network single case agreements, which are typically much higher than in-network rates, in the QPA would frustrate that purpose.

14

Plaintiffs call this a post-hoc rationalization. AA Reply Br. 12. But the preamble to the July 2021 IFR explained that single case agreements should not be included in the QPA calculation because "the term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage," 86 Fed. Reg. at 36,889—the same rationale provided here. Nothing in the cases Plaintiffs rely on, AA Reply Br. 13, narrows a court's "inquiry into an agency's contemporaneous rationale solely to the concise general statement" contained in one portion of the preamble. *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 721 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 626 (2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29,  43 (1983)); *see also* 86 Fed. Reg. at 36,923 (discussing high cost of out-of-network air ambulance services). And the administrative record contains numerous articles and studies examining the impact of exorbitantly high single case agreements for air ambulance services. *See e.g.*, Erin C. Fuse Brown et al., *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions*, 98 MILBANK Q. 747, 756 (2020) (AR 2860); *see also Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 164 F. Supp. 3d 56, 65 (D.D.C. 2016) (deeming it appropriate for an agency to "clarify the administrative record" after a decision by "explaining an assumption" and "illuminat[ing] a connection . . . which the administrative record left somewhat implicit"). The preamble to the July 2021 IFR, the administrative record, and the Departments' litigating position all provide the same rationale in support of the challenged regulation: the QPA should be based only on in-network rates, *i.e.*, rates under the generally applicable terms of the plan or coverage.

A payment arises "under" a plan or coverage if it is "governed by," or is owed "by reason of the authority of," the terms of the plan or policy. *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (defining "under"). A payment under a single case agreement is not dictated by the generally applicable terms of a plan or policy. If such a payment were so dictated, the provider would be in-network, and no single case agreement would be necessary. Instead, plans and issuers have entered into single case agreements because they have made a business decision that it is a better practice to spare their members, at least some of the time, from surprise bills, and to pay providers at high rates for out-of-

network services, even in the absence of a legal compulsion to do so. *See* Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. POL. ECON. 3626, 3633 (2020) (AR 3633) (describing insurers' business options to pay all, some, or none of a surprise bill for out-of-network medical services). The Air Ambulance Plaintiffs suggest in passing that payments made under single case agreements must be payments made "under" the terms of the plan or coverage, or else any such payments would violate the fiduciary duty obligations of ERISA, which prohibit dissipating the plan's assets for a purpose other than providing benefits to participants and beneficiaries. AA Reply Br. 15; *see* 29 U.S.C. § 1104(a)(1)(A). But plans and issuers have a valid reason to pay providers for out-of-network services to avoid at least some of the negative consequences that would result if their customers or participants were routinely denied any assistance with expensive surprise medical bills. Thus, although payments made in single case agreements are payments for the general purpose of providing a benefit to beneficiaries, they are not payments that are dictated "by reason of the authority of" the plan or policy documents themselves. *Ardestani*, 502 U.S. at 135. Payments for in-network services, at rates that are negotiated in advance, are such payments, and so the contracted rates for those in-network services are what are counted to set the QPA. Payments under single case agreements are not. It is not the case that any payment not dictated by the terms of the plan or policy is necessarily a breach of a fiduciary duty under ERISA. 29 U.S.C. § 1104(a)(1)(A).

The Air Ambulance Plaintiffs' contrary theory would lead to absurd results. The statute bases the QPA on the contracted rates recognized by the plan or issuer for the item or service "under such plans or coverage, respectively, on January 31, 2019," subject to an inflation adjustment. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The statute thus instructs the plan or issuer to look to all its plans or policies that were effective during a plan year that includes January 31, 2019, no matter whether the plan or policy operated on a calendar-year basis or over some other time frame. There is no reason, however, to think that Congress attached any particular significance to single case agreements that had been entered into on one specific day, January 31, 2019. *See* Defs.' Br. 35. To this point, Plaintiffs offer no meaningful rejoinder—only an acknowledgment that Congress's express reference to January 31, 2019 creates "ambiguity" in their theory of statutory interpretation. AA Reply Br. 18. But the Air

16

Ambulance Plaintiffs' interpretation of the meaning of the January 31, 2019 date is idiosyncratic—even the TMA Plaintiffs agree that "Congress undisputedly mandated that the rates that factor into QPA calculations be rates recognized on January 31, 2019" and that date "identifies which contracts count." TMA Reply Br. 5.

The Air Ambulance Plaintiffs also insist that it was arbitrary to exclude single case agreements from the calculation of the median contracted rate, but include the same agreements as contracts for purposes of determining whether a health care facility is "participating" for the purposes of some of the Act's balance-billing rules. AA Reply Br. 20. The Departments have explained, however, that this latter definition rests on different statutory language, which establishes that a health care facility is "participating" for the purposes of a given medical item or service—and that the Act's surprise-billing protections will apply for that item or service—when the facility "has a direct or indirect contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such an item or service at the facility."   42 U.S.C. § 300gg-111(b)(2)(A)(i). This is because the surprise billing protections reflect a patient-centric approach: if a patient would not necessarily have reason to know that their care is being provided on an out-of-network basis, then the Act's balance billing protections should apply. *See* 86 Fed. Reg. at 36,889 n.48, 36,931. And notably, the definition of a participating facility is different from that of the QPA, and does not rest on the payment amounts recognized under a plan or coverage in the way that the QPA's definition does.

### F.   The Departments Reasonably Defined Geographic Areas Within Their Discretionary Authority And Doing So Maximizes Reliance On Real-World Contracts Instead Of Third-Party Databases.

The Act requires the QPA for a given service to be calculated on the basis of the median of contacted rates for the service "provided in the geographic region in which the item or service is furnished," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), and authorizes the Departments to issue regulations defining these geographic regions, *id.* § 300gg-111(a)(2)(B)(iii). For air ambulance services, the Departments primarily defined a "geographic region" as "one region consisting of all [metropolitan statistical areas] in the state, and one region consisting of all other portions of the state." 86 Fed. Reg.

at 36,893; see 45 C.F.R. § 149.140(a)(7)(ii)(A). Where this definition leaves the plan or issuer without enough data to calculate a median of contracted rates, however, the relevant geographic region is instead "based on Census divisions—that is, one region consisting of all [metropolitan statistical areas] in each Census division and one region consisting of all other portions of the Census division." 86 Fed. Reg. at 36,893; *see* 45 C.F.R. § 149.140(a)(7)(ii)(B).

The Departments adopted this backup definition to account for the "lower prevalence of participating providers of air ambulance services." 86 Fed. Reg. at 36,893. Air ambulance transports are relatively rare to begin with, and at least 70% of these transports have been performed by out-of-network providers in recent years *See* Erin C. Fuse Brown *et al.*, *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) (AR 2845). The Departments accordingly needed to draw regions broadly enough to capture sufficient data on in-network prices to allow for a meaningful calculation of the QPA. Basing the QPA on valid contracted in-network prices brings the QPA more closely in line with real-world market conditions.

Plaintiffs suggest that there is something inherently wrong with relying on broad geographic areas to base the QPA on real-world market conditions reflected in actual in-network agreements, but they offer no specificity on what harm, exactly, they think they will suffer as a result—for example, they do not argue that relying on broad geographic areas will result in a lower QPA. AA Reply Br. 22; *see also Kitty Hawk Aircargo, Inc.*, 418 F.3d at 458 (holding that injury in fact is necessary to establish standing). Unlike other medical services, air ambulance transports uniquely operate across state lines and wide geographic distances, and air ambulance operators are exempt from most forms of state regulation. The market for air ambulance services thus operates across state lines in a way that the market for other medical services does not. *See* Brown *et al.*, *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions*, 98 MILBANK Q. at 765-66 (AR 2869-70). And although Plaintiffs claim that they see no problem in relying on third-party databases instead of actual valid in-network agreements, AA Reply Br. 22-23, Congress designed the QPA to be based first and foremost on real in-network contracted rates.

The Departments thus reasonably concluded that the better option, to the extent feasible, would be to collect real-world market data, over a wider geographic scope if necessary, rather than relying on information of uncertain provenance from a commercial database. The Air Ambulance Plaintiffs provide no reason to believe that these databases would provide better information than the Departments' market-based approach. Indeed, Plaintiffs' own trade organization, which is litigating this exact issue on their behalf in another forum, has acknowledged that "[t]here is no existing database that contains a representative number of the air ambulance transports in a given state." Letter of Cameron Curtis, Pres., AAMS, et al., to Xavier Becerra, Secretary, U.S. Dep't of Health and Human Servs., et al., at 4 (Dec. 6, 2021), *AAMS v. U.S. Dep't of Health & Hum. Servs.*, 1:21-cv-3031-RJL (D.D.C.) ECF No. 5-8. The Departments were not required to adopt an approach that would have left plans and issuers with no meaningful data from which to calculate the QPA.

## II.   The QPA Disclosure Requirements Were Within the Departments' Authority, And The Court Should Reject Plaintiffs' Invitation To Re-Write The Regulations.

The Departments acted within their statutory authority in adopting reasonable QPA disclosure requirements, and Plaintiffs have not shown otherwise. Their invitation to re-write the disclosure regulations should be rejected.

As Defendants have explained, *see* Defs.' Br. 46, Congress gave the Departments broad discretion regarding disclosure. Congress simply instructed that the Departments issue regulations regarding the information plans and issuers "shall share with the nonparticipating provider or nonparticipating facility" when determining the QPA, 42 U.S.C. § 300gg-111(a)(2)(B)(ii), saying nothing more about the type of information that should be shared, much less mandating the disclosure of any information in particular. The Departments' rules reasonably balance the interest in transparency with the interest in alleviating the potential burdens on plans and issuers that voluminous disclosure requirements represent. 86 Fed. Reg. at 36,898 ("The Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers.").

Plaintiffs argue that the rule "requires no meaningful disclosures," and that the Departments "failed to consider even a single alternative to their minimalist approach." TMA Reply Br. 21. Neither argument is correct, much less renders the disclosure regulations unlawful.

First, Plaintiffs accuse the Departments of "seek[ing] to hide behind the 'broad' language of the statutory provision," *id.* at 22 (citation omitted), while never explaining what that accusation actually means. After all, Congress undoubtedly did provide broad authority and discretion regarding disclosure. *See* 42 U.S.C. § 300gg-111(a)(2)(B)(ii); *see also* Defs.' Br. 46-49. Plaintiffs cannot and do not claim otherwise as a statutory matter. Their complaint, instead, appears to be a policy disagreement about how to go about disclosure. *See* TMA Reply Br. 23 (listing different potential disclosure ideas). But that policy choice was for the Departments, not Plaintiffs, and their disagreement with it does not render the disclosures the Departments did promulgate unlawful. *See Barnhart v. Walton*, 535 U.S. 212, 225 (2002) (statute delegated "considerable authority to fill in, through interpretation, matters of detail related to its administration").

Second, Plaintiffs argue that the Departments should have considered further alternatives, and that the disclosure requirements are thus "procedurally unreasonable." TMA Reply Br. 25. Not so. They baselessly accuse the Departments of paying "lip service" to promoting visibility. *Id.* Yet they ignore the numerous disclosure requirements that the Departments promulgated, including additional disclosures added in response to public comments. *See Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618, 52,625 (Aug. 26, 2022). The disclosure requirements mandate that a plan or issuer provide "the QPA for each item or service involved"; "a statement certifying that . . . [t]he QPA applies for purposes of the recognized amount (or, in the case of air ambulance services, for calculating the participant's, beneficiary's, or enrollee's cost sharing), and [that] each QPA shared with the provider or facility was determined in compliance with the methodology outlined in these interim final rules"; upon request, "information about whether the QPA includes contracted rates that were not set on a fee-for-service basis for the specific items and services at issue and whether the QPA for those items and services was determined using underlying fee schedule rates or a derived amount"; if a related service code was used to determine the QPA for a new service code, then "information to identify

which related service code was used"; and "if an eligible database was used to determine the QPA, then "information to identify which database was used to determine the QPA[]"; upon request, "a statement that the plan's or issuer's contracted rates include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments for the items and services involved that were excluded for purposes of calculating the QPA," 86 Fed. Reg. at 36,898-99, and, if the QPA was based on a downcoded service code or modifier, a statement the code was downcoded, and explanation of why it was downcoded, and the amount the QPA would have been had the code not been downcoded. 45 C.F.R. § 149.140(d)(1)(ii). Again, *see* Defs.' Br. 48, these disclosure requirements were promulgated with the goal of helping parties agree on out-of-network payment rates, *see* 86 Fed. Reg. at 36,899.

The Departments here struck a reasonable balance between "ensur[ing] transparent and meaningful disclosure about the calculation of the QPA" on the one hand "while minimizing administrative burdens on plans and issuers" on the other. *Id.* at 36,898. This balancing was not arbitrary or capricious, and Plaintiffs have not shown otherwise. Notably, they do not ask this Court to set aside the current disclosure requirements, but instead ask it to draft additional disclosure rules. The existence of their proffered additional disclosure ideas, which may well burden payers in a way that makes the system unworkable, does not render the existing disclosure requirements arbitrary or capricious. *See Sw. Elec. Power Co.*, 920 F.3d at 1028-29 (explaining that a regulation can be entitled to deference under both *Chevron* Step Two and the arbitrary and capricious standard even if it is not the only possible version of the regulation that an agency could have written, and even if it is not the court's preferred version). Nor can Plaintiffs compel this court to re-write the disclosure requirements to suit their preferences, especially where the Act does not command that any particular disclosure rules be adopted. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (explaining that a plaintiff may challenge agency inaction only where a statute makes "a specific, unequivocal command" ordering a "precise, definite act . . . about which [an official] had no discretion whatever" (quoting *United States ex. rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888))).

**III.    The Departments Explained Their Reasonable Interpretation Of The Payment Deadline, And Some Payers' Alleged Failure To Follow The Departments' Guidance Does Not Make The Regulation Arbitrary Or Capricious.**

The Departments reasonably explained, in the preamble to the July 2021 IFR, in the August 2022 FAQs, and in guidance documents provided to parties to the IDR process and to IDR entities, that the regulations require a payer to issue an initial payment or notice of denial of payment within 30 calendar days of receiving a bill from a provider that contains the information necessary for the payer to make such a payment—commonly known in the industry as a "clean claim." Plaintiffs appear to prefer to resist the Departments' explanation—which prohibits the very conduct they complain of—and refuse to accept an interpretation of the statutory and regulatory text that seems to require the very thing they ask the Departments to require. *See* AA Reply Br. 3. And although Plaintiffs complain of alleged violations of the regulation by certain payers, that is no basis to invalidate the regulation itself as arbitrary or capricious, as Plaintiffs request.[3]

The Air Ambulance Plaintiffs first argue that Congress did not expressly delegate rulemaking authority regarding the 30-day payment deadline and that the statutory text is unambiguous. AA Reply Br. 3-4. But The No Surprises Act amends the PHSA, ERISA, and the Internal Revenue Code. Each of these statutes authorizes the Secretary of each of the Departments to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter," 42 U.S.C. § 300gg-92; *see also* 26 U.S.C. § 9833; 29 U.S.C. § 1191c. The Departments are repeatedly tasked with the rulemaking necessary to carry out the Act, *see* 42 U.S.C. § 300gg-111(a)(2)(A)(i), (a)(2)(B), (c)(2)(A), including issuing regulations regarding certain payment deadlines, *see id.* § (c)(1)(B). Furthermore, agencies do not need express direction from Congress to interpret ambiguous statutory terms. *See City of Arlington v. FCC*, 569 U.S. 290, 296-301 (2013) ("Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency."). The 30-day

---

[3] If Plaintiffs' argument is that they are harmed by these *payers'* failure to follow the law even in the face of clear guidance from the Departments, it raises the question of whether their injury is even redressable by the relief requested. *See Aransas Proj. v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (explaining that plaintiffs must show "likelihood that the requested relief will redress the alleged injury" (quoting *In re Stewart*, 647 F.3d 553, 557 (5th Cir. 2011))).

payment provision, including the term "bill for such services" is ambiguous. The Departments noted that ambiguity and recognized that they would need to provide further explanation of the 30-day payment deadline, "[g]iven that plans and issuers cannot comply with this requirement unless the plan or issuer" has sufficient information to make a payment determination. 86 Fed. Reg. at 36,900. Here, the term "bill for such services" does not provide any detail on what information the bill must contain to allow the payer to determine whether it should make an initial payment (and if so, for how much) or a denial of payment. (For example, must a bill contain sufficient information for a payer to determine what services were provided, whether the services were provided to a beneficiary of the plan, whether the physician who provided those services was out-of-network, or when the items or services were provided?) Fortunately, the health care industry already has a solution for this problem, in the form of the industry-standard term "clean claim." When explaining the regulation, the Departments articulated their position clearly: "The Departments specify in these interim final rules that the 30-calendar-day period generally begins on the date the plan or issuer receives the information necessary to decide a claim for payment for such services, commonly known as a 'clean claim' under many existing state laws." *Id.*

The Departments' adopted a reasonable interpretation of the Act that incorporated a well-established industry practice for when a 'bill for such services' would trigger payment deadlines. *See Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362 (2022) ("[W]hen a statute is 'addressed to specialists, [it] must be read by judges with the minds of the specialists.'" (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 536 (1947))); *see also City of Dallas*, 118 F.3d at 395 (noting that industry practice is a prime source of statutory interpretation). It was thus eminently reasonable for the Departments to interpret the statute in a way that aligns with well-established and understood industry norms.

Even if the current text of the regulation, if read in Plaintiffs' overly literal way, were ambiguous, the Departments' interpretation would be entitled to deference. An agency may fill in the details of ambiguous rules by issuing "interpretations" through guidance documents or adjudications. *See Tearney v. Nat'l Transp. Safety Bd.*, 868 F.2d 1451, 1453 (5th Cir. 1989) (explaining that agencies "are

free to announce and apply interpretations of existing regulations" (quoting *Nicholson v. Brown*, 599 F.2d 639, 648 (5th Cir. 1979))); *see also Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 362 (5th Cir. 2021) (deferring to agency's explanation of its interpretation of a regulation). And that is just what the Departments have done, both in the preamble to the July 2021 IFR, 86 Fed. Reg. at 36,900, and through documents like the August 2022 FAQs, which further explained that the 30-day period begins when "the plan or issuer receive[s] a bill related to such an item or service from a nonparticipating provider, facility, or provider of air ambulance services that includes the information necessary to decide a claim for payment (*i.e.*, a 'clean claim')." Aug. 2022 FAQs at 20. And an agency's reasonable interpretation of an ambiguous rule is entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-16 (2019).

The Departments have clearly explained that the payment practices that Plaintiffs complain of here—where payers use the excuse of waiting on information from third parties over which providers have no control to delay payments indefinitely—are not permitted under the regulation. The Departments could hardly make their position clearer. If the practices that Plaintiffs complain of persist, then Plaintiffs should report those violations so they may be investigated, and the offending payers potentially subjected to fines and penalties.

## IV.   The Departments Reasonably Interpreted Their Regulation To Require Each Air Ambulance Service Code Be Resolved In A Separate IDR Proceeding.

The Air Ambulance Plaintiffs argue that air ambulance transports should be considered a single "service" such that the rules that apply to resolving disputes involving multiple service codes should not apply to them. AA Reply 7. But regardless of whether air ambulance transports are considered a single service or multiple services, the fact remains that they result in two separate billing codes, and thus must be resolved through two separate IDR proceedings under the current regulations. 45 C.F.R. § 149.510(c)(3)(i)(C). Each service code also carries with it a unique QPA, which the arbitrator must consider during the IDR process. 42 U.S.C. § 300gg-112(b)(5)(C)(i)(I).

Although Plaintiffs argue that permitting multiple billing service codes to be resolved in a single IDR proceeding would be more efficient in the context of air ambulance services, the Air

Ambulance Plaintiffs acknowledge that allowing multiple billing codes, related to multiple items and services, could quickly lead to complicated and burdensome IDR proceedings in other contexts. *See* AA Reply Br. 8 ("For example, in a 'batched' IDR, an arbitrator might be asked to determine the appropriate amount of reimbursement for, say, five different heart surgeries of five different patients."). Any time a standard rule is adopted, there may be instances where it proves less efficient for some small subset of the population. But here, the Departments reasonably chose to interpret the "batching" regulation consistently across all provider specialties and to apply a standard rule without exceptions. Indeed, as explained in the Departments' opening brief, the air ambulance industry would surely not be the only specialty group to demand exceptions from the generally applicable rule, and if every specialty with unique billing practices were allowed an exception, the exceptions could quickly swallow the rule.

## V.   Every Air Ambulance Plaintiff Is A Member Or A Close Affiliate Of AAMS, And They Should Not Be Permitted To Advance Identical Claims In This Duplicative Litigation.

The Air Ambulance Plaintiffs' claims are barred by the rule against claim splitting because the Air Ambulance Plaintiffs are members or close affiliates of the trade association plaintiffs in the *Association of Air Medical Services* case and assert the same core claims as remain pending in that case. *See Ass'n of Air Med. Servs. v. U.S. Dep't of Health & Hum. Servs.*, No. 21-cv-3031-RJL (D.D.C. 2021). In response, the Air Ambulance Plaintiffs do not dispute that each of them is either a member of AAMS or a close affiliate of a member of AAMS. Both Air Methods and East Texas Air One are members of AAMS. AA Reply Br. 28. LifeNet, Inc., is business partners with Air Methods, and LifeNet's financial stake in the No Surprises Act is derivative of Air Methods' ability to obtain reimbursement for LifeNet's services under the Act's procedures. AA Reply Br. 27. Rocky Mountain Holdings is a wholly owned subsidiary of Air Methods. *Id.* And, notably, the Air Ambulance Plaintiffs do not dispute that they would all seek to benefit from a favorable judgment in the *AAMS* case. *Id.* at 26-30. Even if not all of the Air Ambulance Plaintiffs were members or close affiliates of AAMS, their claims would still be barred because AAMS litigated on behalf of the air ambulance industry, and they were "adequately represented by someone with the same interests who [wa]s a party' to the suit." *Taylor v.*

*Sturgell*, 553 U.S. 880, 894 (2008) (alteration in original) (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). The AAMS members would be bound by that judgment in the *AAMS* case, and "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Id.* at 895.[4]

Plaintiffs dispute that the doctrine against claim splitting applies because this lawsuit involves several additional claims not at issue in the *AAMS* case. But the two sets of claims constitute the same claims under the pragmatic standard for determining whether the substance of two cases is similar enough to prevent duplicative litigation. The Fifth Circuit's transactional test "forecloses relitigation of claims that . . . could have been raised in a prior action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 312-13 (5th Cir. 2004). Here, all of Plaintiffs claims could have been brought at the time the *AAMS* case was filed—every one of their claims arises out of regulations first published in 2021.

Finally, Plaintiffs' argument that this Court should exercise its discretion to decide this case because of its familiarity with the No Surprises Act cuts against them. AA Reply Br. 30. That familiarity is due in no small part to the iterative and duplicative nature of lawsuits like this that ought to be barred by the claim-splitting rule. Having already pursued overlapping claims in another forum, the Air Ambulance Plaintiffs should not be permitted to pursue duplicative litigation, and to obtain potentially conflicting relief, here.

## VI.    Plaintiffs' Requested Remedies Are Improper And Unnecessary.

If the Court disagrees with the Departments' arguments, it should, at most, remand the matter without vacating the challenged provisions. Contrary to Plaintiffs' suggestion that the Departments do not object to their requested remedies, the Departments have been clear that the most this Court should do is remand the matter to the Departments. Defs.' Br. 50; *see also Palisades Gen. Hosp. Inc., v.*

---

[4] The Air Ambulance Plaintiffs suggest that the Court's prior denial of the Departments' motion to transfer bears on the outcome of the claim splitting arguments here. Not so. The rule against claim splitting, though similar to the first-filed rule, bars continued litigation of a claim even where the first-filed rule does not. *See Ameritox, Ltd. v. Aegis Scis. Corp.*, No. 3:08-CV-1168-D, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009). For example, in *Ameritox*, the defendants argued unsuccessfully that the first-filed rule barred a subsequent lawsuit filed in Texas. *See id.* at *2. Even though the defendants' motion to transfer under the first-filed rule was rejected, the Texas court held that claim splitting barred the subsequent action because the later-filed action involved one of the same plaintiffs and the same defendant and arose out of the same transaction. *Id.* at *5.

*Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (holding that "[w]hen a "court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end"). Courts have discretion to remand for further explanation without vacatur where vacatur would unduly disturb settled expectations and cause chaos. *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995). Here, Plaintiffs repeatedly suggest that the Departments' explanations for the challenged regulations are inadequate, TMA Reply Br. 8, 9, and remand would allow the Departments an opportunity to provide additional explanation for the challenged regulations. Any relief beyond remand, including Plaintiffs' request that this Court issue various declarations and re-write the regulations or the statute itself, is inappropriate. In particular, any declaration that arbitrators should not consider the QPA during the IDR process is inconsistent with the clear statutory command that arbitrators must consider the QPA. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) (requiring arbitrators to consider the QPA).

Contrary to Plaintiffs' argument that vacatur should be ordered as a matter of course, TMA Reply Br. 27, "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (quoting *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238-39 (5th Cir. 2007)). Plaintiffs' opinion that vacatur would not be highly disruptive is entitled to no weight, as they are not the ones tasked with administrating this complicated Act. As the Departments explained, vacatur would be highly disruptive, because the QPA plays a central role in many aspects of the new processes created by the Act and vacating the QPA regulations would leave payers without the information necessary to calculate the QPA until the Departments can issue appropriate guidance. This would put an immediate halt to calculating patient cost-sharing, to providers' collection of patient cost-sharing amounts, to offers of payment during the open negotiation process, and to the consideration of offers during the IDR process. Without regulations setting the methodology for calculating the QPA, patients could be left without guidance for trying to ascertain their cost-sharing responsibilities when they receive out-of-network care. Plaintiffs' proffered solution—that parties simply proceed without a QPA—shows their hand. Their apparent end goal to remove the statutory requirement that payers or arbitrators

consider in-network rates when determining the appropriate payment for out-of-network services is manifestly contrary to Congress's intent. *See, e.g.*, S. 1266, 116th Cong. (2019); H.R. 4223, 116th Cong. (2019) (rejected versions of bills that omitted consideration of the QPA from the IDR process).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.

Dated: April 14, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIT FEATHERSTON
United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

*/s/ Anna Deffebach*
ANNA DEFFEBACH
GISELLE BARCIA
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-8356
Fax: (202) 993-5182
E-mail: Anna.L.Deffebach@usdoj.gov
D.C. Bar No. 341246

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify on this 14th day of April 2023, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

/s/ Anna Deffebach
ANNA DEFFEBACH

29