## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | § § § | |
|  | § | |
| Plaintiffs, | § | |
|  | § | Case No. 6:22-cv-450-JDK |
| v. | § | |
|  | § | Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | § § § | |
|  | § | |
| Defendants. | § | |
|  | § | |

## MEMORANDUM OPINION AND ORDER

In these consolidated cases, Plaintiff healthcare providers challenge several rules issued by the Defendant Departments in implementing the No Surprises Act (the "Act").

The Act established an arbitration process for resolving payment disputes between certain out-of-network providers and group health plans and health insurers. *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs. (TMA I)*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal dismissed*, 2022 WL 15174345 (5th Cir. Oct. 24, 2022); *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs. (TMA II)*, 2023 WL 1781801, at *11 (Feb. 6, 2023), *appeal filed*, No. 23–40217 (5th Cir. Apr. 6, 2023). The Act also directed the Departments to issue regulations to govern the arbitration proceedings. *E.g.*, 42 U.S.C. § 300gg-111(c)(2)(A).

1

This is not the first challenge by Plaintiffs.  In prior cases, the Court concluded that the Departments improperly restricted arbitrators' discretion and unlawfully tilted the arbitration process in favor of the qualifying payment amount, or "QPA." *See TMA I*, 587 F. Supp. 3d at 542; *TMA II*, 2023 WL 1781801, at *11.  The QPA is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  The net effect of prioritizing the QPA was to favor insurers at the expense of Plaintiff providers. *See TMA II*, 2023 WL 1781801, at *13.  Recently, the Court held that the Departments unlawfully bypassed the Administrative Procedure Act's ("APA") notice-and-comment requirement in issuing rules relating to the administrative fee and the grouping of claims in the arbitration process.  *See generally Tex. Med. Ass'n v. U.S. Dept. of Health & Hum. Servs.*, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023).

Now, Plaintiffs challenge the Departments' regulations governing how insurers calculate the QPA.  Plaintiffs argue that the regulations permit insurers to artificially depress the QPA in conflict with the Act, again tilting the arbitration process in insurers' favor and resulting in unacceptably low payments to providers.  Plaintiffs also claim that the Departments' disclosure requirements are insufficient and prevent effective review of insurers' calculations.  The Air Ambulance Plaintiffs additionally challenge a regulation that extends the deadline for insurers to make an initial payment determination, a rule requiring two separate arbitration proceedings to adjudicate a single air transport, and other air-ambulance-specific QPA calculation rules.

2

For the reasons discussed below, the Court concludes that certain challenged portions of the July 1, 2021 Rule and subsequent guidance conflict with the Act and must be set aside under the APA.  Specifically, all but one regulation pertaining to the calculation of the QPA violate the plain text of the Act.  Likewise, the regulations extending the deadline for making an initial payment determination and requiring two proceedings for one air transport conflict with the Act and are unlawful.  The Departments, however, reasonably explained the other challenged regulations, and the Court therefore finds these regulations are not arbitrary and capricious.

Accordingly, the Court **GRANTS in part** Plaintiffs' motions for summary judgment (Docket Nos. 25, 26) and **DENIES in part** Defendants' cross-motion for summary judgment (Docket No. 41).

## I.

In the No Surprises Act, Congress established an independent dispute resolution ("IDR") process for resolving payment disputes between out-of-network providers and insurers, requiring arbitrators to consider the QPA, among other factors, in determining the proper payment amount.  The Act also includes a detailed definition of the QPA and directs the Departments to issue rules establishing the methodology for determining QPAs.  Citing the Act, the Departments issued an interim final rule and related guidance regarding the QPA that are the subject of these consolidated cases.

### A.

Congress enacted the No Surprises Act in 2020 to address "surprise medical bills."  Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020).

3

Generally, the Act limits the amount an insured patient will pay for emergency services furnished by an out-of-network provider and for certain non-emergency services furnished by an out-of-network provider at an in-network facility.  42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132.[1]

The Act also addresses the payment of these out-of-network providers by group health plans or health insurers (collectively, "insurers").  In particular, the Act requires insurers to reimburse out-of-network providers at a statutorily calculated "out-of-network rate."  *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).  In states with an All-Payer Model Agreement or specified state law, the out-of-network rate is the rate provided by the Model Agreement or state law.  *Id.* § 300gg-111(a)(3)(K).  In states without a Model Agreement or specified state law, the out-of-network rate is either the amount agreed to by the insurer and the out-of-network provider or an amount determined through the IDR process.  *Id.*

Claims submitted to IDR proceed as follows.  When an insured receives certain out-of-network medical services, insurers must first issue an initial payment or notice of denial of payment to the provider within thirty days after the provider submits a bill for that service.  *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C).  If the provider disagrees with the insurer's determination, then the provider may initiate a thirty-day period of open negotiation with the insurer regarding the claim.  *Id.* § 300gg-111(c)(1)(A).  If

---

[1] The Act amended three statutes: the Public Health Service Act ("PHSA") (administered by the Department of Health and Human Services), the Employee Retirement Income Security Act ("ERISA") (administered by the Department of Labor), and the Internal Revenue Code (administered by the Department of the Treasury).  For ease of reference, this Opinion cites to the PHSA.

the parties cannot resolve the dispute through negotiation, they may then proceed to IDR arbitration. *Id.* § 300gg-111(c)(1)(B).

The IDR process is a "baseball-style" arbitration. The provider and insurer each submits a proposed payment amount and explanation to the arbitrator. *Id.* § 300gg-111(c)(5)(B). The arbitrator must then select one of the two amounts, "taking into account the considerations specified in subparagraph (C)." *Id.* § 300gg-111(c)(5)(A)–(B). Subparagraph (C) in turn requires the arbitrator to consider the QPA and five "additional circumstances . . . ." *Id.* § 300gg-111(c)(5)(C)(ii).

As noted above, the QPA is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility. *Id.* § 300gg-111(a)(3)(E)(i). The Act defines QPA as:

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such insurer that are offered within the same insurance market . . . ) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the same geographic region in which the item or service is furnished . . . .

*Id.* § 300gg-111(a)(3)(E)(i)(I). The QPA for any item or service is calculated only once and is then adjusted annually for inflation. *Id.* § 300gg-111(a)(3)(E)(i)(II).

Finally, the Act requires the Secretaries of Health and Human Services, Labor, and the Treasury (collectively, the "Departments"), to "establish through rulemaking . . . . [:]"

5

> (i) the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the [QPA], differentiating by individual market, large group market, and small group market;
>
> (ii) the information such plan or issuer, respectively, shall share with the nonparticipating provider or nonparticipating facility, as applicable, when making such a determination;
>
> (iii) the geographic regions applied for purposes of this subparagraph, taking into account access to items and services in rural and underserved areas, including health professional shortage areas, as defined in section 254e of this title; and
>
> (iv) a process to receive complaints of violations of the requirements described in subclauses (I) and (II) of subparagraph (A)(i) by group health plans and health insurance issuers offering group or individual health insurance coverage.

*Id.* § 300gg-111(a)(2)(B).

The Act implements a parallel IDR process for determining payments to out-of-network providers of air ambulance services, which largely incorporates by reference the aforementioned IDR process. *Id.* § 300gg-112(b)(4)(A) (citing *id.* § 300gg-111(c)(4)).

## B.

On July 1, 2021, the Departments issued the interim final rule, or "July Rule," at issue here. Requirements Related to Surprise Billing: Part I, 86 Fed. Reg. 36,872 (July 13, 2021) (to be codified at 45 C.F.R. § 149). The July Rule implemented several of the Act's provisions regarding the QPA and the IDR process more generally, including (1) the methodology for insurers to calculate the QPA, 45 C.F.R. §§ 149.140(a)(1), (a)(8)(iv), (a)(12), (b)(2)(iv); (2) the information insurers must disclose to providers about their QPA calculations, *id.* § 149.140(d)(2); 86 Fed. Reg.

at 36,898, 36,933; and (3) an explanation of the insurer's 30-day deadline to provide a payment or denial of payment, *id.* § 149.130(b)(4)(i).

In August 2022, the Departments answered a series of "frequently asked questions" related to various provisions in the July Rule. *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, DEP'T OF LAB. (Aug. 19, 2022), https://www.cms.gov/files/documents/faqs-part-55.pdf ("August FAQs"). Two FAQs are at issue here. FAQ 14 acknowledged that the July Rule allows insurers to include rates for services that "providers do not provide" in calculating the QPA. August FAQs at 17. And FAQ 15 interprets the July Rule as permitting third-party administrators of self-insured group health plans to calculate the QPA using rates within all plans governed by the administrator, as opposed to using only the rates of the self-insured group health plan itself. *Id.* at 18.

On August 18, 2022, the Departments issued informal technical guidance for IDR entities, which restricted how "multiple qualified IDR items or services" may be grouped—or "batched"—together in a single IDR proceeding. *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Aug. 18, 2022), https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf ("August Technical Guidance"). In subsequent phone calls with IDR entities, the Departments clarified that the August Technical Guidance requires them to mandate two separate IDRs for each air ambulance transport: one for each of two Healthcare Common Procedure Coding System ("HCPCS") codes that apply to any such transport. *See* Docket No. 26, Ex. C ¶ 3–7; Ex. D ¶ 2–4.

**C.**

Plaintiffs are healthcare providers[2] and air ambulance providers.[3]   All Plaintiffs challenge the QPA-calculation methodology promulgated in the July Rule and as interpreted in the August FAQs as contrary to the Act's unambiguous terms and as arbitrary and capricious.  Docket No. 25 at 17–27; Docket No. 26 at 20–28.  All Plaintiffs also challenge the July Rule's QPA disclosure requirements as neither reasonable nor reasonably explained.  Docket No. 25 at 27–30; Docket No. 26 at 10. And finally, the Air Ambulance Plaintiffs bring four additional challenges to:  the July Rule's interpretation of the Act's 30-day deadline for initial payment or notice of denial, the requirement of two separate IDR processes for each air ambulance transport, the exclusion of case-specific contracted rates from the QPA calculation, and the reliance on widely disparate geographic regions in calculating the QPA for air ambulance services.  Docket No. 26.  Plaintiffs seek vacatur of these challenged provisions under the APA.

Defendants are the Departments responsible for promulgating the July Rule and subsequent guidance—the Departments of Health and Human Services, Labor, and the Treasury, along with the Office of Personnel Management and the current

---

[2]  The healthcare-provider Plaintiffs are the Texas Medical Association, a trade association representing more than 56,000 Texas physicians and medical students; Dr. Adam Corley, a Tyler, Texas physician; and Tyler Regional Hospital, LLC, a hospital in Tyler, Texas.  Docket No. 1 ¶¶ 22–24.  The Texas Medical Association, Dr. Corley, and Tyler Regional Hospital were also plaintiffs in previous cases.  *See TMA I*, 587 F. Supp. 3d at 536; *TMA II*, 2023 WL 1781801, at *7 n.6.

[3]  The Air Ambulance Plaintiffs are LifeNet, Inc.; East Texas Air One, LLC; Rocky Mountain Holdings, LLC; and Air Methods Corporation.  LifeNet, Inc. and East Texas Air One, LLC were also plaintiffs in a prior lawsuit.  *See TMA II*, 2023 WL 1781801, at *7 n.6.

heads of those agencies in their official capacities.  Docket No. 1 ¶¶ 25–32.  Together, the Departments contend that the July Rule, August FAQs, and August Technical Guidance are consistent with the Act, are the result of reasoned decision-making, and are not arbitrary and capricious.  Docket No. 41.

Both sides now move for summary judgment under Federal Rule of Civil Procedure 56.  Docket Nos. 25, 26, 41.  Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  On April 19, 2023, the Court heard oral argument on the cross motions.  Docket No. 57.

Both sides agree that the Court can determine Plaintiffs' APA challenges as a matter of law.

## II.

The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court reviews an agency's statutory interpretation under the two-step *Chevron* framework.  *See generally Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (discussing *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see also City of Arlington v. FCC*, 569 U.S. 290, 306–07 (2013).  The first step determines "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  "If the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If the statute is ambiguous, however, the Court proceeds to step two: "asking whether the agency's construction is 'permissible.'" *Sw. Elec. Power Co.*, 920 F.3d at 1014 (quoting *Chevron*, 467 U.S. at 843).

In determining whether Congress has unambiguously spoken through a statute, the Court applies all the "traditional tools of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). "[W]here a statute's text is clear, courts should not resort to legislative history" and "should not introduce ambiguity through the use of legislative history." *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)).[4]

The APA's "arbitrary and capricious standard" is "deferential," requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "A court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered

---

[4] The parties and various amici discuss the Act's legislative history, *see, e.g.*, Docket No. 56 at 28 (citing S. 1266, 116th Cong. (2019); H.R. 4223, 116th Cong (2019)), but such statements of intent do not override the statute's text. *Hammack v. Baroid Corp.*, 142 F.3d 266, 271 (5th Cir. 1998) ("[T]heories of underlying intent or purpose cannot trump statutory language."); *see also, e.g.*, Brief of Emergency Dep't Practice Mgmt. Ass'n as Amicus Curiae, Docket No. 38, Ex. 2 (Letter from 152 Members of Congress to Defendant Departments).

the relevant issues and reasonably explained the decision." *Id.* (collecting cases).  The Court "should uphold a decision of less than ideal clarity if the agency's path may be discerned." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 513–14 (2009).

## A.

Below the Court addresses Plaintiffs' various challenges to the QPA-calculation methodology set forth in the July Rule and the August FAQs.

## 1.

Plaintiffs first argue that "[t]he July Rule tells insurers to *include* rates in QPA calculations that the plain text of the [Act] requires them to *exclude*."  Docket No. 25 at 18 (emphasis in original).  The Act requires insurers to calculate the QPA based on "contracted rates" "for the same or a similar item or service *that is provided* by a provider in the same or similar specialty *and provided* in the geographic region in which the item or service is furnished . . . ."  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).  But, Plaintiffs complain, the Departments interpreted "contracted rates" in the July Rule broadly to allow insurers to include "ghost rates" in calculating the QPA—rates for items or services that providers have no intention to provide.  Docket No. 25 at 19 (citing August FAQs at 17 (FAQ 14)).  Plaintiffs argue that these ghost rates are generally below fair market value because providers have no incentive to robustly negotiate them.  Docket No. 25 at 23.

The Court agrees with Plaintiffs that the Departments' interpretation of the July Rule conflicts with the Act in this respect.  The Act requires insurers to include in the QPA calculation the rates for services or items that are "provided by a provider."  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  Conversely, nothing in the Act

permits including rates for services or items that are *not* "provided."  "To 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (cleaned up) (quoting *Provide*, AMERICAN HERITAGE DICTIONARY); *see also id.* n.29 ("To 'provide' ordinarily means 'to make available,' to 'furnish,' to 'supply,' or to 'equip.'").  The Act thus requires calculating the QPA using only rates for items and services that are actually furnished or supplied by a provider—not those that a provider has not furnished or never supplied.  By nonetheless permitting insurers to include ghost rates in calculating the QPA, the Department's interpretation of the July Rule conflicts with the Act.

The Departments argue that in the health-insurance industry, "contracted rates are generally negotiated prospectively."  Docket No. 41 at 20.  And "[t]he Act directs that the QPA be based on the median of *the rates themselves*, with each *rate* being a single data point in the calculation of the median."  *Id.* (citing 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).  But that doesn't mean that *all* contracted rates should be included in the QPA calculation.  The Act specifies that the QPA should include only *certain* contracted rates—specifically, rates for items or services "provided by a provider" in the same specialty in the relevant geographic region.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  Indeed, the Departments acknowledge that at least some contracted rates should be excluded from the QPA calculation—$0 rates, for example.  August FAQs at 16 (FAQ 13).

The Departments also argue that Congress chose to include in the calculation of the QPA an "item or service that *is* provided," not those that "have been provided." Docket No. 41 at 21.  The Departments' interpretation of the July Rule, however, allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided.  At oral argument, counsel for the Departments conceded that some providers have rates for services they do not and will never provide and that "those artificially low out-of-specialty rates do sometimes appear in contracts."  Docket No. 60 at 26:11–16.  Further, the August FAQs state by way of example that, for an anesthesiologist whose "contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services)," the insurer "would not be expected to calculate separate median contracted rates for the anesthesia service code . . . because the [insurer] does not have contracted rates for anesthesia services that vary based on provider specialties."  August FAQs at 16-17 (FAQ 14).

This interpretation is unlawful.  Whatever "is provided" means in § 300gg-111(a)(3)(E)(i)(I) of the Act, it cannot justify including rates for items or services that are not provided and never will be provided.  To rule otherwise would read out of the statute the term "provided" altogether.  *Cf. Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("[T]he interpretive canon against surplusage" [is] "the idea that 'every word and every provision is to be given effect.'" (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 174 (2012))); *see also Montclair*

*v. Ramsdell*, 107 U.S. 147, 152 (1883) (Courts must strive "to give effect, if possible, to every clause and word of a statute . . . .").

Because the Departments' interpretation of "contracted rates" conflicts with the Act, the interpretation—set forth in the preamble to the July Rule and the August FAQs—fails at *Chevron* step one.   Under the APA, the Court must set this interpretation aside and need not consider whether it is unreasonable at *Chevron* step two.  *See Flight Training Int'l, Inc. v. FAA.*, 58 F.4th 234, 246 (5th Cir. 2023).

### 2.

Plaintiffs next argue the July Rule improperly allows insurers to include in the QPA calculation rates of providers in different specialties.  Docket No. 25 at 19.  The Act, in contrast, "requires insurers to always calculate the QPAs based on the rates of providers 'in the same or similar specialty.'"   *Id*. (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).  Plaintiffs thus argue that the Rule conflicts with the Act and must be set aside on this basis as well.

Again, the Court agrees.  As noted above, the Act defines the QPA as "the median of the contracted rates recognized by the plan or issuer . . . . for the same or a similar item or service that is provided by a provider in *the same or similar specialty*."  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).  The July Rule, however, directs insurers to calculate rates by specialty "*only* where the [insurer] otherwise varies its contracted rates based on provider specialty," 86 Fed. Reg. at 36,891 (emphasis added), as part of its "usual business practice," 45 C.F.R. § 149.140(a)(12).  Indeed, the August FAQs clarify that insurers need not separately calculate rates by specialty unless:  (1) insurers "purposefully" vary "contracted rates

14

based on provider specialty," or (2) insurers determine "that there is a material difference in the median contracted rates . . . between providers of different specialties."  August FAQs at 16–17 (FAQ 14).  These provisions deviate from the plain text of the Act by allowing insurers to include out-of-specialty rates in calculating the QPA in some instances.  *Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958) ("A regulation which is in conflict with or restrictive of the statute is, to the extent of the conflict or restriction, invalid."); *see also Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013).

The Departments argue this error is harmless.  They say the July Rule permits including out-of-specialty rates only when "there is no material difference in the contracted rates by specialty."  Docket No. 41 at 25.  The Departments thus claim Plaintiffs lack standing to challenge this particular provision.  As in prior cases, however, the Court finds standing based on Plaintiffs' procedural injury and concrete economic harm.  *TMA II*, 2023 WL 1781801, at *8–9.  The July Rule "deprives [Plaintiffs] of the arbitration process established by the Act" by calculating the QPA— a factor arbitrators must consider—contrary to the statute.  *Id*.  That is sufficient to establish procedural harm.  *See id*. (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019)).  Plaintiffs have also shown the likelihood of financial harm by submitting uncontroverted evidence that insurers' fee-schedule negotiation process will lead to out-of-specialty rates being included in QPAs.  Docket No. 25, Ex. B ¶ 18 (noting that insurers offer most providers the same fee schedule for all services, and then providers negotiate increased reimbursement amounts for services they provide); *id.*,

Ex. C ¶ 12 (same); *id.*, Ex. D ¶ 18 (same).  And Plaintiffs contend that this will harm them because the out-of-specialty rates are often very low—sometimes nearing zero— and their inclusion will drive the QPA downward.  *E.g.*, *id.*, Ex. C ¶ 12; *see also TMA II*, 2023 WL 1781801, at *8.

The Departments also argue they "declined to impose an entirely unnecessary burden on [insurers]" by requiring them to use specialty-specific rates in every instance, which is "a reasonable way to interpret a statute."  Docket No. 41 at 25 (first citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 529 n.34 (2d Cir. 2017); and then citing *Nat'l Auto Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 80 (D.D.C. 2012)).  But the Departments may not ignore the plain requirements of the Act merely because insurers may be inconvenienced.  The Departments' cited cases, moreover, are inapposite.  In those cases, the statutes were ambiguous, and the courts held that the agencies' rationale of avoiding the "potential for disruptive results" or burdensome "practical effects" was reasonable under *Chevron* step two.  *Catskill Mountains Chapter*, 846 F.3d at 529; *Nat'l Auto Dealers Ass'n*, 864 F. Supp. 2d at 80.  Here, the Departments have failed to identify ambiguity in the Act.

Because including "out-of-specialty rates" in calculating the QPA unambiguously conflicts with the statute, this part of the July Rule must be set aside under the APA.  *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).

### 3.

Plaintiffs next complain that the July Rule requires insurers to "[e]xclude" from rates used to calculate the QPA "risk sharing, bonus, penalty, or other incentive-

based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv).  Excluding such bonus and incentive payments, Plaintiffs argue, violates the plain text of the Act and unlawfully drives down the QPA.  Docket No. 25 at 20, 22–23.

The Act states that the QPA is "the median of the contracted rates recognized by the plan or issuer . . . as the total maximum payment . . . under such plan or coverage," without exclusions or exceptions.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  "Total" means "[c]onstituting or comprising a whole; whole, entire."  *Total*, OXFORD ENG. DICTIONARY ONLINE (Dec. 2022 ed.).  And "maximum" means the "highest value or extreme limit," the "greatest value which a variable or function takes," or the "highest possible magnitude or quantity of something which is attained, attainable, or customary."  *Maximum*, OXFORD ENG. DICTIONARY ONLINE (Dec. 2022 ed.).  The Act thus plainly requires insurers to calculate QPAs using the "entire," "highest possible" payment that a provider could receive for an item or service under the contracted rate.  The July Rule, in contrast, requires insurers to exclude incentive-based payments from "the total maximum payment."  45 C.F.R. § 149.140(b)(2)(iv).  The Court thus concludes that the Rule conflicts with the Act.  *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments argue that this interpretation of the Act "read[s] the word 'potential' into the phrase 'total maximum payment.'"  Docket No. 41 at 29.  But the phrase "total maximum payment" already includes all potential payments—the "highest possible magnitude or quantity of something which is . . . attainable."

*Maximum*, OXFORD ENG. DICTIONARY ONLINE, *supra*.  The Departments also argue that the Act uses the term "total maximum payments" by referencing "the cost-sharing amount imposed for such item or service."  Docket No. 41 at 29 (quoting 42 U.S.C.  § 300gg-111(a)(3)(E)(i)(I).  And, because cost-sharing amounts are determined at the time an item or service is furnished and do not change based on the amount ultimately paid, the Departments argue that only fixed contracted rates, not bonuses or incentives, should be included.  *Id.*  The Act, however, says that the QPA is "the median of the contracted rates recognized . . . as the *total maximum payment* (*including the cost-sharing amount* imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage . . . ."  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).  The "cost sharing amount" is thus just an example of, not a limitation on, what should be included in "the total maximum payment."  *DIRECTV Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2005) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation. . . . [It] is not one of all embracing definition, but connotes simply an illustrative application of the general principle." (quotation marks omitted)).

Finally, the Departments argue that requiring insurers to include incentive-based payments violates the Act's purpose, which is to reduce the cost of out-of-network services.  Docket No. 41 at 30.  And they point out that the July Rule excludes "penalty" based adjustments from the QPA calculation, which Plaintiffs have not challenged, creating a "one-way ratchet" that increases costs against Congress' intent.  *Id.* at 30 n.10 (citing 45 C.F.R. § 149.140(b)(2)(iv)).  But the Departments—

and the Court—are bound by the text of the statute. *In re Westmoreland Coal Co.*, 968 F.3d 526, 534 (5th Cir. 2020) ("[T]he best evidence of Congress's intent is the statutory text." (quoting *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012))). If the Act creates a "one-way ratchet," that's because it requires "the total maximum payment" to be included in the QPA while saying nothing about "penalties." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Because excluding bonus and incentive payments from the QPA calculation unambiguously conflicts with the Act, the Court will set these provisions aside under the APA. *See Pereira*, 138 S. Ct. at 2113.

### 4.

Finally, Plaintiffs argue that the July Rule unlawfully allows self-insured group health plans, or "plan sponsors," to "use either rates from only their own plans or rates from all plans administered by their third-party administrator to calculate QPAs." Docket No. 25 at 11, 21 (citing 45 C.F.R. § 149.140(a)(8)(iv)). They claim this part of the Rule conflicts with the plain text of the Act and "allow[s] self-insured group health plans to pick whichever method leads to lower QPAs on balance." *Id*. at 11.

As noted above, QPA is defined by the Act to mean "the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor . . . that are offered within the same insurance market . . . .)." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The Act thus requires that QPAs be calculated using the rates of "*all* such plans of *such sponsor*." *Id*. (emphasis added). The July Rule, in contrast, permits self-insured group health plans, "at the option of the plan sponsor," to "allow their third-party administrators

to determine the QPA for the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)."  45 C.F.R. § 149.140(a)(8)(iv).  By allowing these self-insured plan sponsors to do what the Act prohibits, the Rule is not "in accordance with the law."  5 U.S.C. § 706(2)(A).

The Departments argue that the Act "inherently contemplates" that self-insured plan sponsors may calculate the QPA "with reference to other self-insured group health plans."  Docket No. 41 at 30.  This is because, the Departments claim, "the QPA is calculated based on plans offered 'within the same insurance market,' which the statute defines 'in the case of a self-insured group health plan, other self-insured group health plans.'"  *Id*. (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(iv)(IV)).  But the Act still requires the QPA to be calculated using "all such plans of *such sponsor*"—and the Departments cite nothing in the statute that would permit using the rates from plans of *other sponsors*.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  Nor does the Act permit plan sponsors to pick and choose from among plans or rates to calculate a lower QPA.  *See id*.

The Departments also argue that Plaintiffs lack standing to bring this particular challenge.  But, as explained above, Plaintiffs assert a procedural injury— that the July Rule permits the QPA to be calculated in a way that conflicts with the Act.  This "deprives [Plaintiffs] of the arbitration process established by the Act," which is sufficient to confer Article III standing.  *TMA II*, 2023 WL 1781801, at *8 (cleaned up); *see also Texas v. EEOC*, 933 F.3d at 447 ("A plaintiff can show a

20

cognizable injury if [he] has been deprived of a 'procedural right to protect [his] concrete interests.'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))).  The Departments claim that Plaintiffs "offer no evidence or, in fact, any basis at all, to theorize that self-funded plans are choosing how to calculate the QPA based on achieving the lowest possible QPA . . . or that this provision has any consistent effect on the QPA calculations."  Docket No. 41 at 32.  Not so.  Plaintiffs submitted evidence that self-funded plans *are* likely to calculate alternative QPAs and choose the lower amount if available.  *E.g.*, Docket No. 25, Ex. A ¶ 20, Ex. B ¶ 21, Ex. D ¶ 19.  This satisfies the "reasonable claim of minimal impact" necessary to establish procedural harm.  *TMA II*, 2023 WL 1781801, at *8 (quoting *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020)).

The Departments also contend the Rule is reasonable because it avoids administrative costs, reduces the burden on self-funded groups, is more practical than the alternative, and lowers reliance on third-party databases.  Docket No. 41 at 32–33.  But none of these potential benefits permits the Departments to draft a rule that conflicts with the plain text of the governing statute.  *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

Because the third-party administrator provisions of the July Rule unambiguously violate the Act, they likewise must be set aside under the APA.[5]  *See Pereira*, 138 S. Ct. at 2113.

---

[5]  Plaintiffs also argue that the challenged provisions of the July Rule should be set aside as arbitrary and capricious.  *See* Docket No. 25 at 22–24; Docket No. 26 at 15–16, 19–20, 23–24.  Because the Court finds that the July Rule conflicts with the Act and sets it aside under the APA on that basis, the Court need not address Plaintiffs' alternative argument.  *See Flight Training Int'l, Inc. v. FAA*,

## B.

Plaintiffs next challenge the provision of the July Rule specifying what information insurers must disclose concerning their QPA calculations.  Docket No. 25 at 27–30.  According to Plaintiffs, "[t]he Departments' disclosure rule requires no meaningful disclosure" and "gut[s] the [Act's] complaint process" because it "require[s] [insurers] to reveal nothing of substance about their QPAs."  *Id.* at 28–29.  They argue that the disclosure rule is therefore arbitrary and capricious.

The problem for Plaintiffs, however, is that the Act gives the Departments wide latitude in issuing a disclosure rule, and the Departments have shown that their rule is the result of reasoned decision making.  *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (explaining that the APA requires agencies only to engage in "reasoned decisionmaking" to avoid having actions set aside as arbitrary and capricious).

The Act requires the Departments to "establish through rulemaking . . . . a process to receive complaints of violations of the requirements" of the Act's QPA calculations.  42 U.S.C. § 300gg-111(a)(2)(B)(iv).  The Departments are similarly required to establish through rulemaking "a process . . . under which [insurers] are audited . . . to ensure that" the QPA is calculated appropriately.  *Id.* § 300gg-111(a)(2)(A)(i)(II).  And under this "process . . . the Secretary . . . may audit any" insurer "if the Secretary has received any complaint" or information involving lack of

58 F.4th 234 (5th Cir. 2023) ("In light of this disposition, we do not reach FTI's alternative argument that the Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Marable v. Dep't of Com.*, 857 F. App'x 836, 837 (5th Cir. 2021) ("Because we conclude that the first basis relied upon by the district court for summary judgment . . . is dispositive, we need not address" other grounds.).

compliance with the Act's QPA calculation rules.  *Id.* § 300gg-111(a)(2)(A)(ii).  Finally, and crucially here, the Departments "shall establish . . . the information [an insurer] . . . shall share with the" provider.  *Id.* § 300gg-111(a)(2)(B).  Unlike the provisions governing the arbitration process and the calculation of the QPA, the Act lacks specifics about the kind of information the rule should require insurers to provide.  Rather, Congress gave the Secretaries of the Departments wide discretion in the disclosure and auditing process surrounding the QPA.

Through the July Rule, the Departments exercised that discretion.  The Departments explained that they "s[ought] to ensure a transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on" insurers.  86 Fed. Reg. at 36,898.  With that in mind, the Departments outlined a list of disclosure requirements.  45 C.F.R. § 149.140(d).  Among other things, the July Rule requires insurers to provide (1) a certification that the QPAs were calculated in compliance with the Departments' regulations, (2) a notice when QPAs were not set on a fee-for-service basis, (3) a notice of when related service codes were used to calculate the QPA, and (4) a host of information at the request of providers.  *Id.* § 149.140(d).  The Departments explain they created these requirements to ensure the parties have fruitful open negotiations, thereby avoiding unnecessary IDR proceedings.  *E.g.*, 86 Fed. Reg. 36,899.

Plaintiffs argue that the July Rule's disclosures make "the complaint process . . . toothless."  Docket No. 25 at 28.  They point out that the Departments "expect[] to conduct no more than 9 audits annually."  86 Fed. Reg. at 36,935.

Plaintiffs also identify QPA-related information insurers are not required to divulge, including:  "(1) each rate that was included in the QPA; (2) the specialty of the provider who agreed to that rate; (3) the number of times that rate was *actually* paid by the insurer; [and] (4) the amount of any incentive payments excluded from the rates."  Docket No. 25 at 28.  Plaintiffs insist that without this information providers are incapable of effectively advocating for themselves in the IDR process.

But it is the Act itself that deprives Plaintiffs of their preferred complaint process.  Under the Act, the Departments are not required even to entertain a complaint.  *See* 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II).  Rather, the Act allows that "the Secretary . . . . *may* audit any" insurer "if the Secretary has received any complaint" or information involving lack of compliance with the Act's QPA calculation requirements.  *Id.* § 300gg-111(a)(2)(A)(ii)(II) (emphasis added).  Thus, it is the permissive language of the Act rather than the July Rule causing Plaintiffs the alleged harm here.

Further, the Departments did consider the problem of whether providers could advocate for themselves in the IDR process.  And the Court can discern the path taken by the Departments.  *Fox TV Stations, Inc.*, 556 U.S. at 513–14 (Courts "should uphold a decision of less than ideal clarity if the agency's path may be discerned.").  The Departments decided to balance transparency for providers and administrability for insurers.  86 Fed. Reg. at 36,898.  In doing so, they required a host of disclosures, 86 Fed. Reg. at 36,898–99; 45 C.F.R. § 149.140(d)(1)(ii), but they stopped short of granting Plaintiffs their wish list because it would not be administrable, Docket

24

No. 25 at 28; *see also* 86 Fed. Reg. at 36,935 (calculating the estimated man-power hours and cost the July Rule's disclosure requirement would exert upon insurers). The Departments also explained the reasoning behind certain disclosure requirements, which they included to increase the efficacy of open negotiations. *E.g.*, 86 Fed. Reg. at 36,899. Thus, the Court cannot say the Departments failed "entirely" to consider certain issues. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And granting Plaintiffs' wish list or requiring more audits would be the Court "substitut[ing] its own policy judgment for that of the agency"—*i.e.*, rulemaking from the bench, which the Court may not do. *Prometheus Radio Project*, 141 S. Ct. at 1158.

Because the Court finds that the July Rule's disclosure rule is both reasonable and reasonably explained, the Court concludes that it is not arbitrary and capricious. *La. PSC v. FERC*, 761 F.3d 540, 547 (5th Cir. 2014) (declining to set aside rule where the court "[found] that FERC's . . . interpretation is reasonable . . . "); *see also Tex. Oil & Gas Assoc. v. EPA*, 161 F.3d 923, 933–34 (5th Cir. 1998) ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

## C.

The Air Ambulance Plaintiffs challenge four additional aspects of the July Rule. Docket No. 26 at 10.

### 1.

As an initial matter, the Departments invite the Court to dismiss these Plaintiffs' claims "under the rule against claim splitting." Docket No. 41 at 17–18.

The Departments contend that "[n]early all of the Air Ambulance Plaintiffs here are members or close affiliates of members of the trade association plaintiff," the Air Association of Air Medical Services ("AAMS"), in a case filed in the District of Columbia, *Ass'n of Air Medical Services v. U.S. Department of Health & Human Services*, 1:21-cv-3031 (D.D.C. Nov. 16, 2021). *Id.* at 17. The Court declines the invitation.

The rule against claim splitting prohibits a party "from simultaneously prosecuting multiple suits involving the same subject matter against the same defendants." *Gen. Land Off. v. Biden*, 71 F.4th 264, 269–70 (5th Cir. 2023) (first citing *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985); and then citing *Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 746 (5th Cir. 1994)); *see also Ameritox, Ltd. v. Aegis Scis. Corp.*, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009). The rule primarily serves "to protect the defendant from being harassed by repetitive actions based on the same claim." *Ameritox*, 2009 WL 305874, at *4 (quoting *Matter of Super Van, Inc.*, 92 F.3d 366, 371 (5th Cir. 1996)). "In a claim splitting case, the second suit will be barred if the claim involves the same parties and arises out of the same transaction or series of transactions as the first claim." *Ameritox*, 2009 WL 305874, at *4 (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008)).

The rule does not apply here because the Departments have not shown that this case involves the same parties as *AAMS*. "[M]ere membership in or affiliation with" a trade association party is not enough to bar the member from later bringing

26

its own lawsuit.  *Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 82 (D.D.C. 2020); *Cal. Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) ("Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization."); *Viceroy Gold Corp. v. Aubry*, 858 F. Supp. 1007, 1018 (N.D. Cal. 1994) (citing, *e.g.*, *Expert Elec., Inc v Levine,* 554 F.2d 1227, 1233 (2d Cir 1977) (precluding suit where the association was "the body vested with representative authority."), *rev'd on other grounds*, 75 F.3d 482, 489 (9th Cir. 1996)).  The Departments, moreover, provide no evidence that any Air Ambulance Plaintiff was subsidizing, participating in, or controlling the *AAMS* litigation.  *See Cal. Cosmetology Coal.*, 871 F. Supp. at 1267 (describing various circumstances where a member of a trade group may be in privity with the trade group); *Crane v. Comm'r of Dep't of Agric., Food, & Rural Res.,* 602 F. Supp. 280, 287 (D. Me. 1985) (citing *Montana v. United States,* 440 U.S. 147, 151 (1979)) (analyzing the trade association members' control or participation in the prior litigation).

The Departments do not cite a single case holding otherwise.  Instead, the Departments note that one of the Air Ambulance Plaintiffs—Air Methods— "submitted declarations in support of summary judgment in" *AMMS*.  Docket No. 41 at 18 (citing *Ass'n of Air Med Servs*, 1:21-cv-3031, Docket No. 1, Ex. 7 (D.D.C. 2021)). But that is also insufficient to bar Air Methods from later bringing its own claims in its own lawsuit.  *See Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987) (denying preclusion for a "nonparty who was heavily involved" in the first litigation).

Accordingly, the Court concludes that the Departments' claim splitting argument fails.

### 2.

The Air Ambulance Plaintiffs first argue the July Rule "extends indefinitely" the statutory 30-day deadline for insurers to make a payment decision. Docket No. 26 at 11. As explained below, the Court agrees and sets aside this provision of the Rule as unlawful.

The Act requires insurers to send their initial payment decision to the provider "not later than 30 calendar days after the bill for such services is transmitted to the provider." 42 U.S.C. § 300gg-112(a)(3)(A). The statutory text is unambiguous and provides no exceptions. The July Rule, however, states that the 30-day deadline "begins on the date the plan or issuer receives the information necessary to decide a claim for payment for the services." 45 C.F.R. § 149.130(b)(4)(i). As the Air Ambulance Plaintiffs assert, the "insurer's initial payment (or notice of denial of payment) is a critically important date" because the provider "is unable to move forward with the IDR process until the insurer provides this initial payment [decision]." Docket No. 26 at 11. By starting the clock only after the insurer receives the information it deems "necessary," the Rule thus turns a firm 30-day deadline essential to an efficient process into an indefinite delay at the mercy of the insurer.

The Departments argue they never intended to create an indefinite delay. They explain that the 30-day clock should start when the insurer receives a "clean claim"—an industry term meaning "a claim that has no defect, impropriety, or special circumstances, including incomplete documentation that delays timely payment."

Docket No. 41 at 41; *see also* 86 Fed. Reg. at 36,900; Federal IDR Process Guidance for Disputing Parties (Apr. 2022), at 33 (AR 10978).  But the statute uses the term "bill," not "clean claim."  And elsewhere, Congress specified "clean claim" when it wanted to refer to "clean claim."  *See* 42 U.S.C. § 1395w-112(4)(A)(ii) (requiring prompt payment of a "clean claim" for "prescription drug plan sponsors"); 10 U.S.C. § 1095c(a)(1) (requiring certain percentages of TRICARE "clean claims" to be processed within specified timeframes); *id.* § 1095c(3) (defining "clean claim" almost identically to the July Rule and 42 U.S.C. § 1395w-112(4)(A)(ii)); 38 U.S.C. § 1703D(d)(2)(A) (allowing the Secretary to require interest be paid on overdue "clean claims"); *id.* § 1703D(f)(1) (requiring the Secretary to provide "a list of information and documentation that is required to establish a clean claim").  The Departments cannot adopt a meaning of a statutory term where Congress used the same meaning in the same Title because, "[i]f Congress had intended that narrow meaning, it knew how to say so."  *Wallaesa v. FAA*, 824 F.3d 1071, 1083 (D.C. Cir. 2016).

The Departments also argue that "bill" as used in the Act is "a technical term" and they "were within their authority" to align the meaning "with the industry standard definition of a 'clean claim.'"  Docket No. 41 at 41–42.  But "bill" is not the kind of technical term an agency can redefine—or as here, restrict the meaning of.  *Cf., e.g., Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362 (2022) (finding a complex multi-factor equation was sufficiently "technical" to warrant departing from the plain meaning of the statute).  "Bill" is a common term with an ordinary meaning—"[a]n itemized list or statement of fees or charges."  *Bill*, Am. Heritage

Dictionary 180 (5th ed. 2011); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 113 (10th ed. 2001) ("[A]n itemized account of the separate cost of goods sold, services performed, or work done:  invoice.").  By deleting "bill" and replacing it with "the information necessary to decide a claim" (or "clean claim"), the Departments have improperly rewritten the statute.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *accord Benjamin v. United States*, 932 F.3d 293, 300 (5th Cir. 2019).

This part of the July Rule thus conflicts with the Act and must be set aside. *See Pereira*, 138 S. Ct. at 2113.

### 3.

The Air Ambulance Plaintiffs next challenge the Departments' August Technical Guidance requiring two separate IDR processes for a single medical air transport.  Docket No. 26 at 17.  Plaintiffs argue that the Act unambiguously states that each air ambulance transport is a single service and requires only a single IDR process for each payment dispute.  Plaintiffs thus contend that the Guidance is contrary to the statute and is arbitrary and capricious.

The Act states that "the term 'air ambulance service' means medical *transport* by helicopter or airplane for patients."  42 U.S.C. § 300gg-112(c)(1) (emphasis added).  And if negotiations between the air ambulance provider and insurer fail, the statute provides that the parties "may . . . initiate the independent dispute resolution process . . . with respect to *such item or service*."  *Id.* § 300gg-112(b)(1)(B) (emphasis added).  The Act thus defines each air ambulance transport as a single service and

allows initiation of a single IDR process for each service.  Indeed, the Departments initially took the same view, defining "air ambulance service" as a single "transport by a rotary wing air ambulance," 45 C.F.R. § 149.30, and a "Qualified IDR item or service" as "air ambulance services furnished by a nonparticipating provider of air ambulance services . . .," *id.* § 149.510(a)(2)(xi)(A).   And from April 2022 to August 2022, IDR entities initiated a single process and rendered a single decision for a single air ambulance transport—in at least 109 cases.  Docket No. 26, Ex. A ¶ 7.

But in August 2022, the Departments issued Guidance stating that "multiple qualified IDR items or services" can be consolidated, or "batched," into a single IDR process only if, among other requirements, each service is "billed under the same service code."  August Technical Guidance at 2.  And because a single air ambulance transport requires two service codes—one code for the liftoff rate and one for the per-mile rate—the Departments informed IDR entities that each air transport claim dispute would now require two IDR processes.  Docket No. 26, Ex. 3 ¶¶ 3–7; *id.*, Ex. 4 ¶¶ 2–4.  That Guidance violates the unambiguous text of the Act, and none of the Departments' arguments to the contrary are persuasive.  *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments first argue that the Act authorizes them to "specify criteria under which multiple qualified IDR dispute items and services are permitted to be considered jointly as part of a single determination . . . ."  Docket No. 41 at 44 (quoting 42 U.S.C. § 300gg-111(c)(3)(A)).   But that authority extends only to "items" and "services," and, as noted above, the Act defines an air ambulance service as a single

service.   42 U.S.C. § 300gg-112(c)(1).   The Departments also cite the need for uniformity as a reason to depart from the Act's text.   Citing *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020), the Departments argue that allowing IDR entities to adjudicate an air ambulance service dispute in a single IDR, even though each service uses two codes, "would require defining 'services' one way for air ambulance transports and a different way in all other instances."   Docket No. 41 at 45–46.   But *Lomax* involved statutory interpretation, holding that "'[i]n all but the most unusual situations, a single use of a *statutory* phrase must have a fixed meaning' across a statute."   140 S. Ct. at 1725 (emphasis added) (quoting *Cochise Consultancy, Inc. v. United States ex rel Hunt*, 139 S. Ct. 1507, 1512 (2019)).   *Lomax* does not entitle agencies to ignore statutory text and draft a rule that conflicts with the statute.   The problem of consistency, moreover, is one of the Departments' own making—they decided to use service codes to determine batching.   *See* August Technical Guidance at 2.

Because the August Technical Guidance prohibits a single air ambulance service from submitting to a single IDR process, the Guidance violates the Act and must be set aside.   *See Pereira*, 138 S. Ct. at 2113.

### 4.

The Air Ambulance Plaintiffs next argue that the July Rule improperly excludes from the QPA calculation "the many hundreds of thousands of 'contracted rates' that have been agreed to by insurers and providers in case-specific agreements."   Docket No. 26 at 20–21.   Plaintiffs contend this part of the Rule

conflicts with the statutory definition of the QPA.  As explained below, the Court agrees.

The Act defines the QPA as the "median of the contracted rates recognized by" an insurer "under such plans or coverage."  42 U.S.C. § 300gg-111(a)(3)(E)(i).  Many "case-specific agreements" for air ambulance services fall within this definition because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees.  Docket No. 55, Ex. A ¶¶ 7–11; *see also id.*, Ex. B ¶ ¶ 4–8.  These contracts are typically "case-specific" or "single-case" agreements between insurers and providers to cover "patients with commercial insurance or a commercial group health plan" where such coverage "was available to the patient, under the terms of the policy or plan . . . . ."  *Id.*, Ex. A ¶¶ 7–9; *see also id.* Ex. B ¶¶ 3–5.  Under the July Rule, however, such agreements "do[] not constitute a contract" for QPA-calculation purposes.  45 C.F.R. § 149.140(a)(1).  By excluding these contracted rates from the QPA calculation, the Rule conflicts with the Act. *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments agree that the QPA should include "contracted rates [that] are under the 'plan or coverage,'" but argue that case-specific or single-case agreements are not "contracted for under the generally applicable terms of a health plan or health insurance policy."  Docket No. 41 at 35.  These agreements, the Departments contend, "are not included in plans or coverage offered to individuals in a particular market, nor do they set recognized rates under such plans or coverage." *Id*.  But the Act does not say to include only rates "contracted for under the generally

applicable terms of a health plan or health insurance policy."  The Act says to include "contracted rates recognized by [the insurer] . . . under the plans or coverage."  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  And case-specific or single-case agreements are contracts between insurers and providers under a plan or policy providing coverage for air ambulance transports.

The Departments also argue that "contracted rates" refers only to rates negotiated "in advance" by providers or facilities "to participate in any of the networks of the plan or issuer."  Docket No. 41 at 34.  But the Act does not say anything about when the rates are negotiated, providing instead that the QPA should include all "contracted rates recognized by [an insurer under its] plans or coverage."  42 U.S.C. § 300gg-111(a)(3)(E)(i).  The statutory definitions of "group health plan" and "health insurance coverage," in turn, confirm that case-specific and single-case agreements should be included in the QPA calculation.  "Group health plan" is defined to mean "an employee welfare benefit plan . . . to the extent that the plan provides medical care" as defined in that section.  42 U.S.C. § 300gg-91(a)(1).  And "health insurance coverage" means "benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise and including items and services paid for as medical care) . . . ."  *Id.* § 300gg-91(b)(1).  "Medical care" is defined broadly to "mean[] . . . *amounts paid for transportation* primarily for and essential to . . . the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body."  *Id.* § 300gg-91(a)(2) (emphasis added).  Air ambulance services, therefore, fit comfortably within the

definition of "medical care" covered by "group health plans" and "health insurance coverage." *Bilski v. Kappos*, 561 U.S. 593, 604 (2010).

The court in *Ass'n of Air Medical Services v. U.S. Department of Health & Human Services* reached a different conclusion regarding single-case agreements. 2023 WL 5094881, at *3–5 (D.D.C. Aug. 4, 2023) (concluding that the statutory definition of QPA does not include single-case agreements).  But the court's analysis is unpersuasive and fails to address that many case-specific or single-case agreements are negotiated under a plan or policy providing coverage for air ambulance transports.  *See id*.

Because the July Rule excludes these contracted rates in calculating the QPA, the Rule conflicts with the Act and must be set aside.  *See Pereira*, 138 S. Ct. at 2113.

### 5.

Finally, the Air Ambulance Plaintiffs argue that "the July Rule's QPA calculation methodology" should be set aside for an additional reason:  it is arbitrary and capricious because it "permits insurers to calculate QPAs based on rates agreed to in widely disparate geographic regions."  Docket No. 26 at 25.  As explained below, the Court concludes that this portion of the Rule is both reasonable and reasonably explained.

The Act requires that the QPA be calculated based on the contracted rates for an item or service "provided in the geographic region in which the item or service is furnished."  42 U.S.C. § 300gg-111(a)(3)(E)(i).  When an insurer "does not have sufficient information to calculate the median of the contracted rates" in a particular "geographic region," the Act states that the insurer should refer to "any database . . .

in the applicable geographic region." *Id.* § 300gg-111(a)(3)(E)(iii).   The Act also directs the Departments to "establish through rulemaking . . . . the geographic regions . . . taking into account access to items and services in rural and underserved areas." *Id.* § 300gg-111(a)(2)(B)(iii).

In the July Rule, the Departments exercised this rule-making authority by defining a "geographic region" for air ambulance services as "one region consisting of all metropolitan statistical areas . . . in the State" and "one region consisting of all other portions of the State."  45 C.F.R. § 149.140(a)(7)(ii)(A).  If, however, an insurer has fewer than three contracted rates in a "geographic region," the Rule directs the insurer to broaden the "geographic region" to include "regions based on Census divisions—that is, one region consisting of all metropolitan statistical areas in each Census division and one region consisting of all other portions of the Census division." *Id.* § 149.140(a)(7)(ii)(B).   The Departments explained they used larger regions because insurers are more likely to have a sufficient number of contracted rates with which to calculate the QPA.  86 Fed. Reg. at 36,893.

The Air Ambulance Plaintiffs complain about the Rule using Census divisions. "There are only nine Census divisions nationwide and they encompass enormous areas."  Docket No. 26 at 26.  Therefore, Plaintiffs contend, in some instances irregularities will arise—such as "a contracted rate for a medical air transport in Fairbanks, Alaska [dictating] the QPA for a medical air transport in Los Angeles or Honolulu." *Id.* at 26–27 (providing this and other examples).  And Plaintiffs argue that the Departments' justification for using large Census divisions—to ensure

insurers have sufficient information—is "not rational."  Docket No. 26 at 27.  "This is not a rational reason," Plaintiffs contend, because the Act requires insurers to refer to a third-party database when they lack "sufficient information to calculate the median of the contracted rates" in a particular geographic region.   42 U.S.C. § 300gg-111(a)(3)(E)(i).  And, finally, Plaintiffs argue, the Departments fail to explain "why that fallback, the neutral database, would not serve the supposed purpose of the QPA, which is to serve as a proxy of the 'market rates' in the relevant region.'"  Docket No. 26 at 27.

In an arbitrary and capricious review, a court "is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may be discerned."  *Fox TV Stations, Inc.*, 556 U.S. at 513–14.  "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Prometheus Radio Project*, 141 S. Ct. at 1158.  Here, the Departments' rule regarding geographic regions is reasonable and sufficiently explained.

As the Departments explained when promulgating the July Rule, air ambulance QPAs are likely to "result in more instances of insufficient information . . . . [g]iven the nature of air ambulance services, the infrequency with which they are provided relative to other types of items and services subject to [the Act], and the lower prevalence of participating providers of air ambulance services."  86 Fed. Reg. at 36,893.  "Using larger geographic regions, for which plans and issuers are likely to have more information," the Departments stated, "is expected to reduce

the likelihood that the median of contracted rates would be skewed by contracts under which the parties have agreed to particularly high or low payment amounts." *Id.* at 36,892.   And the Departments acknowledged that third-party databases were authorized in instances of insufficient information but found that the Act "envision[ed] that these alternative methodologies be used in limited circumstances where the plan or issuer cannot rely on its contracted rates as a reflection of the market dynamics in a geographic region." *Id.* at 36,888; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021) ("Agencies . . . have expertise and experience in administering their statutes that no court can properly ignore." (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011))).   In other words, the Departments considered the problem of insufficient data due to the nature of air ambulance services, contemplated the use of third-party databases, crafted a solution to the problem, and explained their rationale.

The Court thus concludes that the July Rule on geographic regions is both reasonable and reasonably explained.   *See, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) ("[W]e conclude the FCC did not fail to offer a 'reasonable and reasonably explained' analysis of . . . [its regulations], which is all the APA requires." (quoting *Prometheus Radio Project*, 141 S. Ct. at 1160)); *see also Ass'n of Air Medical Servs.*, 2023 WL 5094881, at *6 (finding that the Departments reasonable explained their decision to rely on Census divisions as the geographic regions for air ambulance services).

## III.

Having determined that certain portions of the July Rule, August FAQs, and August Technical Guidance violate the APA, the Court considers the proper remedy.

Plaintiffs seek vacatur of the offending provisions.  Docket No. 25 at 30; Docket No. 26 at 28.  They argue that the "'seriousness of the deficiency [of these provisions] weighs heavily in favor of vacatur' . . . [a]nd because the challenged provisions 'conflict with the unambiguous terms of the Act in several key respects,' the Departments cannot 'rehabilitate or justify' them on remand."  *Id.* (cleaned up) (quoting *TMA I*, 587 F. Supp. 3d at 548).  Plaintiffs also claim that vacating these provisions will not be unduly disruptive.  Docket No. 54 at 27.  Finally, Plaintiffs request that the Court "declare that arbitrators may not consider any QPA affected by the unlawful provisions" because they are not QPAs as defined by the Act.  *Id.* (citing 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I)).

The Departments argue that "any relief should be appropriately limited" because "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  Docket No. 41 at 49 (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018)); *see also id.* ("Nothing in the APA's directive to 'set aside' unlawful 'agency action' mandates that 'agency action' shall be set aside globally, rather than as applied to plaintiffs." (quoting 5 U.S.C. 706(2)).  The Departments also argue that the Court should at most "remand the matter to the Departments without vacatur of the challenged provisions."  *Id.* at 50.  They claim that vacatur "would be highly disruptive" because "[t]he QPA plays a critical role in many aspects of the new processes effected by the Act and without clear guidance on

how to calculate the QPA, every one of those process could come to a screeching halt." *Id*.

The Fifth Circuit has held that "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). "[T]he ordinary result" of setting aside unlawful rules under the APA is that "the rules are vacated—not that their application to the individual petitioners is proscribed." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944–45 (N.D. Tex. 2019) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).[6]

Courts consider two factors to determine whether vacatur is appropriate: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021) (citing *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)), *rev'd on other grounds*, 142 S. Ct. 2528, 2548 (2022). And "[b]ecause vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Am. Hosp. Ass'n v. Becerra*, 2023 WL 143337, at *5 (D.D.C. Jan. 10, 2023).

---

[6] *But see United States v. Texas*, 143 S. Ct. 1964, 1981 (2023) (Gorsuch, J., joined by Thomas, J. and Barrett, J. concurring) (Section 706(2) of the APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise). . . . Still, from those two words alone, the district court thought the power to nullify the Guidelines with respect to anyone anywhere surely follows . . . . Color me skeptical."); *Arizona v. Biden*, 40 F.4th 375, 395 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining that § 706's "set aside" language does not support disregarding "the long-understood view of equity– that courts issue judgments that bind the parties in each case over whom they have personal jurisdiction").

Here, the seriousness of the deficiencies weighs heavily in favor of vacatur.  As explained above, the challenged portions of the regulations conflict with the unambiguous terms of the Act in several key respects.  There is therefore nothing the Departments can do on remand to rehabilitate or justify the challenged portions of the Rule as written.  *Sw. Elec. Power Co.*, 920 F.3d at 1022 (vacating and remanding part of final rule that was contrary to statute).  Indeed, the Departments never contest the "seriousness of the deficiencies" prong.  *See* Docket No. 41 at 49–50.

Nor is it clear on the record before the Court that vacatur would be unduly disruptive.  The Departments claim that vacating the QPA-methodology rules would require "an immediate pause of patient cost-sharing, offers of payment, and IDR proceedings under the Act while payers are forced to somehow recalculate the QPA without adequate guidance from the Departments."  Docket No. 41 at 50.  But beyond this conclusory sentence, the Departments offer nothing to demonstrate undue disruption.  As Plaintiffs note, for patient cost-sharing, the Departments can exercise their enforcement discretion to allow insurers to continue using their existing QPAs until new QPAs are calculated consistent with the Act.  *See* Docket No. 54 at 27; *see also* August FAQs at 17 (exercising enforcement discretion to give insurers 90 days to adjust to new guidance).  As for offers of payment and IDR proceedings, the Departments fail to explain why those cannot continue in the absence of properly calculated QPAs—or why a temporary pause in the proceedings would be more disruptive than continuing with unlawfully calculated QPAs.  When the Court vacated the rules in *TMA I* and *TMA II*, for example, the Departments similarly

claimed that vacatur would be severely disruptive.  Yet, the Departments simply paused arbitration proceedings until issuing further guidance conforming to the statute and the Court's orders.  *See Payment Disputes between Providers and Health Plans:  Notices*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Feb. 10, 2023), https://www.cms.gov/nosurprises/help-resolve-payment-disputes/payment-disputes-between-providers-and-health-plans.  The Departments nowhere claim that this pause was so disruptive that the Court should bypass the "default rule" of vacatur here.  *Cargill*, 57 F.4th at 472.

The Departments cite *American Hospital Ass'n v. Becerra*, which remanded a rule without vacatur because vacatur would be "highly disruptive" due to the "staggering value and number of transactions at issue."  2023 WL 143337, at *4–6.  But in that case the agency had presented specific facts justifying remand only, including that vacatur could cost nearly $10 billion and disrupt "an enormous number of settled transactions that occurred in those years" given that the relevant payment system processed more than 100 million claims per year.  *See id.*  The Departments have presented nothing similar here.  The Court is thus left to guess how long any claimed disruption would last, how many IDR proceedings would be halted or delayed, and the cost of vacatur.

Accordingly, the proper remedy here is vacatur of the challenged provisions and remand to the Departments for "further consideration in light of this opinion."  *Franciscan All., Inc.*, 414 F. Supp. 3d at 945; *see also Am. Hosp. Ass'n*, 2023 WL 143337, at *5.

## IV.

In sum, the Court holds that the following regulations are unlawful and must be set aside because they conflict with the No Surprises Act:  (1) including in the calculation of QPAs contracted rates for services that providers have not provided, August FAQs (FAQ 14); 86 Fed. Reg. 36,872, at 36,889; (2) including in the calculation of QPAs out-of-specialty rates, 45 C.F.R. § 149.140(a)(12); (3) excluding from the calculation of QPAs risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments, 45 C.F.R. § 149.140(b)(2)(iv); 45 C.F.R. § 149.140(b)(3)(i); (4) allowing self-insured group health plans to use rates from all plans administered by a third-party administrator in calculating the QPA, 45 C.F.R. § 149.140(a)(8)(iv); (5) starting the 30-day deadline for notice or denial of payment when the insurer receives the information "necessary to decide a claim," 45 C.F.R. § 149.130(b)(4)(i); (6) requiring two separate IDR processes for a single medical air transport, *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS., at 2–3 (Aug. 18, 2022) (answering whether "multiple qualified IDR items or services be submitted together"); and (7) excluding from the calculation of air ambulance service QPAs case-specific or single-case agreements, 45 C.F.R. § 149.140(a)(1).  The Court further holds that the following regulations are reasonable and reasonably explained and are upheld: (1) the challenged disclosure requirements, 45 C.F.R. § 149.140(d), and (2) the calculation of the QPA for air ambulance services based on census divisions in instances of insufficient information, 45 C.F.R. § 149.140(a)(7)(ii).

Accordingly, the Court **GRANTS in part** Plaintiffs' motions for summary judgment (Docket Nos. 25, 26), **DENIES in part** Defendants' cross-motion for summary judgment (Docket No. 41), and **ORDERS** that the following provisions are **VACATED** and **REMANDED** for further consideration in light of this Opinion:

(1)   86 Fed. Reg. 36,872, at 36,889, the phrase "regardless of the number of claims paid at that contracted rate";

(2)   45 C.F.R. § 149.140(a)(8)(iv), 26 C.F.R. § 54.9816-6T(a)(8)(iv), and 29 C.F.R. § 2590.716-6(a)(8)(iv), from "or at the option" to "on behalf of the plan";

(3)   45 C.F.R. § 149.140(a)(12), 26 C.F.R. § 54.9816-6T(a)(12), and 29 C.F.R. § 2590.716-6(a)(12), from "as identified" to "practice";

(4)   45 C.F.R. § 149.140(a)(15)(ii)(B), 26 C.F.R. § 54.9816-6T (a)(15)(ii)(B), and 29 C.F.R. § 2590.716-6(a)(15)(ii)(B), from "(or the administering entity" to "if applicable)";

(5)   45 C.F.R. § 149.140(b)(1), 26 C.F.R. § 54.9816-6T(b)(1), and 29 C.F.R. § 2590.716-6(b)(1), from "(or the administering entity" to "if applicable)";

(6)   45 C.F.R. § 149.140(b)(2)(i), 26 C.F.R. § 54.9816-6T(b)(2)(i), and 29 C.F.R. § 2590.716-6(b)(2)(i), from "(or the administering entity" to "if applicable)";

(7)   45 C.F.R. § 149.140(b)(2)(iv), 26 C.F.R. § 54.9816-6T(b)(2)(iv), and 29 C.F.R. § 2590.716-6(b)(2)(iv), in their entirety;

(8)   45 C.F.R. § 149.140(b)(3)(i), from "If a plan or issuer" to "for the service code" and "as applicable"; 26 C.F.R. § 54.9816-6T(b)(3)(i), from "If a plan has" to "for the service code" and "as applicable"; 29 C.F.R. § 2590.716-6(b)(3)(i), from "If a plan or issuer" to "for a service code" and "as applicable";

(9)   45 C.F.R. § 149.130(b)(4)(i), 26 C.F.R. § 54.9817-1T(b)(4)(i), and 29 C.F.R. § 2590.717-1(b)(4)(i), from "For purposes of this paragraph (b)(4)(i), the 30-calendar-day period begins" to "decide a claim for payment for the services";

(10)  45 C.F.R. § 149.140(a)(1), 26 C.F.R. § 54.9816-6T(a)(1), and 29 C.F.R. § 2590.716-6(a)(1), from "Solely for purposes of this definition a single

case agreement" to "or enrollee in unique circumstances, does not constitute a contract";

(11)   5 C.F.R. § 890.114(a), insofar as it requires compliance with the foregoing provisions;

(12)   FAQs 14 and 15 of *FAQs About Affordable Care Act and Consolidated Act, 2021 Implementation Part 55* (Aug. 19, 2022); and

(13)   The portion of *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS., at 2–3 (Aug. 18, 2022) (answering whether "multiple qualified IDR items or services be submitted together"), which requires air ambulance service reimbursement disputes to undergo more than one IDR process (as set forth in 42 U.S.C. § 300gg-111(c)).

So **ORDERED** and **SIGNED** this **24th** day of **August, 2023.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE